UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. SEUSS ENTERPRISES, L.P.,<br><br>　　　　　　　　　　Plaintiff,<br><br>v.<br><br>COMICMIX LLC; GLENN HAUMAN; DAVID JERROLD FRIEDMAN a/k/a JDAVID GERROLD; and TY TEMPLETON,<br><br>　　　　　　　　　　Defendants. | Case No.: 16cv2779-JLS (BGS)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>(ECF No. 8) |

Presently before the Court is Defendant ComicMix LLC's Motion to Dismiss ("MTD"), (ECF No. 8), Plaintiff Dr. Seuss Enterprises, L.P.'s Response in Opposition to the Motion to Dismiss ("Opp'n"), (ECF No. 22), and Defendant's Reply in Support of the Motion to Dismiss ("Reply"), (ECF No. 32). Also before the Court are Defendant's Request for Judicial Notice ("RJN"), (ECF No. 8-2), Plaintiff's Response in Opposition to the Request for Judicial Notice ("RJN Opp'n"), (ECF No. 23), and Defendant's Reply in Support of the Request for Judicial Notice ("RJN Reply"), (ECF No. 33). The Court previously vacated the hearing on the Motion to Dismiss and took the matters under submission without oral argument pursuant to Civil Local Rule 7.1(d). (ECF No. 35.) After

considering the Parties' arguments and the law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss.

## BACKGROUND

This lawsuit concerns two literary works, one of which is alleged to have infringed the other. Plaintiff is the assignee and owner of various copyright registrations for and alleged trademark rights in the works of the late Theodor S. Geisel, better known under his pseudonym "Dr. Seuss." (*E.g.*, Compl. ¶¶ 1, 3, ECF No. 1.) One of Dr. Seuss's best-known books—and the one primarily at issue in this suit—is *Oh, the Places You'll Go!* ("*Go!*").

Defendants created a Kickstarter campaign in order to fund printing and distribution of an allegedly infringing work, *Oh, the Places You'll Boldly Go!* ("*Boldly*"). (*See id.* ¶ 34.) Defendants all took part in the creation of *Boldly*. (*Id.* ¶¶ 2, 4–7, 19–22.) *Boldy* combines aspects of various Dr. Seuss works with "certain characters, imagery, and other elements from *Star Trek*, the well-known science fiction entertainment franchise created by Gene Roddenberry." (*Id.* ¶ 18.) Plaintiff alleges that *Boldly* "misappropriates key elements" of *Go!* and four other Dr. Seuss books. (*Id.* ¶ 26.) Defendants contest this point, and prior to the threat of litigation noted on their Kickstarter page that:

> While we firmly believe that our parody, created with love and affection, fully falls within the boundary of fair use, there may be some people who believe that this might be in violation of their intellectual property rights. And we may have to spend time and money proving it to people in black robes. And we may even lose that.

(*Id.* ¶ 35.) Further, *Boldly*'s copyright page both states that "[t]his is a work of parody, and is not associated with or endorsed by CBS Studios or Dr. Seuss Enterprises, L.P.[,]" and includes the following text: "Copyright Disclaimer under section 107 of the Copyright Act 1976, allowance is made for 'fair use' for purposes such as criticism, comment, news reporting, teaching, scholarship, education, research, and parody." (RJN Ex. 5, ECF No. 15-1, at 2.)

///

Upon learning of *Boldly* and the corresponding Kickstarter campaign, Plaintiff sent Defendants two letters over the span of approximately ten days asserting their exclusive rights in the relevant Dr. Seuss works. (*Id.* ¶ 36, 38.) When Defendants did not respond to the first letter, Plaintiff on the same day sent a takedown notice to Kickstarter and a second letter to Plaintiff. (*Id.* ¶ 37, 39, 40). Kickstarter disabled access to Defendants' campaign later that day. (*Id.* ¶ 41.)

Several weeks later Plaintiff's Counsel and Defendants' Counsel exchanged letters; Defendants argued their use of Dr. Seuss's intellectual property was fair, threatened suit, and advised Plaintiff that Defendants would send a counter-notice to Kickstarter to reinstate the *Boldly* campaign. (*Id.* ¶¶ 42–44.) Plaintiff commenced this suit shortly thereafter. (*See generally id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) permits a party to raise by motion the defense that the complaint "fail[s] to state a claim upon which relief can be granted," generally referred to as a motion to dismiss. The Court evaluates whether a complaint states a cognizable legal theory and sufficient facts in light of Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 "does not require 'detailed factual allegations,' . . . it [does] demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A complaint will not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 557).

In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting

*Twombly*, 550 U.S. at 570); *see also* Fed. R. Civ. P. 12(b)(6). A claim is facially plausible when the facts pled "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 677 (citing *Twombly*, 550 U.S. at 556). That is not to say that the claim must be probable, but there must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Facts "'merely consistent with' a defendant's liability" fall short of a plausible entitlement to relief. *Id.* (quoting *Twombly*, 550 U.S. at 557). Further, the Court need not accept as true "legal conclusions" contained in the complaint. *Id.* This review requires context-specific analysis involving the Court's "judicial experience and common sense." *Id.* at 678 (citation omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.*

## ANALYSIS

Defendants move to dismiss Plaintiff's Complaint in its entirety, arguing that: (1) Plaintiff's copyright claims fail because Defendants' work is shielded by the fair use doctrine; and (2) Defendants' use of Plaintiff's alleged trademarks are shielded by (A) the First Amendment, and (B) the doctrine of nominative fair use such that Plaintiff's trademark claims fail, thus also causing (C) Plaintiff's unfair competition claims to fail. (MTD 1–24.) The Court addresses each argument in turn.

### I. Copyright Claims and Fair Use

Originally articulated in case law, and later codified by the Copyright Act of 1976, the doctrine of "fair use" shields from infringement particular uses of a copyrighted work. *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576–77 (1994); 17 U.S.C. § 107. This is because "courts have recognized that when a second author uses another's protected expression in a creative and inventive way, the result may be the advancement of learning rather than the exploitation of the first writer." *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1259 (2d Cir. 1986).

/ / /

"Fair use is a mixed question of law and fact," and therefore is usually adjudicated either at trial or on a motion for summary judgment where no material facts are in dispute. *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)). However, a fair use defense may occasionally be resolved on a motion to dismiss when it is appropriately raised and there are no material facts in dispute. *Id.* Nonetheless, "in light of a court's narrow inquiry at this stage and limited access to all potentially relevant and material facts needed to undertake the analysis, courts rarely analyze fair use on a 12(b)(6) motion." *Browne v. McCain*, 611 F. Supp. 2d 1073, 1078 (C.D. Cal. 2009) (citing *Four Navy Seals v. Assoc. Press*, 413 F. Supp. 2d 1136, 1148 (S.D. Cal. 2005); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 (9th Cir. 1997)).

In codifying the fair use doctrine, Congress set forth four non-exclusive factors for courts to consider in evaluating whether a particular use of a copyrighted work is fair:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Campbell*, 510 U.S. at 577; 17 U.S.C. § 107. "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" *Campbell*, 510 U.S. at 577 (alteration in original) (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)). Accordingly, "the analysis is a flexible one[,]" to be "perform[ed] on a case-by-case basis" and "in light of the copyright law's purpose 'to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works.'" *Leadsinger*, 512 F.3d at 529 (quoting *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 799–800 (9th Cir. 2003)).

As a threshold matter, Plaintiff argues that "while possible in rare instances to decide fair use at the pleading stage, it is inappropriate here, where significant material facts are necessary to make a determination of fair use." (Opp'n 9.) However, the only genuine fact Plaintiff points to is that "the issue of whether the Defendants' use . . . will appreciably harm the value of [Plaintiff's] Works or . . . market simply cannot be made without discovery and further development of the record on this issue." (*Id.* at 15–16.) And Defendants point out that Plaintiff's sole allegation of market harm is that Defendants "usurped DSE's licensing opportunities." (Reply 4 (citing Compl. ¶ 32).) Thus, as long as the Court takes Plaintiff's allegation of market harm as true, Defendants are otherwise correct that "[t]he complaint, and documents sufficiently referenced therein or otherwise subject to judicial notice, are sufficient to enable the Court to evaluate the issue of fair use." (MTD 6.) In particular, the Complaint itself raises the issue of fair use, (Compl. ¶ 35), and the contents of the two primary books and other relevant works are before the Court and not in reasonable dispute, (RJN Exs. 5, 6).[1] Accordingly, the Court concludes that fair use analysis is appropriate on this Motion to Dismiss and addresses each factor in turn.

### A. *The Purpose and Character of the Use*

"The central purpose of this [factor] is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or

---

[1] Plaintiff, despite explicitly referencing *Go!* and *Boldly* and attaching exemplars from both works in its Complaint, argues that the Court may not consider the full versions of the two works that Defendants attached to their Request for Judicial Notice. (RJN Opp'n 7–8.) But Plaintiff does not dispute the authenticity of the two works. (*See id.*) And "in order to '[p]revent [] plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting . . . documents upon which their claims are based,' a court may consider a writing referenced in a complaint but not explicitly incorporated therein if the complaint relies on the document and its authenticity is unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (alterations in original) (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998)). Otherwise put, Defendants "cannot now seek to delay potential resolution of this action by asserting that this Court may not review the material it claims is infringing and has specifically identified in its Complaint." *City of Inglewood v. Teixeira*, No. CV1501815MWFMRWX, 2015 WL 5025839, at *2 (C.D. Cal. Aug. 20, 2015). Accordingly, the Court **GRANTS** Plaintiff's Request for Judicial Notice regarding *Go!* and *Boldly* and incorporates by reference the other Dr. Seuss works listed in paragraph 26 of the Complaint.

message; it asks, in other words, whether and to what extent the new work is 'transformative.' " *Campbell*, 510 U.S. at 579 (citations omitted) (alteration in original). Because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works[,]" the "more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id.* "[A]n allegedly infringing work is typically viewed as transformative as long as new expressive content or message is apparent." *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013). "This is so even where . . . the allegedly infringing work makes few physical changes to the original or fails to comment on the original." *Id.* (collecting cases). However, even when a new use is transformative, "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise"—affects the overall balance of this factor. *See id.* at 1178 (quoting *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 627 (9th Cir. 2003)).

In the present case, Defendants initially argue that *Boldly* classifies as a parody for purposes of fair use analysis, and thus fits within the framework of the many cases recognizing broad protection for such works. (MTD 10–16.) The Court disagrees.

"[W]hether a defendant's work qualifies as a parody . . . [i]s one of law to be decided by the court." *Walking Mountain*, 353 F.3d at 801. "[T]he heart of any parodist's claim to quote from existing material . . . is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works." *Campbell*, 510 U.S. at 580. Otherwise put, a "parody 'may loosely target an original' as long as the parody 'reasonably could be perceived as commenting on the original or criticizing it, to some degree.' " *Walking Mountain*, 353 F.3d at 801 (quoting *Campbell*, 510 U.S. at 580–81).

In the present case, Defendants' work is most appropriately termed a literary and pictorial "mash-up." *See, e.g.*, *Mash-up*, Merriam-Webster, https://www.merriam-webster.com/dictionary/mash-up (last visited May 3, 2017) (defining term as "something created by combining elements from two or more sources: such as" underlying-work-

specific "characters or situations"). Such works may, of course, also be parodies when they juxtapose the underlying works in such a way that it creates "comic effect or ridicule." *Campbell*, 510 U.S. at 580. However, there is no such juxtaposition here; *Boldly* merely uses *Go!*'s illustration style and story format as a means of conveying particular adventures and tropes from the *Star Trek* canon. And although Defendants argue generally that "*Boldly* uses Dr. Seuss's own works in service of a group-oriented counterpoint to the *Go!* individualist ideal[,]" (MTD 16), the Court cannot conclude that such a "parodic character may reasonably be perceived." *Campbell*, 510 U.S. at 582.

But although *Boldly* fails to qualify as a parody it is no doubt transformative. In particular, it combines into a completely unique work the two disparate worlds of Dr. Seuss and *Star Trek*. *Go!* tells the tale of a young boy setting out on adventure and discovering and confronting many strange beings and circumstances along his path. *Boldly* tells the tale of the similarly strange beings and circumstances encountered during the voyages of the Star Trek Enterprise, and it does so through *Go!*'s communicative style and method. *Go!*'s rhyming lines and striking images, as well as other Dr. Seuss works, are often copied by *Boldly*, but the copied elements are always interspersed with original writing and illustrations that transform *Go!*'s pages into repurposed, *Star-Trek*–centric ones.

However, as previously mentioned, "[a]nother element of the first factor analysis is whether the work's 'purpose' was commercial or had a non-profit aim." *Walking Mountain*, 353 F.3d at 803 (citing *Campbell*, 510 U.S. at 584). And in the present case there is no question that Defendants created their work for profit. Although this weighs against Defendants in this factor, its weight is slight given both the transformative nature of the work, *see Campbell*, 510 U.S. at 579 ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."), and the fact that *Boldly* does not supplant the market for *Go!* or the other relevant Dr. Seuss works, *infra* Section I.D.

Given the foregoing, and on balance, this factor weighs in favor of finding Defendants' use to be fair.

### B. The Nature of the Copyrighted Work

"This factor calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when [fictional] works are copied." *Campbell*, 510 U.S. at 586. However, "this . . . factor typically has not been terribly significant in the overall fair use balancing." *Walking Mountain*, 353 F.3d at 803 (quoting *Dr. Seuss*, 109 F.3d at 1402). And although in the present case this factor therefore weighs against Defendants, a Court must also "consider the extent to which a work has been published." *Seltzer*, 725 F.3d at 1178. That is, "[p]ublished works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred." *Id.* (quoting *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003)). Because in the present case Dr. Seuss published *Go!* several decades ago—and indeed "Dr. Seuss books have topped may bestseller lists, sold over 650 million copies worldwide, and been translated into more than a dozen languages[,]" (Compl. ¶14)—"this factor as a whole . . . weighs only slightly in [Plaintiff's] favor." *Seltzer*, 725 F.3d at 1178.

### C. The Amount and Substantiality of the Portion Used

"The third factor looks to the quantitative amount and qualitative value of the original work used in relation to the justification for that use." *Seltzer*, 725 F.3d at 1178. This is because "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586–87 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449–50 (1984), and *Harper & Row*, 471 U.S. at 564).

In the present case, there is no dispute that *Boldly* copies many aspects of *Go!*'s and other Dr. Seuss illustrations. However *Boldly* does not copy them in their entirety; each is infused with new meaning and additional illustrations that reframe the Seuss images from a unique *Star-Trek* viewpoint. Nor does *Boldly* copy more than is necessary to accomplish its transformative purpose.

The final image comparison in Plaintiff's Complaint is illustrative. (Compl. ¶ 28.) Plaintiff's work depicts two similar-looking, fanciful "Zax" creatures arguing in the middle

of a desert, with footprints to mark their arrival. *Boldly* takes the same desert landscape and footprints, and in the fanciful creatures' place puts two similar-looking beings of seemingly Vulcan descent—one of which is drawn in the same position as his Dr. Seuss counterpart and one of which is transformed from the Dr. Seuss creatures' aggressive stance into a contemplative pose—deep in the midst of playing some type of alien board game.[2] Additionally, *Boldly*'s text reveals that the two Vulcan creatures are, in fact, the same person, unlike *Go!*'s distinct "North-Going" and "South-Going" Zaxes. *Boldly* therefore transforms the argumentative Zaxes and their corresponding depiction into a cloned Vulcan matching wits with himself over an alien boardgame. One Vulcan is positioned almost identically to his Zax counterpart to "conjure up" the Dr. Seuss work, while the other Vulcan is drawn anew and a board-game added in order to fully accomplish the work's overall transformative purpose.

Given the foregoing, the Court concludes that this factor does not weigh against Defendants. *Seltzer*, 725 F.3d at 1178 ("[T]his factor will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use.").

### D. The Effect of the Use Upon the Potential Market

This factor considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell*, 510 U.S. at 590 (citing Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][4]). "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." *Seltzer*, 725 F.3d at 1179 (citing *Campbell*, 510 U.S. at 591). However, "[t]his factor also considers any impact on 'traditional, reasonable,

---

[2] *Boldly* also adds similar-looking children playing in the background near a slide-like structure and a green, rather than *Go!*'s deep blue, sky.

or likely to be developed markets.' " *Id.* (quoting *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997)).

In the current procedural posture Defendants are at a clear disadvantage under this factor's required analysis. *Campbell*, 510 U.S. at 590 ("Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."). In particular, Plaintiff's Complaint alleges that "[i]t is not uncommon for DSE to license" its works, including in "collaborations with other rights holders." (Compl. ¶ 32.) And although Defendants might well be able to ultimately disprove this statement as it applies works of *Boldly*'s type, there is not currently any record evidence on this point. Plaintiff's allegations are taken as true, and therefore a potential harm to Plaintiff's licensing opportunities is presumed.

However, this presumed harm is neutralized somewhat by the fact that *Boldly* does not substitute for the original and serves a different market function than *Go!*. *Kelly*, 336 F.3d at 821 ("A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work."). Indeed, *Boldly*'s market relies on consumers who have already read and greatly appreciated *Go!* and Dr. Seuss's other works, and who simultaneously have a strong working knowledge of the *Star Trek* series. It is therefore unlikely that *Boldly* would severely impact the market for Dr. Seuss's works.

Given the foregoing, and on balance, this factor therefore weighs in favor of Plaintiff.

### E. Additional Considerations and Conclusion

As previously noted, the factors above must be weighed "in light of the purposes of copyright." *Walking Mountain*, 353 F.3d at 800 (quoting *Campbell*, 510 U.S. at 578). In order "[t]o promote the Progress of Science and useful Arts," Article one, Section eight, Clause eight of the United States Constitution empowers Congress to "secur[e] for limited Times to Authors and Inventors the exclusive Right to their respective" works. Effectively, by ensuring that creators of artistic and scientific works are entitled to a period of

exclusivity where they may capitalize on their creative production, the various Copyright Acts and predecessor statutes have attempted to fulfill that purpose.

But this period of exclusivity has always been balanced against the understanding that " '[i]n truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.' " *Campbell*, 510 U.S. at 575 (quoting *Emerson v. Davies*, 8 F. Cas. 615, 619 (No. 4,436) (C.C.D. Mass. 1845) (Story, J.)). Accordingly, "[r]ecognizing that science and art generally rely on works that came before them and rarely spring forth in a vacuum, the Act limits the rights of a copyright owner regarding works that build upon, reinterpret, and reconceive existing works." *Walking Mountain*, 353 F.3d at 799.

This case presents an important question regarding the emerging "mash-up" culture where artists combine two independent works in a new and unique way. *See, e.g.*, *Art Term, Postmodernism*, Tate, http://www.tate.org.uk/art/art-terms/p/postmodernism (last visited Apr. 28, 2017) ("Often mixing different artistic and popular styles and media, postmodernist art can also consciously and self-consciously borrow from or ironically comment on a range of styles from the past."). Applying the fair use factors in the manner Plaintiff outlines would almost always preclude a finding of fair use under these circumstances. However, if fair use was not viable in a case such as this, an entire body of highly creative work would be effectively foreclosed. Of course that is not to say that all mash-ups will or should succeed on a fair use defense; the level of creativity, variance from the original source materials, resulting commentary, and intended market will necessarily make evaluation particularized. In this regard, mash-ups are no different than the usual fair use case. However, in this particular case the Court has before it a highly transformative work that takes no more than necessary to accomplish its transformative purpose and will not impinge on the original market for Plaintiff's underlying work. And the Court is especially mindful that "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the

narrowest and most obvious limits." *Campbell*, 510 U.S. at 582 (alteration in original) (quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)).

At the same time, "[d]epending on the particular facts, some factors may weigh more heavily than others." *Walking Mountain*, 353 F.3d at 800. As it stands in this case, factors one and four—which "have 'dominated the case law' and are generally viewed as the most important factors[,]" *Seltzer*, 725 F.3d at 1179—currently stand in equipoise. Factor two weighs slightly in favor of Plaintiff, and factor three is neutral. And although it would appear that the purposes of copyright favor Defendants, that determination is also a close and unsettled call.

Ultimately, given the procedural posture of this motion and near-perfect balancing of the factors, the Court **DENIES** Defendants' Motion to Dismiss. Specifically, without relevant evidence regarding factor four the Court concludes that Defendants' fair use defense currently fails as a matter of law.

## II. Trademark and Corresponding Unfair Competition Claims

In addition to its copyright claims, Plaintiff asserts claims based on alleged trademark rights under federal trademark and California unfair-competition law. (Compl. ¶¶ 51–62.) Specifically, Plaintiff alleges trademark rights in (1) the title *Oh, the Places You'll Go!*; (2) "the stylized font" used in Dr. Seuss's books; and (3) "the unique illustration style of the characters and backgrounds" of Dr. Seuss's books. (*Id.* ¶ 17.) Plaintiff has produced no federal trademark registrations, (*see id.* ¶ 59 ("DSE is the exclusive owner of common law trademark rights in the Dr. Seuss marks.")), and therefore alleges that each of the three items listed above "are distinctive and have acquired secondary meaning" such that they serve as "indicators of source . . . and make . . . goods immediately recognizable as deriving from Dr. Seuss." (*Id.* ¶ 17.) And although Defendants argue in part that Plaintiff does not or cannot own valid trademark rights in these three items, (MTD 19–21), the Court need only address the issues of whether (A) the claims here are inherently precluded by the First Amendment and (B) the doctrine of nominative fair use bars Plaintiff's claims regarding *Go!*'s title. The Court then briefly concludes this Part

by discussing (C) Plaintiff's unfair competition claims, which rely entirely on Plaintiff's trademark allegations.

### A. The Scope of Trademark Rights Pursuant to Rogers v. Grimaldi

Defendants argue that Plaintiff's trademark claims cannot survive First Amendment scrutiny. (MTD 21–23.) This is because trademark rights, even when validly granted, are not absolute; they at times must yield to the First Amendment. In order to analyze this trademark and First Amendment intersection, the Ninth Circuit has "adopted the Second Circuit's approach from *Rogers v. Grimaldi*, which 'requires courts to construe the Lanham Act "to apply to artistic works <u>only</u> where the public interest in avoiding consumer confusion <u>outweighs</u> the public interest in free expression." ' " *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (quoting *Walking Mountain*, 353 F.3d at 807 (emphasis in original), and *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)). Analysis is two pronged and disjunctive. *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1242 (9th Cir. 2013); *E.S.S. Entm't*, 547 F.3d at 1099. The baseline is that—for allegedly infringing expressive works—"use of a trademark that otherwise would violate the Lanham Act is not actionable . . . ." *E.S.S. Entm't*, 547 F.3d at 1099. However, this baseline may be refuted if either of two circumstances are established: ' "[(1)] the [use of the mark] has no artistic relevance to the underlying work whatsoever, or, [(2)] if [the use of the mark] has some artistic relevance, . . . [the use nonetheless] explicitly misleads as to the source or the content of the work.' " *Id.* (second alteration in original) (quoting *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902 (9th Cir. 2002), and *Rogers*, 875 F.2d at 999). The test applies to trademark use both in the title and the body of the allegedly infringing work. *Id.*

As a threshold matter, Plaintiff argues that this entire framework is inapplicable in the present case because *Rogers* itself dictates that First Amendment analysis "inherently requires a determination of consumer confusion . . . ." (Opp'n 20.) But the Ninth Circuit has previously directly rejected this contention. *Brown*, 724 F.3d at 1241–42 (explaining that "our precedents dictate that we apply the *Rogers* test in § 43(a) cases involving expressive works[,]" that "[w]e have previously rejected the 'likelihood of confusion' test

14

as 'fail[ing] to account for the full weight of the public's interest in free expression' when expressive works are involved" and that "[t]he only relevant legal framework for balancing the public's right to be free from consumer confusion . . . with . . . First Amendment rights in the context of [a] § 43(a) claim is the *Rogers* test"). Accordingly, Plaintiff's argument on this front fails and the Ninth Circuit's articulation of *Rogers* applies.

Regarding *Rogers*'s first prong, in the present case there is no question that Defendants' invocation of Plaintiff's alleged trademarks is relevant to *Boldly*'s artistic purpose. *Boldly* is designed as a mash-up of two creative worlds, and *Go!*'s title, font, and Dr. Seuss's illustration style must be employed to evoke *Go!* and the other Dr. Seuss works here at issue. This is enough to place *Boldly* in the second prong of analysis. *E.S.S. Entm't*, 547 F.3d at 1100 ("[T]he level of relevance merely must be above zero."); *Brown*, 724 F.3d at 1243 (same).

The only remaining question is therefore whether *Boldly* explicitly misleads as to its source or content. The Court finds that it does not. Specifically, "[i]t is key here that the creator must <u>explicitly</u> mislead consumers." *Brown*, 724 F.3d at 1245 (emphasis in original). This requires "an 'explicit indication,' 'overt claim,' or 'explicit misstatement' that caused . . . consumer confusion . . . ." *Id.* (quoting *Rogers*, 875 F.2d at 1001). But in the present case, *Boldly*—aside from changing the cover imagery and title to invoke *Star Trek* characters and the famous, split-infinitive opening line, *To Boldly Go:* Star Trek *& the Split Infinitive*, Merriam-Webster, https://www.merriam-webster.com/words-at-play/to-boldly-split-infinitives (last visited May 2, 2017) (" '[T]o boldly go' is almost invariably the first example that comes to mind whenever one is asked for an example of a *split infinitive* . . . .")—explicitly announces on its cover that it is authored not by Dr. Seuss but instead "by David Gerrold & Ty Templeton." (ECF No. 15, at 1.) And *Boldly*'s copyright page even includes an explicit disclaimer that "[t]his is a work of parody, and is not associated with or endorsed by CBS Studios or Dr. Seuss Enterprises, L.P." (*Id.* at 2.)

///

///

15

16cv2779-JLS (BGS)

These changes and disclosures, in the absence of any factual allegations to the contrary,[3] establish that *Boldly* does not explicitly mislead as to its source or content. *Brown*, 724 F.3d at 1245 ("[T]he slight risk that . . . use . . . might implicitly suggest endorsement or sponsorship to some people is outweighed by the danger of restricting artistic expression, and [in cases where there is no explicit misleading] the Lanham Act is not applicable." (alterations in original)).

Plaintiff attempts to limit the First Amendment's application to these facts by offering several limiting principles, (Opp'n 19–22), but none are persuasive. Prior litigants have asserted similar arguments, such as that aspects of the test as outlined above result in "an inflexible and mechanical rule that more or less automatically protects expressive works regardless of the deception involved." *Brown*, 724 F.3d at 1245. However, our Circuit has previously declined to alter this framework:

> [A] balance need not be designed to find each of the sides weightier with equal frequency. The language in *Rogers* is clear. "[T]hat balance will normally not support application of the [Lanham] Act unless the [use of the trademark or other identifying material] has <u>no artistic relevance to the underlying work whatsoever</u> . . . ." 875 F.2d at 999 (emphasis added). The *Rogers* test is applicable when First Amendment rights are at their height—when expressive works are involved—so it is no surprise that the test puts such emphasis on even the slightest artistic relevance. "Intellectual property rights aren't free: They're imposed at the expense of future creators and of the public at large," *White v. Samsung Elecs. Am., Inc.*, 989 F.2d 1512, 1516 (9th Cir. 1993) (Kozinski, J., dissenting from denial of rehearing en banc), and the *Rogers* test applies when this expense is most significant.

---

[3] Plaintiff asserts that because it alleges that Defendants' conduct was "intentional and willful and is calculated specifically to trade off the goodwill that DSE has developed in its Dr. Seuss Marks[,]" it therefore must be taken as true that Defendants intended to explicitly mislead the public. (Opp'n 22.) But a defendant may intend to or willfully use a mark without any desire to explicitly mislead consumers. And the only other section of the Complaint with relevant allegations states that "Defendants deliberately wrote and illustrated [*Boldly*] with the intention of imitating the Seuss Marks, and in creating confusion in the minds of the relevant public as to the origin of [*Boldly*] and/or deceiving the public as to Dr. Seuss's approval or licensing of [*Boldly*]." (Compl. ¶ 31.) However, this statement is "no more than [a] conclusion[] . . . not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.


*Id.* (alterations in original). This Court both agrees with and is bound by this analysis.

However, Plaintiff notes that *Rogers* explicitly incorporates an exception for "misleading titles that are confusingly similar to other titles." *Rogers*, 875 F.2d at 999 n.5. Although the Ninth Circuit has not directly addressed this exception, even as *Rogers* has arguably expanded in reach over several rounds of Ninth Circuit interpretation, several district courts have concluded that the exception is applicable. *E.g.*, *Kiedis v. Showtime Networks*, No. CV078185DSFMANX, 2008 WL 11173143, at *5 (C.D. Cal. Feb. 19, 2008) ("But as the risk of consumer confusion is higher when 'confusingly similar' titles are involved, the Court cannot hold, as a matter of law, that Defendants are entitled to the across-the-board protection of the two-part test used in the [*Rogers*] case."). And Defendants here do not address this in their Reply. (*See* Reply 7–10.) Accordingly, the Court will not on these grounds grant Defendants' Motion to Dismiss regarding Plaintiff's alleged trademark in *Go!*'s title.

### B. Nominative Fair Use

Defendants assert that nominative fair use shields *Boldly*'s use of *Go!*'s title. (MTD 23–24.) Plaintiff does not argue that the nominative fair use framework is inapplicable to the works here at issue, but instead argues that analysis is premature on a motion to dismiss. (Opp'n 22–24.) However, Courts in our Circuit have considered and dismissed causes of action on nominative fair use grounds at the motion to dismiss stage. *Beachbody, LLC v. Universal Nutrients, LLC*, No. CV 16-02015-R, 2016 WL 3912014 (C.D. Cal. July 18, 2016); *see 1800 GET THIN, LLC v. Hiltzik*, No. CV11-00505 ODW PJWX, 2011 WL 3206486, (C.D. Cal. July 25, 2011) (analyzing nominative fair use, determining "the three requirements of the nominative fair use defense have been satisfied by Defendants[,]" and noting that even "in the alternative . . . the Court still finds Plaintiff's argument without merit"). Indeed, it makes sense that where a "[p]laintiff does not allege sufficient facts to defeat [a] [d]efendants' nominative fair use defense," a plaintiff's "trademark infringement claim [may be] dismissed." *Beachbody, LLC*, 2016 WL 3912014, at *2; *see Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008) (noting in copyright context

16cv2779-JLS (BGS)

that "fair use may be considered on a motion to dismiss, which requires the court to consider all allegations to be true, in a manner substantially similar to consideration of the same issue on a motion for summary judgment, when no material facts are in dispute"). Accordingly, the Court here considers Defendants' Motion to Dismiss Plaintiff's trademark claims on nominative fair use grounds.

The Ninth Circuit recognizes two distinct fair use defenses within the context of trademark law—classic fair use and nominative fair use. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002). Nominative fair use analysis is appropriate when a "defendant has used [a] plaintiff's mark 'to describe the <u>plaintiff's</u> product' for the purpose of, for example, comparison to the defendant's product." *Id.* (emphasis in original) (quoting *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992)). "Such nominative use of a mark—where the only word reasonably available to describe a particular thing is pressed into service—lies outside the strictures of trademark law: Because it does not implicate the source-identification function that is the purpose of trademark, it does not constitute unfair competition; such use is fair because it does not imply sponsorship or endorsement by the trademark holder." *New Kids on the Block*, 971 F.2d at 308 (emphasis removed). "In cases where a nominative fair use defense is raised," a court must determine "whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175–76 (9th Cir. 2010) (quoting *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 801 (9th Cir. 2002)). Once nominative fair use is sufficiently raised, the defendant "bear[s] the burden of establishing that the . . . use of the . . . mark was <u>not</u> nominative fair use." *Id.* at 1182.

In the present case, Defendants offer a reasoned application of each prong of the nominative fair use inquiry. (*See* MTD 23–24.) And Plaintiff's sole argument against nominative fair use is that it should not "appl[y] as a matter of law on a motion to dismiss." (Opp'n 23.) Accordingly, because the Court concludes that analysis on a motion to dismiss

is appropriate, and because Plaintiff does not oppose the substance of Defendants' argument, the Court therefore **GRANTS** Defendants' Motion to Dismiss Plaintiff's trademark cause of action.[4]

### C. Unfair Competition

The Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). This means that if claims relying on the exact same factual conduct are validly dismissed under the Lanham Act, they should also be dismissed under California Unfair Competition law. *E.S.S. Entm't*, 547 F.3d at 1101 ("[T]he First Amendment[, *Rogers*] defense applies equally to ESS's state law claims as to its Lanham Act claim . . . ."); *Playboy Enters., Inc. v. Welles, Inc.*, 78 F. Supp. 2d 1066, 1076 n.4 (S.D. Cal. 1999) (fair use analysis is identical), *aff'd in part, rev'd on other grounds in Playboy Enters., Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002). In the present case, the Court concludes that Defendants' nominative fair use defense precludes Plaintiff's trademark causes of action, (*supra* Sections II.A–B); accordingly, the same result inures regarding Plaintiff's unfair competition claims. (*See* Compl. ¶¶ 58–62 (alleging unfair competition under California Business and Professions Code § 17200 with all supporting allegations regarding trademark rights).)

/ / /

/ / /

---

[4] The only other argument Plaintiff advances against nominative fair use is regarding the third factor, which Plaintiff argues "requires an assessment of likelihood of confusion . . . ." (Opp'n 24.) The Court disagrees. "In cases in which the defendant raises a nominative use defense, the above three-factor test should be applied instead of the test for likelihood of confusion set forth in *Sleekcraft*." *Welles*, 279 F.3d at 801; *Cairns*, 292 F.3d 1139, 1151 (9th Cir. 2002) ("[N]ominative fair use analysis . . . <u>replaces</u> the likelihood of customer confusion analysis set forth in *Sleekcraft*." (emphasis in original)). And the third factor does not analyze likelihood of confusion, but instead simply requires "that the user do 'nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.'" *Welles*, 279 F.3d at 803 (quoting *New Kids*, 971 F.2d at 308).

## CONCLUSION

Given the foregoing, the Court cannot say as a matter of law that Defendants' use of Plaintiff's copyrighted material was fair. The Court therefore **DENIES** Defendants' Motion to Dismiss Plaintiff's claim of copyright infringement. But Plaintiff's trademark and unfair competition claims stand on different footing. Plaintiff does not oppose the substance of Defendants' trademark-based argument regarding nominative fair use, and the Court therefore **GRANTS** Defendants' Motion to Dismiss Plaintiff's claims of trademark infringement and unfair competition. However, given Plaintiff's lack of nominative-fair-use opposition and Defendants' failure to respond to Plaintiff's confusingly-similar-titles argument under *Rogers v. Grimaldi*, the Court grants Plaintiff **LEAVE TO AMEND** its Complaint regarding the second and third causes of action. *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir. 1992) (holding that a Court should freely grant leave to amend "unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency" (quoting *Schriber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986))). Any such amendment must be within <u>fourteen days of the date on which this Order is electronically docketed</u>.

**IT IS SO ORDERED.**

Dated: June 9, 2017

Hon. Janis L. Sammartino
United States District Judge