```
 1                  THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF CALIFORNIA
 2
                BEFORE THE HONORABLE JANIS L. SAMMARTINO
 3               UNITED STATES DISTRICT JUDGE PRESIDING

 4       ------------------------------------------------------

 5
         DR. SEUSS ENTERPRISES, L.P.,    )  CASE NO. 16-CV-2779
 6                                       )
                      PLAINTIFF,         )
 7                                       )  MOTION HEARING
         VS.                             )
 8                                       )
         COMICMIX LLC, ET AL.,           )  NOVEMBER 28, 2017
 9                                       )
                      DEFENDANTS.        )
10       ------------------------------------------------------

11

12       APPEARANCES:

13

14       FOR THE PLAINTIFF:        TAMAR Y. DUVDEVANI
                                   DLA PIPER LLP
15                                 1251 AVENUE OF THE AMERICAS
                                   NEW YORK, NY  10020-1104

16                                 STANLEY J. PANIKOWSKI
                                   DLA PIPER LLP
17                                 401 B STREET, SUITE 1700
                                   SAN DIEGO, CA  92101
18

19       FOR THE DEFENDANTS:       DAN BOOTH
                                   BOOTH SWEET LLP
20                                 32R ESSEX STREET
                                   CAMBRIDGE, MA  02139
21
                                   MICHAEL LICARI
22                                 D'EGIDIO LICARI & TOWNSEND
                                   5402 RUFFIN ROAD, SUITE 209
23                                 SAN DIEGO, CA  92123

24

25       THE COURT REPORTER:       GAYLE WAKEFIELD, RPR, CRR
```

```
1      NOVEMBER 28, 2017

2                        MORNING SESSION

3            THE CLERK:  NUMBER ONE ON THE CALENDAR, 16-CV-2779, DR.

4      SEUSS ENTERPRISES VS. COMICMIX, LLC.

5            THE COURT:  GOOD MORNING, COUNSEL.

6            MS. DUVDEVANI:  GOOD MORNING, YOUR HONOR, TAMAR

7      DUVDEVANI, DLA PIPER, ALONG WITH MY COLLEAGUE STAN PANIKOWSKI,

8      ALSO FROM DLA PIPER, ON BEHALF OF PLAINTIFFS DR. SEUSS

9      ENTERPRISES.

10           THE COURT:  THANK YOU.

11           GOOD MORNING, SIR.

12           MR. BOOTH:  GOOD MORNING, YOUR HONOR.  DAN BOOTH FROM

13     BOOTH SWEET LLP ON BEHALF OF THE DEFENDANTS COMICMIX, LLC,

14     GLENN HAUMAN, TY TEMPLETON, AND DAVID GERROLD, ALONG WITH MY

15     CO-COUNSEL MIKE LICARI.

16           MR. LICARI:  GOOD MORNING, YOUR HONOR.

17           THE COURT:  GOOD MORNING.  THANK YOU.

18           I HAVE A TENTATIVE RULING FOR EVERYBODY, AND I HAVE

19     SOME QUESTIONS.  AFTER THAT, I'LL GIVE YOU SOME TIME TO TELL ME

20     WHATEVER YOU WOULD LIKE TO TELL ME THAT YOU DON'T FEEL WAS

21     COVERED EITHER IN THE QUESTIONS OR OTHERWISE THIS MORNING, AND

22     AT THE CONCLUSION OF THAT, I'M GOING TO TAKE THIS MATTER UNDER

23     SUBMISSION AND YOU'LL GET A REASONED DECISION SHORTLY FROM THE

24     COURT, SO THAT'S THE OUTLINE FOR THIS MORNING.

25           THE COURT HAS PREPARED A TENTATIVE RULING REGARDING
```

1    DEFENDANTS' MOTION TO DISMISS.  THE COURT IS CURRENTLY INCLINED

2    TO DENY THE MOTION AS TO BOTH THE COPYRIGHT CLAIM AND THE

3    TRADEMARK CLAIMS.

4        TURNING TO THE COPYRIGHT CLAIM, THE COURT DID NOT GRANT

5    PLAINTIFF LEAVE TO AMEND ITS COPYRIGHT CLAIM IN ITS LAST ORDER,

6    BUT PLAINTIFFS MADE AMENDMENTS NONETHELESS.  THE COURT IS

7    INCLINED TO CONSIDER PLAINTIFF'S AMENDMENTS TO THE COPYRIGHT

8    CLAIM AND DEFENDANTS' MOTION TO DISMISS.  THE COURT TENTATIVELY

9    FINDS DEFENDANTS' FAIR USE DEFENSE FAILS.  THE COURT CONSIDERED

10   THE INFORMATION ADDED BY PLAINTIFFS RELATING TO THE FOURTH FAIR

11   USE FACTOR AND DETERMINED THIS DOES NOT CHANGE THE COURT'S

12   PRIOR FINDING THAT THE FAIR USE DEFENSE FAILS.

13       THE COURT PREVIOUSLY ANALYZED THE FOUR FAIR USE

14   FACTORS.  THE COURT FOUND FACTOR ONE TO WEIGH IN FAVOR OF

15   DEFENDANTS, FACTOR TWO TO WEIGH SLIGHTLY IN FAVOR OF PLAINTIFF,

16   FACTOR THREE TO BE NEUTRAL, AND FACTOR FOUR TO WEIGH IN FAVOR

17   OF PLAINTIFF.

18       THE COURT NOW TENTATIVELY FINDS THE AMENDMENTS IN THE

19   FIRST AMENDED COMPLAINT HAVE NOT CHANGED THIS FINDING, IF

20   ANYTHING, THE AMENDMENTS REGARDING THE POTENTIAL FOR MARKET

21   HARM SHIFT THE BALANCE MORE IN PLAINTIFF'S FAVOR.  DEFENDANTS'

22   FAIR USE CLAIM FAILS AS A MATTER OF LAW.

23       TURNING TO THE TRADEMARK CLAIMS.  THE COURT DID NOT

24   GRANT PLAINTIFF LEAVE TO ADD A NEW CLAIM, BUT PLAINTIFF ADDED A

25   CLAIM UNDER 28 U.S.C. 1114 FOR ITS E-BOOK MARK.  THE COURT IS

1    TENTATIVELY INCLINED TO CONSIDER THIS NEW CLAIM ALONG WITH THE

2    OTHER TRADEMARK CLAIM.  BUT THE COURT WOULD LIKE TO HEAR FROM

3    THE PARTIES AS TO THEIR POSITIONS ON THIS CLAIM.

4         WITH REGARD TO VALIDITY, DEFENDANTS HAVE ARGUED

5    PLAINTIFF'S UNREGISTERED MARKS NOT BE VALID.  THE COURT

6    TENTATIVELY FINDS THE TITLE *OH, THE PLACES YOU'LL GO!* TO BE A

7    VALID TRADEMARK.  THE COURT WILL REQUEST THE PARTIES ADDRESS

8    THE ASSERTION THAT THE TITLE HAS ACQUIRED SECONDARY MEANING.

9         NEXT, PLAINTIFF'S CLAIM OF TRADEMARK RIGHTS IN THE FONT

10   USED THROUGHOUT THE BOOK IS UNCLEAR, AND THE COURT WILL ALSO

11   ASK THE PARTIES TO ADDRESS THIS.  THE COURT ALSO TENTATIVELY

12   FINDS PLAINTIFF'S CLAIMED ILLUSTRATION STYLE IS NOT A

13   PROTECTABLE TRADEMARK.  AGAIN, I'M GOING TO ASK THE PARTIES TO

14   ADDRESS THIS.  THE COURT PROCEEDS WITH ITS NOMINATIVE FAIR USE

15   ANALYSIS WITH THE FINDING THAT *GO!'S* TITLE, AS IT APPEARS ON

16   THE BOOK, IS VALID, BUT PLAINTIFF'S ILLUSTRATION FILE IS NOT

17   VALID.

18        AS TO THE NOMINATIVE FAIR USE DEFENSE, THE COURT FIRST

19   FINDS THE NOMINATIVE FAIR USE DEFENSE IS APPROPRIATE IN THIS

20   INSTANCE AND HAS ANALYZED THE THREE ELEMENTS.  THE COURT

21   TENTATIVELY FINDS DEFENDANTS ARE UNABLE TO ESTABLISH ALL THREE

22   NOMINATIVE FAIR USE ELEMENTS.  THE COURT TENTATIVELY FINDS

23   DEFENDANTS MEET THE FIRST FACTOR, AS PLAINTIFF'S PRODUCT IS NOT

24   READILY IDENTIFIABLE WITHOUT THE USE OF ITS TITLE, AND

25   DEFENDANTS' USE OF THE MARK IS NECESSARY TO DESCRIBE

1    DEFENDANTS' WORK.

2          THE COURT TENTATIVELY FINDS DEFENDANTS DO NOT MEET THE

3    SECOND FACTOR.  THERE IS NINTH CIRCUIT AND CALIFORNIA DISTRICT

4    COURT AUTHORITY SPECIFICALLY DISCUSSING THE NOMINATIVE FAIR USE

5    DEFENSE WHEN A DEFENDANT USES NOT ONLY THE WORDS OF THE

6    TRADEMARK BUT THE DISTINCTIVE FONT AS WELL.  THE COURT FINDS

7    THIS AUTHORITY PERSUASIVE AND TENTATIVELY FINDS IT WAS

8    UNNECESSARY FOR DEFENDANTS TO USE PLAINTIFF'S DISTINCTIVE FONT

9    ON DEFENDANTS' COVER OF *BOLDLY*.

10         FINALLY, THE COURT TENTATIVELY FINDS DEFENDANTS MEET

11   THE THIRD FACTOR BECAUSE DEFENDANTS HAVE DONE NOTHING TO

12   AFFIRMATIVELY SUGGEST SPONSORSHIP OR ENDORSEMENT BY PLAINTIFF.

13         AS TO THE UNFAIR COMPETITION CLAIMS, AS THE COURT FOUND

14   BEFORE, IF CLAIMS RELYING ON THE EXACT SAME FACTUAL CONDUCT ARE

15   DISMISSED UNDER THE LANHAM ACT, THEY SHOULD ALSO BE DISMISSED

16   UNDER CALIFORNIA UNFAIR COMPETITION LAW.  BECAUSE THE COURT IS

17   TENTATIVELY INCLINED TO DISMISS DEFENDANTS' MOTION AS TO THE

18   TRADEMARK CLAIMS, THE COURT IS TENTATIVELY INCLINED TO DISMISS

19   THE MOTION AS TO THE UNFAIR COMPETITION CLAIMS.

20         NOW, IN ADDITION TO THAT TENTATIVE, I WOULD LIKE TO

21   NOTE THE FOLLOWING:  THE PARTIES HAVE ALSO FILED WITH THE COURT

22   THEIR POSITIONS ON THE RECENT NINTH CIRCUIT CASE *TWENTIETH*

23   *CENTURY FOX VS. EMPIRE DISTRIBUTION*.  DEFENDANTS FILED A NOTICE

24   OF AUTHORITY, AND PLAINTIFF FILED A RESPONSE.  THE NINTH

25   CIRCUIT CASE ANALYZES THE *ROGERS* TEST.  BECAUSE DEFENDANTS DID

1    NOT MOVE TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER

2    *ROGERS* IN THE PRESENT MOTION TO DISMISS, THE COURT DOES NOT

3    ADDRESS THE PARTIES' POSITIONS ON THE SUPPLEMENTAL AUTHORITY.

4    SO WE CAN TALK ABOUT THAT LATER, BUT IT'S REALLY NOT BEFORE THE

5    COURT.

6         SO THAT'S THE COURT'S TENTATIVE.  I DO HAVE SOME

7    QUESTIONS, AND I WOULD LIKE TO START WITH PLAINTIFF, WHOEVER

8    WOULD LIKE TO TAKE THE PODIUM, AND YOU CAN SHIFT DEPENDING ON

9    WHO WANTS TO HANDLE THE QUESTIONS BETWEEN BOTH COUNSEL THERE,

10   WHATEVER YOU WOULD LIKE.

11        MS. DUVDEVANI:  THANK YOU, YOUR HONOR, I'LL BE SPEAKING

12   ON BEHALF OF THE PLAINTIFF TODAY.

13        THE COURT:  VERY WELL.  I'M GOING TO START WITH THE

14   AMENDMENTS TO THE COMPLAINT.  IN THE COURT'S PRIOR ORDER, THE

15   COURT DENIED DEFENDANTS' MOTION TO DISMISS THE COPYRIGHT CLAIM,

16   AND I GRANTED PLAINTIFF LEAVE TO AMEND ITS COMPLAINT REGARDING

17   THE SECOND AND THIRD CAUSES OF ACTION.  PLAINTIFF AMENDED ALL

18   THREE CAUSES OF ACTION AND ADDED A NEW FOURTH CAUSE OF ACTION.

19   I WOULD LIKE YOUR POSITION REGARDING HOW I SHOULD CONSIDER

20   THESE AMENDMENTS -- WHETHER I SHOULD CONSIDER THESE AMENDMENTS.

21        MS. DUVDEVANI:  THANK YOU, YOUR HONOR.  WHEN THE COURT

22   ISSUED ITS RULING GRANTING IN PART AND DENYING IN PART WITH

23   LEAVE TO AMEND, I'LL ADMIT THAT PLAINTIFF DID TAKE A HOLISTIC

24   APPROACH IN LOOKING AT THEIR PLEADING AND ADDED FACTS THAT WE

25   FELT WERE BOTH NECESSARY TO SUPPLEMENT THE RECORD BEFORE THE

1        COURT, BUT ALSO POTENTIALLY USEFUL FOR THE COURT GIVEN THE FACT

2        THAT WE DID ANTICIPATE A POTENTIAL SECOND MOTION TO DISMISS THE

3        CASE.  WE DIDN'T -- FRANKLY, WE DID NOT ANTICIPATE A SECOND

4        MOTION TO DISMISS THE COPYRIGHT CLAIM.  WE HAD A BASIC

5        UNDERSTANDING, UNDER THE NINTH CIRCUIT JURISPRUDENCE, THAT THAT

6        WOULD GENERALLY BE CONSIDERED EITHER LAW OF THE CASE OR TO THEN

7        AGAIN SEEK A MOTION TO DISMISS THE COPYRIGHT CLAIM WOULD

8        ESSENTIALLY BE AN IMPROPER MOTION FOR RECONSIDERATION, BUT WE

9        DID END UP ADDING FACTS THAT WHILE WE DO BELIEVE THE FACTS DID

10       ACTUALLY BUTTRESS THE TRADEMARK CLAIMS AS WELL, AT LEAST

11       INCIDENTALLY, THAT ALSO HAPPENED TO BUTTRESS THE COPYRIGHT

12       CLAIMS.  WE WEREN'T AWARE OF ANY RESTRICTIONS ON AMENDING THE

13       PLEADING IN THAT WAY, AND IF THERE WAS ONE, AND WE MISTOOK THE

14       COURT'S INSTRUCTIONS, WE APOLOGIZE FOR THAT, BUT WE DID BELIEVE

15       FROM AN EQUITABLE STANDPOINT THAT OUR SECOND -- OUR FIRST

16       AMENDED COMPLAINT SHOULD STAND THE WAY IT IS.

17            THE COURT:  IS THERE ANY DIFFERENCE, COUNSEL, IN YOUR

18       ARGUMENT THAT DEFENDANTS ARE INFRINGING THE UNREGISTERED MARKS

19       AND INFRINGING THE E-BOOK MARK?

20            MS. DUVDEVANI:  MEANING A DIFFERENCE IN THE WAY WE VIEW

21       THOSE CLAIMS, YOUR HONOR?

22            THE COURT:  CORRECT.

23            MS. DUVDEVANI:  THERE ARE SLIGHT DIFFERENCES JUST IN

24       THE WAY THE JURISPRUDENCE WORKS IN TERMS OF SECTION 1114 AND

25       SECTION 43(A) OF THE LANHAM ACT.  THE ONE TRADEMARK

1    REGISTRATION THAT WE'VE ASSERTED IS THE TRADEMARK REGISTRATION

2    THAT DR. SEUSS ENTERPRISES HAS FOR THE MARK *OH, THE PLACES*

3    *YOU'LL GO!*.  CONTRARY TO THE BRIEFING THAT WAS SUBMITTED BY

4    DEFENDANTS, THAT REGISTRATION IS NOT IN RELATION TO A SINGLE

5    TITLE.  THAT RELATION -- THAT REGISTRATION, IF YOUR HONOR WOULD

6    LOOK AT THE ACTUAL GOODS AND SERVICES UNDER THAT REGISTRATION,

7    AS WELL AS THE SPECIMENS OF USE, REALLY ENCOMPASS A BROAD

8    VARIETY OF GOODS AND SERVICES, INCLUDING DOWNLOAD DIGITAL

9    E-BOOKS, AN APP THAT'S CALLED *OH, THE PLACES YOU'LL GO!* AND A

10    VARIETY OF OTHER GOODS THAT DR. SEUSS PUTS OUT.

11    THERE ARE STATUTORY DIFFERENCES, YOUR HONOR, IN WHAT

12    DR. SEUSS CAN OBTAIN FROM A SECTION 1114 CLAIM VERSUS A 43(A)

13    CLAIM, BUT AT THE END OF THE DAY FOR THE MOST PART THOSE TWO

14    CLAIMS ARE ANALYZED IN VERY SIMILAR WAYS IN CIRCUIT COURTS

15    THROUGHOUT THE COUNTRY.

16    ONE THING I WILL NOTE ABOUT THIS, AND IT DOES GO TO

17    THE -- I'M JUMPING AHEAD, BUT IT GOES TO ONE OF THE POINTS THAT

18    YOUR HONOR RAISED ABOUT TITLES BEING PROTECTABLE TRADEMARKS,

19    AND I BELIEVE THAT YOU SAID TENTATIVELY YOU DO AGREE THAT IT

20    IS.  I DID NOTICE THAT IN THE CASES CITED BY THE DEFENDANTS ON

21    REPLY REGARDING THAT POINT, INCLUDING THE *HERBKO* CASE OUT OF

22    FEDERAL CIRCUIT, AND THE *SPIN CITY* CASE OUT OF THIS CIRCUIT

23    THAT RELIED ON *HERBKO*, DEFENDANTS ATTEMPT TO MAKE THE POINT

24    THAT TITLES CANNOT BE PROTECTABLE TRADEMARKS, AND THAT'S

25    ACTUALLY INCORRECT AS A MATTER OF LAW.

1        WHAT COURTS HAVE DETERMINED, AND IT'S REALLY A TTAB

2    USPTO DECISIONS, IS THAT SINGLE TITLES OF WORKS CANNOT BE

3    REGISTRABLE, AND, THEREFORE, THOSE CASES RELY -- WERE ALL ABOUT

4    REGISTRABILITY DETERMINATIONS AND PRIORITY FIGHTS.  THE VERY

5    SAME CASE THEY CITED, *HERBKO,* ALSO DROPS A FOOTNOTE AND POINTS

6    OUT THAT TITLES CAN CERTAINLY BE AFFORDED TRADEMARK PROTECTION

7    SO LONG AS A PARTY PROVES SECONDARY MEANING.

8        SECONDARY MEANING IS CERTAINLY A FACT ISSUE THAT

9    PARTIES TEND TO PROVE THROUGHOUT DISCOVERY, VIA SURVEY AND

10   OTHER TYPES OF SIMILAR EVIDENCE, AND THAT IS SOMETHING THAT DR.

11   SEUSS WILL PLAN TO DO AS THIS CASE MOVES FORWARD INTO

12   DISCOVERY.

13       THE COURT:  MOVING ON TO WHERE YOU WERE GOING WITH

14   THAT, COUNSEL, YOU ARGUE THAT THE TITLE *OH, THE PLACES YOU'LL*

15   *GO!* HAS REQUIRED A SECONDARY MEANING IN THE MINDS OF THE PUBLIC

16   AND ARE READILY ASSOCIATED WITH DR. SEUSS AND DR. SEUSS

17   ENTERPRISES, SO WHY HAS IT ACQUIRED A SECONDARY MEANING?

18       MS. DUVDEVANI:  IT HAS ACQUIRED SECONDARY MEANING --

19   THANK YOU, YOUR HONOR.  THE BASIC PREMISE OF SECONDARY MEANING

20   IS THAT A WORD OR A PHRASE OR A SYMBOL OUT IN THE PUBLIC

21   SPHERE, WHEN SOMEBODY LOOKS AT IT, IT'S NOT JUST THAT THEY SEE

22   A SYMBOL OR A WORD, IT'S THAT THEY LOOK AT IT AND THEY BELIEVE

23   THAT IT'S A SOURCE INDICIA.  THE WAY THAT TRADEMARKS GAIN

24   PROTECTION IN THIS COUNTRY IS EITHER IF THEY OBTAIN SECONDARY

25   MEANING OR IF THEY'RE IMMEDIATELY ARBITRARY OR FANCIFUL.

1    TRADEMARK LAWYERS TEND TO PLEAD BOTH THAT THEIR MARK IS

2    INHERENTLY DISTINCTIVE OR HAS GAINED SECONDARY MEANING IN THE

3    MARKETPLACE, BUT WHAT WE MEAN ABOUT IT HERE IS THAT WHEN A

4    CONSUMER IS GOING TO LOOK AT THE PHRASE *OH, THE PLACES YOU'LL*

5    *GO!* OR LOOK AT THE ILLUSTRATIVE STYLE OF DR. SEUSS OR LOOK AT

6    DR. SEUSS'S DISTINCTIVE FONT, IT'S NOT JUST SOME FANCY WAY OF

7    JUST DOING LETTERS, OR IT'S NOT JUST A PARTICULAR PIECE OF

8    ARTWORK, OR IT'S NOT JUST A TITLE THAT TRIGGERS IN THEIR HEAD A

9    SECONDARY MEANING, AN ACQUIRED MEANING KNOWING THAT THAT COMES

10   FROM A SOURCE.

11        FOR EXAMPLE, AS WE PLED IN OUR COMPLAINT, THERE ARE A

12   NUMBER OF WORKS THAT DR. SEUSS PUTS OUT THAT HAS THE AFFIXATION

13   OF A TITLE OR A FAMILY OF TITLES FOR *OH, THE PLACES YOU'LL GO!*

14   AND OUR POSITION, AND A POSITION THAT WILL PROVE OUT IN

15   DISCOVERY, IS THAT WHEN A CONSUMER SEES THAT TITLE AND IS ASKED

16   "WHAT DOES THAT MEAN TO YOU?", IT'S NOT JUST A TITLE, THEY SAY,

17   "OH, THAT MUST BE FROM DR. SEUSS."  THAT IS THE POINT OF OUR

18   ALLEGATION OF SECONDARY MEANING.

19        THE COURT:  THAT'S HELPFUL, COUNSEL.  THANK YOU.

20   YOU'RE CLAIMING TRADEMARK RIGHTS BOTH IN THE STYLIZED FONT USED

21   CONSISTENTLY ON THE FRONT AND BACK COVERS, SPINE, TITLE PAGE OF

22   DR. SEUSS BOOKS, AND THE STYLIZED FONT THAT IS USED

23   CONSISTENTLY THROUGHOUT ALL THE BOOKS.

24        MS. DUVDEVANI:  THAT'S CORRECT, YOUR HONOR.

25        THE COURT:  ARE YOU CLAIMING TRADEMARK RIGHTS ON ALL

1    FONTS ON ALL COVERS OF DR. SEUSS'S BOOKS OR DR. SEUSS

2    ENTERPRISES BOOKS, HOWEVER YOU WANT TO CALL IT, AND THE FONT

3    THROUGHOUT ALL THE BOOKS?  I MEAN, THIS SEEMS VERY BROAD TO THE

4    COURT.  HELP ME OUT HERE.

5         MS. DUVDEVANI:  SURE.  DR. SEUSS USES --

6         THE COURT:  HOW CAN ALL OF THIS BE PROTECTABLE I GUESS

7    IS WHERE I'M GOING.

8         MS. DUVDEVANI:  SURE.  THAT'S A VERY GOOD QUESTION,

9    YOUR HONOR.  DISTINCTIVE WRITING CAN BE PROTECTABLE.  WE SEE

10   THIS IN THE CASES THAT WE CITED ON PAGES 8 TO 9 IN OUR BRIEF.

11   WE SEE EXAMPLES OF THIS THROUGHOUT THE WORLD.  WHETHER IT'S THE

12   ESPN -- IF YOUR A SPORTS FAN -- RACING STRIPE THAT'S AN EXAMPLE

13   OF DISTINCTIVE LETTERING.  SO IF SOME OTHER COMPANY IS GOING TO

14   USE A VERY SIMILAR FONT, PEOPLE MIGHT ASSOCIATE IT WITH ESPN.

15        IT'S THE SAME THING HERE WITH DR. SEUSS.  HE HAS A VERY

16   DISTINCTIVE FONT, OR THE COMPANY DOES -- TED GEISEL HAS NOW

17   UNFORTUNATELY PASSED AWAY -- THAT HE HAS USED CONSISTENTLY

18   THROUGHOUT THE WORKS, AND ALSO HAS OBTAINED A SECONDARY

19   MEANING.  AND ANOTHER THING THAT WE'LL BE PROVING IN DISCOVERY

20   IS THAT WHEN A CONSUMER WOULD SEE THAT FONT IN CONNECTION WITH

21   WRITTEN WORKS, LIKE WHAT WE BELIEVE IS THE DEFENDANTS'

22   INFRINGING WORK HERE, IT IS GOING TO CREATE A FALSE ASSOCIATION

23   BETWEEN DR. SEUSS AND THOSE WORKS.

24        SO AGAIN IT'S A QUESTION OF SECONDARY MEANING.  THAT IS

25   ABSOLUTELY PROTECTABLE.  I DON'T KNOW OF ANY JURISPRUDENCE THAT

1    SAYS THAT DISTINCTIVE STYLIZED LETTERING IS NOT PROTECTABLE.

2    THE COURT:  WELL, LET ME ASK YOU THIS, COUNSEL, WHY IS

3    IT IMPORTANT FOR THE COURT TO SPECIFICALLY DETERMINE WHETHER

4    PLAINTIFF MAY CLAIM PROTECTION IN THE FONT?  CAN THE COURT

5    EVALUATE DEFENDANTS' USE OF "GO" AS A WHOLE, INCLUDING THE

6    WORDS OF THEIR TITLE AND THE LOOK OF IT, IN ANALYZING THE

7    NOMINATIVE FAIR USE DEFENSE?

8    MS. DUVDEVANI:  ONE OF THE THINGS THAT DR. SEUSS HAS

9    DONE HERE IS PLED A VARIETY OF TRADEMARKS THAT THEY BELIEVE ARE

10   BEING INFRINGED, SO WE DO BELIEVE IT'S IMPORTANT THAT AS THE

11   CASE PROGRESSES THERE IS A DETERMINATION AS TO WHETHER OR NOT

12   THAT USE CREATES A LIKELIHOOD OF CONFUSION.  I CERTAINLY WOULD

13   AGREE WITH -- I THINK WHAT THE COURT IS SAYING THAT AT THE END

14   OF THE DAY IT ALSO IS THE WORK AS A WHOLE, THE PRODUCT THAT

15   COULD BE AN INFRINGEMENT, THAT MIGHT BE MORE OF AN ISSUE OF

16   TRADE DRESS, FRANKLY, THAN IT IS OF INDIVIDUAL TRADEMARK

17   RIGHTS.

18   BUT TAKING A STEP BACK, YOUR HONOR, ONE OF THE REASONS,

19   AND THE PRIME REASON THAT DR. SEUSS MOVED HERE, NOT JUST ON

20   COPYRIGHT BUT ON TRADEMARK, IS THERE IS A REAL LEGITIMATE

21   CONCERN ON DR. SEUSS'S PART THAT A CONSUMER WOULD WALK INTO A

22   BOOKSTORE, SEE THE INFRINGING BOOK, *OH, THE PLACES YOU'LL*

23   *BOLDLY GO!* AND SAY, "WOW, DR. SEUSS COLLABORATED WITH STAR

24   TREK.  I TRUST DR. SEUSS FOR MY CHILDREN.  I'VE BEEN BUYING

25   THOSE WORKS FOR MANY YEARS.  HERE'S ANOTHER ONE THAT THEY DID.

1    I'M GOING TO BUY THIS FOR MY CHILD."  THAT IS THE -- YOU KNOW,

2    AT THE END OF THE DAY ONE OF THE THING THAT I, AS A BIT OF A

3    TRADEMARK NERD, LOVE ABOUT TRADEMARK LAW, AS OPPOSED TO

4    COPYRIGHT AND MAYBE PATENT LAW, IS THAT WHILE THOSE TWO

5    DISCIPLINES REALLY ARE MEANT PRIMARILY TO PROTECT THE INVENTOR

6    OR THE CREATOR OF WORKS AND INVENTIONS, TRADEMARK LAW IS ALL

7    ABOUT AVOIDING LIKELIHOOD OF CONSUMER CONFUSION IN THE

8    MARKETPLACE.

9         NOW, OF COURSE, THE TRADEMARK OWNER DOES GET SOME

10   BENEFIT OF PROTECTING ITS RIGHTS, BUT THE CONCERN HERE IS THAT

11   A CONSUMER WOULD THINK THAT A GOOD IS ORIGINATING OR SPONSORED

12   OR APPROVED BY DR. SEUSS WHEN IN FACT IT IS NOT, AND THAT IS

13   THE REASON THAT WE REALLY HAVE THE TRADEMARK CLAIM.  AND WE

14   BELIEVE THAT THERE'S VERY PLAUSIBLE FACTS AND ALLEGATIONS HERE

15   THAT REALLY WOULD SUPPORT THE IDEA THAT A CONSUMER WOULD

16   MISTAKENLY BELIEVE THAT THIS REALLY IS A DR. SEUSS-AUTHORIZED

17   WORK, DESPITE THE FACT THAT THE DEFENDANTS' NAMES ARE ON THE

18   COVER.  AS WE POINTED OUT IN OUR AMENDED PLEADING, THERE ARE A

19   PANOPLY OF GOODS AND BOOKS THAT DR. SEUSS OR HIS LICENSEES HAVE

20   PUT OUT THAT HAVE OTHER PEOPLE'S NAMES ON THE TITLE.

21        THE COURT:  HOW IS IT, AND COMMENT ON THIS, IF YOU

22   WILL, THAT THE GENERAL ILLUSTRATION STYLE CAN BE PROTECTABLE.

23        MS. DUVDEVANI:  SURE, YOUR HONOR.  I'LL ACKNOWLEDGE

24   THAT THAT'S A BIT MORE OF A -- I DON'T KNOW IF I WANT TO SAY AN

25   AMORPHOUS CLAIM OR A CLAIM THAT'S HARDER TO GRASP THAN PERHAPS

A SPECIFIC WORD, A SPECIFIC LOGO, OR EVEN DISTINCTIVE

LETTERING, BUT AT THE END OF THE DAY THERE'S NOTHING IN THE

JURISPRUDENCE THAT I'M AWARE OF IN TRADEMARK LAW THAT SAYS THAT

TRADEMARK LAW CAN'T BE DISTINCTIVE STYLES OF, YOU KNOW, ART OR

ANYTHING ELSE.  IT REALLY -- IT'S GOING TO BE OUR BURDEN TO

PROVE THAT CERTAINLY, BUT AT THE END OF THE DAY, AGAIN, IT'S A

HARDER ONE --

THE COURT:  IT'S A HARDER ONE THAN THE OTHERS.

MS. DUVDEVANI:  IT IS A HARDER ONE.  WE HAVE OUR WORK

CUT OUT FOR US, I WILL ACKNOWLEDGE THAT, BUT AT THE END OF THE

DAY WE CAN PROVE THAT ARTISTIC STYLE DOES HAVE A SECONDARY

MEANING IN THE MARKETPLACE.  THERE IS NO OTHER REASON THAT IT

CAN'T BE CONSIDERED A PROTECTABLE SOURCE INDICATOR, THE SAME

WAY A MUSICAL TONE CAN BE, THE SAME WAY A DRAWING CAN BE, THE

SAME WAY A LOGO CAN BE, AND THAT WILL -- I ACKNOWLEDGE THE

VALIDITY OF THOSE RIGHTS IS GOING TO BE OUR BURDEN TO PROVE,

BUT WE'RE PREPARED TO DO THAT.

THE COURT:  ARE YOU CLAIMING TRADEMARK RIGHTS IN EACH

CHARACTER, THE SPECIFIC CHARACTERS AND THE BACKGROUND OF *GO!*

MS. DUVDEVANI:  NOT NECESSARILY, YOUR HONOR, AGAIN I

BELIEVE THAT RELATES MORE TO A TRADE DRESS ISSUE AS OPPOSED TO

INDIVIDUAL TRADEMARK ISSUES.  THE DIFFERENCE BETWEEN TRADE

DRESS IS THE LOOK AND FEEL OF A PRODUCT VERSUS THE SPECIFIC

TRADEMARK THAT'S AFFIXED TO IT, SO I DO BELIEVE AT THE END OF

THE DAY, WHEN WE'RE WORKING TOWARDS OUR CASE, THE ILLUSTRATIVE

```
1    STYLE AND ALL OF THOSE FACTORS TOGETHER, THE ARTWORK THAT WAS

2    TAKEN VERBATIM HERE BY THE DEFENDANTS, WE WOULD PROVE THAT

3    THAT'S ALSO PROTECTABLE, THAT A CONSUMER AGAIN WOULD LOOK AT

4    THAT ARTWORK, ESPECIALLY AS A WHOLE IN CONNECTION WITH THE

5    BOOK, BUT EVEN PERHAPS SEPARATELY, AND BELIEVE THAT THAT

6    ARTWORK DOES ORIGINATE FROM DR. SEUSS.

7         THE COURT:  MY FINAL QUESTION AT THIS POINT, COUNSEL,

8    IS ASSUMING THAT THE COURT DOES NOT LOOK AT PLAINTIFF'S STYLE

9    OR BACKGROUND AS TRADEMARKS, AND I FOCUS ON THE TITLE AS IT

10   APPEARS ON THE COVER OF THE BOOK, ADDRESS THE SECOND FACTOR OF

11   NOMINATIVE FAIR USE, WHETHER DEFENDANTS USE MORE OF THE MARK

12   THAN WAS REASONABLY NECESSARY.

13        MS. DUVDEVANI:  I APOLOGIZE, YOUR HONOR, THE SECOND USE

14   WITH REGARD TO WHICH ASSERTED TRADEMARKS?

15        THE COURT:  WELL, LET ME STATE THIS AGAIN FOR YOU.

16   UNDER NOMINATIVE FAIR USE, ASSUMING THE COURT DOES NOT LOOK AT

17   PLAINTIFF'S STYLE OR BACKGROUND AS TRADEMARKS, AND I FOCUS ON

18   THE TITLE AS IT APPEARS ON THE COVER OF THE BOOK, WOULD YOU

19   COMMENT ON THE SECOND FACTOR OF THE NOMINATIVE FAIR USE,

20   WHETHER DEFENDANT USED MORE OF THE MARK THAN WAS REASONABLY

21   NECESSARY.

22        MS. DUVDEVANI:  SURE.  I WOULD, IF I MIGHT INDULGE --

23        THE COURT:  OF COURSE.

24        MS. DUVDEVANI:  I DO WANT TO TAKE A STEP BACK AND TALK

25   ABOUT NOMINATIVE FAIR USE AS A WHOLE AND WHY -- I KNOW YOUR
```

1    HONOR NOTED THAT IN YOUR TENTATIVE RULING YOU BELIEVE THAT IT'S

2    APPROPRIATE IN THIS CASE, BUT WHAT I'M ABOUT TO SAY I'M HOPING

3    COULD SWAY THAT, AND IT DOES IMPACT WHAT YOU JUST MENTIONED

4    ABOUT THE VERY POINT THAT YOU MENTIONED.

5         AS YOUR HONOR NOTED IN YOUR FIRST ORDER TOWARDS THE

6    END, WHEN THERE ARE CASES OF NOMINATIVE FAIR USE, *SLEEKCRAFT* IS

7    NO LONGER USED.  THERE IS THIS THREE-FACTOR TEST THAT THE

8    COURTS, INCLUDING THE *JARDIN* COURT OUT OF THE NINTH CIRCUIT,

9    AND MOST OTHER COURTS OUT OF THE NINTH CIRCUIT THAT TALK ABOUT

10   NOMINATIVE FAIR USE POINT OUT THAT THIS *SLEEKCRAFT* TEST IS NOT

11   APPROPRIATE FOR NOMINATIVE FAIR USE, AND THAT THE THREE FACTORS

12   THAT THE PARTIES BRIEFED IS THE APPROPRIATE ROUTE.  THE

13   QUESTION IS WHY, YOUR HONOR, WHY IS IT THAT WHEN YOU HAVE A

14   TRUE CASE OF NOMINATIVE FAIR USE THAT *SLEEKCRAFT* IS NO LONGER

15   APPROPRIATE?  WHEN YOU HAVE CASES OF NOMINATIVE FAIR USE, AND

16   WE SEE THEM EVERY SO OFTEN, THE QUINTESSENTIAL CASES ARE CASES

17   OF COMPARATIVE ADVERTISING, COKE IS BETTER THAN PEPSI.  OF

18   COURSE TO DO THAT, IF YOU BELIEVE COKE IS BETTER THAN PEPSI,

19   YOU NEED TO BE ABLE TO USE DEFENDANT'S IDENTICAL MARK, RIGHT?

20   IF YOU ARE SELLING PRODUCTS THAT WORK OR ARE COMPATIBLE WITH

21   OTHER PRODUCTS, LIKE THESE HEADPHONES I'M SELLING ON AMAZON ARE

22   COMPATIBLE WITH THE SAMSUNG GALAXY, YOU NEED TO BE ABLE TO AT

23   LEAST USE THE WORDMARK FOR SAMSUNG GALAXY TO GET YOUR POINT

24   ACROSS.

25         IF YOU'RE A CAR REPAIR WORK AND YOU NEED TO SAY THAT WE

1    HAVE GENUINE CHEVROLET PARTS, YOU NEED TO BE ABLE TO USE THE

2    WORD CHEVROLET IN ORDER TO SELL YOUR GOOD OR SERVICE.

3         IN ALL OF THOSE EXAMPLES WHAT WE REALLY SEE IS THAT YOU

4    NEED TO USE THE NOMINATIVE USE, THE ACTUAL IDENTICAL USE OF THE

5    TRADEMARK IN ORDER TO GET YOUR POINT ACROSS.  WE EVEN SEE THIS

6    IN THE SEMINAL CASE OF *THE NEW KIDS ON THE BLOCK* THAT DOES HAVE

7    THE COKE OR PEPSI EXAMPLE WHERE HOW IS A NEWSPAPER SUPPOSED TO

8    DO A CONTEST ABOUT NEW KIDS IF THEY CAN'T USE THE NAME OF THE

9    FAMOUS BOY BAND?

10        *PLAYBOY V. WELLES* HAS A VERY, VERY LUCID DISCUSSION AS

11   TO WHY *SLEEKCRAFT* IS NOT APPROPRIATE, AND WHAT THE COURT SAYS

12   THERE IS THAT IN CASES IN WHICH THE DEFENDANT RAISES A

13   NOMINATIVE USE DEFENSE, THE THREE-FACTOR TEST SHOULD BE IMPLIED

14   INSTEAD OF THE TEST FOR LIKELIHOOD OF CONFUSION SET FORTH IN

15   *SLEEKCRAFT*.  THE THREE-FACTOR TEST BETTER EVALUATES THE

16   LIKELIHOOD OF CONFUSION IN NOMINATIVE FAIR USE CASES, AND

17   HERE'S THE CRUX OF IT, YOUR HONOR, THE NINTH CIRCUIT GOES ON TO

18   SAY, "WHEN A DEFENDANT USES A TRADEMARK NOMINALLY, THE

19   TRADEMARK WILL BE IDENTICAL TO THE PLAINTIFF'S MARK, AT LEAST

20   IN TERMS OF THE WORDS IN QUESTION.  THUS, APPLICATION OF THE

21   *SLEEKCRAFT* TEST, WHICH FOCUSES ON THE SIMILARITY OF THE MARK

22   USED BY THE PLAINTIFF AND THE DEFENDANT, WOULD LEAD TO THE

23   INCORRECT CONCLUSION THAT VIRTUALLY ALL NOMINATIVE USES ARE

24   CONFUSING.

25        THE THREE-FACTOR TEST, WITH ITS REQUIREMENTS THAT THE

DEFENDANT USE MARKS ONLY WHEN NO DESCRIPTIVE SUBSTITUTE EXISTS, USES NO MORE OF A MARK THAN NECESSARY, AND DOES NOTHING TO SUGGEST SPONSORSHIP OR INDORSEMENT BY THE MARK HOLDER BETTER ADDRESSES CONCERNS REGARDING THE LIKELIHOOD OF CONFUSION IN NOMINATIVE FAIR USE."

HERE WE ARE TRYING TO FIT A ROUND PEG INTO A SQUARE HOLE BY EVEN SAYING THAT THIS IS A NOMINATIVE USE CASE BECAUSE THE TITLE IN QUESTION, WHICH IS THE QUESTION THAT YOU HAD ASKED, IS NOT THE IDENTICAL WORDMARK.  IT DOESN'T REFER BACK TO THE PLAINTIFF'S PRODUCT.  IT REFERS BACK TO THE DEFENDANTS' OWN PRODUCT, AND IT CHANGES THE MARK.  WE'VE ALLEGED IN OUR PLEADING THAT IT'S A CONFUSINGLY SIMILAR USE.  THEY'RE NOT USING, LIKE IN THE *TOHO* CASE, THE WORD GODZILLA FOR A BOOK ABOUT THE GODZILLA SERIES.  THEY'RE NOT DOING AN ANTHOLOGY OF *OH, THE PLACES YOU'LL GO!*  THEY CREATED A BRAND NEW WHAT WE BELIEVE KNOCKOFF WORK, *OH, THE PLACES YOU'LL BOLDLY GO!* THAT ACTUALLY CHANGES OUR MARK.

SO WE REALLY FEEL THAT THE WHOLE NOMINATIVE FAIR USE TEST IS ACTUALLY INAPPROPRIATE IN THIS CASE AND IS MUCH MORE AKIN -- AND IF I CAN REALLY THINK OF A SINGLE CASE THAT THIS IS SO ON POINT WITH, IT IS THE *CAT NOT IN THE HAT*, AND NOT JUST BECAUSE THAT'S ALSO A DR. SEUSS CASE.  THERE THOSE PARTIES DIDN'T EVEN RAISE NOMINATIVE FAIR USE, EVEN THOUGH NOMINATIVE FAIR USE EXISTED IN 1977, PROBABLY FOR THE SAME REASON THAT THEY WEREN'T USING *THE CAT IN THE HAT* FOR THEIR BOOK, THEY

1    CHANGED IT TO USE *THE CAT NOT IN THE HAT*, AND WHAT DID THE

2    COURT SAY?  THE COURT SAID THAT THAT WAS ESSENTIALLY A

3    NON-COPYRIGHT, IT WAS NOT A COPYRIGHT FAIR USE, AND AT THE END

4    OF THE DAY THEY JUST EVALUATED THE NORMAL LIKELIHOOD OF

5    CONFUSION FACTORS FOR THAT WORK.

6         I WOULD SUBMIT -- NO OFFENSE TO THE PREVIOUS DR. SEUSS

7    CASE -- THIS IS AN EVEN I'LL SAY EASIER CASE TO PROVE UP

8    TRADEMARK INFRINGEMENT BECAUSE THERE I THINK IT IS ARGUABLE

9    THAT IT IS UNLIKELY THAT DR. SEUSS WOULD EVER HAVE PUT OUT A

10   BOOK THAT WAS ESSENTIALLY A MASH-UP, SO TO SPEAK, OF THE O.J.

11   SIMPSON TRIAL AND *THE CAT IN THE HAT*.  HERE, AS WE AT LEAST

12   HAVE SEEN A BIT FROM OUR PLEADINGS, IT IS HIGHLY LIKELY THAT

13   DR. SEUSS WOULD COLLABORATE WITH ANOTHER RIGHTS HOLDER TO

14   CREATE A BOOK THAT'S ESSENTIALLY A DERIVATIVE OF ONE OF THEIR

15   OTHER FAMOUS WORKS.

16        SO TO GO BACK TO YOUR QUESTION, YOUR HONOR, WE DO

17   BELIEVE THAT THE DEFENDANTS -- IF WE'RE GOING TO PUT THIS

18   SQUARE PEG IN A ROUND HOLE OF NOMINATIVE FAIR USE, WE DO THINK

19   THAT DEFENDANTS USED MORE THAN WAS REASONABLY NECESSARY TO

20   IDENTIFY OUR WORKS.  IF THEY WANTED TO -- REALLY, IF WE'RE

21   GOING TO PRESUPPOSE THAT THIS IDEA OF CREATING A WORK THAT'S

22   NOT A PARODY, THAT'S NOT A CRITIQUE, THAT'S NOT A SATIRE IS

23   TRANSFORMATIVE IN THE SENSE OF COPYRIGHT FAIR USE, AS OPPOSED

24   TO JUST IN THE SENSE OF HOW THE COPYRIGHT ACT USES THE WORD

25   TRANSFORM IN CONNECTION WITH DERIVATIVE WORK, AND THAT'S

1    ACTUALLY ALLOWED, WE WOULD STILL SUBMIT THAT THERE WERE

2    CLEVERER AND MORE CREATIVE WAYS FOR THE DEFENDANT TO DO THAT

3    WITHOUT TAKING SOMETHING THAT WAS SO CONFUSINGLY SIMILAR TO OUR

4    TITLE, AND THEN WHEN YOU ADD THE DISTINCTIVE FONT, AND THEN

5    WHEN YOU ADD THE SLAVISH COPYING, IT IS ALL THE MORE LIKELY

6    THAT A CONSUMER IS GOING TO BE CONFUSED BY THE PRODUCT.

7         THE COURT:  THANK YOU.  THOSE ARE THE ONLY QUESTIONS I

8    HAD FOR YOU RIGHT NOW.  I HAVE SOME QUESTIONS FOR THE DEFENSE,

9    AND THEN BOTH OF YOU CAN HAVE AN OPPORTUNITY TO TELL ME

10   ANYTHING YOU WOULD LIKE.

11        WHO WOULD LIKE TO COME TO THE PODIUM FOR THE DEFENSE?

12        MR. BOOTH:  I WOULD, YOUR HONOR.

13        MS. DUVDEVANI:  THANK YOU, YOUR HONOR.

14        THE COURT:  THANK YOU VERY MUCH, COUNSEL.

15        SOME OF THE QUESTIONS ARE THE SAME, SOME ARE DIFFERENT.

16   GOING BACK TO THE AMENDMENTS TO THE COMPLAINT THAT WERE MADE,

17   DO YOU WANT TO COMMENT ON ANY OF THAT?  I'VE INDICATED THAT I

18   DIDN'T GRANT LEAVE TO AMEND A LOT OF IT.  THE PLAINTIFFS HAVE

19   CONCEDED THEY TOOK A HOLISTIC APPROACH, THEY'VE DONE WHAT

20   THEY'VE DONE TO THE COMPLAINT.  DO YOU WANT TO COMMENT ON THAT?

21        MR. BOOTH:  OUR COMMENT ON THAT WOULD SIMPLY BE THAT

22   THE LIBERTIES THEY TOOK WERE FAR BEYOND WHAT THE COURT HAD

23   ALLOWED, AND THERE'S NO CLEAR BASIS THAT THEY EVEN OFFERED AS

24   TO WHY THE COURT SHOULD CONSIDER --

25        THE COURT:  WHAT'S THE PREJUDICE AT THIS POINT?

1       THERE'S ALSO THAT ARGUMENT.  I MEAN, AT THIS POINT WE'RE EARLY

2       ON, THEY'VE AMENDED THE WAY THEY'VE AMENDED, TAKING A BROAD

3       APPROACH.  IS THERE ANY PREJUDICE TO YOU?  WE'RE SO EARLY ON IN

4       THIS CASE, COUNSEL.

5               MR. BOOTH:  IF THE COURT WERE TO NOT CONSIDER THOSE

6       AMENDMENTS AND WERE TO LOOK SIMPLY AT THE ORIGINAL COMPLAINT AS

7       TO THE COPYRIGHT ISSUES, THEN, YES, I BELIEVE THERE IS

8       PREJUDICE BECAUSE ALL THAT THEY ALLEGED IN THE ORIGINAL

9       COMPLAINT -- AS WE POINT OUT IN OUR MOTION TO DISMISS, THE

10      AMENDED COMPLAINT, ALL THAT THEY CLAIMED FOR MARKET HARM WAS

11      HARM BECAUSE OF EFFECTIVELY A LOSS OF SUBSTITUTION.  THEY CLAIM

12      THAT THEIR RIGHTS -- THAT THIS NEW BOOK WAS USURPING THEIR

13      LICENSING RIGHTS, MEANING, EFFECTIVELY, THAT IT WASN'T BEING

14      LICENSED BY DR. SEUSS.  IF THAT'S THE CASE, IF THAT'S THE ONLY

15      HARM, THAT'S NOT A REASONABLE HARM TO CONSIDER BECAUSE ONCE

16      YOU'VE DECIDED THAT THIS IS A TRANSFORMATIVE WORK UNDER THE

17      FAIR USE PRINCIPLES, UNDER THE FAIR USE DOCTRINE YOU DON'T HAVE

18      A SUBSTITUTION ISSUE, AND PLAINTIFFS SIMPLY CAN'T SAY, "WE

19      COULD HAVE GOTTEN A LICENSE FOR THAT.  WE COULD HAVE MADE YOU

20      PAY US SOMETHING FOR THE RIGHT TO MAKE A MASH-UP."  THAT'S JUST

21      NOT HOW IT WORKS.  WHEN YOU'VE GOT TRANSFORMATIVE WORK, THERE'S

22      NO WAY TO GET THAT LICENSE.

23              THIS IS A FAIR USE WORK WITHIN A FAIR USE MARKET SO

24      IT'S ABSOLUTELY PREJUDICIAL.  IT REALLY HURTS THE PLAINTIFF'S

25      CASE ONCE YOU HAVE NARROWED IT SO MUCH TO THE POINT THAT THE

1    ONLY THINGS THAT ARE ISSUE ARE DERIVATIVE WORKS, AND THEY

2    DIDN'T CLAIM WHAT IS BEING USURPED WAS THEIR RIGHT -- EVEN IN

3    THE ORIGINAL COMPLAINT THEY DID NOT ALLEGE WHAT WAS BEING

4    HARMED WAS THE RIGHT TO MAKE DERIVATIVE WORKS.  THEY CLAIMED

5    WHAT WAS BEING HARMED WAS THEIR RIGHT TO LICENSE THIS

6    PARTICULAR WORK, AND THAT'S NOT A REASONABLE, COGNIZABLE

7    CONSIDERATION, SO THERE WOULD BE PREJUDICE TO THE DEFENDANTS,

8    YOUR HONOR.

9         THE COURT:  IF THE COURT DOES NOT STRIKE COUNT 2 IN THE

10   FIRST AMENDED COMPLAINT, DOES YOUR DEFENSE DIFFER AT ALL

11   BETWEEN THE UNREGISTERED MARKS AND THE E-BOOK MARK?  YOU'RE

12   ARGUING THAT THE NOMINATIVE FAIR USE DEFENSE APPLIES TO

13   REGISTERED AND UNREGISTERED MARKS BUT DO NOT ADDRESS THE E-BOOK

14   MARK SPECIFICALLY, AND WHY SHOULD THE COURT DISMISS COUNT 2

15   BASED ON THE NOMINATIVE FAIR USE DEFENSE?

16        MR. BOOTH:  OTHER THAN THE FACT THAT IT WAS NOT --

17   THERE WAS NO LEAVE GRANTED TO ADD THE CLAIM OR EVEN REQUEST IT,

18   THE -- THE ANALYSIS IS EFFECTIVELY THE SAME.  WHEN YOU HAVE A

19   NOMINATIVE FAIR USE ANALYSIS, IT'S APPLIED IN EFFECTIVELY THE

20   SAME WAY ACROSS THE BOARD, REGISTERED MARKS OR UNREGISTERED

21   MARKS.  THE SAME WOULD BE TRUE FOR THE *ROGERS* DEFENSE.  AND SO

22   THERE THE ISSUE WOULD BE -- IF YOU'RE NOT GOING TO DISMISS THE

23   CLAIMS RELATED TO THE UNREGISTERED MARKS THEN THE REGISTERED

24   MARK WOULD STAY IN AS WELL, IF YOU CONSIDERED THERE WAS NO

25   PREJUDICE TO THE DEFENDANTS.

1        THE COURT:  OKAY.  IN YOUR REPLY YOU ARGUE THE FONTS

2   VARY WIDELY FROM COVER TO COVER.  ARE DEFENDANTS CONTESTING

3   PROTECTION OF THE LOOK OF THE TITLE *GO!* ON THE BOOK COVER OR

4   THE PROTECTION OF THE FONTS OF ALL DR. SEUSS BOOKS?  AND DO YOU

5   CONTEST THAT *GO!* AS IT APPEARS ON THE COVER OF THE BOOK IS

6   PROTECTABLE?

7        MR. BOOTH:  WELL, THERE ARE TWO ASPECTS TO WHAT THEY'RE

8   CLAIMING PROTECTION IN IN THE WAY THE TITLE APPEARS.  ONE IS

9   THE TITLE ITSELF, REGARDLESS OF THE FONT STYLE, AND THE OTHER

10  IS THE TITLE AS IT APPEARS IN ITS DISTINCTIVE LETTERING, OR SO

11  THEY CLAIM.

12        THE COURT:  I SAY THE LOOK OF THE TITLE.

13        MR. BOOTH:  RIGHT, THE LOOK OF THE TITLE.  AND SO THE

14  LOOK OF THE TITLE IS VARIABLE BECAUSE -- THEY'RE CLAIMING THAT

15  IT'S A CONSISTENT FONT, BUT IT'S NOT IN A CONSISTENT FONT, AND

16  SO THAT IS SOMETHING THEY CAN'T REACH.  YES, THERE ARE CASES

17  THAT SAY THAT WHEN YOU'VE GOT A SET-IN-STONE STYLE FOR A FONT

18  AND YOU ILLUSTRATE A SPECIFIC SET OF WORDS OR A SPECIFIC

19  PHRASING IN THAT WAY, THEN, SURE, THAT'S PROTECTABLE, THAT CAN

20  BE PROTECTED, AND THEN YOU'VE GOT A TRADEMARK CLAIM

21  POTENTIALLY.

22        BUT HERE WE'VE GOT LETTERING THAT VARIES WIDELY, BOTH

23  WITHIN THE MARK THAT THEY CLAIM AND ACROSS THE BOARD THROUGH

24  ALL OF THEIR TITLES.  SO AS SPELLED OUT ON THE TITLE IN

25  PARTICULAR, THERE'S VARIATION EVEN WITHIN THAT TITLE, SO WE'RE

1    NOT LOOKING AT A DISTINCTIVE FONT.  WE'RE NOT LOOKING AT THE

2    SORT OF THING THAT YOU CAN ACTUALLY PROTECT JUST ON THE BASIS

3    OF THE LETTERING IS THE SAME.

4          THE COURT:  OKAY.  SO YOU DON'T THINK IT'S PROTECTABLE

5    THEN.

6          MR. BOOTH:  IF IT WAS --

7          THE COURT:  TELL ME WHAT PART OF IT DO YOU THINK IS

8    PROTECTABLE.

9          MR. BOOTH:  WHAT PART OF THE LOOK OF THE --

10          THE COURT:  WELL, THE FONTS, THE PROTECTION OF -- THE

11    LOOK -- THE TITLE IS PROTECTABLE, THE LOOK OF THE TITLE, THE

12    BOOK COVER, THE FONTS, TELL ME WHAT, IF ANY, OF ALL OF THESE

13    THINGS YOU THINK IS PROTECTABLE, SIR, IF ANY OF IT.

14          MR. BOOTH:  A FAIR QUESTION.  OUR POSITION IS THAT A

15    TITLE OF A BOOK IS NOT INDEPENDENTLY PROTECTABLE FOR A SINGLE

16    BOOK BECAUSE A TITLE DOES NOT DESIGNATE THE SOURCE OF THE BOOK.

17    A TITLE DESIGNATES THE BOOK ITSELF, AND SO PRODUCT-IDENTIFYING

18    INFORMATION ISN'T A TRADEMARK.  SOURCE-IDENTIFYING INFORMATION

19    IS.  A TITLE IS NOT SOURCE IDENTIFYING.  IT'S PRODUCT

20    IDENTIFYING.  IT TELLS YOU, "WHAT BOOK AM I HOLDING?"

21          THE COURT:  BUT IT COULD BE SOURCE IDENTIFYING,

22    COULDN'T IT?

23          MR. BOOTH:  THE FUNCTION OF A TITLE -- OUR POSITION IS

24    THAT THE FUNCTION OF A TITLE IS SIMPLY TO TELL YOU WHAT THE

25    BOOK IS.

1          THE COURT:  NO, I UNDERSTAND THAT, BUT I'M JUST SAYING

2     IT COULD TELL YOU THE SOURCE, TOO, COULDN'T IT?

3          MR. BOOTH:  THERE ARE TITLES THAT WILL TELL YOU WHAT

4     THE SOURCE IS, AND THIS IS A TITLE THAT TELLS YOU WHAT THE BOOK

5     IS.

6          THE COURT:  OKAY.  THAT'S YOUR POSITION.  WHY IS IT

7     IMPORTANT FOR THE COURT TO SPECIFICALLY DETERMINE WHETHER

8     PLAINTIFF MAY CLAIM PROTECTION IN THE FONT?  COULD THE COURT

9     EVALUATE YOUR USE OF *GO!* AS A WHOLE, AND I ASKED THIS OF

10    OPPOSING COUNSEL ALSO, LOOKING AT THE WORDS OF THE TITLE AND

11    THE LOOK OF IT IN ANALYZING NOMINATIVE FAIR USE?  COULD I LOOK

12    AT IT AS A WHOLE WITHOUT GETTING INTO THE DETAILS, IF YOU WILL?

13    WHAT'S YOUR VIEW OF THAT?

14         MR. BOOTH:  I SUPPOSE THE QUESTION THERE, AS I

15    UNDERSTAND IT, IS --

16         THE COURT:  I MEAN, LOOK AT IT AS A WHOLE AS OPPOSED TO

17    THE FONT AND THE SPECIFICS THAT PLAINTIFF'S ASKING ME TO DO.

18         MR. BOOTH:  I THINK THEIR CLAIM FAILS EITHER WAY, IF

19    YOU LOOK ON THE MICRO LEVEL, WHERE YOU'RE BREAKING IT DOWN

20    TITLE, ILLUSTRATION, FONT STYLE, EACH OF THOSE THERE ARE

21    PROBLEMS WITH THE WAY THAT THEY'VE PLEADED THE CLAIM IN THE

22    COMPLAINT.  THAT'S NOT SOMETHING THAT THEY CAN PROTECT FOR EACH

23    OF THOSE.  THE TITLES WE'VE ALREADY TALKED ABOUT.

24         THE LOOK OF A FONT COULD BE PROTECTABLE, BUT IN THIS

25    CASE ISN'T BECAUSE WHAT THEY'RE CLAIMING PROTECTION IN IS A

1        DISTINCTIVE LETTERING THAT'S USED ACROSS THE BOARD, AND THAT'S

2        SOMETHING THAT THEY SIMPLY DON'T HAVE WHEN YOU ACTUALLY LOOK AT

3        THE COVERS OF THEIR BOOKS IN THE COMPLAINT.

4            AND AGAIN, THEN YOU'VE GOT THE ILLUSTRATION STYLE WHICH

5        IS, OUR POSITION, FAR TOO VARIABLE ACROSS THE BOARD.  THAT'S

6        NOT THE SORT OF FIXED DISTINCTIVE MARK THAT CAN BE PROTECTED.

7        SECTION 1127 OF THE TRADEMARK ACT TELLS YOU THAT A MARK IS A

8        NAME, A SYMBOL.  THESE ARE CONCRETE THINGS.  AN ILLUSTRATION

9        STYLE IS FAR TOO VARIED.  YOU SIMPLY CAN'T HAVE THAT SORT OF

10       PHANTOM MARK PROTECTED UNDER THE TRADEMARK LAWS.

11           THE COURT:  OKAY.

12           MR. BOOTH:  SO THAT'S AS TO THE MICRO LEVEL.  AS TO THE

13       MACRO LEVEL, COULD YOU ANALYZE THE ENTIRE USE AND SAY, "WELL,

14       IT'S NOMINATIVE."  AND OUR POSITION IS, YES, YOU CAN LOOK AT IT

15       THAT WAY, AND I BELIEVE THAT'S REASONABLE.  THE OVERALL

16       QUESTION THEN WOULD BE WHAT MARKS ARE THEY CLAIMING AND ARE

17       THOSE MARKS BEING USED IN A NOMINATIVE FAIR WAY?  AND OUR

18       POSITION IS YES, THEY ARE.

19           THEY'RE CLAIMING TRADEMARKS IN ALMOST THE ENTIRE BOOK,

20       IF NOT THE ENTIRE BOOK.  THEY'RE CLAIMING THE WAY EVERYTHING

21       LOOKS, AND THE WAY EVERYTHING'S LETTERED, AND THE TITLE ITSELF.

22       THERE'S NOT MUCH LEFT.

23           THE COURT:  AND THE STYLE.

24           MR. BOOTH:  RIGHT.

25           THE COURT:  THE ILLUSTRATION STYLE, WHICH COUNSEL SAYS

1    THAT'S THE HARDEST OF ALL OF THEM IN PLAINTIFF'S POSITION, BUT

2    WE'RE EARLY ON IN THIS LITIGATION, AND I'M SURE WE'RE ALL GOING

3    TO HEAR MORE ABOUT THAT, DEPENDING ON HOW THE COURT RULES.

4         MR. BOOTH:  I GUESS THE POINT WOULD THEN BE IF YOU THEN

5    TAKE THE NOMINATIVE FAIR USE ANALYSIS, AND THE QUESTION IS, IS

6    IT REASONABLY NECESSARY TO USE THOSE ALLEGED MARKS, WELL, IF

7    THE ENTIRE BOOK IS THE ALLEGED MARKS, HOW WOULD IT BE EVEN

8    CONCEIVABLE TO DO THE SORT OF MASH-UP THAT'S BEING DONE WITHOUT

9    MAKING SOME USE OF THOSE MARKS.  YOU SIMPLY HAVE TO USE SOME OF

10   THOSE MARKS TO REFER TO THE PRODUCT ITSELF AND TO MAKE THE

11   POINTS THAT ARE BEING MADE IN THE NEW BOOK.  SO THERE'S JUST NO

12   WAY TO GET AROUND THAT IF THOSE ARE THE MARKS THEN NOMINATIVE

13   FAIR USE STARTS TO LOOK GOOD.  YOU SEEM TO HAVE THAT FIRST

14   FACTOR ADDRESSED.

15        THE COURT:  COUNSEL, LET ME ASK YOU WHAT I ASKED

16   OPPOSING COUNSEL.  LET'S ASSUME FOR A MOMENT THAT THE COURT

17   DOESN'T LOOK AT PLAINTIFF'S STYLE OR BACKGROUNDS AS TRADEMARKS,

18   AND THAT THE COURT FOCUSES ON THE TITLE AS IT APPEARS ON THE

19   COVER OF THE BOOK, TALK ABOUT THE SECOND FACTOR IN NOMINATIVE

20   FAIR USE, WHETHER YOU USED MORE OF THE MARK THAN WAS REASONABLY

21   NECESSARY.

22        MR. BOOTH:  THE TITLE OF THE BOOK IS *OH, THE PLACES*

23   *YOU'LL BOLDLY GO!*  THE TITLE OF THE PLAINTIFF'S BOOK IS *OH, THE*

24   *PLACES YOU'LL GO!*  THE USE IS REASONABLY NECESSARY BECAUSE

25   THERE'S A JOKE THERE.  THE JOKE IS A SORT OF PLAY ON WORDS ON

1    *OH, THE PLACES YOU'LL GO!* AND TO *BOLDLY GO* FROM THE STAR TREK

2    SERIES.  WHAT THEY WANT TO DO IS RESTRICT THE USE OF THEIR

3    MARKS IN SUCH A WAY SO THAT THAT JOKE SIMPLY COULDN'T WORK.

4    YOU COULDN'T MAKE THAT JOKE.  YOU COULDN'T COMBINE THESE TWO

5    DISCRETE SOURCES AND MAKE THAT PLAY ON WORDS, A PLAY ON WORDS

6    THAT INDICATES TO CONSUMERS PRECISELY WHAT SORT OF BOOK YOU'VE

7    GOT.  YOU DON'T HAVE YOUR STANDARD DR. SEUSS BOOK.  YOU'VE GOT

8    A BOOK THAT IS MAKING AN UNUSUAL COMBINATION OF TWO DIFFERENT

9    SOURCES.  SO IT'S SPECIFICALLY NECESSARY TO ALERT THE CONSUMERS

10   TO WHAT KIND OF BOOK YOU'RE LOOKING AT.

11            THE COURT:  DO YOU THINK A CONSUMER IS GOING TO KNOW

12   WHAT THEY'RE LOOKING AT WHEN THEY SEE THE BOOK, IF YOU LOOKED

13   AT THE TWO COVERS?

14            MR. BOOTH:  YES.

15            THE COURT:  YOU THINK SO?  DO YOU HAVE LITTLE CHILDREN

16   WHO READ DR. SEUSS?

17            MR. BOOTH:  I HAVE THREE, NOT SO LITTLE ANYMORE.  BUT,

18   YES, I THINK THAT THEY WOULD BE ABLE TO SEE THERE'S A

19   DIFFERENCE BETWEEN THESE TWO BOOKS, SOMETHING'S DIFFERENT HERE.

20   WE DON'T HAVE THE BOY FROM *OH, THE PLACES YOU'LL GO!* STANDING

21   ON A PEAK, WE HAVE SOMEONE IN A STAR TREK UNIFORM STANDING ON

22   THE U.S.S. ENTERPRISE, SO THERE'S A DIFFERENCE THAT'S

23   IMMEDIATELY APPARENT, AND IT'S SUCH AN UNUSUAL DIFFERENCE THAT

24   PEOPLE WHO KNOW WHAT THE U.S.S. ENTERPRISE IS WILL BE

25   IMMEDIATELY ALERTED.  AND SO THE TARGET MARKET HERE FOR THIS

1    BOOK IS THE PEOPLE WHO ARE FAMILIAR WITH BOTH WORKS, AND THOSE

2    PEOPLE WILL RECOGNIZE THIS IS DIFFERENT.

3         THE COURT:  THANK YOU, COUNSEL, THOSE ARE THE ONLY

4    QUESTIONS I HAVE FOR YOU THIS MORNING.  AS I PROMISED, I'LL

5    GIVE EACH SIDE AN OPPORTUNITY TO TELL ME ANYTHING YOU'D LIKE TO

6    TELL ME THAT MAYBE WE HAVEN'T COVERED, EITHER IN THE QUESTIONS

7    OR OTHERWISE.

8         YOU'RE AT THE PODIUM, WOULD YOU JUST LIKE TO JUST

9    CONTINUE AND TELL ME ANYTHING YOU WOULD LIKE TO TELL ME, AND

10   THEN I'LL GO BACK --

11        MR. BOOTH:  SURE.  I THINK WHAT I WOULD LIKE TO FOCUS

12   ON IS THE THIRD FACTOR OF FAIR USE, THE QUESTION OF MARKET

13   HARM, BECAUSE THE NINTH CIRCUIT'S BEEN VERY CLEAR THAT THAT'S

14   SOMETHING THAT ONE CAN'T PRESUME WHEN YOU HAVE A TRANSFORMATIVE

15   WORK.

16        SO IN THIS CASE WE'RE IN AN UNUSUAL POSITION ON A

17   MOTION TO DISMISS BECAUSE WE ALREADY HAVE SEVERAL CRITICAL

18   DECISIONS HAVING BEEN MADE.  WE'VE ALREADY GOT A DECISION THAT

19   IT'S REASONABLY APPROPRIATE TO CONSIDER FAIR USE AS LONG AS --

20   WHAT WAS SAID IN YOUR INITIAL ORDER, AS LONG AS YOU TAKE AS

21   TRUE THE ALLEGATION OF MARKET HARM.

22        THE PROBLEM IS IN THIS CASE, IN THE AMENDED COMPLAINT,

23   YOU'VE GOT VOLUMINOUS ALLEGATIONS OF DIFFERENT MARKETS THAT DR.

24   SEUSS ENTERPRISES IS INVOLVED IN.  THEY'RE INVOLVED IN A HOST

25   OF DERIVATIVE MARKETS.  THERE'S A GLUT OF DERIVATIVE WORKS THAT

1    HAVE COME OUT, NONE OF WHICH ARE THE TYPE OF USE THAT'S AT

2    ISSUE, NONE OF WHICH ARE MASH-UPS.  WE HAVE A SPECIFIC TYPE OF

3    TRANSFORMATIVE USE, AND THERE'S NO ALLEGATION AND NO ARGUMENT

4    FROM THE PLAINTIFF THAT THIS IS A MARKET THAT THEY'RE IN OR

5    COULD REASONABLY ENTER.  IN FACT, OUR POSITION IS THAT A FAIR

6    USE MARKET IS ONE THAT THEY SIMPLY CAN'T ENTER.

7        FIRST OFF, ON THE FACTS, THEY HAVEN'T ENTERED, AND

8    THESE ARE BOOKS THAT HAVE BEEN AROUND FOR DECADES.  AND IF

9    THERE WERE A MARKET FOR IT, IT'S SURPRISING, TO SAY THE LEAST,

10   THAT IT'S NOT MENTIONED IN THE COMPLAINT OR MENTIONED IN EITHER

11   RESPONSE TO OUR MOTIONS TO DISMISS.  UNDER THOSE CIRCUMSTANCES,

12   IS IT PLAUSIBLE UNDER *TWOMBLY* THAT THERE IS A MARKET THAT THEY

13   COULD BE COMPETING IN WHERE THIS COULD BE HARMING THEM?  WHAT

14   YOU LOOK AT FOR MARKET HARM ARE REASONABLE OR LIKELY TO BE

15   DEVELOPED MARKETS OR MARKETS THAT ALREADY EXIST, AND WE DON'T

16   HAVE ANY REASON TO BELIEVE THAT THERE IS SUCH A MARKET THAT

17   ALREADY EXISTS THAT THEY'RE ALREADY IN.

18       SO THE QUESTION IS WHAT'S REASONABLE?  WELL, YOU LOOK

19   AT THE TRADITIONAL MARKETS AND THOSE FOR BOOKS WOULD BE SEQUELS

20   OR PREQUELS OR MOTION PICTURE ADAPTATIONS, TV SHOWS, THEATRICAL

21   ADAPTATIONS, FOREIGN LANGUAGE ADAPTATIONS.  THOSE ARE MARKETS

22   THAT DR. SEUSS HAS OCCUPIED REPEATEDLY, AND THEY HAVEN'T,

23   HOWEVER, GOTTEN INTO A MARKET FOR WORKS THAT MASH UP THEIR

24   CREATIVE ENTERPRISE WITH PREEXISTING CHARACTERS FROM ANOTHER

25   CREATIVE ENTERPRISE.  THAT'S NOT SOMETHING THAT THEY DO, AND

1        IT'S NOT SOMETHING THAT THERE'S ANY REASON TO BELIEVE THAT THEY

2    REASONABLY COULD DO.

3            WHEN PEOPLE LOOK FOR MASH-UPS, THEY'RE LOOKING FOR NEW

4    WORKS THAT AREN'T FETTERED BY THE ORIGINAL COPYRIGHT OWNERS.

5    THEY'RE LOOKING FOR THE MOST CREATIVE WORK THAT THEY CAN FIND

6    AND THAT'S DONE BY SOMEBODY WHO MAKES HAY WITH WHAT THEY'VE

7    GOT.  THAT'S DONE BY SOMEONE WHO FIGURES OUT HERE IS A NOVEL

8    COMBINATION.  HERE'S SOMETHING THAT RESONATES BETWEEN THESE TWO

9    WORKS, A RESONATION THAT WOULDN'T BE FOUND, THAT WOULDN'T BE

10   CREATED BY SOMEONE LIKE DR. SEUSS ENTERPRISES WHO MAKES CLEAR

11   IN THEIR COMPLAINT THAT THEY'RE INTERESTED IN PROTECTING THE

12   INTEGRITY OF THEIR ORIGINAL WORKS.  THEY HAVE NO INTEREST IN

13   USING THEIR ORIGINAL WORKS IN A WAY THAT TRANSGRESSES THOSE

14   LINES.

15           THE COURT:  IS THERE ANYTHING ELSE YOU WANT TO TELL ME?

16   THAT'S HELPFUL.  I APPRECIATE THE COMMENTS.

17           MR. BOOTH:  THANK YOU, YOUR HONOR.  UNLESS THERE'S MORE

18   THAT WE HEAR FROM THE PLAINTIFFS --

19           THE COURT:  I'LL CERTAINLY GIVE YOU AN OPPORTUNITY TO

20   RESPOND.

21           MR. BOOTH:  THANK YOU.

22           THE COURT:  ANYTHING YOU WOULD LIKE TO TELL ME, AND

23   HOPEFULLY UNINTERRUPTED BY QUESTIONS.  GO AHEAD, COUNSEL.

24           MS. DUVDEVANI:  THANK YOU, YOUR HONOR.  I SHOULD START

25   WITH THE FOURTH FAIR USE FACTOR SINCE THAT'S WHERE WE JUST LEFT

1    OFF, AND I'LL RESPECTFULLY SUBMIT THAT THE DEFENDANT IS WRONG

2    ON THE FACT AND WRONG ON THE LAW.  WRONG ON THE FACT, WE'VE

3    ALREADY PLED AT LEAST ONE EXAMPLE IN OUR PLEADING THAT JIM

4    HENSON AND DR. SEUSS ENTERPRISES COMBINED *THE WUBBULOUS WORLD*

5    *OF DR. SEUSS.*  THEY'VE ALREADY COLLABORATED WITH OTHER RIGHTS

6    HOLDERS, SO RIGHT THERE THAT'S AN EXAMPLE OF A DERIVATIVE WORK

7    THAT DR. SEUSS HAS CREATED THAT DOES --

8         AGAIN, I'LL POINT OUT THAT I KNOW PERHAPS YOUR HONOR

9    DOESN'T WANT TO HEAR ARGUMENT ABOUT THE FIRST FAIR USE FACTOR,

10   BUT WE WILL SUBMIT AS WE GO FORWARD INTO THE CASE, AND

11   POTENTIALLY ON SUMMARY JUDGMENT, THAT EVEN IF THE COURT

12   CONSIDERS THE DEFENDANTS' WORKS TRANSFORMATIVE, IT REALLY IS

13   TRANSFORMATIVE IN THE SENSE OF THE DERIVATIVE WORK, NOT

14   TRANSFORMATIVE IN THE SENSE OF FAIR USE.  I COULD WAX ON ABOUT

15   THAT IF YOU WANT, YOUR HONOR, OR WE CAN LEAVE THAT TO ANOTHER

16   DAY, IF I'M NOT GOING TO CONVINCE YOU AT THE PLEADING STAGE

17   THAT THAT'S THE CASE.

18        REGARDING THE LAW ON THE FOURTH FAIR USE FACTOR, THE

19   LAW IS VERY CLEAR ON THIS.  IT'S WHETHER OR NOT IT AFFECTS THE

20   MARKET FOR THE ORIGINAL AND WHETHER OR NOT IT WOULD AFFECT THE

21   MARKET FOR THE DERIVATIVE WORKS.  LET ME JUST SPEND ONE MOMENT

22   ON THE ORIGINAL BECAUSE IT SEEMS TO HAVE BEEN SOMETHING THAT

23   ALL OF US HERE TODAY HAVE SOMEWHAT GLOSSED OVER A BIT IN THE

24   FIRST ROUND, AND I'LL ACKNOWLEDGE THAT EVEN DR. SEUSS DID A

25   BIT, SO LET ME ADDRESS IT NOW.

1          YOU MENTIONED CHILDREN THAT READ DR. SEUSS.  I WILL

2     HAVE ONE SOON, I HOPE, BUT I DO HAVE A 6-YEAR OLD NIECE.  MY

3     SISTER AND I WERE BOTH RAISED BY STAR TREK FANS.  MY SISTER IS

4     A STAR TREK FAN.  MY NIECE AS A RESULT IS ALSO A STAR TREK FAN.

5     SHE'S ALSO, OF COURSE, A DR. SEUSS FAN.  SHE TALKS TO ME ON

6     FACETIME AND READS *ONE FISH, TWO FISH*.  IF MY SISTER WERE TO GO

7     INTO BARNES & NOBLE ON A FIXED INCOME AND HAD ONE BOOK TO BUY

8     FOR MY NIECE AND SAW THE *OH, THE PLACES YOU'LL GO!* AND SHE SAW

9     *OH, THE PLACES YOU'LL BOLDLY GO!* MY SISTER WOULD BUY THE

10    DEFENDANTS' WORK BECAUSE HERE IS ONE WORK THAT SHE CAN BUY THAT

11    IS GOING TO SATISFY MY NIECE'S NEED FOR STAR TREK AND MY

12    NIECE'S NEED FOR DR. SEUSS.  WE SUBMIT THAT THIS ALSO SUPPLANTS

13    THE ORIGINAL WORK, AND THAT IT IS A VERY PLAUSIBLE ALLEGATION

14    THAT IT WOULD.

15         HOWEVER, WITH REGARD TO DERIVATIVE WORKS, THERE IS A

16    SERIOUS PROBLEM THERE.  WE'VE ALREADY PLED ALLEGATIONS SHOWING

17    THAT WE CREATE DERIVATIVE WORKS OF THIS NATURE.  THE DERIVATIVE

18    MARKET THAT'S AFFECTED AND IN *HARPER & ROW*, THE SUPREME COURT

19    SAYS THIS, IT'S NOT JUST THE ACTUAL EXISTING MARKET BUT THE

20    POTENTIAL MARKET.  *GREEN DAY -- SELTZER V. GREEN DAY*, THE NINTH

21    CIRCUIT SAID THE SAME THING, "THE FACTOR TO CONSIDER IS THE

22    IMPACT ON POSITIONAL, REASONABLE OR LIKELY TO BE DEVELOPED

23    MARKETS."

24         AND *CASTLE ROCK* OUT OF NEW YORK STATES SOMETHING THAT'S

25    VERY INTERESTING TOO, THAT "EVEN IF IT'S NOT SOMETHING THAT THE

1    PLAINTIFF WOULD CONTEMPLATE DEVELOPING, COPYRIGHT IS A SET OF

2    EXCLUSIVE RIGHTS, AND THAT CONTROLS THE RIGHT TO CREATE AND TO

3    CONTROL WHAT COMES OUT THERE AS A DERIVATIVE WORK." AND WHAT

4    THE COURT SAYS, "THAT EVEN IF A COPYRIGHT HOLDER MADE THE

5    ARTISTIC DECISION NOT TO SATURATE THOSE MARKETS, THAT'S THEIR

6    RIGHT." THERE IT WAS A DICTIONARY ABOUT SEINFELD, AND WHAT THE

7    COURT SAID IS "EVEN IF THEY WERE NEVER GOING TO DO THAT, THAT'S

8    THEIR RIGHT."

9    *SALINGER V. COLTING* THE SAME THING. EVEN IF MR.

10   SALINGER WAS NEVER GOING TO DO A SEQUEL TO *CATCHER IN THE RYE*,

11   THAT WAS HIS RIGHT TO DECIDE WHETHER OR NOT HE WANTED TO DO IT.

12   NOW, THE QUESTION THAT I THINK MY COLLEAGUE TO MY RIGHT

13   REALLY ADDRESSED IS WHETHER OR NOT THIS WOULD BE A REASONABLE

14   MARKET. WHAT WE SEE IN THE NINTH CIRCUIT JURISPRUDENCE IS NOT

15   WHETHER OR NOT THIS EXACT THING WAS GOING TO BE CREATED, AND

16   FRANKLY DR. SEUSS DOES HAVE A BOOK CALLED "THERE'S NO PLACE

17   LIKE SPACE" -- WHICH MY NIECE ALSO HAS -- WHICH IS IN OUR

18   PLEADING, BUT IT REALLY IS MORE OF A QUESTION OF WHETHER IT BE,

19   YOU KNOW, JUDICIALLY REASONABLE TO THINK THAT THEY WOULD ENTER

20   THAT MARKET.

21   THE PERFECT EXAMPLE IS THE *MATTEL V. FORSYTHE* CASE, THE

22   CASE WHERE SOMEBODY TOOK ADULT-AIMED NUDE BARBIES AND POSED

23   THEM IN PHOTOGRAPHS BEING ATTACKED BY VINTAGE HOUSEHOLD

24   APPLIANCES, AND WHAT DID THE COURT SAY THERE? THE COURT SAID

25   THAT IT'S VERY HARD TO CONTEMPLATE THAT MATTEL OR ITS LICENSEES

1    WAS EVER GOING TO ENTER THE ADULT-ORIENTED PHOTOGRAPHY MARKET

2    FOR BARBIE DOLLS.  THAT IS ABSOLUTELY NOT THE CASE HERE.  IT'S

3    VERY CONCEIVABLE THAT IF DR. SEUSS CHOOSES TO DO SO, HE COULD

4    COLLABORATE WITH STAR TREK OR SIMILAR RIGHTS HOLDERS IN ORDER

5    TO CREATE THIS TYPE OF MASH-UP, AS WE'RE CALLING IT, AND,

6    FRANKLY, AGAIN WITH THE JIM HENSON EXAMPLE THEY'VE ALREADY DONE

7    SO.

8          JUST TO ADDRESS SOME OF THE OTHER POINTS THAT I WANTED

9    TO FROM YOUR TENTATIVE RULING, DID YOU WANT TO TALK ABOUT THE

10   RECENT *EMPIRE* CASE?

11         THE COURT:  WELL, NOBODY IS ASKING ME TO DO ANYTHING.

12   I DON'T THINK IT'S APPROPRIATELY BEFORE THE COURT TO DO

13   ANYTHING.  THERE'S NO MOTION FOR RECONSIDERATION.  THERE'S NO

14   -- NOTHING RAISED IN THE INSTANT MOTION THAT GOES THERE.  I

15   WANTED TO POINT THAT OUT TO PEOPLE.

16         MS. DUVDEVANI:  ALL RIGHT.

17         THE COURT:  SOMETHING MAY COME AFTER THOSE COMMENTS, I

18   DON'T KNOW, BUT IT REALLY WASN'T -- I APPRECIATE IT BEING

19   CALLED TO THE COURT'S ATTENTION, BUT I'M NOT GOING TO SUA

20   SPONTE DO SOMETHING WITH IT, I DON'T BELIEVE, AT THIS JUNCTURE.

21         MS. DUVDEVANI:  OKAY, YOUR HONOR.

22         THE COURT:  IF YOU WANT TO COMMENT ON THAT POSITION I'M

23   TAKING, GO AHEAD, AND I'LL CERTAINLY HEAR FROM YOU ON THAT.

24         MS. DUVDEVANI:  I DO THINK OUR BRIEFING COVERS IT.  ONE

25   OF THE POINTS THAT I WOULD MAKE IS THERE IS A BIT OF CONFUSION

1    REGARDING THE SECOND *GRIMALDI* FACTOR.  FRANKLY, THIS KIND OF

2    TIES INTO SOMETHING THAT YOU DID NOTE ABOUT THE THIRD

3    NOMINATIVE FAIR USE FACTOR ABOUT SPONSORSHIP OR ENDORSEMENT.

4    *GRIMALDI* TALKS ABOUT IT EXPLICITLY MISLEADING, SO THEY ARE KIND

5    OF TWO SIDES OF THE SAME COIN SO TO SPEAK.  THE WAY BOTH --

6    JUST STARTING WITH *GRIMALDI* AND WITH *EMPIRE*, LOOK, IT'S NOT

7    NECESSARY TO SATISFY THAT PRONG THAT THERE NEEDS TO BE

8    SOMETHING REALLY EXPLICIT LIKE THE AUTHORIZED BIOGRAPHY.

9    THAT'S NOT THE WAY THE CASE LAW HAS DEVELOPED.  IT CAN BE ALL

10    THE INDICIA THAT SURROUNDS THE WORK THAT WOULD DO THAT.  WHAT

11    THE NINTH CIRCUIT RECENTLY SAID IS IT POINTED OUT THERE WERE NO

12    REFERENCES TO THE EMPIRE DISTRIBUTION TO THE PLAINTIFF THERE,

13    SO, THEREFORE, THEY FAILED THE TEST.

14        WE SEE A REALLY GOOD EXAMPLE OF THIS IN THE *E.S.S.*

15    CASE, THE CASE THE NINTH CIRCUIT DECIDED ABOUT THE STRIP CLUB

16    INSIDE THE VIDEO, THE *ROCK STAR ENTERTAINMENT* CASE, WHERE THE

17    COURT POINTED OUT THAT THE REASON THAT THAT CASE FAILED THE

18    SECOND PRONG OF *GRIMALDI* WASN'T BECAUSE THERE WASN'T AN

19    EXPLICIT REFERENCE, BUT WHAT THE CASE REALLY -- WHAT THE COURT

20    REALLY SAID THERE WAS THAT THERE WOULD BE NOTHING FOR CONSUMERS

21    OF THE VIDEO TO BELIEVE THAT SOMEHOW THE GAME WAS ENDORSED OR

22    RELATED TO THE STRIP CLUB OWNERS BECAUSE THE INSIDE -- ONE OF

23    THE EXAMPLES THEY GAVE WAS THE INSIDE OF THE STRIP CLUB INSIDE

24    THE VIDEO LOOKED VERY GENERIC, AND THAT'S THE WORD THAT THEY

25    USED, THAT IT WAS JUST THE MARK ALONE ON THE VIDEO AND THEN

1    WHEN YOU WERE A VIRTUAL USER OF THE VIDEO GAME AND YOU ENTERED

2    A STRIP CLUB, IT JUST LOOKED LIKE A GENERIC STRIP CLUB.

3         THAT'S THE OPPOSITE OF WHAT WE HAVE HERE, AND THAT

4    REALLY DOES TIE INTO THE THIRD NORMATIVE FAIR USE POINT AS

5    WELL.  OUR POINT IS NOT THAT THERE'S SOME ENDORSEMENT ON THE

6    COVER OF *OH, THE PLACES YOU'LL BOLDLY GO!* THAT SAYS "A DR.

7    SEUSS-AUTHORIZED WORK" THAT SATISFIES THAT PRONG, BUT THERE

8    NEED NOT BE UNDER THE CASE LAW FOR THE SAME REASONS AS THE

9    SECOND PRONG OF *GRIMALDI*.  WE SEE IN THE TOYOTA CASE, THE

10   *TOYOTA V. TABARI* CASE, THAT THE COURT FOUND THAT THE THIRD

11   FACTOR WAS SATISFIED REGARDING SUGGESTION OF ENDORSEMENT WHEN

12   THE STYLIZED LEXUS MARKS WERE USED.  THE COURT SAID THAT THAT

13   NOT ONLY SATISFIED THE SECOND FACTOR BUT THE THIRD FACTOR AS

14   WELL.  IT WASN'T SOME EXPLICIT STATEMENT IN THE WEBSITE THAT

15   SAYS, "WE ARE AN OFFICIAL AUTHORIZED LEXUS DEALER."  IT WAS THE

16   VERY FACT THAT THEY USED THE LEXUS STYLIZED MARKS.

17        WE SEE IT IN THE *BEACH BOYS* CASE AS WELL.  THERE WERE

18   NO ALLEGATIONS, AS FAR AS I COULD TELL FROM READING ANY OF

19   THOSE CASES, THAT THERE'S ANYTHING THAT SAID "OFFICIAL BEACH

20   BOYS CONCERT."  IT WAS THE WAY THAT "BEACH BOYS" WAS USED IN

21   CONNECTION WITH THE CONCERT THAT CREATED THAT CONFUSION AS TO

22   ENDORSEMENT OR SPONSORSHIP.

23        SO WHILE I RECOGNIZE THAT YOUR TENTATIVE RULING, YOUR

24   HONOR, STATED THAT THE THIRD FACTOR WAS MET, WE SUBMIT IT WAS

25   NOT MET UNDER THE FACTS OF THE CASE AND UNDER THE MOST RELEVANT

1    JURISPRUDENCE.

2         LET ME SEE IF THERE WAS ANYTHING ELSE THAT YOU HAD

3    MENTIONED THAT I HAD WANTED TO COVER, AND THEN I'LL SHUT UP,

4    UNLESS THE COURT HAS ANY QUESTIONS.  I THINK THAT WAS IT, YOUR

5    HONOR.

6         THE ONLY THING THAT I'LL LEAVE THE COURT WITH IS AGAIN

7    REGARDING THE QUESTIONS THAT YOU ASKED COUNSEL REGARDING

8    PREJUDICE.  I WOULD SUBMIT THAT THERE'S NO PREJUDICE AT THIS

9    STAGE, AND THAT GIVEN RULE 15'S LIBERAL PLEADING STANDARDS WE

10   BELIEVE THAT WHAT WE DID WAS PROPER AND SHOULD BE CONSIDERED BY

11   THE COURT.

12        THE COURT:  LET ME GO BACK TO *EMPIRE* FOR A SECOND, THE

13   NEW CASE.

14        MS. DUVDEVANI:  SURE.

15        THE COURT:  ARE YOU SUGGESTING THE COURT NEEDS TO DO

16   ANYTHING OR THAT IT'S JUST NOTED BECAUSE YOU DON'T THINK IT

17   CHANGES ANYTHING.

18        MS. DUVDEVANI:  I DON'T THINK IT CHANGES ANYTHING.

19   *EMPIRE* CERTAINLY -- *EMPIRE* SUPPORTS US.  YOU KNOW, IT'S REALLY

20   INTERESTING BECAUSE I NOTICED THAT IN DEFENDANTS' I BELIEVE --

21   IN BOTH ROUNDS OF BRIEFING THEY TRIED TO DISCREDIT *DR. SEUSS*

22   *ENTERPRISES VS. PENGUIN* ONCE AGAIN THAT CASE IS CITED.  SO TWO

23   WEEKS AGO THE NINTH CIRCUIT SAID THAT THAT CASE IS GOOD

24   AUTHORITY, AND SO FOR BOTH PRONGS OF THE *GRIMALDI* TEST AND

25   *EMPIRE* IT POINTS IT OUT THAT, YES, THERE COULD BE SOME RELATION

ARTISTICALLY TO THE UNDERLYING WORK, BUT THERE'S A DIFFERENCE
BETWEEN A RELATION TO THE WORK ALONG THE LINES OF USING THE
WORD "EMPIRE" BECAUSE IT EVOKES THEMES OF A MUSICAL EMPIRE OR
USING SOMEBODY ELSE'S TRADEMARK TO AVOID THE DRUDGERY OF
CREATING SOMETHING FRESH, AND IT CITES THE *DR. SEUSS* CASE
THERE.  WE BELIEVE THAT THE FIRST PRONG THAT'S ANALYZED BY THE
RECENT DECISION SUPPORTS DR. SEUSS, AND THE SECOND PRONG
SUPPORTS DR. SEUSS AGAIN BECAUSE WHAT THE COURT SAYS IS THAT IN
*EMPIRE* THERE ARE NO REFERENCES TO *EMPIRE DISTRIBUTION*.

HERE, WE HAVE ALLEGED THAT EVERYTHING THAT THE
DEFENDANT HAS DONE HERE ARE ALL REFERENCES TO DR. SEUSS.  THEY
EVEN ADMIT IT IN THEIR BRIEFING THAT WHAT THEY'RE TRYING TO DO
IS COMBINE DR. SEUSS WITH STAR TREK.

I DO ULTIMATELY AGREE WITH THE COURT THAT IT'S NOT
BEFORE THE COURT AT THIS MOMENT, BUT IF THE COURT IS INCLINED
TO NEVERTHELESS CONSIDER IT AT THIS STAGE OF THE PROCEEDINGS,
AS OPPOSED TO PERHAPS ON SUMMARY JUDGMENT, IT WOULD STILL
SUPPORT DR. SEUSS'S POSITION.

THE COURT:  THANK YOU.

MS. DUVDEVANI:  THANK YOU, YOUR HONOR.

THE COURT:  I'M SURE YOU WANT TO RESPOND, COUNSEL,
PLEASE COME FORWARD.

MR. BOOTH:  YOU ARE CORRECT.  THANK YOU, YOUR HONOR.
I'LL PICK UP WHERE THE PLAINTIFFS LEFT OFF.

WE DO AGREE WITH THE COURT AND THE PLAINTIFF ON THIS

1    ISSUE, THE *ROGERS* TEST IS NOT SQUARELY BEFORE THE COURT, AND

2    THE *EMPIRE* CASE IS NOT SQUARELY BEFORE THE COURT.

3         THE COURT:  IT WAS CALLED TO MY ATTENTION, AND I

4    APPRECIATE THAT IN THE PLEADINGS THAT CAME IN AND WHATNOT.

5         MR. BOOTH:  RIGHT.  THIS WOULD BE A RULE 12(C) ISSUE.

6    THERE MAY BE A MOTION FOR JUDGMENT ON THE PLEADINGS.  IT'S NOT

7    AN ISSUE THAT WAS SQUARELY BRIEFED BY EITHER PARTY AS TO THE

8    AMENDED COMPLAINT.

9         SO THE ONE THING I WILL SAY IS THAT THERE IS A PRETTY

10   CLEAR DISTINCTION BETWEEN THIS CASE AND THE *DR. SEUSS VS.*

11   *PENGUIN* CASE FROM 20 YEARS AGO.  IN THAT CASE THERE WAS NOT A

12   TRANSFORMATIVE WORK, AND THAT CHANGED THE ENTIRE ANALYSIS.  THE

13   ANALYSIS WAS SIMPLY THIS WAS NOT GOING TO BE A FAIR USE.  THERE

14   WAS GOING TO BE A PRESUMPTION OF HARM, AND SO FAIR USE WAS NOT

15   GOING TO WIN.

16        IN THIS CASE, WE DON'T HAVE THAT.  WE HAVE A

17   TRANSFORMATIVE WORK.  AND AS IN CASE AFTER CASE, WHEN THERE'S A

18   TRANSFORMATIVE WORK, THERE IS NO PRESUMPTION OF MARKET HARM, AS

19   A RESULT THE ANALYSIS HAS TO FOCUS ON WHAT ARE THE MARKETS THAT

20   THE PLAINTIFF OCCUPIES, TRADITIONALLY COULD OCCUPY OR

21   REASONABLY MIGHT OCCUPY.  WE DON'T HAVE A USE IN ANY OF THOSE

22   MARKETS RIGHT NOW.

23        THE PLAINTIFFS COME TO YOU AND TELLS YOU THAT *THE*

24   *WUBBULOUS WORLD OF DR. SEUSS* IS AN EXAMPLE OF THE SAME KIND OF

25   WORK THAT WE'VE GOT WITH *OH, THE PLACES YOU'LL BOLDLY GO!*

1    THEY'RE RADICALLY DIFFERENT.  *OH, THE PLACES YOU'LL BOLDLY GO!*

2    IS A MASH-UP, AGAIN, BETWEEN TWO PREEXISTING ENTERPRISES, AND

3    THEY'RE PREEXISTING CHARACTERS, THEY'RE PREEXISTING ART.

4    THAT'S NOT WHAT WE HAVE IN *THE WUBBULOUS WORLD OF DR.*

5    *SEUSS.*  JIM HENSON COMPANY, YES, WAS A COLLABORATIVE PARTNER,

6    BUT YOU CAN LOOK IN VAIN THROUGH *THE WUBBULOUS WORLD OF DR.*

7    *SEUSS* BEFORE YOU SEE KERMIT THE FROG.  WE DON'T HAVE A JIM

8    HENSON COMPANY CHARACTER.  WE HAVE JIM HENSON MAKING NEW

9    MUPPETS IN ORDER TO ACT OUT DR. SEUSS STORIES OR DR. SEUSS

10    DERIVATIVE STORIES.  THAT'S A DERIVATIVE WORK, NOT A

11    TRANSFORMATIVE WORK, AND THAT'S THE DIFFERENCE.

12    SO THE ISSUE AS TO LIKELY TO BE DEVELOPED, WE KNOW THAT

13    DR. SEUSS HAS SATURATED THE MARKET, AS THE PLAINTIFF SAYS, WITH

14    OTHER WORKS, IN OTHER DERIVATIVE FIELDS, AS THEY'RE ENTITLED

15    TO.  THOSE ARE NOT IN THE FAIR USE MARKET FOR MASH-UPS, SO

16    THERE'S NO NEED TO CONSIDER THEM, AND THEY CERTAINLY WOULDN'T

17    REASONABLY BE CONSIDERED MARKETS WHERE THEY CAN BE HARMED.

18    AS TO -- I WANT TO GO BACK TO ONE OTHER POINT, IF I MAY

19    ON --

20    THE COURT:  OF COURSE.

21    MR. BOOTH:  USING A NONIDENTICAL MARK, BECAUSE AGAIN

22    THE TITLE IS NOT THE SAME BETWEEN THE TWO BOOKS, AND THAT'S

23    WHAT MAKES THIS CASE JUST LIKE THE *MATTEL VS. MCA* CASE.  THERE

24    THE PLAINTIFF'S MARK WAS BARBIE.  THE DEFENDANT'S MARK, THE

25    DEFENDANT'S USE WAS IN A TITLE, BARBIE GIRL, AND THROUGHOUT THE

1    SONG, AND THAT'S NOT AN IDENTICAL USE, THAT'S A USE OF A VARIED

2    MARK, AND YET THAT WAS FOUND TO BE A FAIR USE.  THAT WAS NOT

3    UNREASONABLE BECAUSE YOU CAN -- UNDER THESE DOCTRINES YOU CAN

4    UNDER TRADEMARK LAW CONTINUE TO USE A NOMINATIVE VERSION OF

5    THAT MARK.  YOU CAN NAME THE PLAINTIFF'S MARK IN YOUR OWN

6    TITLE, AND YOU CAN STILL CONTINUE TO GO ON.  SO THE CASES DON'T

7    SUPPORT DENYING NOMINATIVE FAIR USE.  THE CASES DON'T SUPPORT

8    DENYING FAIR USE ON THESE FACTS.

9         WITHOUT ANY SORT OF SPECULATIVE MARKET THAT THEY CLAIM

10    COMPETITION IN, WITHOUT ANY PRECEDENT SAYING THAT YOU SIMPLY

11    CAN'T USE THE TITLE IN ANOTHER TITLE, THE PRECEDENTS DON'T

12    SUPPORT THAT.  THEY SUPPORT THE OPPOSITE.  WE DON'T HAVE A CASE

13    THAT SHOULD GO FORWARD.

14         THE COURT:  THANK YOU.

15         MR. BOOTH:  THANK YOU, YOUR HONOR.

16         THE COURT:  I'LL LET YOU GO BACK AND FORTH.

17         MS. DUVDEVANI:  JUST ONE REALLY QUICK THING.  *MATTEL*

18    COULD NOT BE MORE DISTINGUISHABLE FROM THIS CASE.  FRANKLY,

19    EVERY CASE THAT THE DEFENDANT HAS POINTED TO ARE PARITY CASES.

20    THE COURT HAS ALREADY MADE A RULING THAT THIS ISN'T A PARITY.

21    THE REASON THAT THE COURT IN *MATTEL* FOUND THAT *BARBIE GIRL* WAS

22    NOT A NOMINATIVE FAIR USE WAS ALL ABOUT PARITY.  IF THE COURT

23    READS THE DECISION THEY'LL SEE THAT.  AND THERE'S A BIG

24    DIFFERENCE BETWEEN HAVING BARBIE GIRL AND A SONG THAT TALKS

25    ABOUT "I'M A BARBIE GIRL, IN A BARBIE WORLD," THEY'RE USING THE

1    WORD "BARBIE."  THERE'S A DIFFERENCE BETWEEN USING THAT AND

2    ATTACHING THE WORD "GIRL" TO IT AND INSERTING A NEW WORD IN THE

3    MIDDLE OF SOMEBODY'S TRADEMARK.  AND AGAIN, IF WE JUST LOOK AT

4    THE RATIONALE AND THE PURPOSES BEHIND NOMINATIVE FAIR USE AS

5    OUTLINED IN *PLAYBOY V. WELLES* THAT DISTINCTION IS REALLY MADE

6    CLEAR.  THAT'S ALL I HAVE, YOUR HONOR.

7         THE COURT:  ANYTHING ELSE?

8         MR. BOOTH:  WE WOULD PUT IT TO YOU THAT THE DISTINCTION

9    BETWEEN A TRANSFORMATIVE WORK THAT IS A PARITY, A

10   TRANSFORMATIVE WORK THAT IS NOT A PARITY, DOES NOT MEAN THAT

11   THE ANALYSIS SHOULD BE DIFFERENT.  AND SO WHEN YOU'VE GOT

12   TRANSFORMATIVE WORK, YOU'VE GOT ONE, PERIOD.  YOU DON'T NEED TO

13   SAY THERE'S ONLY A PARITY OF LAW THAT APPLIES.  IT'S JUST A

14   FAIR USE LAW, AND THE PRINCIPLES OF *MATTEL* MAKE PERFECT SENSE.

15   THE PRINCIPLES OF ALL OF THESE CASES CROSS THAT LINE.  THANK

16   YOU.

17        MS. DUVDEVANI:  ONE LAST THING I'LL SAY, YOUR HONOR, IS

18   THAT AGAIN THIS REALLY GOES TO LOOKING AGAIN AT THE FIRST FAIR

19   USE FACTOR, AND I SAID I DON'T KNOW THAT I'M GOING TO CHANGE

20   YOUR MIND STANDING HERE TODAY, BUT IT SEEMS THAT DEFENDANTS'

21   ENTIRE ARGUMENT IS PREMISED ON THE BELIEF THAT THEIR WORK IS

22   TRANSFORMATIVE IN THE SENSE OF FAIR USE.  I DON'T KNOW OF A

23   SINGLE CASE THAT TAKES A WORK THE WAY *OH, THE PLACES YOU'LL*

24   *BOLDLY GO!* DID, WHICH WAS NOT FOR CRITICISM, WHICH WAS NOT FOR

25   RIDICULE, WHICH WAS NOT CRITIQUE, WHICH WAS NOT FOR PARITY.

1    THIS WAS LITERALLY TO CREATE A WHOLESALE COMMERCIAL WORK WITH

2    THE SAME PURPOSE AT THE END OF THE DAY, THE PURPOSE BEING AN

3    ILLUSTRATED CHILDREN'S BOOK, AND IT WAS CALLED A TRANSFORMATIVE

4    USE UNDER THE FAIR USE ACT AS OPPOSED TO A DERIVATIVE WORK.

5    THE CASE THAT -- THE DEFENDANT CITES *PASSIM* IN THEIR BRIEF

6    RELATING TO THIS.  *SELTZER V. GREEN DAY* IS PROBABLY ONE OF THE

7    CASES -- ONE OF THE ONLY CASES THAT I KNOW THAT DOESN'T REALLY

8    TALK ABOUT COMMENTARY, CRITIQUE OR PARITY OF THE PLAINTIFF'S

9    WORKS, BUT WHAT DO YOU SEE THERE?

10        THE COURT SAYS TWO THINGS ABOUT THE FAIR USE FACTOR;

11    FIRST, THE COURT POINTS OUT THAT IT SERVES A DIFFERENT PURPOSE.

12    THE PLAINTIFF'S WORK WAS A THIRD OF THAT.  THE DEFENDANTS' WORK

13    WAS USED IN THE BACKDROP OF A MUSIC VIDEO INSIDE A CONCERT THAT

14    HAD 32 SONGS, AND THE AUTHOR THEN GOES ON TO POINT OUT THAT

15    THAT USE WAS ONLY INCIDENTALLY COMMERCIAL BECAUSE IT WAS JUST

16    USED INSIDE THE CONCERT, BUT IT WASN'T TO MARKET CDS, IT DIDN'T

17    APPEAR ON AN ALBUM COVER OR ANYTHING ELSE, THAT THE COURT

18    GENERALLY DISCOUNTED THE COMMERCIAL NATURE.

19        HERE WHAT WE HAVE IS SOMETHING THAT IS -- DOESN'T

20    REALLY FIT INTO ANY OF THE TYPICAL FAIR USE TRANSFORMATIVE

21    CATEGORIES.  IT DOESN'T SERVE A DIFFERENT PURPOSE THAN THE

22    ORIGINAL WORK, AND IT'S A WHOLESALE COMMERCIAL WORK.

23        MR. BOOTH:  IF I MAY, YOUR HONOR.  I'VE BEEN UP SEVERAL

24    TIMES ALREADY.  I APPRECIATE THAT.

25        THE COURT:  THAT'S OKAY.

```
1              MR. BOOTH:  THERE IS A DIFFERENCE BECAUSE THERE IS NO

2     CASE LAW THAT SAYS THAT A FAIR USE CANNOT BE MADE WHEN WORK HAS

3     AT LEAST SOME CRITICAL BEARING ON THE ORIGINAL WORK, AND THAT'S

4     WHAT'S HAPPENED HERE.  THERE IS -- THE COURTS FOUND THAT THIS

5     IS NOT A PARITY, THAT THE NEW BOOK IS NOT RIDICULING OH, THE

6     PLACES YOU'LL GO! BUT THERE IS A CRITICAL BEARING ON THAT WORK

7     AND ON STAR TREK BECAUSE WHAT THIS MASH-UP HAS DONE IS

8     COMMENTED ON THE RESONANCES BETWEEN THOSE TWO WORKS, HAS

9     HIGHLIGHTED AND ILLUSTRATED THOSE RESONANCES TO MAKE THEM CLEAR

10    THAT THEY HAVE MUCH IN COMMON AND EXPLORED THE WAYS THAT -- NOT

11    FOR THE READER PERHAPS, BUT MADE THE WORK OF ART THAT MAKES

12    THIS INSIGHT AVAILABLE TO THE READER TO SEE THESE ARE THE WAYS

13    THAT THESE WORKS RELATED.  THERE'S A LOT GOING ON IN STAR TREK,

14    A LOT GOING ON IN DR. SEUSS'S WORK, WHICH IS SIMILAR, AND

15    THAT'S REASONABLE.  THAT'S REASONABLE AS FAIR USE TO DO.

16              YOU DON'T SIMPLY HAVE TO CRITICIZE BY KNOCKING DOWN AN

17    EARLIER WORK TO MAKE FAIR USE.  YOU CAN MAKE REASONABLE

18    COMMENT.  YOU CAN CREATE LITERARY ANALYSIS, INSIGHTS, AND

19    THAT'S WHAT'S BEING PROVIDED IN THIS CASE.  FAIR USE LAW

20    SUPPORTS THAT CERTAINLY.  THE IDEA OF FAIR USE IS THAT YOU'RE

21    SUPPOSED TO CREATE BREATHING SPACE TO BUILD ON PREEXISTING

22    WORKS, AND THAT'S EXACTLY WHAT OUR BOOK DOES -- WHAT OUR

23    CLIENT'S BOOK DOES.  THIS IS A BOOK THAT TAKES PREEXISTING

24    WORKS AND POINTS OUT, JUST AS A LITERARY CRITIC WOULD DO, BUT

25    IN EVEN MORE VISUALLY, IMMEDIATELY RECOGNIZABLE STYLE, "HERE'S
```

1     WHAT THESE WORKS HAVE IN COMMON," AND FAIR USE WON'T PREVENT

2     THAT.  COPYRIGHT LAW DOESN'T PREVENT BUILDING ON PREEXISTING

3     WORKS TO MAKE NEW POINTS ABOUT THOSE WORKS AND CREATE A NEW

4     WORK.  THANK YOU, YOUR HONOR.

5            MS. DUVDEVANI:  THIS IS NOT A CRITIQUE.  IT'S A

6     COMMERCIAL WORK.  THIS IS *O.J. SIMPSON* AGAIN.  WE ARE HAVING A

7     VERY HARD TIME UNDERSTANDING WHY MISAPPROPRIATING FROM TWO

8     RIGHTS HOLDERS AND PUTTING IT TOGETHER CREATES A TRANSFORMATIVE

9     FAIR USE WHEN MISAPPROPRIATING A CURRENT NEWS STORY WITH A DR.

10    SEUSS WORK DID NOT.  WE DO FEEL THAT ULTIMATELY AT THE END OF

11    THE DAY IF THIS WORK WAS CONSIDERED A TRANSFORMATIVE FAIR USE

12    IT WOULD COMPLETELY SWALLOW THE DERIVATIVE WORK OF COPYRIGHT

13    HOLDERS, BUT AGAIN I'LL SAY PERHAPS THAT'S FOR ANOTHER DAY.

14           THE COURT:  LET ME TAKE A BREAK AND COME BACK.  I THINK

15    WE'RE READY TO TAKE THIS UNDER SUBMISSION, BUT LET ME LOOK AT

16    EVERYTHING, SEE IF WE HAVE ANY FURTHER QUESTIONS.  LET'S TAKE

17    10 MINUTES.  THANK YOU.

18           MR. BOOTH:  THANK YOU, YOUR HONOR.

19           MS. DUVDEVANI:  THANK YOU, YOUR HONOR.

20    (COURT WAS AT RECESS.)

21           THE COURT:  COUNSEL, AFTER ALL THOSE MINUTES, LOOKING

22    AT MY NOTES AND GOING THROUGH THINGS, I DON'T BELIEVE I HAVE

23    ANY QUESTIONS OF EITHER SIDE AT THIS JUNCTURE.  UNLESS THERE'S

24    ANYTHING ELSE, AND I'M NOT INVITING THAT, BUT SOMETHING BURNING

25    THAT YOU NEED TO SAY, I'LL DEEM THIS MATTER SUBMITTED, AND I'M

1    GOING TO GO BACK THROUGH EVERYTHING.  YOUR COMMENTS WERE VERY

2    HELPFUL THIS MORNING AND I APPRECIATE IT, AND YOU'LL GET A

3    REASONED ORDER FROM THE COURT.

4         MS. DUVDEVANI:  THANK YOU, YOUR HONOR.  I RECOGNIZE

5    THAT THE COURT DOESN'T OFTEN HOLD ORAL ARGUMENT, AND DR. SEUSS

6    DOES APPRECIATE THE OPPORTUNITY TO BE HEARD TODAY.

7         THE COURT:  IT IS HELPFUL TO THE COURT BECAUSE THIS IS,

8    NUMBER ONE, AN INTERESTING CASE, NUMBER TWO, RAISES INTERESTING

9    ISSUES.  BOTH COUNSEL ARE WELL INFORMED, AND IT'S HELPFUL TO

10   THE COURT TO HEAR YOUR ANSWERS TO MY QUESTIONS, SO THANK YOU.

11        MS. DUVDEVANI:  THANK YOU, YOUR HONOR.

12        MR. BOOTH:  THANK YOU, YOUR HONOR.

13   (COURT WAS AT RECESS.)

14

15

16                    C E R T I F I C A T E

17

18        I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
     QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
19   STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
     ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
20   ABOVE-ENTITLED MATTER ON NOVEMBER 28, 2017; AND THAT THE FORMAT
     USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
21   STATES JUDICIAL CONFERENCE.

22

23   DATED:  DECEMBER 12, 2017     /S/ GAYLE WAKEFIELD
                                   GAYLE WAKEFIELD, RPR, CRR
24                                 OFFICIAL COURT REPORTER

25