# EXHIBIT 1

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3   _____

4   DR. SEUSS ENTERPRISES, L.P., a     )
    California limited partnership,    )
5                                      )
              Plaintiff,               ) Case No.
6                                      )
                           )  3:16-cv-02779-JLS-BGS
7        v.                            )
                                       )
8   COMICMIX, LLC, a Connecticut       )
    Limited liability company; MR.     )
9   GLENN HAUMAN, an individual;       )
    MR. DAVID JERROLD FRIEDMAN A/K/A   )
10  DAVID GERROLD, an individual; and  )
    MR. TY TEMPLETON, an individual.   )
11                                     )
              Defendants.              )
12  _____     )

13

14

           HIGHLY CONFIDENTIAL TRANSCRIPT
15                   (FULL)

16

17      Videotaped oral deposition of JOSHUA S. GANS,

18  Ph.D., called by the Plaintiff herein, held before a

19  stenographic court reporter at the offices of DLA

20  Piper LLP (Canada), 1 First Canadian Place, Ste.

21  6000, Toronto, Ontario, Canada on Tuesday, the 6th

22  day of November, 2018, at 9:00 a.m. EST.

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 2

1  A P P E A R A N C E S:
2  For Plaintiff:
3  DLA PIPER LLP (US)
4  BY: MARC E. MILLER, ESQ.
5     1251 Avenue of the Americas
6     New York, NY 10020-1104
7     Tel: 212-335-4500
8     Fax: 212-335-4501
9     marc.miller@dlapiper.com
10
11  For Defendants:
12  BOOTH, SWEET LLP
13  BY: DAN BOOTH, ESQ.
14     32 R Essex Street
15     Cambridge, MA 02139
16     Tel. 617-250-8602
17     Fax: 617-250-8883
18     dbooth@boothsweet.com
19
20
21
22
23
24  ALSO PRESENT:
25  Peter Goodale, CLVS - Videographer

Page 3

1     INDEX OF PROCEEDINGS
2
3  WITNESS: JOSHUA SAMUEL GANS, Ph.D.: SWORN
4  EXAMINATION                              PAGE
5     By Mr. Miller              9
6     By Mr. Booth               378
7
8
9     INDEX OF SPECIALLY DESIGNATED SECTIONS
10              From p/l  To p/l
11  Confidential section          88/22   89/4
12  Highly confidential section   219/23  387
13
14
15  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: n/a
16  INFORMATION TO BE SUPPLIED: n/a
17
18
19
20
21
22
23
24
25

Page 4

1     INDEX OF EXHIBITS
2  NO./ DESCRIPTION                        PAGE.
3  EXHIBIT 1 marked for identification:      11
4     Expert Report of Professor Joshua
5     Gans
6  EXHIBIT 2 marked for identification:      11
7     Second Report of Professor Joshua
8     Gans
9  EXHIBIT 3 marked for identification:      24
10     Rebuttal Expert Report of Dr. Na
11     Dawson, dated October 12, 2018
12  EXHIBIT 4 marked for identification:     140
13     Plaintiff's Notice of Video
14     Deposition of Joshua S. Gans
15  EXHIBIT 5 marked for identification:     143
16     Web page printout containing
17     header: "Oh, the Places You'll Go
18     is the top-selling book for
19     graduation season, but it doesn't
20     actually offer great advice" (6
21     pp.)
22  EXHIBIT 6 marked for identification:     172
23     Complaint for 1. Copyright
24     Infringement; 2. Trademark
25     Infringement; and 3. Unfair

Page 5

1     Competition Demand for Jury Trial
2  EXHIBIT 7 marked for identification:     172
3     First Amended Complaint for 1.
4     Copyright Infringement; 2.
5     Trademark Infringement; and 3.
6     Unfair Competition Demand for
7     Jury Trial
8  EXHIBIT 8 marked for identification:     219
9     E-mail marked Highly Confidential
10     - Outside Attorneys' Eyes Only,
11     Bates AMU 6-29-2018 Production
12     000003-08
13  EXHIBIT 9 marked for identification:     249
14     E-mail from Robert Nash to Glenn
15     Hauman dated 2/2/2017 7:29:35
16     a.m., Bates GEEKNET000445
17  EXHIBIT 10 marked for identification:    255
18     Book entitled: "Information
19     Wants to be Shared"
20  EXHIBIT 11 marked for identification:    265
21     Article "Remix Rights and
22     Negotiations Over the Use of
23     Copy-Protected Works" by Joshua
24     S. Gans, University of Toronto
25     and NBER, June 2015

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

1  --- Upon commencing at 8:56 a.m.
2      THE VIDEOGRAPHER:  Good morning.  We are
3  going on the record at 8:56 a.m. on
4  Tuesday, November 6, 2018.  Please note
5  that the microphones are sensitive and may
6  pick up whispering, private conversations,
7  and cellular interference.
8      Please turn off all cellphones or
9  place them away from the microphones, as
10  they can interfere with the deposition
11  audio.  Audio and video recording will
12  continue to take place unless all parties
13  agree to go off the record.
14      This is Media Number 1 of the
15  video-recorded deposition of Dr. Joshua
16  Samuel Gans, taken by counsel for the
17  plaintiff -- is that correct?
18  MR. MILLER:  That's right.
19  THE VIDEOGRAPHER:  Thank you -- in the
20  matter of Dr.~Seuss Enterprises, L.P.
21  versus ComicMix LLC et al., filed in the
22  United States District Court for the
23  Southern District of California, Case No.
24  16-CV-02779-JLS-BGS.
25      This deposition is being held at DLA

Page 7

1  Piper, LLP, First Canadian Place 100 King
2  Street West, Suite 6000, Toronto, Ontario,
3  Canada.
4      My name is Peter Goodale, Certified
5  Legal Videographer, and the certified
6  court reporter is Karin Jenkner, both from
7  the firm Veritext Legal Solutions.
8      I am not authorized to administer an
9  oath.  I'm not related to any party in
10  this action, nor am I financially
11  interested in the outcome.
12      Counsel and all present in the room
13  will now state their appearances and
14  affiliations for the record.
15  MR. MILLER:  Marc Miller, from DLA Piper,
16  on behalf of plaintiff Dr.~Seuss
17  Enterprises, L.P.
18  MR. BOOTH:  Dan Booth, counsel for the
19  defendants, of Booth Sweet LLP.
20  THE VIDEOGRAPHER:  Thank you.  Will the
21  court reporter please swear in or affirm
22  the witness.
23  --- REPORTER'S NOTE:  Witness was sworn
24  THE VIDEOGRAPHER:  Please begin.
25  MR. MILLER:  Okay.  Just real quick before

Page 8

1  we get started, I'd like to put on the
2  record that yesterday, November 5th, 2018,
3  at approximately 11:25 a.m. Eastern Time,
4  the defendants served, via e-mail, a
5  second expert report of Professor Gans.
6      Defendants' tactic of serving
7  Professor Gans' second expert report
8  yesterday morning has robbed plaintiff
9  Dr.~Seuss Enterprises, L.P. of any
10  reasonable amount of time to review the
11  second report and digest its contents in
12  advance of today's deposition; and,
13  therefore, has prejudiced DSE's ability to
14  depose Doc--- Professor Gans regarding the
15  entire substance of his opinions and his
16  planned testimony in this action.
17      Accordingly, DSE reserves the right
18  to continue Professor Gans' deposition and
19  recall Professor Gans for another session
20  at defendants' expense.
21  MR. BOOTH:  And I'll put on the record
22  that this was not a tactic, and the
23  defendants utterly oppose that
24  characterization and would oppose any
25  further deposition, and the report was

Page 9

1  provided when it was available.
2      And if there are further questions,
3  we're certainly open to discussing, a
4  subsequent discussion, about how those
5  questions might be addressed, but another
6  deposition shouldn't be necessary.
7  MR. MILLER:  Okay.  I appreciate your
8  position.  We have ours.  We'll reserve
9  our rights, and we'll see how we do today.
10      And I'll be asking the Professor as
11  many questions as I can about his second
12  report.  But if we need to carry on the
13  deposition, we will reserve our right and
14  insist that we do so.
15  MR. BOOTH:  We'll reserve our right to
16  object.  Thank you.
17      JOSHUA SAMUEL GANS, PH.D.,
18      having been duly sworn,
19  was examined and testified as follows:
20  EXAMINATION BY MR. MILLER:
21  Q.  All right.  Good morning.  Please
22  state your full name for the record.
23  A.  Joshua Samuel Gans.
24  Q.  Is it okay if I call you Professor?
25  A.  Sure.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 22

1  testified.
2      Q.  Do you think it would have been
3  helpful to the consideration of your opinion had you
4  read the deposition transcript of DSE's corporate
5  representative and president before forming your
6  opinion and writing your report?
7      MR. BOOTH:  Objection.
8      A.  I see no reason that it would have
9  been because I don't -- I'm not aware that that
10  person spoke to market impact.
11      BY MR. MILLER:
12      Q.  How do you know what that person
13  spoke to if you didn't review the transcript?
14      A.  I just said I'm not aware.
15      MR. BOOTH:  Objection.
16      BY MR. MILLER:
17      Q.  You don't know one way or the other?
18      MR. BOOTH:  Objection.
19      A.  I don't know one way or the other.
20      BY MR. MILLER:
21      Q.  You didn't read her testimony?
22      MR. BOOTH:  Objection.
23      A.  I did not.
24      BY MR. MILLER:
25      Q.  So let me ask my question one more

Page 23

1  time; I'm not sure that I got a clear answer.
2      Are all of the opinions that you intend to
3  testify about at trial in this action stated in your
4  expert report?
5      MR. BOOTH:  Objection.
6      A.  All of the opinions that I have at
7  this time are stated in my report.
8      BY MR. MILLER:
9      Q.  You served a second report in this
10  action; isn't that right?
11      A.  Yes.
12      Q.  That's Exhibit 2?
13      A.  Yes.
14      Q.  Take a look at Exhibit 2 for a
15  moment.  Is this a true and accurate copy of your
16  second expert report in this action?
17      A.  It is.
18      Q.  Can you please turn to page 12, the
19  last page.
20      A.  Yes.
21      Q.  Is that your signature?
22      A.  It is.
23      Q.  This report's dated, right?
24      A.  It was.  I remembered to do so.
25      Q.  And the date is?

Page 24

1      A.  The 5th of November, 2018.
2      Q.  Did you read the second expert report
3  before you signed it?
4      A.  I did.
5      Q.  And were you comfortable with its
6  contents before you signed it?
7      A.  I was.
8      Q.  Why did you prepare a second report
9  in this action?
10      MR. BOOTH:  Objection.
11      A.  I was given, a little while ago, a
12  rebuttal report from Dr. Na Dawson of my first
13  report.  And, in looking at it, I found it so
14  misrepresentative of my first report, I felt that I
15  should file a second report, and, and that's, that's
16  what started that process.
17      BY MR. MILLER:
18      Q.  When did that process start?  When
19  did you receive a copy of Dr. Dawson's report?
20      MR. BOOTH:  Objection.
21      A.  I believe that was a week or so ago.
22  I can't tell you the exact date.
23      MR. MILLER:  Since we're discussing Dr.
24      Dawson's report, why don't we mark it.
25  EXHIBIT 3 marked for identification:  Rebuttal

Page 25

1      Expert Report of Dr. Na Dawson, dated
2      October 12, 2018
3      BY MR. MILLER:
4      Q.  Professor, you just mentioned
5  Dr. Dawson's report.  Is Exhibit 3 that report?
6      A.  It looks like it.
7      Q.  What is Dr. Dawson's report dated?
8      A.  It says here it's dated October 12,
9  2018.
10      Q.  And you first saw a copy of this
11  report last week?
12      MR. BOOTH:  Objection.
13      A.  A week or so ago, I can't remember
14  the exact date.
15      BY MR. MILLER:
16      Q.  You don't remember?
17      A.  No.
18      MR. BOOTH:  Objection.
19      A.  I don't remember the date.
20      BY MR. MILLER:
21      Q.  Did you first see a copy of
22  Dr. Dawson's report in preparing for your testimony
23  today?
24      A.  No.  I, in fact, saw a copy of this
25  report before I even knew that I would be deposed

7 (Pages 22 - 25)

Exhibit 1, Page 4

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1  today on this date.
2      Q.  All right.  Let's look back at
3  Exhibit 2, your second expert report.
4      Did you do the first draft of your second
5  expert report?
6      A.  I did the first draft at every
7  version of it.
8      Q.  Did anyone assist you in drafting the
9  second expert report?
10      A.  Mr. Booth looked over it and gave
11  some very minor suggestions.
12      Q.  And when did you draft the second
13  expert report?
14      A.  Last week.  I believe last week.
15      Q.  What did you do to prepare your
16  second expert report?
17      A.  I read Dr. Dawson's report.  I
18  re-read it with my first report, because it
19  referenced parts of it.  I re-read the original
20  Complaint.  And I also, as part of this, did some
21  checking of certain claims made, that she made about
22  what was going on on Amazon.
23      Oh, and I did re-read -- I did pull out
24  and look at, again, the Miceli and Adelstein paper.
25      Q.  You said that you did some checking

Page 27

1  of certain claims that she made about what was going
2  on on Amazon --
3      A.  Yes.
4      Q.  -- what does that mean?
5      A.  Well, let me take Exhibit 3.  And if
6  we go here -- sorry, let me find the page.  Ah.
7  Yes.
8      She had produced, not a screen shot but a
9  printout of an Amazon web page.  It's on -- it's an
10  exhibit in her statement.
11      Q.  Which exhibit?
12      A.  Exhibit No. 1.
13      Q.  Thank you.
14      A.  And I was looking at that.  And she
15  had made some claims about it, about that or about
16  what searches might come up.
17      And so I was trying to replicate it, which
18  is when I noticed that someone called Jordan was the
19  log-in on the account.  And I did not know who
20  Jordan was, or anything about his history of
21  purchases on Amazon or searches or anything like
22  that.
23      And so that's what I was doing.  And I
24  provided all what I would see without that
25  distortion.

Page 28

1      Q.  Sorry, why is that a distortion?
2      A.  Well, Amazon tailor various bits of
3  what gets served up from search results based on the
4  characteristics that it knows about the individual
5  who's logged in.
6      So that means that if I were to search
7  Amazon, do a search, I would come up with a
8  different web page than if you were to do it while
9  you were logged in.
10      So if someone were -- was schooled in
11  understanding, you know, what Amazon's pages were
12  and how they operate, they would want to provide
13  evidence that was not related to the computer or
14  log-in that only one person, a person unknown, might
15  provide and would in fact do perhaps what I did,
16  which is ensure that you are logged out at the time,
17  and provide the search, so that it could be
18  replicated, potentially.
19      Q.  Thanks for the explanation.  That was
20  a long answer.  Why don't we break that down a
21  little bit.
22      So you said that "Amazon tailors various
23  bits of work get served up from search results based
24  on the characteristics it knows about the individual
25  who's logged in."

Page 29

1      What do you mean?  What "various bits" get
2  tailored based on the individual that's logged in?
3      MR. BOOTH:  Objection.
4      A.  Well, there has been discussion for
5  many years of Amazon doing a number of things.
6  First of all, it will, when you do your initial
7  search, it will put things in a rank order based on
8  what they think you're searching for.
9      And it could well be that some
10  characteristics of the individual, maybe that
11  they're male or female, maybe where they live, maybe
12  what they purchased in their past, might cause them
13  to serve something up in a different order.
14      Secondly, depending on what you put
15  forward, what your characteristics are, they may
16  actually even offer you a different price for the
17  products in those lists.
18      Depending on whether you're an Amazon
19  Prime customer, they may present things somewhat
20  differently.
21      And they also may take into account -- and
22  we don't know, I don't know specifically in this
23  particular case whether they would; but they would
24  take into account other aspects of other things you
25  were purchasing to be able to recognize what you

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

1  might be perhaps shopping for, in case it was not
2  just one thing but several things.
3       Q.  How do you know how Amazon designs
4  its algorithms?
5       A.  So I have been studying digitization
6  for now over two decades.  Amazon right from its
7  beginning.  I've written numerous things about
8  Amazon and other search behavior in digital markets.
9  I have been -- written many papers regarding digital
10 advertising.
11      I have written an entire book regarding
12 the economy of attention on the Internet and how
13 that interacts with things such as search and
14 advertising.  I've participated in every single
15 summer economics and digitization conference --
16      (Query by reporter)
17      A.  Conference, economics and
18 digitization conference at the NBER, which has
19 included many works from Amazon.
20      I have been recruited by Amazon to act as
21 an economist for them, which I did not proceed with.
22      And I have recently supervised a Ph.D.
23 student who studied the Amazon algorithms of
24 determining, in particular, these people who bought
25 this product bought another product, and the

Page 31

1  mechanics of those.  And I supervised that Ph.D.
2  student for six years.
3       And so that's how I come to know this
4  stuff about Amazon.
5       Q.  So you've seen Amazon's algorithms?
6       A.  No.  What I have seen is all of the
7  publicly-available information regarding what those
8  algorithms purport to do.
9       And in some -- in one particular market,
10 because of -- by virtue of that Ph.D. thesis that I
11 supervised, I was able to see a very in-depth
12 analysis of those products and the sorts of results
13 that were being served up.
14      Q.  Have you ever spoken to anyone that
15 works at Amazon on those algorithms about how they
16 work?
17      MR. BOOTH:  Objection.
18      A.  Yes.
19      BY MR. MILLER:
20      Q.  When was that?
21      A.  At the Economics of Digitization
22 meetings.  You may not know, but Amazon employs 150
23 Ph.D. economists.  Usually a dozen of them turn up
24 to those meetings, and we discuss things such as the
25 operations of algorithms and other things like that,

Page 32

1  to the extent that they could tell us.
2       And there have been a number of people who
3  I've talked to over the years regarding those
4  things.  And I haven't, in those interactions, heard
5  anything that caused me to doubt that the
6  plain-language meaning of the statements that they
7  make with regard to those algorithms was not true.
8       Q.  What do you mean, the plain language
9  of the meaning?
10      A.  Well, if we go back to my --
11      Q.  Hold on.  Let me just -- let me get
12 my question up.
13      You said "the plain-language meaning of
14 the statements that they make with regard to those
15 algorithms."
16      A.  Yes.
17      Q.  What does that mean?
18      A.  All right; that's what I'm going to
19 show you.
20      If we go back to my original statement,
21 which is Exhibit 1, and we go to page 12.
22      You'll see that in the screen shot of the
23 page that I talk -- actually, it's the top half of
24 the page -- is "frequently bought together."
25      But that's not an algorithm, that's just

Page 33

1  telling you whether these two things were
2  "frequently bought together" in the same basket.
3       Q.  That's not an algorithm?
4       A.  Well, you could call it -- I don't --
5  I'm not -- okay.  So there are --
6       MR. BOOTH:  Objection.
7       A.  -- there are -- algorithms are -- all
8  right.  I guess it's an algorithm, yes.  But it's a
9  statement, it seems to me.  Whereas --
10      BY MR. MILLER:
11      Q.  Let me ask you a question about that.
12 "Frequently bought together"?
13      A.  Yes.
14      Q.  So the items that appear below that
15 heading --
16      A.  Yes.
17      Q.  -- how are they generated?  How does
18 Amazon generate what products appear under that
19 heading?
20      A.  So what they look at is, if someone
21 has bought Oh, The Things You Don't Know!, what is
22 the most likely thing they included in the same
23 basket or cart as that product.
24      And what it's saying, that of the people
25 who bought Oh, The Things You Don't Know! -- I don't

9 (Pages 30 - 33)

Exhibit 1, Page 6

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 34

1 know if it's the top item or whatever, because
2 "frequently" is a bit loose, but I -- thing that is
3 normally also purchased in that same cart is Oh! The
4 Places You'll Go.
5      Q.  Do you know that for sure?
6      A.  That was my understanding based on my
7 informal interactions at these conferences.
8      (Query by reporter)
9      Informal.
10      BY MR. MILLER:
11      Q.  Have you ever studied the algorithm
12 that generates the "frequently bought together"
13 results?
14      MR. BOOTH:  Objection.
15      A.  That would require Amazon to disclose
16 it to me.
17      BY MR. MILLER:
18      Q.  And Amazon has never disclosed the
19 algorithm for the "frequently bought together"
20 results; is that right?
21      A.  I do not, I do not believe it's been
22 publicly disclosed, what their precise algorithm and
23 code are for any of these things.
24      Q.  So you don't know with certainty how
25 algorithm gen -- sorry, how Amazon's algorithms

Page 35

1 generate the results under the "frequently bought
2 together" heading; is that right?
3      MR. BOOTH:  Objection.
4      A.  As I said, my informal discussions,
5 confirmed with "frequently bought together," meant
6 these things were "frequently bought together," and
7 they were not misleading the public in that.
8      Q.  So let me ask my question again.  I
9 don't think that you've answered it.
10      Do you know for certain how Amazon
11 generates the products that appear under the
12 "frequently bought together" heading?
13      MR. BOOTH:  Objection.
14      A.  As I am not an employee of Amazon and
15 I've not been disclosed that information, I do not
16 know for certain whether they misrep -- whether
17 their representations are true.
18      Q.  So you are merely speculating about
19 how Amazon generates the "frequently bought
20 together" results?
21      MR. BOOTH:  Objection.
22      A.  I don't think it's speculation.  I
23 think when a company makes billions of statements of
24 the same kind, it is not unreasonable to, at a first
25 likelihood, believe that they are true, especially

Page 36

1 when there is no obvious reason for them to be
2 lying.
3      BY MR. MILLER:
4      Q.  But you don't know, one way or the
5 other, whether it's true or whether they're
6 misleading or lying, as you say?
7      MR. BOOTH:  Objection.
8      A.  I am not a person who's able to look
9 at a web page of an established company and know for
10 certain that their representations are 100 percent
11 true.
12      BY MR. MILLER:
13      Q.  So, again, you're just speculating
14 about what Amazon's "frequently bought together"
15 results, how those are generated; is that right?
16      MR. BOOTH:  Objection.
17      A.  What do you mean by "speculation"?
18      Q.  What do you mean by "speculation?"
19 What does that word mean to you?
20      MR. BOOTH:  Objection.
21      A.  Speculation means to me to be
22 guessing without any context, understanding,
23 expertise, knowledge, et cetera.
24      In that regard, I do not believe I'm
25 speculating when saying to you that my belief is

Page 37

1 that the plain-language meaning -- meaning of
2 "frequently bought together" is as, as Amazon is
3 representing it.
4      BY MR. MILLER:
5      Q.  Are you an expert in Amazon's
6 algorithms?
7      MR. BOOTH:  Objection.
8      A.  What do you regard as an expert?
9      BY MR. MILLER:
10      Q.  I'll just flip the question back to
11 you.  What do you regard as an expert?
12      MR. BOOTH:  Objection.
13      A.  I have studied Amazon, its
14 entrepreneurial strategy, its digitization strategy,
15 its book-selling strategy, for two decades.  I pay
16 very close attention, whenever I interact with
17 Amazon products, on what is going on with those
18 things.
19      I have not been disclosed, nor have I
20 asked to be disclosed, Amazon's actual algorithms,
21 and so I haven't studied those explicitly.  But,
22 standing as a pure outsider, without any special
23 access, I believe I know as much as any digital
24 economist on this subject.
25      Q.  So if I understand what you're

10 (Pages 34 - 37)

Exhibit 1, Page 7

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 38

1 saying, you believe that you understand Amazon's
2 business strategy in the way that they conduct their
3 business; is that right?
4     A.  I --
5     MR. BOOTH:  Objection.
6     A.  I do.
7     BY MR. MILLER:
8     Q.  But are you an expert in the
9 algorithms that they use to generate the results
10 under these headings, "frequently bought together,"
11 "customers who bought this item also bought"?
12     MR. BOOTH:  Objection.
13     BY MR. MILLER:
14     Q.  Are you an expert in those
15 algorithms?
16     MR. BOOTH:  Objection.
17     A.  This is going to take a while, this
18 answer.
19     BY MR. MILLER:
20     Q.  Go ahead.
21     A.  So if we go back to when Amazon
22 began, it started out as a company that was focused
23 exclusively on book selling and was, at its initial
24 time in doing so, trying to beat the
25 brick-and-mortars -- bricks-and-mortar stores by

Page 39

1 having the ability to send to customers not books
2 that were -- would have been in stock in a store,
3 which would have been between 25 to a small --
4 25,000 for a small bookstore, 50,000 for your, say,
5 Barnes & Noble, or a hundred thousand different
6 books in, say, a Borders.
7     Instead, it listed a million and then 2
8 million, et cetera, books that were available.
9     Over time, that allowed it to get a sense
10 of what sort of books different customers were
11 buying and to start gathering data on that, and
12 keeping that data.  And it did so from its founding
13 in 1994, and it still does it through to the present
14 day.
15     Back in 2000 -- well, back in the 1990s,
16 or actually even in the 1980s, an
17 artificial-intelligence pioneer called Jeffrey
18 Hinton pioneered a whole lot of new techniques in
19 what was called neural networks.
20     Neural networks were a way of doing
21 artificial intelligence that have been around and
22 conceived on from the '50s and '60s, but hadn't
23 actually produced anything of use.
24     What they had done is the neural networks
25 had tried to provide a way of contextualizing large

Page 40

1 amounts of information by modeling on the human
2 brain, hence the word "neural networks," and also on
3 sort of how they thought the brain would work.
4     So those developments were occurring in
5 parallel to the developments of Amazon and many
6 other Internet companies gathering large corpuses of
7 data.
8     But what happened in the 2000s, was a
9 bunch of artificial intelligence scientists decided
10 to take these neural networks, which were just a
11 layer of meshed classifications, and start to have
12 them have layer upon layer of information.
13     You can think about it as one of those
14 little Pachinko things where you see the little
15 balls go and get sorted, and they just added more
16 layers.
17     They hadn't been able to do that -- they
18 thought this would be sort of a good thing.  They
19 hadn't been able to do it previously because the
20 processing speeds hadn't been fast enough, and also
21 because there hadn't been enough data to really have
22 these things some -- give some bite.
23     But when they were able to do it, firstly
24 with images and then things like natural-language
25 processing, they were able to develop algorithms

Page 41

1 that were able to do one specific function, and that
2 they could predict things, they could take
3 information that we had and turn it into information
4 we need.
5     So when you were looking at -- gave a
6 computer an image, it would be able to tell you what
7 a human would think in that image -- would think is
8 in that image:  A dog, a cat, a frisbee, a child,
9 what have you.  And it did that because it used this
10 trained data set of millions of tagged images.  And
11 then it could get a completely new image and predict
12 what someone would say the image was.
13     From the perspective --
14     (Query by reporter)
15     A.  From the perspective of a company
16 like Amazon, these new techniques allowed them to
17 take this corpus of millions of millions of
18 transactions, all tagged by individuals, boxes, time
19 of day, et cetera, based on what they saw on the web
20 page, and things like that, and be able to use them
21 to predict various things.
22     And so all the algorithms that Amazon
23 tends to use are based in this artificial
24 intelligence or machine learning, that they are
25 called.  That's where the 150 economists are coming

11 (Pages 38 - 41)

Exhibit 1, Page 8

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 42

1 from. That's where Amazon's vice presidents who
2 used to be an economics professor come from. That's
3 where some of the foremost machine-learning experts
4 in the world have come from.
5         And what they're able to do is to say,
6 okay, if I grab this data, I can come up with
7 predictions. So one of the things that it tries to
8 do in these algorithms that predicts, is predict
9 when someone is searching for Oh, The Things That
10 You Don't Know!, what are they doing? What are they
11 trying to do? What are other things that they would
12 likely want to buy?
13         And some of that will be based on the
14 corpus of millions of people in the places of "Oh,
15 The Things" -- Oh, the Places You Will Go!, maybe
16 eventually a million people, on other things that
17 they bought.
18         In other cases that will be nuanced
19 through various interactions in some of these
20 sublayers of the overall neural net to be things
21 that depend on time of year and other things like
22 that.
23         For instance, if you search for Oh, those
24 things you don't know!, in September, you come up
25 with a different result of what gets presented on

Page 43

1 the web page than if you search for it in November.
2 I discovered that this week.
3         And you can see why that is, because
4 September is closer to college graduation, whereas
5 November is closer to Christmas. And so there are
6 different things one might wish to purchase.
7         And so Amazon's algorithms are doing that
8 predictive task throughout the whole world, which
9 informs what is on their web page. So when they put
10 "frequently bought together," part of it is that
11 they're saying that's what people have done, which
12 is the representation. But it says "frequently," it
13 says -- not most bought together, not number 1, or
14 anything like that.
15         (Query by reporter)
16         A. Not number 1, not something like
17 that, because they're taking into account the
18 purchasing -- their prediction of the purchasing
19 intent of the customer.
20         So when I don't log in here, they got to
21 guess that I'm a generic customer possibly in
22 Canada. When Jordan logs in, it's going to be
23 something slightly different.
24         The point is that the Amazon algorithms
25 are all based on this thing, which just earlier this

Page 44

1 year, machine learning, I wrote a book that
2 describes all of those processes, including in that
3 book a discussion of what Amazon both does to our
4 understanding and what (sic) may do with regard to
5 these algorithms.
6         And so that's why I'm claiming to be as
7 much of an expert on this as any other digital
8 economist you might be bringing forward in this
9 matter.
10         Q. You're not a computer scientist,
11 right, Professor?
12         MR. BOOTH: Objection.
13         A. I'm not a computer scientist?
14         Q. Is that right?
15         MR. BOOTH: Objection.
16         A. I, I'm not a formally-trained
17 computer scientist, no.
18         BY MR. MILLER:
19         Q. And you've never reviewed the
20 computer code that forms these algorithms that you
21 just talked about, right?
22         MR. BOOTH: Objection, asked and answered.
23         A. I've never reviewed neural network
24 computer code? I have reviewed it.
25

Page 45

1         BY MR. MILLER:
2         Q. Have you reviewed Amazon's computer
3 code that generates these algorithms?
4         MR. BOOTH: Objection.
5         A. As I said to you previously, in a
6 previous question you asked, Amazon have not
7 disclosed those to me.
8         BY MR. MILLER:
9         Q. And so you don't know how exactly
10 Amazon generates the results that appear under a
11 heading like "frequently bought together;" isn't
12 that right?
13         MR. BOOTH: Objection.
14         A. As I said, while I do not exactly
15 know because they haven't disclosed it to me, I, in
16 my studies of this and interactions with people from
17 Amazon, have never had any reason to believe it was
18 anything other than the plain-language meaning of
19 what we see on that web page.
20         Q. Can you list all of the various
21 inputs that go into the Amazon algorithm for
22 "frequently bought together"?
23         MR. BOOTH: Objection.
24         A. I cannot.
25         BY MR. MILLER:

12 (Pages 42 - 45)

Exhibit 1, Page 9

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 46

1    Q.  Can you list the various inputs that
2  go into Amazon's algorithm for "customers who bought
3  this item also bought"?
4        MR. BOOTH:  Objection.
5        A.  I cannot list all of the things that
6  they have.  I do not know the full extent of
7  Amazon's data corpus.
8        BY MR. MILLER:
9        Q.  Have you ever -- excuse me.
10       Have you ever reviewed Amazon's data?
11       A.  They have not --
12       MR. BOOTH:  Objection.
13       A.  -- they have not disclosed their data
14  to me.
15       BY MR. MILLER:
16       Q.  Have you ever reviewed the actual
17  purchasing data from Amazon?
18       MR. BOOTH:  Objection.
19       A.  Amazon have not dis -- well, no, not
20  true.  I've reviewed some of it, yes.
21       BY MR. MILLER:
22       Q.  What have you reviewed?
23       A.  I've reviewed the Amazon disclosed
24  purchasing data for my own books.
25       Q.  And in connection with your expert

Page 47

1  opinion in this case, have you reviewed any
2  purchasing data from Amazon related to the items
3  that you've referred to?
4        MR. BOOTH:  Objection.
5        A.  Well, I regard searches of these web
6  pages as a partial review of purchasing data, but I
7  have not reviewed their entire purchasing data with
8  respect to Dr.~Seuss, transformative works of
9  Dr.~Seuss and other children's book, et cetera.
10       BY MR. MILLER:
11       Q.  So, in considering the information on
12  this web page in forming your expert opinion in this
13  case, you are taking the information on this website
14  at face value --
15       MR. BOOTH:  Objection.
16       BY MR. MILLER:
17       Q.  -- is that right?
18       A.  I'm saying I have no reason to doubt
19  Amazon's representations and so I'm taking them at
20  face value.
21       Q.  And you're just speculating about how
22  Amazon generates these results?
23       MR. BOOTH:  Objection, asked and answered.
24       A.  I do not regard what I've testified
25  thus far as speculation.

Page 48

1        BY MR. MILLER:
2        Q.  Right.  But you haven't actually
3  reviewed any of the data that underlies the output
4  on Amazon's web page; isn't that right?
5        MR. BOOTH:  Objection.
6        A.  Amazon have not provided me with that
7  data.
8        BY MR. MILLER:
9        Q.  Let's go back to your second report.
10  I believe before we started talking about Amazon,
11  you were talking about why it was that you wrote a
12  second report, right?
13       A.  I can't remember what I was talking
14  about.
15       Q.  You had testified earlier that you
16  were, in preparing your second expert report, you
17  were reviewing Dr. Dawson's report and your first
18  report, right?
19       A.  Yes.
20       Q.  And what other information did you
21  review in preparing your second report?
22       A.  No --
23       MR. BOOTH:  Objection.
24       A.  -- no other information, other than
25  her report, the stuff that I've talked to you about

Page 49

1  with regard to Amazon, and the documents that I've
2  listed in my second report.
3        BY MR. MILLER:
4        Q.  Can you identify the documents that
5  you've listed in your second report, please?
6        A.  Yes.
7        Q.  List them out?
8        A.  They are the paper that I reference
9  in footnote 1 on page 6.  Miceli/Adelstein 2006, and
10  the original Complaint from this matter, which I
11  reviewed but I -- because I did not take the time,
12  did not reference any explicit part in this report
13  because it was already referenced in my first
14  report.
15       Q.  There's no other materials that you
16  referenced in considering, in forming your second
17  report, other than the article in footnote 1 --
18       A.  My --
19       Q.  Excuse me, let me just finish my
20  question -- other than the article referenced in
21  footnote 1 and the original Complaint?
22       MR. BOOTH:  Objection.
23       A.  That is correct.  So I was -- my
24  second report was purely a reaction to Dr. Dawson's
25  rebuttal report.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 50

1    BY MR. MILLER:
2        Q.  Can you point out any language in
3    your second expert report that are not your words or
4    were written by somebody else?
5        A.  The word that was suggested to me
6    that I had not --
7        MR. BOOTH:  Objection, may I?  Objection.
8        A.  The word suggested to me that I had
9    not used previously was "cognizant."
10   BY MR. MILLER:
11       Q.  Where does that appear?
12       A.  It appears in a few places.  It was
13   an adjective to some things that were suggested to
14   me was a good adjective, and I liked it as well.  We
15   would have to do a quick search for where that was.
16   It was, like, in one or two places.
17       I remember that because I did that
18   yesterday.
19       Sorry.  Top of page 6, I wrote:  (as read)
20           "If the publication of Boldly
21           does not cognizab--- cognizably --"
22   I can't write it, but you can write it.  "-- harm or
23   improve the sale --" I think I just had "harm"
24   previously.  I had put an adjective or --
25           (Query by reporter)

Page 51

1    Harm.  H-a-r-m.
2    BY MR. MILLER:
3        Q.  What does the word "cognizably harm,"
4    or what does that phrase, mean to you?
5        MR. BOOTH:  Objection.
6        A.  It means that it was -- well, I
7    thought it had been sort of recognizably, you know.
8    Sort of materially.  That was my...
9    BY MR. MILLER:
10       Q.  And who suggested that phrase to you?
11       MR. BOOTH:  Objection.
12       A.  Mr. Booth.
13   BY MR. MILLER:
14       Q.  Are there any other words in your
15   second report that are not your own?
16       A.  No.
17       MR. BOOTH:  Objection.
18       A.  No.
19   BY MR. MILLER:
20       Q.  Have you reviewed your expert report
21   since you signed it?
22       A.  Actually, no.  I signed it yesterday.
23       Q.  Are there any mistakes in your second
24   expert report that you'd like to correct?
25       A.  I do not believe so.

Page 52

1        Q.  Did your opinions change between your
2    first expert report and your second expert report?
3        A.  They did not.
4        Q.  Have your opinions changed since you
5    drafted your second expert report?
6        A.  They have not.
7        Q.  And are you reasonably certain of the
8    opinions stated in your second expert report?
9        A.  I am reasonably certain of those
10   opinions.
11       Q.  Are all of the opinions that you
12   intend to testify about at trial in this action
13   stated either in your first or second expert
14   reports?
15       MR. BOOTH:  Objection.
16       A.  Well, all of the opinions that I
17   intend to testify about are stated in these reports.
18   BY MR. MILLER:
19       Q.  Do you intend to further supplement
20   your opinions with any other reports?
21       MR. BOOTH:  Objection.
22       A.  I do not intend to do so.  I didn't
23   intend to have a second report either.
24   BY MR. MILLER:
25       Q.  All right.  Let's take a look at your

Page 53

1    first expert report, Exhibit 1.
2        MR. BOOTH:  We've been going for about an
3        hour.  Might I ask, are you okay?  Do you
4        want a break?
5        THE WITNESS:  I'm okay.
6        MR. BOOTH:  Great.
7        MR. MILLER:  Just go a little bit longer.
8    BY MR. MILLER:
9        Q.  So attached to your expert report is
10   your c.v.; is that right?
11       A.  Yes.
12       Q.  It's Exhibit A -- or, sorry, Appendix
13   A to your report as referenced?
14       A.  Yeah, I think so.
15       Q.  There's no heading on your c.v. that
16   indicates it's Appendix A?
17       A.  No.  You know, I was doing this
18   myself, and, you know, I will apologize for my poor
19   formatting.
20       Q.  All right.
21       And so is your c.v. that was attached as
22   Appendix A -- this is a true and correct copy as of?
23       A.  September something, yes.
24       Q.  September?  Do you know what date?
25       A.  I don't remember the date.  No, I

14 (Pages 50 - 53)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 86

1  at and do a search for apps -- other apps that can
2  do the same thing.  And do -- are they priced?  Are
3  they affiliated with certain carriers?  Are they --
4  any of this sort of stuff.  And, in fact, that was
5  sort of generically available.  So it wasn't clear
6  that the functionality that this Israeli company was
7  giving this particular app was all that unique.
8       So regardless of the copyright issue, the
9  value of the copyright itself, even if it was there,
10 I assessed to be low or non-existent.
11      Q.  Did any of the parties in that
12 dispute challenge your testimony?
13      MR. BOOTH:  Objection.
14      A.  No, they did not.  In the end,
15 though, going to -- it was one of these ones where
16 you testify straight rather than deposed.  And
17 one hour before I was going to be testifying, they
18 said they, they would not want to cross-examine me.
19 And so they just took my report.
20      BY MR. MILLER:
21      Q.  So you served a report in that matter
22 but you didn't testify?
23      A.  I didn't end up testifying, no.
24      Q.  What were the names of the parties
25 involved in that dispute?

Page 87

1       MR. BOOTH:  Objection.
2       A.  So I'm not sure -- so the reason it's
3  not listed there is, I, I, I was told that I
4  shouldn't put them on any public document.  So I
5  didn't, you know, 'cause it was a private
6  arbitration.
7       BY MR. MILLER:
8       Q.  Do you recall the names?
9       MR. BOOTH:  Objection.
10      A.  I recall the name of my client.
11      BY MR. MILLER:
12      Q.  And who was that?
13      MR. BOOTH:  Objection.
14      A.  I don't know if I should be able to
15 say.  Do I have to say that here?
16      BY MR. MILLER:
17      Q.  There's a protective order in this
18 dispute, and if you so wish, we can mark this
19 transcript confidential so it won't be disclosed to
20 the public.
21      MR. BOOTH:  Objection.
22      BY MR. MILLER:
23      Q.  But you can answer the question.
24      MR. BOOTH:  Objection.  May we go off the
25 record.

Page 88

1       THE VIDEOGRAPHER:  Off the record --
2       MR. MILLER:  Sure.
3       THE VIDEOGRAPHER:  Hang --
4       MR. MILLER:  What's the issue?
5       THE VIDEOGRAPHER:  Hang on a second.  Off
6  the record at 10:46.
7       (Discussion off the record)
8  --- Upon recessing at 10:46 a.m.
9  --- Upon resuming at 10:49 a.m.
10      THE VIDEOGRAPHER:  We're back on the
11 record at 10:49 a.m.
12      BY MR. MILLER:
13      Q.  So before we went off the record, I
14 was asking you about the names of the parties
15 involved in this copyright arbitration dispute.  And
16 so we'll designate the portion of the transcript
17 containing your answer to that question as
18 confidential, to prevent the names from being
19 released to the, to the broader public.  So...
20 --- REPORTER'S NOTE:  Confidential section begins
21 ██████████████████████████████
██████████████████████████████
██████████████
██████████████████████

Page 89

1  ██████████████████
██  ██████████████
3  --- REPORTER'S NOTE:  Confidential section ends
4       BY MR. MILLER:
5       Q.  Was there a copyright "fair use"
6  defence at issue in that arbitration dispute?
7       A.  No.
8       Q.  So in neither of the two copyright
9  disputes that you've been involved in as an expert
10 has there been a "fair use" defence at issue; is
11 that right?
12      MR. BOOTH:  Objection.
13      A.  That is correct.
14      BY MR. MILLER:
15      Q.  Would you consider yourself an expert
16 in copyright fair use?
17      MR. BOOTH:  Objection.
18      A.  My expertise in that particular
19 aspect comes from my 2015 paper and research on, on
20 copyright and derivative works.
21      BY MR. MILLER:
22      Q.  Is that the paper that's referenced
23 in your expert report?
24      A.  It is.
25      Q.  Okay.  Just a couple of other

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 90

1  questions about your CV before I move on.
2        Underneath the "Consulting" heading and
3  underneath "Long-term Associations" and "Litigation
4  and Witness Statement Preparation," you have another
5  subheading called "Projects by Industry," and there
6  are six industries listed here.
7        A.  And "other."  Oh, yeah, there's --
8  one is "other."  Yes.
9        Q.  Sorry.  Six headings?
10       A.  Yes.
11       Q.  All right.  What, what are these
12  projects?  What, what is this?
13       MR. BOOTH:  Objection to form.
14       A.  Well, when I was in Australia, and
15  this mostly dates from that, because I was a big
16  fish in a small pond, people asked me for written
17  economic advice about all manner of industries.
18       BY MR. MILLER:
19       Q.  Okay.
20       A.  And what the --
21       Q.  This is all --
22       A.  This is all --
23       Q.  -- all non-U.S.?
24       A.  This --
25       MR. BOOTH:  Objection.

Page 91

1        A.  This is all pretty, all pretty much
2  non- -- I think this is all non-U.S. --
3        BY MR. MILLER:
4        Q.  And then --
5        A.  -- except for I -- some recent stuff
6  in "other."
7        Q.  Okay.  What might that be?
8        A.  I was giving advice to U.S. Air- --
9  Airways on an antitrust matter.  I was giving
10  economic advice to Microsoft on licensing of, of
11  video encoding and Wi-Fi standards.  And I was
12  giving them advice on antitrust matters.  Those --
13  they were in the -- from the U.S.
14       Q.  Is there anything in the projects by
15  industry that relates to copyright?
16       A.  On the other parts, no, no.  There
17  was some copyright work -- my goodness, "other" goes
18  on -- that I did regarding copyright collection
19  agencies.  That's going back 20 years now, so I
20  can't remember all the details.
21       Q.  Mm-hm.
22       A.  That's somewhere there.
23       Q.  Just point me where you're, where
24  you're looking on --
25       A.  My, my -- that's -- that, I would

Page 92

1  like to do.  Oh, there it is.  It's a paper for
2  inquiry into intellectual property on behalf of
3  APRA, the Australia Performing Rights Association,
4  November 1999.
5        So it was last millennium.  I didn't --
6        Q.  Did that, did that --
7        A.  Yeah.
8        Q.  Did you write a paper concerning --
9  well, one, was that U.S. copyright law?
10       A.  No.  That was Australian copyright
11  law.
12       Q.  Okay.  And it didn't concern an
13  infringement dispute; is that right?
14       MR. BOOTH:  Objection.
15       A.  It did not.
16       BY MR. MILLER:
17       Q.  Okay.
18       A.  I haven't looked at this for a while.
19       Q.  There's nothing listed on your CV
20  under your "Consulting" work that has to do with any
21  prior experience in the book publishing industry; is
22  that right?
23       MR. BOOTH:  Objection.
24       A.  What do you mean by "prior experience
25  in the book publishing industry"?

Page 93

1        BY MR. MILLER:
2        Q.  Do you have any prior experience
3  working in the book publishing industry?
4        A.  Other than studying it, no.  Oh, and
5  being an author --
6        Q.  Sure.
7        A.  -- and negotiating book publishing
8  contracts.
9        Q.  But you've never worked in the book
10  publishing industry?
11       A.  So I've never worked for a, a
12  publisher of books.
13       Q.  Have you ever worked for a company
14  that's in the entertainment industry?
15       MR. BOOTH:  Objection.
16       A.  I was the advisor to, Chief
17  Economist, they gave me a title at Revlo, which was
18  a start-up, in the, in the e-gaming industry and
19  YouTube streaming industry.  So that's entertainment
20  by my books.
21       I was -- I'm advising currently a company
22  called FilmChain.  That has to do with the
23  collection of royalties for movies, for var- -- all
24  the various parties that are involved in that.
25       Q.  Is that listed on here?

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 94

1    A.   No, I'm not a formal advisor yet.
2  It -- as of the time of those things, I haven't
3  signed anything, but I've been meeting with them,
4  and it's when they get their act together.
5    Q.   FilmChain, you said?
6    A.   FilmChain, it's called.
7    Q.   Is that in the U.S.?
8    A.   FilmChain, I think actually -- I
9  mean, they're part of our program here in the -- in
10  Toronto --
11       (Query by reporter)
12    Part of our program in Toronto, but --
13    Q.   What does that --
14    A.   -- I think the company --
15    Q.   Sorry.  What does that mean, "part of
16  our program"?
17    A.   Oh, that's the Creative Destruction
18  Lab, of which I'm the Chief Economist.  It's listed
19  here in my current positions.
20    The Creative Destruction Lab is a
21  seed-stage start-up program that we run here out of
22  the University of Toronto.  I've been doing that for
23  about five years.  And we get now through just the
24  Toronto part of it, about 175 start-ups a year,
25  which we put through mentoring, education.  I teach

Page 95

1  the main course for the MBAs that builds on that.
2  And so that's where my knowledge of artificial
3  intelligence comes from, for instance.
4    And so FilmChain are one of the people in
5  that cohort this year.
6    Q.   Do you have any other experience in
7  the broader entertainment industry?
8    MR. BOOTH:  Objection.
9    A.   Oh, as I said, apart from the
10  research that I've done, no.
11    BY MR. MILLER:
12    Q.   Do you have any prior experience
13  working with intellectual property licensing?
14    MR. BOOTH:  Objection.
15    A.   I've worked on court cases that have
16  involved that.  I've also written several papers on
17  that.
18    BY MR. MILLER:
19    Q.   And besides your court cases and your
20  academic papers, is there any actual work experience
21  in the field relating to licensing that you've had?
22    A.   Well, I've -- I have advised many of
23  these start-ups on various licensing strategies.  I
24  don't negotiate licensing, but I've advised them on
25  options and other things to consider, levels, rates,

Page 96

1  and so on.
2    Q.   Do you have any prior experience
3  launching a brand?
4    MR. BOOTH:  Objection.
5    A.   Yes.  Yes, I do.  And the reason I am
6  laughing is because you asked the question, I guess
7  I have to answer it.
8    So obviously my consulting company was,
9  you know, launched in 2001, was an attempt to launch
10  a brand and even came up with icons and invested in
11  it.
12    And just this year, I tried to launch my
13  own line of, of T-shirts under the brand that I
14  invented called "My Other Kid."
15    And it, it was a -- I, I, I wouldn't call
16  it a brand, but my intention was to launch a brand.
17  It's not a brand because, you know, it doesn't have
18  any value demonstrably in the market.
19    BY MR. MILLER:
20    Q.   And besides that venture, anything
21  else?
22    MR. BOOTH:  Objection.
23    A.   No.  Of the stuff -- there are
24  various works in, in competition and antitrust work
25  all the time.  Understanding the value of a brand

Page 97

1  and its defensibility and other things like that are
2  things -- are issues that come up.  But I have not
3  personally experienced in launching a brand, other
4  than the two cases I've mentioned.
5    BY MR. MILLER:
6    Q.   Right.
7    A.   I could show you my website.  It's
8  still up, if you want to see it.
9    Q.   I'll have to check that out another
10  time.
11    A.   Okay.  All right.  It won't be
12  congested.
13    Q.   Have you ever been to a
14  licensing-industry trade show?
15    MR. BOOTH:  Objection, relevance.
16    A.   No.
17    BY MR. MILLER:
18    Q.   Do you know what a licensing-industry
19  trade show is?
20    A.   Yes, I do.
21    Q.   Are you familiar with the licensing
22  expo that's held in Las Vegas, Nevada?
23    MR. BOOTH:  Objection.
24    A.   I'm not familiar with that particular
25  one.

25 (Pages 94 - 97)

Exhibit 1, Page 14

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 98

1      BY MR. MILLER:
2          Q.   Are you familiar with others?
3          MR. BOOTH:  Objection.
4          A.   During the course of various bits of
5    research into licensing and the markets for ideas,
6    one of the things we once thought of investigating
7    was what went on at these licensing-trade shows,
8    'cause I'm aware that they occur in all sorts of
9    industries all around the place.
10         (Query by reporter)
11         A.   Occur in all sorts of industries
12   around the place.  And I don't remember precisely
13   why we decided not to pursue that angle.  But we
14   didn't.  So that's the extent of my awareness.
15         BY MR. MILLER:
16         Q.   Have you ever read any
17   licensing-industry trade publications?
18         MR. BOOTH:  Objection.
19         A.   I have but I can't recall specific
20   things.  I've read them in the way that I sort of
21   had to read them for something, and then I don't
22   have any other recollection of them.
23         BY MR. MILLER:
24         Q.   Have you ever read License Global?
25         MR. BOOTH:  Objection.

Page 99

1      BY MR. MILLER:
2          Q.   Or heard of that?
3          A.   I have not.
4          Q.   You don't have any prior experience
5    working in the retail industry; is that right?
6          MR. BOOTH:  Objection.
7          A.   Prior experience?  No.  Apart from my
8    consulting work that might have involved retail
9    firms, I have not, except for my failed fashion
10   brand, which was a retail excursion.
11         And I've been recently -- it's not on here
12   'cause it's recent -- been doing some work for
13   Shopify, which is a large Canadian online platform
14   that serves retailers, and so I've been having some
15   experience from that end of it.
16         BY MR. MILLER:
17         Q.   You're consulting for Shopify right
18   now?
19         A.   Yes, that is correct.
20         Q.   Not listed on your c.v.?
21         A.   It's not listed, it's not listed
22   because I just didn't update it.  It only occurred
23   to me now.  Doesn't have any intellectual-property
24   angles to it.
25         Q.   You don't have any prior experience

Page 100

1    working in the marketing field, right?
2          MR. BOOTH:  Objection.
3          A.   What do you mean by "working in the
4    marketing field"?
5          BY MR. MILLER:
6          Q.   What do you understand "marketing" to
7    mean?
8          A.   So as a --
9          MR. BOOTH:  Objection.
10         A.   -- as an academic field, marketing is
11   actually quite closely related to economics.  There
12   are issues in pricing, there are issues in
13   advertising, branding, distribution, customer
14   relationships.
15         So I spent a number of years working on
16   the economics of advertising markets, and so that,
17   you know, that basically was tightly integrated in
18   with the marketing discipline.
19         (Query by reporter)
20         A.   Discipline.
21         One of my co-authors is a marketing
22   professor on several things, including a recent
23   paper on complaints to airlines, which is a
24   marketing function.
25         And -- but I haven't, I haven't been

Page 101

1    employed by a marketing firm.
2          BY MR. MILLER:
3          Q.   And you haven't worked in some other
4    companies, a private company's marketing department,
5    right?
6          A.   No, I've had to market my own
7    consulting services, obviously, but as I said, I've
8    been an academic my whole life.
9          That said, yeah, we all get drawn into the
10   academic marketing in our academic -- sorry,
11   academic services.  And, of course, as an author,
12   I've had to market my own books and things like
13   that.
14         BY MR. MILLER:
15         Q.   Okay.  Other than this current
16   engagement, this case, have you ever been retained
17   to consult in a dispute or litigation involving
18   books before?
19         MR. BOOTH:  Objection.
20         A.   There was a matter I recall, but I
21   don't think it went anywhere, where I did a little
22   bit of work, but I didn't -- it was such a little
23   bit of work that I didn't -- I don't even know if I
24   put it on this c.v.  It was to do with book sales
25   and the seasonality.  Remember, we were playing a

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 102

1 lot of Canadian data.
2      What exactly we were looking for was not
3 clear but -- or I just can't recall. But I do
4 remember it was startling that most books are sold
5 on holidays. Just in total. It's like they're
6 gifts. The reading side of it's very low.
7      And I invested -- I remember building on
8 that and finding some more information about that
9 when I wrote my Information Wants to be Shared book
10 and the chapter about book-selling in that.
11      Q. Was that a dispute relating to the
12 copyright in those books? I mean, what was that
13 about, that matter you're referring to?
14      A. I do not remember. I don't remember
15 the dispute. I remember the data. Which is a bit
16 funny, but that's...
17      Q. Fair enough.
18      So other than this current engagement,
19 have you ever been involved or retained to consult
20 in a dispute or litigation involving the publishing
21 industry?
22      MR. BOOTH: Objection.
23      A. I have been involved in various
24 aspects of the publishing industry. You know, going
25 way back, my father was what was called a

Page 103

1 subscription agent, and so I used to work for him
2 during the summers, and they would arrange journal
3 subscriptions for libraries which were being
4 published and priced, or overpriced.
5      And then, later on, I, as part of a large
6 grant I received from the Sloan Foundation studying
7 various things, I ended up writing a book about
8 scholarly publishing and the influence of market
9 power, copyright, and other issues in that. That
10 came out last year.
11      But -- so I actually haven't done much in
12 the way of any paid work, or, and I guess, including
13 this, in publishing, but I've done lots of work in
14 it.
15      BY MR. MILLER:
16      Q. Right. But you've never been
17 retained in a -- to consult as a expert witness in a
18 dispute concerning the publishing industry; is that
19 right?
20      MR. BOOTH: Objection.
21      A. Music publishing, obviously, but --
22      BY MR. MILLER
23      Q. Book publishing?
24      A. -- but -- not that I can recall, the
25 book publishing.

Page 104

1      Q. Same question: Other than this
2 current case, have you ever been retained to consult
3 as an expert in a dispute or a litigation concerning
4 the entertainment industry?
5      MR. BOOTH: Objection.
6      A. Well, yes. So there was the music
7 publishers' one. That's a previous one with that in
8 gymnasiums. There was one regarding television a
9 few years ago.
10      BY MR. MILLER:
11      Q. What was that television matter?
12      A. Yeah, so the television matter was --
13 I'm trying to remember what was it now. It was a --
14 oh, yeah, I remember.
15      It was -- it was -- so, you know, you
16 watch TV shows and there's music played in the TV
17 shows.
18      And so when they broadcast those TV shows,
19 they're meant to pay back the performer and the
20 composer for the music that gets played.
21      And so there was a discussion about the
22 licensing fees to get paid for that, and I'm trying
23 to remember the name of those royalties. They have
24 some name. Anyway.
25      And I was retained 'cause they were having

Page 105

1 trouble -- they could do the normal stuff but they
2 wanted some out-of-the-box thinking. You know,
3 what's some ways in which we could come at this
4 problem without doing the sort of mess that we did
5 in the music case?
6      And, you know, what's a benchmark and so I
7 was thinking about how to use Canada and all this
8 sort of stuff.
9      And in the end, they didn't like any of
10 the ideas I came up with. So it was never used.
11 But that's 'cause they were kind of out of the box.
12 That was my thing.
13      But it was kind of interesting. You know,
14 there's so much -- it makes you hyperaware of every
15 song that's played in TV shows. It's like, aha.
16 There's another -- something.
17      I don't know why that's not listed here
18 either. In the old days I would be better about
19 listing my stuff. But it didn't -- if I had
20 testified or submitted a witness statement, it would
21 have.
22      Q. Okay. Let's turn to page 4 of
23 Exhibit 1, your expert report, your first expert
24 report.
25      A. Okay.

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 106

1  Q.  How did you come to be involved in
2  this matter?
3  A.  I believe I received an e-mail from
4  Mr. Booth -- I'm not -- I don't think I'm divulging
5  anything in privileged communication here -- where
6  he said:  "I'd come across your paper in the
7  International Journal of Industrial Organization,
8  and I'm acting on behalf of the clients here in this
9  matter against Dr. Seuss.  Can I talk to you about
10  it?"
11  And, and so we had a conversation.  And
12  you know, when I heard about the case, and matters,
13  I said, oh, this was just the sort of thing that I
14  was thinking about in that article.  No wonder you
15  came across it.
16  I think I can help you.
17  Q.  What was that?
18  A.  My guess, I think that was like July.
19  Q.  Of 2018?
20  A.  Could it be... it was -- it was --
21  July or August.  It wasn't that -- you know.  That
22  long before I ended up doing a -- I can't -- but I
23  can't recall the dates.  I mean, we could look them
24  up.
25  Q.  But to the best of your recollection

Page 107

1  right now?
2  A.  Oh, no, I remember, no, no.
3  Deadline.  You'll know,know it.  There was a
4  deadline, it was two weeks before they had to
5  disclose the experts.  That's when I was contacted.
6  Q.  And that was sometime in August?
7  A.  Yeah, so it was two weeks before
8  that.  Whenever that date was, because we had to
9  work out that I could be disclosed as an expert in
10  whatever.
11  (Query by reporter)
12  Q.  And who retained you as an expert in
13  this case?
14  MR. BOOTH:  Objection.
15  A.  I believe it was Booth Sweet.  I
16  signed something, I had to sign the protective
17  order, I had to sign a retainer letter.
18  Q.  For what purpose were you retained as
19  an expert in this case?
20  MR. BOOTH:  Objection.
21  A.  I was retained to provide a report
22  indicating what evidence that I thought existed
23  regarding the likely market impact of the
24  publication of Oh, The Places You'll Boldly Go! on
25  Dr.~Seuss' books and commercial interests.

Page 108

1  Q.  If you look at the first paragraph on
2  page 4, under the heading "Assignment"?
3  A.  Yes.
4  Q.  There's a sentence that begins with:
5  (as read).
6  "Booth Sweet LLP"?
7  A.  Yes.
8  Q.  Is that an accurate statement of your
9  assignment in this matter?
10  A.  Yes.
11  Q.  In the sentence following that, you
12  say:  (as read).
13  "This is a task that I undertake
14  using my expertise as an
15  economist."
16  Is that right.
17  A.  I have said that, yes.
18  Q.  Aside from being a economist, is
19  there anything else you believe qualifies you to
20  offer your opinion in this matter?
21  MR. BOOTH:  Objection.
22  A.  Well, I always see myself as an
23  economist first, but I, in this particular matter, I
24  think I mentioned earlier that when we had discussed
25  that initially, I felt I was the right expert for

Page 109

1  this case.
2  And that was actually on several
3  dimensions.  The first was the case was exactly the
4  sort of case, in the sort of domain of things that I
5  was thinking about, when I did my research for the
6  2015 paper.  It's the sorts of things that -- it's
7  not just this industry that that were going on
8  elsewhere, regarding copyright, derivative,
9  transformative works, remixing.  And those are a set
10  of economic issues that I was interested in, and
11  here was a case that was squarely on that.
12  Q.  Let me stop you there before you go
13  on to your next reason.  You've used the word
14  "squarely fits," "exactly fits," but in your report
15  on page 7, you say -- well, why don't you turn to
16  it.
17  A.  Mm-hm.
18  Q.  In the last paragraph on that page,
19  you say that:  (as read).
20  "Boldly is a transformative work
21  of Go! rather than a remix."
22  A.  Yes.  That is, that is correct.
23  Q.  Right.  The following sentence you
24  say:  (as read).
25  "For that reason it does not

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 110

1    precisely fit the express of the
2    model provided for my research on
3    remix rights."
4        So --
5    A.  So let me explain --
6    Q.  Let me get my question out.  How do
7 you -- how is it that you're telling me now that
8 this is exactly and precisely the right fit for your
9 research, this case, but in your report you say that
10 it's not precisely the right fit for your research?
11    MR. BOOTH:  Objection.  Let's not
12    mischaracterize his testimony.
13    A.  Let me -- you know, when you look
14 back at this, you'll see I was careful with my words
15 for this reason.
16    Q.  Mm-hm?
17    A.  When we do research, we academics, we
18 do a lot of research that ends up being a published
19 paper.
20    And the published paper ends up being
21 molded in various commence.  And when you what you
22 normally end up doing for the published paper is you
23 sort of mold it toward the most difficult case, the
24 case that represents the most challenges, and that
25 becomes the thing that gets risen to the top of it.

Page 111

1    So in the case of remix rights, that was a
2 much harder case.  So if you're trying to say, oh,
3 I've got some copyright protection, and then
4 somebody is literally taking a sample, a chunks of
5 video, and then using it somewhere else, like,
6 bottom, copying it, actual cut and past, right?  And
7 people are saying, I'm going to look at that case,
8 and saying, you know, when should that occur?
9    But in the process, I note -- and it's
10 throughout the footnotes and also someone who is
11 schooled in reading these papers would know -- that
12 it applies to other cases that are subsumed within
13 it, even though they weren't the main in the title.
14 And one of those is transformative works, where
15 nothing is being lifted, but what was being lifted
16 is something not tangible but intangible.
17    You know, fortunately, the mathematics of
18 the model apply for that?
19    Now, what it did not apply for was in the
20 remixes.  The remixes were directly damaging the
21 creator of the initial work.  I mean, in my model I
22 allowed a remixer to take an entire song and put it
23 in their thing, and to see if that was ever a good
24 idea.  And maybe to add a different video to it.
25    And when I presented this, which is not in

Page 112

1 the paper, but when I presented this in academic
2 seminars, there's this great example where the
3 entire track of, of Endless Love by Lionel Ritchie
4 and Diana Ross -- it's a song; do you know it?
5    Q.  Sure?
6    A.  Otherwise I would have had to sing it
7 and this would be interesting.  Endless Love, and it
8 was lifted, overlaid laid with George W. Bush and
9 Tony Blair sort of mouthing the words to each other.
10 Okay?  So in other words, you could take that, close
11 your eyes, and you're literally listening to the
12 work, the song.  So they've taken the whole thing,
13 and then they've added this other thing to it.
14    And so that was the case where I had to
15 show that the law would or would not apply, as a
16 matter of economics in terms of the optimal
17 copyright regime.
18    But this case here, was nothing like that.
19 No one's alleging they've taken a whole
20 copy-and-paste thing going on.  In fact, it's far
21 simpler, it's just sort of the overall design.
22    So everything interesting about this case
23 goes in the second function, if we were to open my
24 paper, we could look at that.
25    But none of it in the first.

Page 113

1    So, so it makes it -- you know, if that
2 was -- that paper would never have got published
3 because it wouldn't have been very -- interesting
4 enough.  But my research on how to set it up and how
5 to look at that problem, and the structure of it,
6 the formalizing what the rights were, what the
7 negotiations that were possible that might occur,
8 and then what a court could ex post impose, that was
9 all the same.
10    So I wanted to be -- there to be no doubt
11 when I wrote this statement that the -- it does not
12 precisely fit the expression of the model.  However,
13 the issues that arise with respect to market impact
14 do fit the model, and that's what I wrote here.
15    And I can tell you that because I was the
16 person who came up with that model, and I was
17 thinking about the broad issues as I did that
18 research.
19    But that doesn't answer your first
20 question about my expertise.  I don't know if you
21 want me to come back to that.
22    Q.  Yeah, I think we'll come back to your
23 model in a minute.  Let's go back to the question I
24 asked you about your expertise, which I think was:
25 Aside from being an economist?

29 (Pages 110 - 113)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 114

1    A.  Yes.
2    Q.  Is there anything else in your
3  background that you believe qualifies you to offer
4  an opinion in this case?
5    A.  Okay.  So the first was that, you
6  know, this article.  The second was that I've had a
7  broad interest in book publishing per se and it's
8  reflected in some books of mine.  And then the third
9  part was the subject matter here.
10    And that this was -- I mean, I didn't have
11  to be told very much when Mr. Booth said here's what
12  the title of the transformative work, it's Oh, The
13  Places You'll Boldly Go!, I knew which two elements
14  that that was coming into play.
15    Now --
16    Q.  Why is that?
17    A.  Well, the reason being is because own
18  how you get formal expertise in Star Trek.  I don't
19  know what would qualify someone.  But if you were to
20  search the world for an economist who was as
21  knowledgeable about Star Trek, all of its elements,
22  has watched every minute of it, understands all of
23  that stuff, has looked into the industry of it, et
24  cetera, there would be two or three names on the
25  list, and I would be one of them.

Page 115

1    Not only that -- and you know, aside from
2  the fact that I've got all three of my children are
3  named after Star Trek characters, so I obviously am
4  a fan.  I don't know if that makes you an expert bit
5  makes you definitely familiar.
6    And the third, and of course --
7  similarly -- I don't think I'm unique to this as a
8  parent, I have read the complete works of Dr.~Seuss
9  out loud00 hundreds of times, so I was familiar with
10  what that was.
11    Now, this is a luxury I do not normally
12  get when am testifying before the courts on market
13  impact and other things like that.  Normally, I'm
14  not as steeped in the, in the, in the cultural
15  milieu of this thing.  But this time I was.  Which
16  is what you asked before:  Why did I think I was a
17  good fit for this case?  It was precisely because
18  not only had I written these articles but the
19  subject matter played into -- we can call it
20  personal interest, but a very deep personal
21  interest.
22    Q.  So are you claiming to be an expert
23  in Star Trek in this case?
24    MR. BOOTH:  Objection.
25    A.  I'm not claiming to -- I don't -- as

Page 116

1  I said, I don't know what an expert in Star Trek is.
2  But if the threshold for being an expert in Star
3  Trek was being able to take Oh, The Places You'll
4  Boldly Go! and immediately be able to identify by
5  name all of the Easter -- not Easter eggs, the
6  things that the places on each page were represented
7  in.  And there was probably about 80 or -- 80 or so
8  of those throughout the whole book, and I'd probably
9  get 80 or 90 percent of them.  And of what, what the
10  author was communicating to me.
11    I also realize that doesn't make me a very
12  large target market, but I was able to do that.
13  Which I don't know if anybody else can other than
14  the authors in this proceeding.
15    I don't know if that makes me an expert.
16  But what that allowed me to do was to look at this
17  and say, well, you know, I know what market Star
18  Trek is targeted at, what sort of people.  I know
19  what sort of people Dr.~Seuss is targeted at.  And
20  moreover, in both cases there's other evidence of
21  those sorts of things.
22    So that, at least from my perspective,
23  dramatically lowered my cost of being able to get
24  into this case and provide expert advice.
25    Q.  All right.  I'll have a few questions

Page 117

1  for you about the target markets for the various
2  properties you mentioned, but let me ask a few
3  questions before we get there.
4    Actually, hold on.  I'm not sure that you
5  answered my question previously, which is:  Are you
6  claiming to be an expert on Star Trek in this
7  matter?
8    MR. BOOTH:  Objection, asked and answered.
9    BY MR. MILLER:
10    Q.  It's a yes-or-no question.
11    A.  I don't know what an expert on Star
12  Trek is.
13    Q.  So the answer is no?
14    MR. BOOTH:  Objection.
15    A.  So I'm not making that claim.
16    BY MR. MILLER:
17    Q.  Okay.  Aside from being an economist,
18  is there anything else in your background that
19  qualifies you to provide the expert testimony that
20  you are providing in this matter?
21    MR. BOOTH:  Objection, asked, answered.
22    A.  I think, you know, it's just not
23  economics but also digital economics.  Which is why
24  I looked at some of the things that I looked at and
25  we discussed earlier regarding Amazon, and why I

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 118

1  came to have that "oh, I know what evidence we
2  should look for" moment.  So that is part of my
3  expertise as well.
4        BY MR. MILLER:
5        Q.  Anything else?
6        A.  We went through, 'cause you asked
7  about algorithms, I think as an economist I have
8  particular expertise in how algorithms are generated
9  in today's economy.
10       Q.  Meaning that you understand what
11  factors go into an algorithm, or what variables and
12  inputs go into an algorithm?
13       MR. BOOTH:  Objection.
14       A.  No, from an economic perspective, I
15  more deeply understand the technology that's going
16  into the production of these algorithms, as well as
17  their limitations and benefits.
18       BY MR. MILLER:
19       Q.  Okay.  But you're not a computer
20  scientist; you don't write computer code; right?
21       MR. BOOTH:  Objection to form.
22       A.  Oh, we all write computer code, but
23  I'm not a computer scientist.
24       BY MR. MILLER:
25       Q.  What do you mean "we all write

Page 119

1  computer code"?
2        MR. BOOTH:  Objection.
3        A.  Basically, everything.  The model
4  generated in the paper we've been talking about, and
5  the calculations done, were written in code.  I
6  wrote a -- I coded that up.  The Shapley value
7  analysis in the previous copyright case required
8  coding, quite a lot of it.
9        BY MR. MILLER:
10       Q.  Those are written in a computer
11  coding language?
12       A.  Yes.
13       Q.  Which one?
14       A.  They were both written in
15  Mathematica.
16       Q.  Mathematica?
17       A.  It has to be for --
18       Q.  Are you expert in Mathematica
19  coding?
20       MR. BOOTH:  Objection, he was speaking.
21  Let him finish his answer, please.
22       A.  Oh, all right.  I can -- I am -- I
23  can code in Mathematica for the purposes that I need
24  it.
25       BY MR. MILLER:

Page 120

1        Q.  So you're not an expert in this case
2  in Mathematica coding or some other computer coding;
3  is that right?
4        MR. BOOTH:  Objection.
5        A.  I'm not even sure how it's relevant,
6  but I'm not -- no.  We were, we were talking about
7  algorithms in general and their economic
8  applicability.  That I'm an expert in.  I'm
9  trying --
10            (overspeaking)
11       BY MR. MILLER:
12       Q.  So -- no -- let me clarify.
13       A.  And I'm an expert in teaching a
14  coding language, not --
15       MR. BOOTH:  Please let him finish his
16  answers.
17       A.  Not that I would regard.
18       BY MR. MILLER:
19       Q.  All right.  Let me clarify it.
20  I'm trying to understand what parts of
21  your background qualify you to be offering an expert
22  opinion in this matter --
23       A.  Yes.
24       Q.  -- besides economics.
25       A.  Yes.

Page 121

1        Q.  Right?  You mentioned algorithms,
2  right?
3        A.  The economics of them, yes.
4        Q.  So are you claiming in this case that
5  you are an expert in coding algorithms, or the
6  development or creation of algorithms, whatever
7  phrase you want to use to describe that?
8        MR. BOOTH:  Objection.
9        A.  I'm not claiming to be anything other
10  than an economic expert.
11       BY MR. MILLER:
12       Q.  Okay.  Thank you.
13       Other than this current case, have you
14  ever been retained by any of the named defendants
15  before?
16       A.  No.
17       Q.  Do you know any of the named
18  defendants?
19       A.  Well, I -- by reputation, of course
20  you'd have to know.
21       Q.  What does that mean?  How do you
22  know?  Well, let's go through each one.
23       Mr. Hauman.  Do you know him personally?
24       A.  No.  No, I don't.
25       Q.  Do you know his reputation?

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 122

1    A.  No.
2    Q.  Was the first time you heard of
3  Mr. Hauman in the context of this litigation?
4    A.  Yes.
5    Q.  Have you ever met Mr. Hauman?
6    A.  No.
7    Q.  Have you ever spoken with Mr. Hauman?
8    A.  No.
9    MR. BOOTH:  Objection.
10   BY MR. MILLER:
11   Q.  How about Mr. Templeton?
12   A.  I have no --
13   MR. BOOTH:  Objection.
14   A.  Same for him.
15   Q.  You don't know him?
16   A.  No.
17   Q.  You've never met him?
18   A.  No.
19   Q.  Does he have a reputation that you're
20  familiar with?
21   A.  No.
22   Q.  Did you speak to him in the context
23  of your work in this case?
24   MR. BOOTH:  Objection.
25   A.  No.  No.

Page 123

1    BY MR. MILLER:
2    Q.  And lastly, Mr. Gerrold?
3    A.  Yes.
4    Q.  Do you know him?
5    A.  I do not know him personally.
6    Q.  But you know him how?
7    A.  He wrote -- he wrote "The Trouble
8  With Tribbles."  We all know him.
9    Q.  So you know his professional work?
10   A.  Yes.
11   Q.  Have you ever met him?
12   A.  No.
13   Q.  Have you ever spoken with him?
14   A.  No.
15   MR. BOOTH:  Objection.
16   BY MR. MILLER:
17   Q.  Did you know any of the attorneys for
18  the defendants before your work in this case?
19   A.  No.
20   Q.  Had you ever done any consulting work
21  or been retained by Mr. Booth or his firm prior to
22  this matter?
23   MR. BOOTH:  Objection.
24   A.  No.  No.
25   BY MR. MILLER:

Page 124

1    Q.  Same question for Mr. Booth's
2  co-counsel.  Do you know Michael Licari?
3    A.  No.
4    Q.  Have you ever spoken with him?
5    MR. BOOTH:  Objection.
6    A.  No.
7    BY MR. MILLER:
8    Q.  And you've never worked for his firm
9  or him in the past?
10   MR. BOOTH:  Objection.
11   A.  No.
12   BY MR. MILLER:
13   Q.  Let's look back at your first expert
14  report, Exhibit 1.
15   You didn't include a list of materials
16  that you reviewed in considering and forming your
17  opinions, right?
18   MR. BOOTH:  Objection.
19   A.  It doesn't look like there is, no.
20   BY MR. MILLER:
21   Q.  Do you often do that when you write
22  an expert report?
23   MR. BOOTH:  Objection.
24   A.  Usually they are included.  Usually
25  I -- I don't know what process happened here.  I

Page 125

1  mean, this is because of the shoestring here.  Yeah,
2  normally they'll be included, a list of it.
3    Now, they would be just -- there's nothing
4  that I have considered in this for the -- during
5  this report that I have not referenced in a
6  footnote.
7    Q.  So, to be clear, let's go through
8  all -- I want a list of all the materials that you
9  considered in forming your opinions in this case.
10   A.  Sure, and I will tell you.
11   Q.  Okay?  So please list them.
12   A.  Okay.  This article from Slate from
13  May 17, 2016.  I received PDFs of Oh, The Places
14  You'll Go!, and Oh, The Places You'll Boldly Go!
15   I have, of course, my own International
16  Journal of Industrial Organization article.  The
17  original complaint.  And I reviewed, which isn't
18  listed here and I don't know which document it is,
19  is the judge's, the judge -- there was a judgment
20  that discussed...  There were some -- yeah, there
21  was an order issued by the judge, the one that said
22  they needed more evidence on market impact.  I
23  reviewed that.  I reviewed the Amazon sites or some
24  of them as listed here.  And that's it.
25   Q.  The order that was issued by the

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 126

1  Court, do you know which order that was?  You know
2  that there were two orders in the Court, issued by
3  the Court?
4      MR. BOOTH:  Objection.
5  BY MR. MILLER:
6      Q.  In connection to the "fair use"
7  defence?
8      MR. BOOTH:  Objection.
9      A.  I can't remember which one in
10  particular that I looked at.  It was me trying to
11  get a sense of the case rather than anything that I
12  ended up relying on.
13  BY MR. MILLER:
14      Q.  So did you rely on the Court's order
15  in forming your opinion in this case?
16      MR. BOOTH:  Objection.
17      A.  I did not rely on it in forming my
18  opinion because this was about the market impact.
19  The thing that I recall from that was that the court
20  order -- the court discussion, had said that there
21  was no evidence had been presented on market impact
22  at that time.
23      That's the part I recall, and that's the
24  part I -- if I relied on something, it was the fact
25  that there was no evidence presented.

Page 127

1      Q.  But you didn't disclose that you
2  reviewed and considered the Court's opinion in any
3  of your written reports; is that right?
4      MR. BOOTH:  Objection.
5      A.  I didn't, no.  I, I had meant to put
6  a list of documents, but I think, I don't know what
7  happened to it.
8  BY MR. MILLER:
9      Q.  So the answer is no, you did not list
10  the Court's order?
11      A.  Well, obviously in the thing that was
12  here, no.
13      Q.  Do you know what stage of the
14  proceedings this case was at when the Court decided
15  that issue?
16      MR. BOOTH:  Objection.
17  BY MR. MILLER:
18      Q.  And wrote that order?
19      MR. BOOTH:  Objection.
20      A.  I don't know what you mean by "stage
21  of proceedings."
22      Q.  Did counsel advise you regarding the
23  stage of the proceedings at that time?
24      MR. BOOTH:  Objection.  All communications
25  would be confidential and privileged that

Page 128

1  you're discussing, so to the extent that
2  you can answer without disclosing
3  privileged or confidential communication,
4  you may answer.
5  BY MR. MILLER:
6      Q.  And to the extent that counsel
7  advised you to assume certain things or anything
8  that counsel said to you that formed some basis for
9  your opinion, you must disclose them.
10      MR. BOOTH:  Objection.
11      A.  Yes.  That's right.
12  BY MR. MILLER:
13      Q.  What is right?
14      A.  That I must disclose it.  So when I
15  wrote my understanding --
16      Q.  Mm-hm?
17      A.  -- from counsel in my report, that
18  was disclosing.
19      Q.  So my question was:  Did counsel
20  advise you about the stage of the proceedings
21  relating to the issue that you reviewed?
22      A.  I don't recall what counsel advised
23  me about the stage of proceedings.  I focussed on
24  the task I had at hand.
25      Q.  And that was to do what?

Page 129

1      MR. BOOTH:  Objection.  Asked and
2  answered.
3      A.  That was, that was to examine what
4  evidence exists that could inform the Court about
5  the likely market impact of the publication of Oh,
6  The Places You'll Boldly Go!
7  BY MR. MILLER:
8      Q.  And what evidence did you review to
9  form your opinion?
10      A.  And the evidence -- so, in terms of
11  documentary evidence being reviewed is the stuff
12  that I've just listed for you.
13      Q.  Mm-hm?
14      A.  And the corpus of, you know, two and
15  a half decades of being an economist and knowing how
16  to use economics.
17      Q.  So, besides the items that you listed
18  before, were there any other materials that you did
19  consider in forming your opinion?  And by
20  "materials," I mean actual documents --
21      A.  Yeah.
22      Q.  -- or, you know, some evidence that's
23  related to this case?
24      MR. BOOTH:  Objection.
25      A.  I'm sorry.  Evidence related to this

33 (Pages 126 - 129)

Exhibit 1, Page 22

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 130

1  case. I mean, I was providing the expert report.
2      BY MR. MILLER:
3      Q.  Everything's disclosed in your report
4  that you considered?
5      A.  Every document related to this case
6  that I considered, apart from the order that I
7  clearly didn't put in this, has been disclosed in
8  this report.
9      Q.  Did you select the materials that you
10 reviewed in forming your opinion?
11     MR. BOOTH: Objection.
12     A.  I -- so did I review every single
13 document in this case?
14     Q.  No, that was not my question. My
15 question is, did you select the materials you
16 reviewed to form your opinion in this case?
17     MR. BOOTH: Objection.
18     I asked for materials where the
19 plaintiffs had explicitly discussed market impact
20 variables.
21     BY MR. MILLER:
22     Q.  And what materials were you given in
23 response to your inquiry?
24     A.  The original complaint --
25     MR. BOOTH: Objection.

Page 131

1      A.  I was given the original complaint.
2      BY MR. MILLER:
3      Q.  Are you aware that there has been an
4  amended complaint filed by the plaintiff in this
5  action?
6      A.  I was probably given the amend....
7      (Query by reporter)
8      Yes, I was given that. By -- I regard the
9  amended complaint as the complaint.
10     Q.  Right. But you referred to the
11 "original complaint," which is different from the
12 amended complaint.
13     A.  Right.
14     Q.  So which is it that you reviewed?
15     A.  Oh, in the ones I listed in the
16 footnote, it was the original complaint, but I
17 believe there were the same references in -- the
18 same statements went unamended in the amended
19 complaint.
20     Q.  Did you review the amended complaint?
21     A.  Yeah, I must have, but isn't that the
22 same document?
23     Q.  No?
24     A.  Oh, okay. All right. Well, I'm not
25 a lawyer.

Page 132

1      Q.  Right. Did you -- so let me ask the
2  question again.
3      Did you review the amended complaint in
4  this action?
5      A.  Yes.
6      Q.  And why is it not listed in your
7  expert report?
8      A.  Because I --
9      MR. BOOTH: Objection.
10     A.  Because I regarded that as the
11 complaint. I'm not a lawyer.
12     BY MR. MILLER:
13     Q.  Did you, did you ask counsel what was
14 different about the two documents?
15     MR. BOOTH: Objection.
16     A.  I looked and I saw what was different
17 about the two documents.
18     BY MR. MILLER:
19     Q.  But you assumed that they were --
20     A.  I wanted to make sure.
21     Q.  Let me ask my question.
22     Did you assume that they were the same
23 after you looked at them?
24     MR. BOOTH: Objection.
25     A.  No.

Page 133

1      BY MR. MILLER:
2      Q.  So which one did you rely on in
3  forming your opinion?
4      MR. BOOTH: Objection.
5      A.  I relied on the original complaint,
6  and I recall checking the amended complaint to see
7  if plaintiffs had changed their statements that I
8  was relying on between that complaint and the
9  amended complaint.
10     BY MR. MILLER:
11     Q.  And what was your conclusion?
12     A.  They had not.
13     Q.  Were there any other materials that
14 you asked counsel for in order to -- let me strike
15 that.
16     Were there any other materials that you
17 wanted to review to form your opinion that you asked
18 counsel for that you were not given?
19     MR. BOOTH: Objection. To the extent that
20     the -- that you can answer without
21     disclosing confidential or privileged
22     communications, you may answer.
23     A.  At some stage I would have asked, you
24 know, I wasn't -- I asked, you know, what sort of
25 things might have been disclosed had -- one thing

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 134

1  was, you know:  Do you have detailed sales
2  information regarding Dr.~Seuss books, and other
3  things like that.
4        BY MR. MILLER:
5        Q.  Mm-hm?
6        A.  I asked if counsel had had that, and
7  they had not got that information, was my
8  recollection.
9        Q.  You were told that Dr.~Seuss hadn't
10  produced any sales records in this case?
11        MR. BOOTH:  Objection.
12        A.  I am not sure what -- it was, it was
13  stuff about -- it was during an earlier
14  conversation, so I don't require (sic) but it was
15  like, I wondered what had been made available.
16        BY MR. MILLER:
17        Q.  Mm-hm?
18        A.  Regarding detailed sales things,
19  including timing and other things that might allow
20  us, if it turned out that there was another work, to
21  analyze things.  But I don't believe that was
22  available.  I'm not sure what the reason was.
23        I haven't seen a -- you can tell me now if
24  it was in a document that I've seen, but I never saw
25  any detailed sales information.

Page 135

1        Q.  So I will represent to you that
2  Dr.~Seuss produced many documents that contained
3  sales figures for its works in addition to its --
4  the other products that it --
5        A.  Let me be very specific.  A time
6  series.
7        Q.  What do you mean by "a time series?"
8        A.  A time series is the sales by, you
9  know, week, going back to the publication of Oh, The
10  Places You'll Go!
11        Q.  Mm-hm?
12        A.  Because you have to be able to look
13  at that time series to understand the sales cycles.
14        Q.  So you wanted to see sales by week?
15        A.  Yes.
16        Q.  Of Oh, The Places You'll Go!
17        A.  Yes.
18        Q.  In order to develop your opinion in
19  this case?
20        A.  No.  I was saying that when I was
21  doing the initial thoughts about what sort of
22  evidence might be available to be of use to the
23  Court, one of the discussions that had was:  Were
24  there very, very detailed sales figures produced by
25  DSE?  And my understanding is that had not been

Page 136

1  produced.
2        And so I thought, okay, well, that
3  evidence isn't available.  I will look for other
4  evidence.  And the other evidence is what I produced
5  in my report.
6        Q.  Right.  But you didn't look at the
7  evidence that was actually produced by DSE in this
8  case, right?
9        MR. BOOTH:  Objection.
10        A.  I looked at any evidence that was
11  referenced by -- no.  When -- in the original
12  complaint, there was none of that reference -- none
13  of that evidence was referenced.  Or the amended
14  complaint, for that matter.
15        BY MR. MILLER:
16        Q.  Right.  But you didn't look at any of
17  the documents produced during discovery by DSE in
18  this case; isn't that right?
19        A.  I --
20        MR. BOOTH:  Objection.
21        A.  All I can tell you is, I asked were
22  there detailed sales figures of the sort that I was
23  looking for, produced, I guess, in discovery, and
24  was told no.
25        BY MR. MILLER:

Page 137

1        Q.  And counsel didn't give you the
2  reports that DSE produced in this case, is that
3  right?
4        MR. BOOTH:  Objection.
5        A.  I presume it was not given to me
6  because it would -- did not have what I asked for.
7  That was my assumption.  But I didn't need it, in
8  the end, to form my opinion.
9        Q.  You didn't think it was important to
10  review Dr. Seuss' sales figures to develop your
11  opinion about the market --
12        MR. BOOTH:  Objection.
13        BY MR. MILLER:
14        Q.  -- for Dr. Seuss' works?
15        MR. BOOTH:  Objection.
16        A.  Well, I did, and I reviewed publicly
17  available figures that I referenced in my report,
18  but I...
19        (Query by reporter)
20        That I referenced in my report to confirm
21  what I thought I already knew about Dr. Seuss, which
22  was it was tremendously successful in book
23  publishing.
24        Q.  Mm-hm.  You didn't think it was
25  important to review the documents produced by

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 138

1 Dr.~Seuss in this case?
2       MR. BOOTH: Objection.
3       A.  If the documents had anything to do
4 with market impact, that would have informed on it,
5 they would have -- it would have been useful to
6 review.  But I didn't need them to form my opinion.
7       If you would like to put something to me
8 and ask about it, I'm happy to do so.  I'm really
9 only here to help.
10      MR. BOOTH:  If I may, Marc, I had
11      mentioned earlier that Dr. Gans has -- had
12      hoped to be available at noon in a
13      separate matter.  If it's possible, as
14      that's about 15 minutes from now, you might have --
15      sure how many questions you might have --
16      MR. MILLER:  Sure.  Let me wrap up this
17      particular segment, take a few minutes.
18      MR. BOOTH:  Thank you much.
19      BY MR. MILLER:
20      Q.  Did you speak with anyone else
21 besides counsel in forming your expert opinion in
22 this case?
23      MR. BOOTH:  Objection.
24      A.  No.
25      BY MR. MILLER:

Page 139

1       Q.  You didn't speak with any other
2 experts that were retained by the defendants?
3       MR. BOOTH:  Objection.
4       A.  The -- there were other experts?  No,
5 I don't.  Didn't.
6       BY MR. MILLER:
7       Q.  Did you speak with any consultants
8 that were retained by the defendants?
9       MR. BOOTH:  Objection.
10      A.  No.
11      BY MR. MILLER:
12      Q.  Did you speak with anyone that works
13 for defendant ComicMix?
14      A.  No.
15      MR. BOOTH:  Ob...
16      BY MR. MILLER:
17      Q.  Did you speak with anyone that works
18 in the book publishing industry?
19      MR. BOOTH:  Objection.
20      BY MR. MILLER:
21      Q.  In forming your opinion in this case?
22      MR. BOOTH:  Objection.
23      A.  I spoke to no one, no one outside of
24 counsel in this case.
25      BY MR. MILLER:

Page 140

1       Q.  Did you review any of the expert
2 reports that were served in this case?
3       A.  No.
4       Q.  Did you review Dr. Dawson's report?
5       A.  Oh, Dr. Dawson's, yes.  Sorry.
6       Q.  Did you review any of the other
7 reports that were served in this case?
8       A.  No.
9       MR. MILLER:  All right.  Why don't we take
10      a break.  You can make your phone call.
11      THE VIDEOGRAPHER:  This marks the end of
12      Media Number 2 in the deposition of
13      Dr. Joshua S. Gans.  We're going off the
14      record at 11:48.
15 --- Luncheon taken at 11:48 a.m.
16 --- Upon resuming at 12:45 p.m.
17      THE VIDEOGRAPHER:  Here begins Media
18      Number 3 in the deposition of Dr. Joshua
19      S. Gans.  We're back on the record at
20      12:45 p.m.
21      MR. MILLER:  We're going to mark the next
22      exhibit.
23      THE REPORTER:  This will be 4.
24 EXHIBIT 4 marked for identification:  Plaintiff's
25      Notice of Video Deposition of Joshua

Page 141

1       S. Gans
2       BY MR. MILLER:
3       Q.  Okay, Professor, do you recognize the
4 document that's been marked as Exhibit 4 and handed
5 to you by the court reporter?
6       A.  Yes.
7       Q.  What is that document?
8       A.  Oh, no, I don't recognize it.  I've
9 never seen it before.
10      Q.  Okay.
11      A.  When would I have seen this?
12      Q.  Did your counsel share that document
13 with you?
14      A.  I don't --
15      MR. BOOTH:  Objection.
16      A.  I don't think so.
17      BY MR. MILLER:
18      Q.  Okay.  That's a deposition notice.
19      A.  Okay.
20      Q.  Which sets out that we're going to be
21 holding this deposition today, starting this morning
22 at 9.
23      A.  Okay.
24      Q.  You haven't seen that before?
25      A.  No.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 142

1    Q.   Okay.
2    MR. BOOTH:  I'd like to note for the
3    record that this deposition notice was --
4    is dated November 2nd, 2008 (sic) which
5    was Friday, and the parties had already
6    agreed that the deposition would be held
7    here at this location starting at 9
8    o'clock today.
9    MR. MILLER:  Okay.  Thanks for that
10   clarification.
11   Q.   Professor, what did you do to prepare
12   for today's deposition?
13   A.   I met with counsel yesterday for an
14   hour.  I re-read my first expert report.  And I had
15   another look at Oh, The Places You'll Boldly Go!,
16   the PDF.
17   Q.   Did you work on your second expert
18   report?  Were you still working on it yesterday
19   while you were preparing for today's deposition?
20   A.   Oh, I, I had finished that off.  I
21   wasn't -- but I hadn't started any preparation for
22   the deposition.
23   Q.   Did you review your second report in
24   preparation for today's deposition?
25   A.   No, I only finished it yesterday.

Page 143

1    Q.   Anything else that you did in
2    preparation for today?
3    A.   No.
4    Q.   Speak to anyone else?
5    A.   No.
6    Q.   All right.  Let's look at Exhibit 1,
7    which is your first expert report.
8    A.   Okay.
9    Q.   I'll turn your attention to page 4,
10   section 3, which is titled:  "Basic Facts."
11   A.   Yes.
12   Q.   What materials did you review and
13   consider in forming the statements that appear in
14   section 3 of your report?
15   A.   The things I reviewed were, apart
16   from stuff that I had in memory, I looked at this
17   Slate article, which was the thing that came up in a
18   search just for understanding how many copies of Oh,
19   The Places You'll Go! had sold.
20   Q.   Let's just mark that Slate article.
21   Thank you.
22   EXHIBIT 5 marked for identification:  Web page
23       printout containing header:  "Oh, the
24       Places You'll Go is the top-selling
25       book for graduation season, but it

Page 144

1    doesn't actually offer great advice"
2    (6 pp.)
3    BY MR. MILLER:
4    Q.   Professor, what is the document
5    marked as Exhibit 5 that the court reporter has just
6    handed to you?
7    A.   This looks like a printout of the
8    Slate article I referenced in footnote 1.
9    Q.   Why did you select this article?
10   A.   I selected this article -- I had
11   actually read this article before.  I selected this
12   article because it had...  Where is the thing?
13   It had the reference to 12 point (sic)
14   million copies sold of Oh, The Places You'll Go!
15   Q.   Show me where in this article you're
16   referring to?
17   A.   So on page 2, in the second
18   paragraph, it said:
19       "In 26 years, Oh, The Places
20       You'll Go! has sold more than 12.5
21       million copies in all formats, with
22       sales increasing each of the past
23       four years.  It is Seuss'
24       bestselling book of all time, and
25       yes, it's mostly thanks to

Page 145

1    graduations."
2    (Query by reporter)
3    THE WITNESS:  "Thanks."
4    BY MR. MILLER:
5    Q.   Do you know how many copies of Oh,
6    The Places You'll Go! were sold last year?
7    A.   No.
8    Q.   Do you know how many copies were sold
9    the year before that?
10   A.   No, my -- this article was only up to
11   2016, and I'm not even sure it included 2016.
12   Q.   Mm.  Do you know how many copies were
13   sold in 2016?
14   A.   No.
15   Q.   Do you know how many copies of Oh,
16   The Places You'll Go! were sold in any given year?
17   A.   In any given year?
18   Q.   Mm-hm?
19   MR. BOOTH:  Objection.
20   A.   No.
21   BY MR. MILLER:
22   Q.   And you didn't review any of the
23   sales documents that Dr.~Seuss produced in this
24   action, right?
25   A.   I only reviewed documents that would

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 146

1  be informative to the questions I had at hand.
2      Q.  Mm-hm.  So you're relying on an
3  article from Slate for your information that
4  Dr.~Seuss' Oh, The Places You'll Go! is a bestseller
5  every year?
6      MR. BOOTH:  Objection.
7      BY MR. MILLER:
8      Q.  Is that right?
9      MR. BOOTH:  Objection.
10     A.  That is what I'm relying on, yes.
11     BY MR. MILLER:
12     Q.  And you didn't think it would be
13  relevant to look at Dr.~Seuss' actual sales figures
14  to determine independent of some article from the
15  Internet?
16     A.  Let me explain to you --
17     MR. BOOTH:  Objection.
18     A.  -- how expert -- how expert reports
19  go.  They normally have an initial section that lays
20  out the context.  That's all I was doing here.
21     BY MR. MILLER:
22     Q.  Mm-hm.  But you didn't think that it
23  would be relevant to actually review the evidence
24  produced in this case in laying out the context of
25  your expert report?

Page 147

1      MR. BOOTH:  Objection.
2      A.  I'm sorry, where was the evidence?
3      BY MR. MILLER:
4      Q.  The evidence are the documents that
5  were produced by the parties in this case, and the
6  deposition testimony that was proffered.
7      A.  Can you describe to me more of what
8  they had?
9      I mean, I just don't have the memory you
10  have for all the documents, and I haven't seen all
11  of them, but I'm happy to -- if you ask me about any
12  given one, to tell you why it is likely I didn't
13  consider it.
14     Q.  Sure.  Are you aware that Dr.~Seuss
15  produced sales reports for its books in this case?
16     A.  I'm not aware precisely of what they
17  produced.  I am -- my only understanding was they
18  hadn't produced the data that I would find useful,
19  which I spelled out when I initially was discussing
20  this case.
21     Q.  And again, you wanted -- remind me
22  again what you thought was useful data?
23     A.  In order to analyze the market impact
24  of a transformative work of the likely small scale
25  of something like Oh, The Places You'll Boldly Go!,

Page 148

1  I felt I would need weekly data stretching back all
2  the way to the publications of Oh, The Places You'll
3  Go! on it and all other Dr.~Seuss products, and,
4  also, to be able to relate that at least to the
5  timing of entry of other transformative works which
6  we do know existed.
7      Q.  And that information was not, to your
8  knowledge, available to you; is that right?
9      A.  To my knowledge, it was not available
10  to me, nor has it been submitted in this case to my
11  knowledge.
12     Q.  But you didn't actually review any of
13  the evidence that was submitted in this case, right?
14     MR. BOOTH:  Objection.
15     A.  I reviewed certain parts.  I
16  certainly reviewed the original and, obviously,
17  amended statements of claim -- or complaints, I'm
18  sorry.  And, you know, that -- if that had
19  referenced anything, such things, I probably would
20  have asked for it if they'd referenced the data I'd
21  wanted.
22     BY MR. MILLER:
23     Q.  What's your understanding of what's
24  included in a complaint in a U.S. lawsuit?
25     MR. BOOTH:  Objection.

Page 149

1      A.  My understanding is, it is a set of
2  claims that the -- well, in this case the plaintiffs
3  believe are factually correct or they are going to
4  prove are factually correct in this matter to
5  support their overall case.
6      Q.  Do you know what the word
7  "allegation" means?
8      MR. BOOTH:  Objection.
9      A.  I know what the word "allegation" is,
10  yes.
11     BY MR. MILLER:
12     Q.  What is an allegation?
13     A.  It means a conjecture of a state of
14  truth.
15     Q.  And are you aware that the
16  complaints, both the original and the amended, that
17  were filed by Dr.~Seuss in this case contain
18  allegations?
19     MR. BOOTH:  Objection.
20     A.  I didn't think they contained -- when
21  it was in reference to their own business, I didn't
22  regard them as allegations.  When they claimed that
23  they were a bestselling brand, I thought that that's
24  what they believed.
25     Q.  Did you want to review any of the

38 (Pages 146 - 149)

Exhibit 1, Page 27

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 150

1 underlying documents to see whether or not
2 Dr.~Seuss' allegations were supported?
3      A.  It was --
4      MR. BOOTH:  Objection.
5      A.  I only have to review underlying
6 evidence if I think it will be likely to be material
7 in the question I was trying to answer.
8      BY MR. MILLER:
9      Q.  Mm-hm.
10      A.  And I'm, as I said, if you're
11 happy -- you know, Dr. Dawson did not indicate a
12 single bit of evidence that she thought I failed to
13 consider.  You have thus far not put any before me.
14 That raises confidence that my initial request that
15 what was available and the stuff that I used was the
16 economical way to approach the question in this
17 matter.
18      Q.  You didn't think that it was relevant
19 to look at the sales reports of Dr.~Seuss' books
20 over, let's say, the past five years?
21      MR. BOOTH:  Objection --
22      BY MR. MILLER:
23      Q.  In considering the market for
24 Dr.~Seuss' works?
25      MR. BOOTH:  Objection.

Page 151

1      A.  Was it going to change my opinion
2 that Dr.~Seuss is a terrific brand that has
3 bestselling books, that is a formidable player in
4 this market?  I did not believe that knowing year by
5 year as opposed to aggregate, or anything more than
6 was in this Slate article, was going to change my
7 opinion on that.
8      However, if you are willing to represent
9 to me that you have a document that I should have
10 considered and that I would have come to a
11 conclusion -- you believe, even if you believe, come
12 to a conclusion that Dr.~Seuss isn't as successful
13 as I make it out here, please put forward.
14      BY MR. MILLER:
15      Q.  Mm-hm.  Why didn't you look at any of
16 the documents that were produced by Dr.~Seuss in
17 this case?
18      MR. BOOTH:  Objection.
19      A.  There were many matters and issues
20 associated with this case that I was only looking at
21 documents that was my understanding were going to be
22 useful for the assessment of market impact.  And
23 given that Dr.~Seuss to my knowledge had not
24 secretly published this book and had a market test
25 of it, there was nothing for me to look at.

Page 152

1      Q.  Mm-hm.  Did you ask your counsel if
2 there were market reports produced by Dr.~Seuss in
3 this case?
4      MR. BOOTH:  Objection.
5      A.  Market reports about what?
6      BY MR. MILLER:
7      Q.  Sales of Dr.~Seuss' books, for
8 example?
9      A.  No, I only asked for sales figures
10 that I thought would be applicable to the analysis
11 of the market impact of a transformative work.
12      Q.  Mm-hm.  And short of the weekly sales
13 figures that you believe are most relevant, did you
14 ask to see any of the sales reports or market data
15 that was produced in this case?
16      A.  No.  I didn't think that any of that
17 information would be useful to altering or refining
18 my opinion in this -- as I've had in my reports.
19      Q.  Mm-hm.  You didn't think the number
20 of books for Oh, The Places You'll Go!, for example,
21 that Dr.~Seuss sold?
22      A.  It would have literally no impact.
23 No impact.  Unless it turned out -- and I will admit
24 this, it wasn't a bestseller.  But I had no reason
25 to believe it wasn't a bestseller because in the

Page 153

1 statement of claim it was claimed to be a
2 bestseller.
3      Q.  Mm-hm?
4      A.  And no one has claimed otherwise.
5 And in fact, on the days that I was writing my
6 report, it was a bestseller literally that day.
7      Q.  How do you know that?
8      A.  If you go to Amazon, you can see that
9 it is currently a bestseller.
10      Q.  Mm-hm.  Did you rely on that in
11 forming your opinion?
12      A.  No.
13      Q.  So you didn't rely on any market data
14 in forming your opinion besides this Slate article;
15 is that right?
16      MR. BOOTH:  Objection.
17      A.  I relied on all the market data I
18 thought was available that was of relevance.
19      BY MR. MILLER:
20      Q.  Which in your opinion is this Slate
21 article that you cite in your report?
22      A.  No.
23      MR. BOOTH:  Objection.
24      A.  The Slate article, as I said, was
25 just a thing that I cited for the actual number of

39 (Pages 150 - 153)

Exhibit 1, Page 28

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 154

1 sales of Oh, The Places You'll Go! or some sense of
2 it. The reason is because no sales, overall
3 cumulative sales figures, were listed in the
4 original statement of claim.
5        Q.  Again, aside from the Slate article,
6 you did not review any market data in forming your
7 opinion in this case; is that correct?
8        A.  I --
9        MR. BOOTH:  Objection.
10        A.  Yes, I did review market data.  I did
11 my interrogation of Amazon's system.  I regard that
12 as market data.
13        BY MR. MILLER:
14        Q.  You looked at Amazon's website?
15        A.  Mm-hm.
16        Q.  You didn't look at any sales data or
17 purchasing data from Amazon; is that right?
18        MR. BOOTH:  Objection.  Asked and
19        answered.
20        A.  Let's list through all the things
21 that I did not get.
22        BY MR. MILLER:
23        Q.  Mm-hm?
24        A.  Okay.  I did not look at demographic
25 information regarding the population of children

Page 155

1 born in each month going back, forwards, and of
2 school-aged children.
3        I did not look at the movie sales of
4 Dr.~Seuss movies.
5        I did not look at the ticket sales that
6 were driven in Universal Studios by the Dr.~Seuss
7 little part.
8        I did not look at electoral votes and
9 college votes of Republicans and Democrats, going
10 back, forward, far back.
11        I did not look at detailed oceanographic
12 data to indicate weather patterns.  I did not
13 look...
14        Shall we go on?
15        I only looked at things that were going to
16 be useful for my analysis.
17        (overspeaking)
18        Aggregate sales figures of Dr.~Seuss are
19 not useful for the analysis of market impact of
20 transformative works.  Very simple as that.
21        Q.  I appreciate your humour.
22        A.  And not useful of it.
23        Q.  I appreciate your humour.  However,
24 my question is simple.  You're here to opine, as an
25 expert, an economist, correct?

Page 156

1        A.  Yes.
2        Q.  And the subject of your testimony is
3 the market impact that the Accused Work would have
4 on Dr.~Seuss' works; is that correct?
5        A.  Yes.
6        Q.  And you're telling me that in forming
7 your opinion on market impact, you did not consider
8 any market data that was produced by the parties in
9 this case; is that right?
10        MR. BOOTH:  Objection.
11        A.  The data that as I understand and
12 also from what you're telling me now that was
13 produced in this case, was not market data that
14 would be useful to a economist in forming their
15 opinion about market impact.  And so I did not use
16 it.
17        BY MR. MILLER:
18        Q.  Okay.  So the only thing that you're
19 telling me that would have been useful in terms of
20 market data in forming your opinion is what?  Please
21 repeat it.
22        A.  So...
23        MR. BOOTH:  Objection.
24        A.  In order to have analyzed what the
25 total quantum of impact on each and every one of

Page 157

1 Dr.~Seuss' products, both now and in the future,
2 from a transformative work, you need two things.
3        You need data with sufficient time series
4 granularity to be able to detect the effects of
5 entry of transformative works on those products.
6 This is just a start.
7        And you need examples of the precise date
8 of entry of some of those transformative products,
9 and probably of, also, competitive products in the
10 broader space to Dr.~Seuss to even get started.
11        And none of that data was available.
12        Q.  So if none of that data was
13 available, on what are you basing your expert
14 opinion in this case?
15        A.  I am basing my expert opinion on the
16 evidence that I've presented in my report.
17        Q.  Which is none of the data that you
18 would find to be useful in actually developing this
19 opinion; is that right?
20        A.  You didn't ask that, you asked about
21 market data provided by Dr.~Seuss.  I did not use
22 market data provided by Dr.~Seuss as evidence,
23 except insofar as I relied on statements that you
24 regard as allegations in this original claim that I
25 took to be factual.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 158

1    Q.  You told me just now that you would
2 need two things in order to analyze and opine as an
3 expert on the total quantum of impact on each and
4 every one of Dr.~Seuss' products, now and in the
5 future, from the publication of Boldly," correct?
6       MR. BOOTH:  Objection.  Don't
7       mischaracterize what my witness has
8       testified.
9    A.  I said --
10      MR. MILLER:  Dan, keep your objections
11      limited to form.
12   A.  -- that if I was going --
13      BY MR. MILLER:
14   Q.  Go ahead.
15   A.  If I was going to have market data
16 that was going to yield something informative on
17 this issue, just market data on its own, it would
18 have to be of that form.
19   Q.  And neither of the two things that
20 you listed for me, which was:  "Data, sufficient
21 time series granularity to be able to detect the
22 effects of entry of a transformative work on that
23 product," that's one.  Correct?  Is that what you
24 said?
25      MR. BOOTH:  Objection.

Page 159

1    A.  Yeah.  I said it.
2       BY MR. MILLER:
3    Q.  That was not available to you; is
4 that right?
5    A.  That is not part of the market data
6 that has been made available in this case, I
7 believe, by any party.
8    Q.  Mm-hm, so it was not --
9    A.  I'm quite happy for you to correct
10 me.
11   Q.  So it was not considered by you in
12 this case; is that right?
13   A.  It couldn't be considered by me as no
14 one had produced it.
15   Q.  So the answer is no, you did not
16 consider --
17   A.  Does it exist?
18   Q.  Data of -- excuse me.
19      (Query by reporter)
20      You did not consider data of that type in
21 forming your opinion; is that right?
22   A.  I did not and could not have.
23   Q.  The second type of data that you said
24 you would need in order to form this opinion would
25 be "examples of the precise data [sic] entry of

Page 160

1 those transformative products" and --
2    A.  The date of entry.
3    Q.  Okay.  Date of entry.
4       Did you have any precise dates of entry of
5 these so-called transformative products to consider?
6    A.  Yes.
7       MR. BOOTH:  Objection.
8       BY MR. MILLER:
9    Q.  You did?
10   A.  Yes.
11   Q.  And what were those?
12   A.  I don't recall all of them, but one
13 of them we know right here was May 7th, 2016.
14   Q.  And what is the May 7th, 2016 --
15   A.  That is the date of which --
16   Q.  Let me finish my question, Professor.
17      What was the May 7, 2016, date that you
18 are referring to?
19   A.  That is the publication date listed
20 on Amazon of Oh, The Things You Don't Know!
21   Q.  And where are you looking at that?
22   A.  Why?
23   Q.  Where?
24   A.  I'm looking at that on the
25 screen shot that I provided in my document, right

Page 161

1 here on page 12.
2       MR. BOOTH:  Is that in the -- in Exhibit
3       1, the first expert report?
4       THE WITNESS:  It's in the -- yes.
5       MR. BOOTH:  Thank you.
6       BY MR. MILLER:
7    Q.  Is it your testimony that the date
8 May 7, 2016, on page 12 of your expert report as
9 Exhibit 1 is the publication date for the work "Oh,
10 The Things You Don't Know!"?
11   A.  Had I had the other set of data to do
12 that work and thing, that is likely what I would
13 have been using as the publication date for this
14 particular thing.
15   Q.  You just said had you had the other
16 set of data.  What are you talking about?  What
17 other set of data?
18   A.  The data set on Dr.~Seuss sales of
19 sufficient granularity.  Can I ask you, was it
20 represented from May... From April 30th to May 6th,
21 were the total sales of Oh, The Places You'll Go!
22 actually in a piece of evidence in this matter?
23   Q.  I'm not here to answer your
24 questions.  I'm asking them.
25   A.  Well, I don't -- this is the problem.

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 162

1  I can't answer my question unless you answer that.
2      Q.  Let me ask the question.  I'm not
3  here to answer questions, you are.
4      A.  Okay.
5      Q.  Did you ask your counsel whether
6  Dr.~Seuss produced relevant market data for its
7  sales between -- what was the time frame you just
8  said, May 7, 2016 and...?
9      A.  No, April 30, and May 6th.  I did.
10     Q.  You did?
11     A.  The weekly data.
12     Q.  Weekly data?
13     A.  I asked for weekly data.  That's a
14  week.
15     Q.  Did you ask whether any data was
16  produced?
17     A.  I only asked for the data I needed.
18  As I said, we've already gone through the list of
19  things I didn't ask for, because I didn't believe
20  that that would be useful.
21     Q.  And is it your opinion that the entry
22  of Oh, The Things You Don't Know! into the market
23  had no impact on Dr.~Seuss' sales of Oh, The Places
24  You'll Go!
25     MR. BOOTH:  Objection.

Page 163

1      A.  Based on the evidence that I've seen
2  thus far, my likely best estimate is that it had no
3  to slightly positive impact.
4      BY MR. MILLER:
5      Q.  And what evidence are you basing that
6  opinion on?
7      A.  If we go to page 12 and we look at
8  the screen shot here, you will see that Oh, The
9  Things You Don't Know! was bought in common with Oh,
10  The Places You'll Go! and also with Seuss-isms and
11  Oh, The Places I've Been!, both Dr.~Seuss books.
12     Q.  Mm-hm?
13     A.  That is the evidence I've looked at
14  and that is why I've reached the conclusions that I
15  do.
16     Q.  So the evidence that you've looked
17  at, just to be clear, is limited to the Amazon web
18  page?
19     MR. BOOTH:  Objection.
20     BY MR. MILLER:
21     Q.  Correct?
22     A.  It's limited to my investigations of
23  the Amazon web page.  I didn't take a screen shot of
24  every page I visited on Amazon during that time.  I
25  surfaced the ones that were relevant to this matter.

Page 164

1      Q.  Did you rely on other data from
2  Amazon that's not referenced in your expert report
3  in forming --
4      A.  No.
5      Q.  -- your opinions?
6      A.  Based -- no, I formulated to myself
7  prior to doing it that I would regard as evidence
8  that these two products were complements.  If I did
9  a search for Oh, The Places -- Oh, The Things You
10  Don't Know!, and in the "frequently bought items"
11  things such as the ones that came up actually came
12  up.
13     Before doing that search, I didn't know if
14  that would have occurred.  I did the search, they
15  occurred, and I regarded it as confirmation of what
16  I -- of that hypothesis.  So it was evidence.
17     Q.  Do you know the authors of the book
18  Oh, The Things You Don't Know!?
19     A.  I do not.
20     MR. BOOTH:  Objection, can you clarify?
21     Did you mean personally or does he know
22     their names?
23     MR. MILLER:  He answered the question,
24     Dan.  I'm going to move on.
25     Q.  Did you review any sales data for the

Page 165

1  book Oh, The Things You Don't Know!?
2      A.  The only sales-related things that I
3  reviewed was their Amazon ranking.
4      Q.  Where do you see their Amazon ranking
5  in your report?
6      A.  That's not on the screen shot there.
7      Q.  Why not?
8      A.  Why not?
9      Q.  Yeah.
10     A.  Because I could only take a
11  screen shot of whatever could fit on my screen.  And
12  I didn't need, for the purposes that I had, given
13  that I put the URL, anything other than to the, to
14  the, to the line that I ended up placing there.
15     Q.  So their Amazon ranking is not
16  relevant to sales data of the book?
17     MR. BOOTH:  Objection.
18     A.  Oh, it is relevant to sales data of
19  the book.  But the sales are so low that it's
20  effectively zero.
21     BY MR. MILLER:
22     Q.  How do you know that the sales are so
23  low?
24     A.  This is in the 2 million ranks.  And
25  so let me...  So in Amazon's sales ranks, they take

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 166

1  all their books from one to four million, and they
2  rank them in terms of their sales number. And they
3  update it approximately every 30 minutes or so.
4       So the sales rank doesn't actually tell
5  you what the sales volume was, pit depends on the
6  time of year, et cetera. But because I have ten
7  books, up until recently I used to subscribe to a
8  service, before it was stopped, which would allow
9  you to take Amazon sales data and tell your
10 prediction of what the book sales were likely to be.
11      And I have several books that sell in the
12 same ranking as Oh, The Things You Don't Know, and I
13 can tell you that means they get maybe one or two
14 units sold a month. Whereas, in, you know, oh the
15 things you -- Oh, The Places You'll Go! is in the
16 tens of thousands.
17      Q. You're just speculating about that?
18      A. No, no, I'm telling you. That is
19 what it is. From NovelRank.
20      Q. You didn't look at any sales figures
21 of the book Oh, The Things You Don't Know!, is that
22 right?
23      MR. BOOTH: Objection.
24      A. I don't have access to sales because
25 I've got --

Page 167

1       BY MR. MILLER:
2       Q. Right. So you're just making a
3  guess, based on your knowledge of how Amazon's
4  rankings work, about how many units were sold on the
5  book Oh, The Things You Don't Know!?
6       MR. BOOTH: Objection.
7       A. I am making a --
8       MR. BOOTH: Objection.
9       A. -- what I would regard educated
10 guess.
11      BY MR. MILLER:
12      Q. Yes.
13      A. If I know -- let me give you the
14 logic.
15      Q. Right?
16      A. And then you can -- the Court can
17 determine whether this is sound reasoning --
18      (Query by reporter)
19      If... So I have a book that's ranked in
20 2.5 blah-blah-blah million. Oh, The Things You
21 Don't Know! is ranked approximately 2.5
22 blah-blah-blah million. I know that my book has
23 one, maybe two, units a month at that ranking.
24      So, given that it has approximately the
25 same rankings as Oh, The Things You Don't Know!, I

Page 168

1  think it is a reasonable guess that Oh, The Things
2  You Don't Know! on Amazon is achieving that same
3  sales.
4       Q. Mm-hm. Do you know the exact ranking
5  of the book Oh, The Things You Don't Know!?
6       MR. BOOTH: Objection.
7       A. As of this minute, no, but we can
8  find out.
9       BY MR. MILLER:
10      Q. What are the exact rankings of your
11 books?
12      A. I can find out as of this minute.
13      (Query by reporter)
14      I can look on my phone right now and we
15 can find out.
16      Q. And my other question was, do you
17 know the exact ranking of your own books on Amazon
18 ranking?
19      MR. BOOTH: Objection.
20      A. Not the exact ranking right now. No.
21      BY MR. MILLER:
22      Q. So again, you're just approximating
23 and guessing as to how many units of the book Oh,
24 The Things You Don't Know! were actually sold?
25      MR. BOOTH: Objection.

Page 169

1       A. No. As I said, I've outlined my
2  logic there, and at the time that I did look at the
3  ranking of Oh, The Things You Don't Know!, I
4  compared it to the ranking most similar of one of my
5  books on Amazon, and was able to therefore infer
6  what the likely sales of it were.
7       BY MR. MILLER:
8       Q. But you didn't write that in your
9  report, correct?
10      A. I didn't think it was very -- of any
11 use for this assessment. That wasn't the point that
12 I was making. I was making that people who did buy
13 Oh, The Things You Don't Know! also tended to buy
14 other Dr.~Seuss products together.
15      Q. And on that point, what evidence did
16 you consider to support that statement?
17      A. I considered Amazon's statement that
18 that was what was occurring.
19      Q. So you considered the web page?
20      A. That is right.
21      Q. And nothing further?
22      MR. BOOTH: Objection.
23      A. There is nothing further that I had
24 access to.
25      BY MR. MILLER:

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 170

1      Q.  Please turn back to Exhibit 1 in your
2  expert report, to page 5.
3      A.  Yes.
4      Q.  And the final statement on that
5  paragraph at the top.
6      A.  Oh.  Exhibit 1.
7      Q.  Where it says.
8          "Dr.~Seuss books, including the
9          other Dr.~Seuss books, are targeted
10         at a young readership, pre-K
11         through Grade 2, with some
12         additional products targeted to
13         Grade 5."
14     A.  Yes.
15     Q.  You see that?
16     A.  Yes.
17     Q.  That's your words?
18     A.  Yes.
19     Q.  What's your source for that?
20     A.  Dr.~Seuss books.
21     Q.  Dr.~Seuss' books?
22     A.  Yes.  I have all of them.
23     Q.  You have them all?
24     A.  Yep.  Or all of them up until, the
25  ones he wrote anyway.

Page 171

1      Q.  Mm-hm?
2      A.  And I pulled them off a shelf, and
3  they're very, very clear on what their readership
4  targets are on each and every one of them.  I didn't
5  think that was controversial.
6      Q.  Do you know who buys Dr.~Seuss'
7  books?
8      MR. BOOTH:  Objection.
9      A.  I do not know who buys, I know who
10  they are targeted at.
11     BY MR. MILLER:
12     Q.  Is there a difference between who
13  buys and who they're targeted at?
14     MR. BOOTH:  Objection.
15     A.  Yes.  If they're targeted at a young
16  readership, they might be bought by parents,
17  grandparents, friends, family, friends of friends,
18  et cetera.
19     Q.  So would you consider the buyer of a
20  Dr.~Seuss book to be an adult?
21     MR. BOOTH:  Objection.
22     A.  I think that would often be the case,
23  although, you know, some parents might give their
24  kids some money to shop at a bookstore and they
25  might buy it themselves.

Page 172

1      BY MR. MILLER:
2      Q.  Did you think it would be relevant to
3  review any documents about who Dr.~Seuss targets as
4  buyers for its products?
5      MR. BOOTH:  Objection.
6      A.  No, I didn't, because the original
7  complaint made very clear who they did.  I wasn't
8  disputing the original complaint.  Or the amended
9  complaint (indiscernible).
10     THE REPORTER:  Or the amended?
11     A.  Complaint.
12     MR. MILLER:  You can mark both of those,
13     please.
14  EXHIBIT 6 marked for identification:  Complaint for
15         1. Copyright Infringement; 2.
16         Trademark Infringement; and 3. Unfair
17         Competition Demand for Jury Trial
18  EXHIBIT 7 marked for identification:  First Amended
19         Complaint for 1. Copyright
20         Infringement; 2. Trademark
21         Infringement; and 3. Unfair
22         Competition Demand for Jury Trial
23     THE REPORTER:  Exhibits 6 and 7 are
24     marked.
25     MR. BOOTH:  Which one is 6?  Which one is

Page 173

1  7?
2      Thank you.
3      BY MR. MILLER:
4      Q.  Professor, the document that's been
5  marked as Exhibit 6 by the court reporter --
6      A.  Yes.
7      Q.  -- that you have in front of you,
8  what is that document?
9      A.  I think that's the original
10  complaint.
11     Q.  Is this the document that you
12  reviewed and relied on in forming your expert
13  opinion?
14     A.  I believe so.
15     Q.  Show me where in this document it is
16  that you say supports your statement that you know
17  who Dr.~Seuss targets as buyers for its products?
18     A.  Okay.
19     (witness perusing document)
20     MR. BOOTH:  This is a long document so if
21     you need to take time to review it.
22     A.  I'm going to go through each of the
23  parts that gave me that impression, because I didn't
24  feel this was controversial, but if it is now
25  controversial.

44 (Pages 170 - 173)

Exhibit 1, Page 33

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 174

1    "Most of" -- on the bottom of page 3: (as
2  read).
3           "Most of the Dr.~Seuss books
4      were written to entertain children,
5      but, more importantly, to promote
6      and stimulate children's love of
7      reading and literary skills."
8      BY MR. MILLER:
9      Q.  Does that say anything about buyers
10 of the books?
11     A.  I'm sorry, where -- are we talking
12 about buyers of the books?
13     Q.  That was my question.  And that was
14 the statement that you just made.  I was asking --
15     A.  I'm sorry, I thought we were talking
16 about my report.
17     Q.  I asked you a question about how you
18 know who buys Dr.~Seuss'.  And your answer to
19 me was:  "I read the complaint."
20     A.  Oh, I'm sorry.  I thought you were
21 talking about who Dr.~Seuss' books were targeted at.
22     Q.  Yeah.  Then I asked --
23     A.  I thought I had already answered your
24 question.  I said I did not know the precise people
25 who bought Dr.~Seuss books.

Page 175

1      Q.  Right.  So you don't know who buys
2  Dr.~Seuss' books?
3      MR. BOOTH:  Objection.
4      A.  I do not know the precise people.
5      BY MR. MILLER:
6      Q.  Did you review any consumer surveys
7  regarding who buys Dr.~Seuss' books?
8      A.  I, I did not because I was happy with
9  the statements that were made in the complaint
10 regarding the targeting, and that was what was
11 relevant for my analysis.
12     Q.  Again, where in the complaint does it
13 say who the target buyers for the book is?
14     A.  Sorry, the target -- what do you mean
15 "target buyers"?
16     Q.  Who buys Dr.~Seuss' books?
17     MR. BOOTH:  Objection, asked and answered.
18     A.  I'm going to have to obviously
19 explain the children's book market --
20     BY MR. MILLER:
21     Q.  Please.
22     A.  -- a little more closely.
23           When things and products, of which include
24 books at targeted children, the purchase of a person
25 giving over the money may well be an adult.  But as

Page 176

1  a matter of economics, the adult will consider a
2  variety of factors, including the suitability of the
3  product for the children, how much they will enjoy
4  it, et cetera, in doing it.  In which case, this is
5  an example of a good of which there is potentially
6  joint consumption, but also a separation of the
7  person who might be forking out the money from those
8  who might be consuming the article.
9           So you have to take into account that
10 before you use vague words, trying to misstep other
11 things or not relating them to the substance of the
12 matter at hand.
13           And remember, and let's go all the way
14 back as to why this is relevant.  This is relevant
15 because it has been asserted that if Oh, The Places
16 You'll Boldly Go! is published, then that is going
17 to have a material and cognizant negative impact on
18 sales of Dr.~Seuss products which are targeted for
19 the enjoyment of children.
20     Q.  Mm-hm?
21     A.  But I basically say, from all my
22 experience, if an employee -- a product is targeted
23 to the enjoyment of adults comes into the market,
24 that won't have any effect on the -- any detrimental
25 effect on the products that are for the enjoyment of

Page 177

1  children.  And that's the broad thing being
2  discussed here.
3           And at the moment, in this questioning,
4  and in the allegations in the thing, there is
5  nothing to suggest that what Dr.~Seuss products have
6  in mind is anything other than the enjoyment of
7  children, or being enjoyed by children.
8           And I believe that is a statement that I
9  can rely on as evidence, fact, and common sense.
10     Q.  So you're relying on nothing but your
11 common sense since you didn't review any evidence to
12 support that statement; is that right?
13     MR. BOOTH:  Objection.  Objection.  Do not
14 mischaracterize the testimony.
15     MR. MILLER:  Dan, limit your objections as
16 to form.  He can answer for himself.
17     MR. BOOTH:  Do not mischaracterize the
18 testimony and then you won't have those
19 objections.
20     A.  I have relied on the factual
21 allegations as listed in here.
22     BY MR. MILLER:
23     Q.  Right.  You didn't review any
24 evidence that was produced in this case?
25     A.  I --

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 178

1    MR. BOOTH: Objection.
2       A.  I don't -- I regard it as evidence
3  when a party makes a representation towards --
4  before the Court that isn't challenged by something
5  else.
6       BY MR. MILLER:
7       Q.  In your report, I believe you state
8  that Dr.~Seuss' book Oh, The Places You'll Go! is
9  the sole exception and is targeted at adults.  Let
10 me find it.  Do you recall that statement?
11      A.  I didn't say it was --
12      MR. BOOTH: Objection.
13      A.  I didn't say it was targeted at
14 adults.
15      BY MR. MILLER:
16      Q.  Okay.  Let's find it.
17      MR. BOOTH: If you want to point him to a
18 specific passage.
19      THE WITNESS: I know where it is.
20      A.  You want the bottom of page 9.
21      BY MR. MILLER:
22      Q.  Go ahead and read the statement that
23 you're referring to at the bottom of page 9.
24      A.  (as read):
25           "It is my understanding that,

Page 179

1           with the sole exception of Go!,
2           which is marketed not only to
3           children but also as a gift to be
4           given to college graduates and
5           other graduates, the Seuss books
6           are targeted at young children
7           below the age of 6 or so years old,
8           and plaintiff's other products also
9           target that market segment."
10      That is my understanding, and my
11 understanding comes from this statement of claim.
12      Q.  So let's unpack this sentence here.
13 You got a few things that are inside there.
14      So you say it is your understanding
15 that -- is how you start the sentence.
16      A.  Mm-hm.
17      Q.  What is your understanding based on?
18 The complaint; is that right?
19      A.  It's -- my understanding is based on
20 the complaint, yes.
21      Q.  And nothing else?  Just the
22 complaint?
23      MR. BOOTH: Objection.
24      A.  Oh, also my knowledge of it.  If you
25 read, for instance, the Slate article, it says just

Page 180

1  that too.
2       BY MR. MILLER:
3       Q.  Okay.  So the Slate article and the
4  complaint?
5       A.  Mm-hm.
6       Q.  Is there anything else that you
7  relied on to form your understanding in support of
8  this statement?
9       MR. BOOTH: Objection.
10      A.  It is a very hard thing to extract
11 myself from such an iconic thing as Dr. Seuss and
12 knowledge of it, to tell you exactly the full
13 formation of my understanding about things that are
14 in the common parlance that we have here.
15      BY MR. MILLER:
16      Q.  Okay.  After the comma, you say: (as
17 read)
18           "... with the sole exception of
19           Go!, which is marketed not only to
20           children but also as a gift to be
21           given to college graduates and
22           other graduates."
23      What does that statement mean?
24      A.  That means that Go! is marketed at
25 times of graduation as a thing you would give

Page 181

1  college graduates.  And I don't regard college
2  graduates as children under 6, usually.
3       Q.  You regard college graduates as
4  adults?
5       A.  No.  I regard them as not being
6  children under 6.
7       Q.  What do you regard college graduates
8  as?
9       A.  As being young adults of 17, 18 --
10 of, sorry, 21, 22 years old.
11      Q.  Mm-hm.  So what do you consider to be
12 children?  What age ranges do you consider to be
13 children?
14      MR. BOOTH: Objection.
15      A.  I'm not considering it be children.
16 I'm just noting that Dr.~Seuss books are, most
17 products are, targeted to children under the age of
18 6.
19      BY MR. MILLER:
20      Q.  Yeah, that didn't answer my question.
21      What age ranges do you consider to be
22 children?
23      A.  What purpose do you want me to
24 consider it children?  I have different definitions
25 of what I would consider a child, depending on

46 (Pages 178 - 181)

Exhibit 1, Page 35

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 182

1  context.
2      Q.  Sure.  In the context of this report,
3  in this case, what age ranges do you consider to be
4  children?
5      A.  Broadly speaking, under the age of
6  10.
7      Q.  What age range do you consider to be
8  adults, in the context of this case?
9      A.  Broadly speaking, over the age of 18.
10     Q.  And so, in the context of this case,
11 and in your definition of "adult"...
12     A.  Mm-hm.
13     Q.  Do you consider college graduates to
14 be adults?
15     A.  I consider them -- I...
16         You know, I teach college students.  You
17 want to tap the label "adults" on everything they
18 do, that's one thing.  I'm happy with the label of
19 "not children."
20     Q.  That's not answering my question,
21 Professor.
22         Using your definition of "adults," the age
23 range, over the age of 18, do you consider college
24 graduates to fit the definition of "adult?"
25     MR. BOOTH:  Objection.

Page 183

1      A.  I -- they are adults unto the extent
2  that they are not children.
3      BY MR. MILLER:
4      Q.  In the remainder of your sentence
5  there, you say: (as read)
6          "The Seuss books are targeted at
7          young children below the age of 6
8          or 7 years old, and plaintiff's
9          other products also target that
10         market segment"?
11     A.  Correct.
12     Q.  Is that accurate?
13     A.  Yes, that's what I say.
14     Q.  What is your basis for making that
15 statement?
16     A.  My basis for the statement was the
17 statements here in the original complaint by the
18 plaintiff.
19     Q.  Do you know how Dr.~Seuss markets its
20 products?
21     MR. BOOTH:  Objection.
22     A.  I am aware of it, yes.
23     Q.  And how does Dr.~Seuss market its
24 products?  What's your understanding of it?
25     MR. BOOTH:  Objection.

Page 184

1      A.  Oh, let's have a -- let's go through
2  this stuff.
3          If you go to a bookstore, there are
4  different categories of where books are.  And
5  they've got one section called Children's Books.
6  And in Children's Books are all of the Dr.~Seuss
7  books.
8          My understanding of a Children's Books
9  section is that that is marketing books to be
10 consumed and read by children, or read to children.
11 I am not aware of Dr.~Seuss books being in other
12 locations in any bookstore except for Oh, The Places
13 You'll Go!, which at graduation times tends to sit
14 on the front little tables.  And who knows who
15 that's getting targeted at.
16     BY MR. MILLER:
17     Q.  Are you aware that Dr.~Seuss'
18 President and corporate representative in this case
19 testified about which books Dr.~Seuss markets to
20 children versus which ones they market to adults?
21     A.  I'm --
22     MR. BOOTH:  Objection.
23     A.  I'm not aware of -- I have not
24 reviewed that evidence.
25     BY MR. MILLER:

Page 185

1      Q.  If you had reviewed that evidence,
2  would it have impacted your opinion?
3      A.  I have not --
4      MR. BOOTH:  Objection.
5      A.  -- reviewed that evidence, so I don't
6  know what the impact on its opinion would be, but I
7  would be happy to do so right now.
8          Could you -- could I ask if you could name
9  one book that you mentioned other than Oh, The
10 Places You'll Go! that they marketed to adults?  I'm
11 happy to consider it --
12     Q.  I'm not here to answer your
13 questions?
14     A.  -- because I -- but I know the whole
15 works, so I would like to know.
16     Q.  Professor.  I'm not here to answer
17 your questions.
18     A.  Okay.
19     Q.  I'm the one asking them.
20     A.  But you don't understand that from my
21 perspective, that leads me to infer that this
22 doesn't exist.  And to continue with this --
23     Q.  Professor, I'm not going to argue
24 with you.  I'm here to ask you questions.
25     A.  Okay.

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 186

1    Q.  So the answer (sic) is:  Are you
2  aware that Dr.~Seuss markets its books to adults?
3       MR. BOOTH:  Objection.
4       A.  I am aware that there is a book that
5  Dr.~Seuss markets to adults.
6       BY MR. MILLER:
7       Q.  And you did not review the deposition
8  transcript or testimony of Dr.~Seuss' corporate
9  representative and President in this case; is that
10  right?
11      A.  I did not review that.
12      Q.  Okay.  And you didn't review any
13  documents that Dr.~Seuss produced in this action
14  related to its marketing or its publishing program
15  and who it targets?
16      MR. BOOTH:  Objection.
17      A.  I reviewed -- I did not review any
18  documents related to things that were unnecessary
19  for me to form my opinion on the basis of the
20  documents I have already told you.
21      BY MR. MILLER:
22      Q.  Okay.  So, again just to be clear,
23  what's the source for the statements that you made
24  that we were just looking at?
25      A.  A combination of statements in the

Page 187

1  original claim, the Slate article, and my 20 years
2  of understanding how Dr.~Seuss has appeared and
3  marketed throughout that, because it's part of the
4  cultural iconography of both Australia and the U.S.
5  and probably all English-speaking countries.
6       Q.  Okay.  Are you aware of any of the
7  Dr.~Seuss books that appear on a bestseller list for
8  adult books?
9       MR. BOOTH:  Objection.
10      A.  I have -- I've seen the overall
11  bestseller lists 'cause there's no, like, just as
12  adult book bestseller list that I'm aware of.  But
13  Oh, The Places You'll Go! has appeared on the
14  bestseller lists for overall things.  But it is also
15  listed at the bestseller list for children's books
16  as well.
17      I'm not aware of any Dr.~Seuss book that
18  is a bestseller on the overall list that does not
19  appear on the bestseller of the children's books.
20      Q.  Are you aware of any other products
21  that Dr.~Seuss markets besides its books --
22      A.  Yeah --
23      Q.  That are -- well, here, let me ask a
24  simpler question.
25      Are you aware of Dr.~Seuss' other products

Page 188

1  besides its books?
2       MR. BOOTH:  Objection.
3       A.  Yes.
4       BY MR. MILLER:
5       Q.  What products are those that you're
6  aware of?
7       A.  Oh boy.  Okay.  Guess I'm aware of
8  both, so I'm going to have to do them all.
9       They have various games and puzzles,
10  including a large floor puzzle of the Cat In The Hat
11  --
12       (Query by reporter)
13       They have various games and puzzles,
14  including a large floor puzzle of the Cat In The Hat
15  which you can plonk over a floor that has literally
16  the fur of the Cat In The Hat on it.
17       They have every name of children's
18  products that you could have with their thing
19  stamped to it.  They have balls; they have games;
20  they have cards that allow you to teach and do word
21  flash cards to help with reading.
22       They have, obviously, movies.  They've got
23  DVDs; they've got cartoons and live-actions, and
24  then most recently CGI ones.
25       They have plonked their brand name on all

Page 189

1  manner of children's clothing which you can get,
2  with Doctor Who (sic) characters on it.
3       They have plush toys: Horton the Elephant,
4  and also the Cat In The Hat, and other things like
5  that.
6       They have apps.  They have apps of all the
7  Dr.~Seuss books plus they also have an app where you
8  can sort of play a Dr.~Seuss world, a game type
9  thing, and other things that I'm probably not aware
10  of anymore.
11       They have websites that they used to --
12  They have websites that they used to do in the 19 --
13  in the 2000s which had Dr.~Seuss things going on
14  with them.  They have music and CDs that I presume
15  come from other stuff, or maybe -- I can't remember
16  what was on them.
17       They have posters that you can buy.  And
18  I've now forgotten -- anyway.  They have quite a
19  lot.  A considerable amount of them in my house, or
20  used to be in my house.
21       Q.  So is it fair to say your knowledge
22  of the products that Dr.~Seuss markets is based upon
23  the goods you've seen in your personal experience,
24  in your special life?
25       MR. BOOTH:  Objection.

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 190

1    A. Not just that. For my sins, another
2  book that I wrote previously was on the economics of
3  parenting. And a substantial amount of that were
4  how brands such as Dr.~Seuss, and there are others,
5  marketed to parents and children.
6        And so I took a, for a number of years
7  there, a keen interest in those sorts of things.
8        BY MR. MILLER:
9        Q. Mm-hm. Did you rely on that book?
10 What was it called, the parenting book?
11       A. No, it's called Parentonomics.
12       Q. Parentonomics. Did you rely on
13 Parentonomics in forming your opinion in this case?
14       MR. BOOTH: Objection.
15       A. No, I didn't rely on that explicitly,
16 it's just as part of the mix that of the things that
17 make up me.
18       Q. Mm-hm?
19       A. I'm just saying it was not purely
20 personal, my experience with Dr.~Seuss. Also, it
21 goes back because I of course had those things when
22 I was a child as well, as you probably did as well.
23       Q. Mm-hm. Were you aware that Dr.~Seuss
24 sells fine art products?
25       A. Actually, yes. But they're sort

Page 191

1  of -- well, I don't know. With all these things,
2  there might be some adults that purchase it for
3  themselves but my recollection of them when they
4  were expensive but they were aimed at being able to
5  decorate a child's room. That's my recollection of
6  them.
7        Q. Mm-hm. What's that based on?
8        MR. BOOTH: Objection.
9        A. It's my memory because you brought
10 them up right now. I did not consider -- I do not
11 believe -- I will say this right now -- that the
12 publication of Oh, The Places You'll Boldly Go!
13 would have any impact whatsoever on the fine art
14 sales or anything that might come from Dr.~Seuss, or
15 some of those fine art are not produced by Dr.~Seuss
16 themselves but are produced by other artists that
17 are transformative works, and I don't think they'll
18 impact on those either.
19       BY MR. MILLER:
20       Q. So -- all right. Let's break down
21 that statement.
22       One, on what are you basing your opinion
23 that you don't think the publication of Oh, The
24 Places You'll Boldly Go! would have any impact on
25 fine art sales?

Page 192

1        MR. BOOTH: Objection.
2        A. It's a book. And my belief is that a
3  book will not impact on the fine arts sales of --
4  that might be based on a different book. I think
5  those are distinct markets. I think that if I was
6  testifying in an antitrust matter about market
7  definition, I would not constitute a conjoined book
8  and fine art market, I can't imagine ever.
9        BY MR. MILLER:
10       Q. Did you... Are you opining on market
11 definition in this case?
12       MR. BOOTH: Objection.
13       A. I'm opining on market impact in this
14 case. You put forward to me a market definition
15 question which I was happy to opine on.
16       BY MR. MILLER:
17       Q. Are you opining on market definition
18 in this case?
19       A. No.
20       MR. BOOTH: Objection.
21       A. No, I'm not. I'm opining on market
22 impact.
23       BY MR. MILLER:
24       Q. So your statement that the
25 publication of Oh, The Places You'll Boldly Go!

Page 193

1  would not have any impact whatsoever on fine art
2  sales is based on just a belief?
3        MR. BOOTH: Objection.
4        BY MR. MILLER:
5        Q. Is that right?
6        MR. BOOTH: Objection.
7        A. I think in 25 years as an economist,
8  with a Ph.D. from Stanford, 130 published articles,
9  more books now than I can count, that I can sensibly
10 apply economics to understand when products are in
11 distinct markets, when those markets are
12 sufficiently far distance from one another.
13       And what I'm willing to opine now, based
14 on all that experience, is that the book market for
15 children's books, specifically Oh, The Places You'll
16 Boldly Go!, operates in a completely distinct and
17 unrelated market to the market for fine art.
18       Q. Is Oh, The Places You'll Boldly Go!
19 in the children's book market?
20       MR. BOOTH: Objection.
21       A. No, Oh, The Places You'll Boldly Go!
22 is in the, is in the book market.
23       BY MR. MILLER:
24       Q. I think you're confusing yourself,
25 Professor.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 194

1    A.  Okay.
2    Q.  You just said that Oh, The Places
3 You'll Boldly Go! is in the children's book market.
4    A.  I'm sorry.  Then let me clarify.  Oh,
5 The Places You'll Boldly Go! is in the book market.
6    Q.  Mm-hm.  And you don't think that the
7 publication of Oh, The Places You'll Boldly Go!
8 would have any impact on, in that example, the fine
9 art products that Dr.~Seuss licenses?
10    A.  That is my... I'm willing to bet my
11 reputation on it.
12    Q.  Okay.  You didn't review any evidence
13 to support that, you're just basing it on your
14 belief, based on your experience; is that right?
15    MR. BOOTH:  Objection.
16    A.  This is experience that you have to
17 have in -- basically, half of the job is
18 understanding and getting a sense of what have got
19 to be complements and substitutes and what are in
20 the same markets.  And what you have to have
21 described to you is some sort of similar economic
22 functional related products.
23    Q.  Mm-hm?
24    A.  And as far as I can tell, there is no
25 relationship between the fine art market and the

Page 195

1 market for these sorts of books.  It's as simple as
2 that.  Not as substitutes.
3    Q.  But again, you didn't study any
4 evidence regarding Dr.~Seuss' fine art in the
5 context of --
6    A.  There is no evidence --
7    Q.  Let me finish my question -- in the
8 context of forming your opinion in this case; is
9 that right?
10    MR. BOOTH:  Objection.
11    A.  My belief that there is no evidence
12 regarding Dr.~Seuss' fine arts activities in this
13 case.
14    BY MR. MILLER:
15    Q.  Mm-hm.  Did you review any licence
16 agreements that Dr.~Seuss produced in this case?
17    MR. BOOTH:  Objection.
18    A.  I am unaware of any licence
19 agreements to Dr.~Seuss produced in this case.
20    BY MR. MILLER:
21    Q.  You're unaware of them?
22    A.  I'm unaware of them.
23    Q.  Did you ask to see any of them?
24    A.  No, I only asked for things that were
25 material for the questions that I was looking at,

Page 196

1 and that wasn't.
2    Q.  Did you ask to see any of the
3 financial records of Dr.~Seuss Enterprises
4 regarding, for example, royalties earned from the
5 sales of licensed products?
6    MR. BOOTH:  Objection.
7    A.  I only looked at evidence that would
8 be of importance for the -- for this case.
9    BY MR. MILLER:
10    Q.  Mm-hm.  Is Dr.~Seuss' revenues not
11 important for assessing market impact in this case?
12    A.  It is not because just having a
13 blanket revenue number doesn't give you any
14 information.
15    Q.  Mm-hm.  Are revenues related to
16 specific licensed products that Dr.~Seuss has
17 authorized to be sold relevant to your assessment of
18 market impact?
19    MR. BOOTH:  Objection.
20    A.  During my discussion initially about
21 evidence that might be available, I believe I did
22 make a question, although I believed it not to be
23 the -- to exist:  Had Dr. Seuss had any licensing
24 agreements with science fiction characters and
25 brands?

Page 197

1    BY MR. MILLER:
2    Q.  Why did you think that that would be
3 relevant?
4    A.  I would think that that would be
5 relevant because it would indicate that there might
6 be -- that might have been relevant because it might
7 indicate whether Dr. Seuss had an interest in
8 pursuing science fiction markets and marketing.
9    Q.  Mm-hm?
10    A.  But I have never heard of that.  But
11 I did ask as part of the brainstorming initially on
12 what evidence might be available.
13    Q.  Let's go back your report where we
14 left off at page 10.
15    A.  Yeah.
16    Q.  The next para---
17    MR. BOOTH:  Which report?  Is this the
18 first or second?
19    MR. MILLER:  First report, Exhibit 1, page
20 10?
21    MR. BOOTH:  Thank you.
22    BY MR. MILLER:
23    Q.  The next paragraph starting with "by
24 contrast," can you read that sentence, please?
25    A.  (as read).

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 198

1    "By contrast, my understanding
2    is that Boldly is a work targeted
3    at adults and perhaps young
4    adults."
5        Q.   What's your source for that
6    statement?
7        MR. BOOTH:  Objection.
8        A.   Two sources.  One is, Boldly was
9    produced to me, and I read it.
10       BY MR. MILLER:
11       Q.   Hold on.  Let me ask you a question.
12       You read Boldly.  Did you list it in your
13   report as something that you considered?
14       MR. BOOTH:  Objection.
15       A.   Did I list Boldly as something I
16   considered?
17       BY MR. MILLER:
18       Q.   Mm-hm?
19       A.   It was produced to me.  And I've
20   referenced it numerous times here, of what was
21   inside it, so obviously it's listed.
22       Q.   Okay, so the question -- let me just
23   ask you the question.
24       Did you consider -- sorry.  Did you read
25   Boldly in forming your expert opinion in this case?

Page 199

1        A.   Yes.
2        Q.   Okay.  Go ahead.  You were going to
3    continue on with that sentence.
4        A.   That's what it was.  I can't recall
5    other things.  I think that was the main thing.
6        It's not very hard, when you read Boldly,
7    to see what it's targeted at.  I mean, it doesn't
8    take a genius.  I mean, let's be very clear; it
9    deals with death, which none of the Dr. Seuss books
10   that I recall had ever done.
11       Q.   Mm-hm.  Did you know what the
12   defendants' plans were with respect to Boldly in
13   terms of who they were marketing and targeting as
14   readers?
15       MR. BOOTH:  Objection.
16       A.   I understood them to have a
17   Kickstarter campaign that's now been pulled off
18   because of this matter.
19       My understanding of it was -- but I'm not
20   going to recall where it came from -- that it was
21   marketed to people who would appreciate what they
22   had done in that book; that they were marketing it
23   as a, as a, as a, as a work that would -- that
24   people who were familiar with various things would
25   treat it as opposed to some other message for the

Page 200

1    world that you might write in some other bits of
2    literature.
3        It seems to me that if you look at it, it
4    was plainly apparent that the expectation was that
5    people familiar with Star Trek would be purchasers
6    of this book.
7        Q.   And you're basing that solely on your
8    reading of the book?
9        MR. BOOTH:  Objection.
10       BY MR. MILLER:
11       Q.   Is that right?
12       A.   Well, it's not just my reading.  It's
13   also, you know, when you look at what the book is
14   about, and you look at the language of the book, and
15   you look at the pictures in the book.  It's not,
16   it's not a -- you know, it's just the same way that
17   when I look at an apple, I know that's being, you
18   know, a piece of food.  It's just something you
19   would come.
20       My, my belief is that anyone who
21   understands -- looks at this book will understand
22   that an appreciation of Star Trek is one of the
23   assumptions of the readers in this book.
24       Q.   Mm-hm.  So let me ask my original
25   question again because I don't think you've answered

Page 201

1    it.
2        Do you know what the -- excuse me.
3        Do you know what the defendants' plans
4    were with respect to marketing Boldly?
5        MR. BOOTH:  Objection.
6        A.   I do not know what their plans were.
7        BY MR. MILLER:
8        Q.   Do you know what the defendants'
9    plans were with respect to the readers that they
10   were targeting?
11       MR. BOOTH:  Objection.
12       A.   I do not know what their plans were.
13       BY MR. MILLER:
14       Q.   On page 10 of Exhibit 1, a little bit
15   further down in that paragraph we were just looking
16   at, you say: (as read)
17       "In particular, Boldly contains
18       many references throughout to
19       specific episodes of the original
20       series, and, in my opinion, would
21       be unlikely to hold any value or
22       interest to a consumer who was not
23       already versed in Star Trek
24       original series tropes and
25       characters and in Go!."

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 202

1    What's your opinion based on there?
2    MR. BOOTH:  Objection.
3    A.  My reading -- it's based on my
4  reading of Boldly and my knowledge of Star Trek.
5    BY MR. MILLER:
6    Q.  Did you think it would be helpful to
7  conduct a survey of consumers to see and gauge what
8  their interest in this book might be?
9    MR. BOOTH:  Objection.
10    BY MR. MILLER:
11    Q.  Would that have been relevant to
12  forming your expert opinion here?
13    MR. BOOTH:  Objection.
14    A.  No, I do not believe it would have,
15  in terms of the market impact.  Surveys are
16  imprecise instruments.  They can be used in certain
17  times to inform things.  But for a speculative
18  product like this, without data, I couldn't do.  The
19  best thing, if we'd really been serious about market
20  impact, would have been to publish Boldly and then
21  done a very detailed examination of its impact on
22  Dr. Seuss.
23    Q.  Mm-hm.  And in the absence of
24  publishing Boldly, would you have perhaps tried to
25  simulate market conditions?

Page 203

1    A.  You can't --
2    MR. BOOTH:  Objection.
3    A.  You can't simulate -- creative works
4  are not great for quantitative simulation of market
5  conditions.
6    (Query by reporter)
7    Creative works.
8    Q.  Mm-hm?
9    A.  No, what you would want to do is you
10  would want to understand broad issues of market.
11    Sometimes you can look at the various
12  products and where they're being positioned, and you
13  can draw enough information to know what the likely
14  impact is going to be.  And that's what I was doing
15  here.
16    Q.  You were looking at various products
17  and where they were being positioned?  That's how
18  you --
19    A.  Yes.
20    Q.  -- formed your opinion here?
21    A.  Yes.
22    MR. BOOTH:  Objection.
23    A.  But you can -- the -- let me put it
24  very clearly to you.
25    The inference being drawn is of the

Page 204

1  separate markets that these books were being target
2  at.  If, there, someone had done, you know, found a
3  way of which I can't imagine yet but I'm happy to
4  entertain anything that you might have brightly come
5  up with that placed these things squarely in
6  competition with one another, that would cause me to
7  revise my basic understanding of which those were
8  targeted.
9    However, even so, the main issue of this
10  case was not on the sales of Go! and on the
11  different targeting of those, but the different
12  between Boldly and other Dr. Seuss products.
13    And Boldly is not a toy.  It's not a piece
14  of fine art.  It's not a -- it's not a thing with
15  clothes.  It's not a thing that goes in a house.
16  It's not something you would put on a mouse.  Oh,
17  I'm sorry, it's too late in the afternoon.  But
18  they're not those things.
19    Q.  But you're --
20    A.  And that is -- and that is a plain
21  reading of it.  And I've seen literally, and you've
22  put nothing before me, and neither did Dr. Dawson,
23  to suggest otherwise.
24    Q.  Mm-hm?
25    A.  And so I'm not going to change my

Page 205

1  opinion based on clear reading of the -- of what is
2  going on here.
3    Q.  So you're aware that Dr. Seuss is
4  alleging that the defendants have infringed the
5  copyright in the book Oh, The Places You'll Go!; is
6  that right?
7    A.  I believe that's an allegation, yes.
8    Q.  So why are you saying that the book
9  itself, Oh, The Places You'll Go!, in its sales and
10  market impact in relation to it, is not relevant to
11  this case?
12    MR. BOOTH:  Objection.
13    A.  My understanding that the market
14  impact segment of a fair use proceeding is not to do
15  with the impact on the original work that is being
16  derived from but on other things that might be part
17  of the creator's commercial interests.
18    BY MR. MILLER:
19    Q.  Have you been told to assume that by
20  counsel?
21    A.  I have been told both by counsel and
22  also it was reaffirmed very clearly that Dr. Dawson
23  was told the same thing and she stated it in her
24  report.
25    Q.  Mm-hm.  I'm asking what you were

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 206

1  told.
2      A.  I was told by counsel.
3      Q.  So you were told by counsel to assume
4  that there would be no negative impact on the
5  original work --
6      A.  No.
7      MR. BOOTH:  Objection.
8      A.  No.
9      BY MR. MILLER:
10     Q.  -- and publication of Boldly."
11  So what --
12     MR. BOOTH:  I'm sorry, let me --
13  objection.
14     BY MR. MILLER:
15     Q.  So what is it that you were told to
16  assume by counsel?
17     MR. BOOTH:  Objection.
18     BY MR. MILLER:
19     Q.  Because you don't state anywhere in
20  your testimony or in your report?
21     A.  I was not -- I was not told to assume
22  anything --
23     Q.  Okay?
24     A.  -- about that.
25     Q.  So what were you told then about...

Page 207

1      (Query by reporter)
2      THE WITNESS:  Sorry.
3      BY MR. MILLER:
4      Q.  Okay.  So what were you told about
5  the impact that Boldly would have on the original
6  work Oh, The Places You'll Go!?
7      A.  Nothing.
8      Q.  Nothing?
9      A.  Nothing.
10     Q.  And you didn't consider that in
11  forming your opinion in this case?
12     MR. BOOTH:  Objection.
13     A.  That I was told to assume nothing?
14  No.  I did consider that.
15     BY MR. MILLER:
16     Q.  No.  Did you consider the impact, the
17  market impact, of the publication of Boldly on the
18  original work Oh, The Places You'll Go!?
19     A.  Yes.
20     Q.  And show me here in your report where
21  you state that analysis and draw your conclusion.
22  Limit it to that specific question about the
23  market --
24     A.  No, I know, the impact on Oh, The
25  Places You'll Go!

Page 208

1      Q.  Correct.
2      (Query by reporter)
3      A.  On page 9, section A:  (as read)
4          "The later work does not impact
5          on the targeted market for the
6          original works.  I have examined
7          the claims of the plaintiff and
8          have reviewed Go!, the other
9          Dr. Seuss book" -- "other Seuss
10         books, and Boldly.  In my opinion,
11         Boldly addresses a different market
12         and market function from Go!  The
13         other Doc--" or "other Seuss books
14         and the plaintiff's other products.
15         The plaintiff --""
16     Q.  So let me stop you there.  I'm asking
17  you a question about the market impact that Boldly
18  would have on Oh, The Places You'll Go!
19     A.  Mm-hm.
20     Q.  This sentence includes more than just
21  Go!; is that right?
22     A.  It does.
23     Q.  All right.  So let's focus on just
24  Go! for a minute.
25     A.  Okay.  But that's not a very fair

Page 209

1  thing to argue, that I had to consider it separately
2  from all other statements when it was my desire to
3  consider them within the same thing.  But the
4  statement applies if we just stop reading:  (as
5  read)
6          "in my opinion, Boldly addresses
7          a different market and market
8          function from Go!."
9      And we could just stop there.  I'm saying
10  that that statement, I regard it as a statement.
11     BY MR. MILLER:
12     Q.  Okay.  What's your source for that
13  statement?
14     MR. BOOTH:  Objection.
15     A.  I will continue to read:  (as read)
16         "Plaintiff repeatedly asserts
17         that the market for plaintiff's
18         products, including Go! and the
19         Seuss books is children."
20     And I'm going to quote:  (as read)
21         "'Most of the Dr. Seuss books
22         were written to entertain children,
23         but more importantly, to promote
24         and stimulate children's love of
25         reading and literary skills.

53 (Pages 206 - 209)

Exhibit 1, Page 42

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 210

1       Children around the world would
2       read" -- "read the Dr. Seuss books
3       and parents and educators worldwide
4       use the Dr. Seuss books to motivate
5       children, teach community values
6       and enhance literature" --
7       "literacy.'"
8     That is the statements from the plaintiff.
9    Q.  Right.  Those statements, those
10 allegations from the complaint, don't mention Oh,
11 The Places You'll Go!, do they?
12     MR. BOOTH:  Objection.
13    A.  Oh, The Places You'll Go! is a
14 Dr. Seuss book.
15     BY MR. MILLER:
16    Q.  Right.  But it's not specifically
17 mentioned in the allegation you're relying on,
18 right?
19     MR. BOOTH:  Objection.
20    A.  I don't see why that would be
21 different since it even says later on:  (as read).
22       "Some of the best well [sic]
23       Dr. Seuss are..."
24 And the first one:  "Oh, The Places You'll Go!"  The
25 first one.

Page 211

1    A reasonable person could consider the Oh,
2 The Places You'll Go! to be a Dr.~Seuss book and to
3 believe that statements about the Dr.~Seuss books
4 would apply to Oh, The Places You'll Go!.
5     If you wish to tell me that Oh, The Places
6 You'll Go! is not a Dr. Seuss book, and that I've
7 misread this, please do so.
8    Q.  That's not my question.
9    A.  Well, I don't know what your question
10 is, because I've answered what I thought your
11 question was.
12    Q.  Okay.  Let me --
13    A.  Where in this doc--- you asked, and
14 we can go back -- where in this document do you look
15 at the impacts on the market for the original work?
16 And I pointed that page 9 and onwards.
17    Q.  Sure.  And my last question, which we
18 were just talking about, was:  Where in the
19 statement which you're relying on from the
20 allegations made in the complaint, does it mention
21 Oh, The Places You'll Go!?
22    The answer, I believe you pointed me to
23 another section, is that right, not the statements
24 that you quoted here in your report?
25    A.  That's right.

Page 212

1    Q.  Okay.
2    A.  'Cause you remember I told you I was
3 writing this report --
4       (overspeaking)
5    Q.  So let me ask you the next question.
6     MR. BOOTH:  Please don't interrupt my --
7 the witness's answers.  Let him continue
8 and let him complete his sentences.
9     MR. MILLER:  Dan, state your objection,
10 and then I'm going to ask the next
11 question.
12     MR. BOOTH:  Please comply.
13     BY MR. MILLER:
14    Q.  The next sentence, which we already
15 discussed, you say:  (as read).
16       "It's my understanding that with
17       this sole exception of Go!, which
18       is also marketed not only to
19       children but also as a gift to be
20       given to college graduates in other
21       countries."
22       Right?
23    A.  Yes.
24    Q.  Right.  So we already discussed that
25 Oh, The Places You'll Go! is marketed not only to

Page 213

1 children but also as a gift to be given to college
2 graduates and graduates; is that right?
3    A.  Yes.
4    Q.  Is that the market for Dr. Seuss?  Is
5 that your statement for the market for how Dr. Seuss
6 markets Oh, The Places You'll Go!?
7     MR. BOOTH:  Objection to form.
8    A.  I have -- that is my statement for
9 how they market the Oh, The Places You'll Go!
10     BY MR. MILLER:
11    Q.  Okay.  And is that also the market
12 function that Oh, The Places You'll Go! addresses?
13     MR. BOOTH:  Objection.
14    A.  It -- I believe that book,
15 unlike other Dr. Seuss books, has several market
16 functions.
17    Q.  Mm-hm.  What are those?
18    A.  One is the same as all the other
19 Dr. Seuss books.  And the other is that it has
20 turned out to be a gift for college graduates.
21    Now, Part B on page 10 is a second part of
22 the answer to your first question way back when.
23    Q.  Okay.
24    A.  You asked me to point to the places.
25    Q.  Okay.  Let's go back, though, to Part

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 214

1    A.  I'm trying to understand what your opinion is
2    with respect to the market impact that Boldly would
3    have on just the market for Oh, The Places You'll
4    Go!
5         A.  Okay.
6         Q.  All right?
7         A.  So the -- my first point, and I will
8    say this again, is Go! is written as Go! is written.
9    It's a thing that is targeted as children and, as a
10   derived product, gets also given to college
11   graduates as a gift.
12        I don't know if college graduates read the
13   book or not, but that's another matter.  But in
14   contrast.
15        Q.  All right.  You just said --
16            (overspeaking)
17        A.  By contrast -- so you asked me to
18   complain my argument here.  I'm going to --
19        Q.  You just said "a derived product
20   that's given to college graduates."  What do you
21   mean by that?
22        A.  It's a product that is, is in a -- so
23   college graduates could read books, you know, like,
24   you know, Moby Dick or Ulysses by James Joyce.
25   These are, you know, works of literature.  And

Page 215

1    instead, here's this person who's done all this
2    years and years of schooling, learning all those
3    things, and the book that's given at graduation is a
4    picture book, a picture book aimed at young readers.
5         I'm telling you that that is a derived
6    book from the notion of a children's book, and that
7    in fact, the part of the nature of that gift is the
8    very fact that it's directed at children at this
9    crossover point into what is clear potential
10   adulthood.  And it has a certain irony to it.
11        That's what I see when I see that.  And
12   that's what I meant by the word "derived."  You'll
13   see that reflected in the Slate article as well.
14        Q.  Right.  But you're not talking about
15   a different book than Oh, The Places You'll Go!
16   It's the same book.
17        A.  I am.
18        Q.  I think I'm confused by your word
19   "derived."  You use the word" derivative" throughout
20   your report.
21        A.  Oh, I'm sorry.
22        Q.  But I don't think that's what you're
23   talking about here --
24        A.  No.
25        Q.  -- is that right?

Page 216

1         A.  No, it is not.
2         Q.  All right.  So we're talking about
3    the original work, Oh, The Places You'll Go!
4         A.  Yes.
5         Q.  Right?  And it's your understanding
6    that Dr. Seuss markets that book to both children
7    and to college graduates?
8         MR. BOOTH:  Objection.
9         BY MR. MILLER:
10        Q.  Correct?
11        MR. BOOTH:  Objection.
12        A.  Well, not to college graduates but to
13   people giving gifts to college graduates.
14        BY MR. MILLER:
15        Q.  All right.  So adults that buy gifts
16   to college graduates --
17        MR. BOOTH:  Objection.
18        BY MR. MILLER:
19        Q.  Is that correct?
20        MR. BOOTH:  Objection.
21        A.  Yes.  That's my understanding.
22        BY MR. MILLER:
23        Q.  Are you aware that the defendants
24   were planning to market Boldly also as a gift to
25   college graduates?

Page 217

1         MR. BOOTH:  Objection.
2         A.  It doesn't strike me as implausible
3    that they would be, but I'm not aware.
4         BY MR. MILLER:
5         Q.  And you didn't review any documents
6    from the defendants' side that would have told you
7    their plans for how they were going to market the
8    book to people buying gifts for college graduates;
9    is that right?
10        MR. BOOTH:  Objection.
11        A.  I did not review any of those
12   documents because when I saw Boldly, I thought that
13   was a distinct possibility, which is why I conducted
14   the second part of my analysis.
15        BY MR. MILLER:
16        Q.  And the second part of your analysis
17   is you're referring to the Amazon analysis?
18        A.  That was primarily the Amazon.
19   Obviously I have to explain.  It also got some
20   economic principles as part of it, yes.
21        Q.  Okay.  Before we go into the economic
22   principles, I just want to make sure we're on the
23   same page.
24        Is it fair to say that both Oh, The Places
25   You'll Go! and Oh, The Places You'll Boldly Go! are

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER



Page 218

1  marketed as a gift to give to college graduates, or
2  were intended to be marketed in the case of Boldly;
3  is that fair to say?
4      MR. BOOTH:  Objection.
5      A.  I'm not -- I'm not aware with
6  certainty about Oh, The Places You'll Boldly Go!,
7  but I found it plausible that there may be somebody
8  who decides that that would be a good gift for a
9  certain sort of college graduate.
10      BY MR. MILLER:
11      Q.  Okay.  Were you aware that the
12  defendants had been in negotiations with a publisher
13  for Oh, The Places You'll Boldly Go!
14      A.  I, I was not.  I have not inquired
15  into any such thing.  I'm not aware.
16      Q.  You were not aware that they were in
17  talks with a publisher to publish Boldly?
18      A.  No.  It didn't matter.  I mean, they
19  would publish it one way or another.
20      Q.  Okay?
21      A.  I was only analyzing:  If it were
22  published, what was the likely market impact?  So
23  whether they were in conversations with a publisher
24  or not was not material to that.
25          (Query by reporter)

Page 219

1      They were in conversations with a
2  publisher was not material to that.
3  EXHIBIT 8 marked for identification:  E-mail marked
4      Highly Confidential - Outside
5      Attorneys' Eyes Only, Bates AMU
6      6-29-2018 Production 000003-08
7  THE REPORTER:  That's Exhibit 8.
8  MR. MILLER:  Thank you.
9      Q.  Professor, you've been handed a
10  document marked Exhibit 8.
11      A.  Okay.
12      Q.  Have you seen this document before?
13      A.  No, I have not.
14      Q.  What does this document look like to
15  you?
16      A.  Let me have a look.
17      Q.  And while the Professor is reviewing
18  the document, we'll mark this section of the
19  testimony as "highly confidential," given the
20  document is designated as such.
21  --- REPORTER'S NOTE:  Highly confidential section
22      begins.
23      (witness perusing document)
24

Page 220

1

Page 221

15      Q.  Mm-hm.  So would you -- well, let me
16  ask.
17      Do you think that -- actually, I think you
18  said this in your report.  Give me one second.  On
19  page 13 of Exhibit 1?
20      A.  Yes.
21      Q.  This is towards the end of your
22  section B, a couple lines above the heading C.
23      A.  Mm-hm.
24      Q.  You discuss complements and
25  substitutes here.

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 222

1      A.  Yes.
2      Q.  Right?  So did you, as part of your
3  analysis in this case, did you form an opinion as to
4  whether Go! and Boldly are complements or
5  substitutes of one another?
6      A.  I formed an opinion of what the
7  evidence that I saw was telling me, that there's
8  likely to be a complementary relationship between
9  the two.
10      Q.  And that was based on your review of
11  the Amazon web page, right?
12      A.  Correct.
13      Q.  Does looking at the publishing
14  proposal in Exhibit 8 change your opinion in any way
15  on whether the books Go! and Boldly are complements
16  or substitutes of one another?
17      MR. BOOTH:  Objection.  Have you even
18  established what this document is?
19      MR. MILLER:  I don't think I have to.
20      Q.  Go ahead and answer my question if
21  you understand it.
22      A.  It doesn't change because my
23  hypothesis, my working -- my working -- my... the
24  thing that I felt most likely as I was analyzing
25  this was that the likely audience for Boldly were

Page 223

1  the intersection of Star Trek and Dr. Seuss fans,
2  and may well include college graduates in that.
3      So that's not -- that was something I was
4  aware of, which was precisely the reason that I
5  looked to a comparable on Amazon to see regarding
6  the complements and substitutes relationship.
7  Because, had I not seen any evidence, I would not
8  have necessarily been able to form some opinions on
9  that.
10      But these parody works -- and if you look,
11  actually, it's not just this one, and I'll tell you
12  this now because I did the research.  If you look at
13  any of these other parody works -- good Night, iPad;
14  Go the Fuck to Sleep; All My Friends are Dead; The
15  Great Ones; Oh, The Meetings You'll Have!, there's
16  just a host of them that are there -- invariably
17  when you search for the parody, the "frequently
18  bought together" is with the original.
19      So it's not just this one example where I
20  know I put this one example, but that was because it
21  was of pertinence to this case; but for parodies in
22  general, they tend to do so.
23      And so nothing in this book acquisitions
24  form was saying that they would have to sell books
25  at the expense of Dr. Seuss.  But in fact, I would

Page 224

1  think that they would be more successful at getting
2  a publication if they knew that they would be
3  complements with one another.
4      And I never regarded it as anything other
5  than realistic, that as to the fact that Oh, the
6  Places You'll Go! was a phenomenally bestseller that
7  was part of the motivation for doing a
8  transformative work of it.  That's, I think,
9  basically why we have this case.
10      Q.  If Boldly was marketed to graduates
11  and gift-givers for graduates, do you think it would
12  be in competition for sales with Oh, The Places
13  You'll Go!, the original work?
14      MR. BOOTH:  Objection.
15      A.  No, not necessarily.  I must admit I
16  think that the proposal here, if I were reviewing
17  it, based on sort of putting my business school
18  professor hat on, I wouldn't have thought that
19  graduates and parents of graduates was going to be
20  the likely intersection.  I would be trying to
21  market it to people who both loved Dr. Seuss and
22  Star Trek, those two combinations, which mostly are
23  Star Trek fans who would like to have it.
24      It might be a gift for people who were
25  known to be in those two things, were known to have

Page 225

1  one or the other, most likely Star Trek, because
2  that's the way the book was coming.
3      I think it is -- when you're giving a
4  gift, I mean, if you find the college graduate that
5  is Star Trek obsessed, and not just Star Trek
6  obsessed but obsessed with the Star Trek of the
7  1960s, you may say, well, maybe I'll buy this rather
8  than Oh, The Places You'll Go!, if I was considering
9  a gift to them.  But that's like, what's the set of
10  those people?  It's like nothing.
11      Whereas if you're thinking about gifts for
12  people who just like Star Trek, which also isn't
13  that big a market, well, that would be a different
14  thing.  But they need not be graduates or college
15  graduates.
16      So I don't see, in terms of that direct
17  impact, yeah, they've stated this as their thing as
18  a per---
19      (Query by reporter)
20      Yeah.  They've stated this as their thing,
21  but, you know, I've written book proposals before.
22  They ask people to come up with audience.  They ask
23  authors to come up with these things.  And truth be
24  told, they have no idea.
25      The categories, I think you should look

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 270

1  mean...
2      Q.  So, again, what's the basis for your
3  understanding of the various legal doctrines that
4  you are discussing or applying in the context of
5  this article?
6      MR. BOOTH:  Objection.
7      A.  My basis is I'm not discussing legal
8  doctrines.  I'm discussing different property rights
9  regimes from an economics point of view.
10     BY MR. MILLER:
11     Q.  What's the difference --
12     A.  I did not publish this in a law
13  journal.
14         (Query by reporter)
15     I did not publish this in a law journal.
16     Q.  What's the difference between a
17  property rights regime and a legal doctrine
18  concerning copyright law?
19     MR. BOOTH:  Objection.
20     A.  Well, a property rights regime from
21  an economics perspective is one that tell us you who
22  has a legal right to exclude another person,
23  company, or other entity from use or engagement with
24  a particular asset.
25     BY MR. MILLER:

Page 271

1      Q.  Okay.  So what was your basis for
2  understanding who has legal rights to exclude
3  another from use or engagement with a particular
4  asset?
5      MR. BOOTH:  Objection.
6      A.  Well, there is a long history in
7  economics of the study of the economics of property
8  rights.  And as you'll see from -- if you look in
9  the references, I cite and derive it from several
10  papers that were seminal in that regard, including
11  one by Oliver Hart, who had two years ago won the
12  Nobel Prize for his contributions in this area.
13     So I was basing my use of property rights
14  and modelling on it on that tradition.  But that had
15  not been done for copyright before.
16     Q.  Did you consult with legal counsel as
17  part of your research for this report?
18     MR. BOOTH:  Objection.
19     BY MR. MILLER:
20     Q.  Or for this, sorry, for this article?
21     A.  I typically would never consult with
22  legal counsel for a research report like this, but I
23  did present this with law professors, who I regard
24  as knowledgeable.  And they found it interesting.
25     And I cite, if you look, if you look at

Page 272

1  the thing I've -- at least in this working paper,
2  but University of Toronto Law School listed as where
3  I gave a seminar.  But I also gave another one at
4  the, at the Law Council of Australia, I think later
5  on, after this was already in the publication
6  process.
7      Q.  Mm-hm?
8      A.  And Ariel Katz is of course Canada's
9  leading copyright scholar, so...  I acknowledge
10  that.
11     Q.  Is Ariel Katz a lawyer?
12     MR. BOOTH:  Objection.
13     A.  Yes.
14     BY MR. MILLER:
15     Q.  Did Ariel Katz advise you on the
16  legal doctrines that were -- you were considering in
17  forming your --
18     A.  Yes, he --
19     Q.  Hold on... in forming your analysis
20  and your conclusions in this article?
21     MR. BOOTH:  Objection.
22     A.  Ariel Katz is a law professor.  I
23  gave him an earlier version of this article to read,
24  and I think he was probably at the seminar.  And he
25  gave me some comments back which I incorporated into

Page 273

1  this, I can't recall specifically what.
2      BY MR. MILLER:
3      Q.  Is Ariel Katz a U.S. lawyer?
4      MR. BOOTH:  Objection.
5      A.  Ariel Katz is not a U.S. lawyer, and
6  he's a Canadian law professor.
7      BY MR. MILLER:
8      Q.  So he's not an expert on U.S.
9  copyright law, is he?
10     MR. BOOTH:  Objection.
11     A.  Oh, he is.
12     BY MR. MILLER:
13     Q.  He is?
14     A.  Yes.
15     Q.  He's not a U.S. lawyer, though?
16     MR. BOOTH:  Objection.
17     A.  You don't have to actually be in the
18  U.S. to be an expert on copyright law around the
19  world.
20     BY MR. MILLER:
21     Q.  What do you think qualifies him as an
22  expert on U.S. copyright law?
23     MR. BOOTH:  Objection.
24     A.  We could go and review his c.v. and
25  see his publication record.

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 274

1  BY MR. MILLER:
2      Q.  Are you an expert on U.S. copyright
3  law?
4      MR. BOOTH:  Objection.
5      A.  I'm not a lawyer.
6  BY MR. MILLER:
7      Q.  Are you an expert on U.S. copyright
8  law?
9      A.  I don't regard myself as an expert on
10  copyright law.
11      Q.  How did you conduct your research for
12  this study underlying this article?
13      MR. BOOTH:  Objection.
14      A.  On this article?  The way I usually
15  do research.  I would spend much time at my desk
16  formulating models and assumptions, trying to
17  understand them, coding them up in Mathematica to
18  see which effects are important, then ultimately
19  deriving theorems and clear results and linking it
20  up to intuition, which is what the article does.
21      (Query by reporter)
22  Linking it up to intuition.
23      Q.  Anything else?
24      A.  No, that would be -- that's the
25  process.

Page 275

1      Q.  Did you do any case studies as part
2  of this research?
3      A.  Apart from -- oh, you can see in the
4  article, the, the examination of Google's automated
5  copyright regime, I did not do any case studies for
6  this.  Although I did, as you can see if you'd look
7  at the introduction here, I was motivated by certain
8  cases that had been widely discussed.  Right in the
9  first paragraph those are listed.
10      Also, I had read a previous book by Larry
11  Lessig from some years ago about, I think it was
12  titled "Remix."  Larry~Lessig, I don't know if
13  you've heard of him.  He's a law professor at
14  Harvard University and he writes quite a bit about
15  copyright law.
16      Q.  Did Professor Lessig contribute to
17  your work on this article?
18      MR. BOOTH:  Objection.
19      A.  No, he did not.
20  BY MR. MILLER:
21      Q.  Did he review a copy of your article?
22      A.  I believe I may have sent one to him,
23  and he may have said, "That's very interesting," and
24  I didn't hear anything more.
25      Q.  He didn't have --

Page 276

1      A.  I would have acknowledged him if he
2  was --
3      Q.  He didn't have any involvement in the
4  research that you did underlying this article,
5  right?
6      A.  No.
7      MR. BOOTH:  Objection.
8  BY MR. MILLER:
9      Q.  So again, you said you didn't do any
10  case studies as part of your research for this
11  article, right?
12      MR. BOOTH:  Objection.
13      A.  It's not common to do case studies in
14  this sort of research.
15  BY MR. MILLER:
16      Q.  This is a theoretical paper, is that
17  right?
18      MR. BOOTH:  Objection.
19      A.  It is a theoretical paper.  It is a
20  theoretical paper waiting for its application.
21  BY MR. MILLER:
22      Q.  Mm-hm.  Is there something in this
23  paper, in this article, that you applied to the
24  facts in this case and form the basis for your
25  expert opinion that you're offering?

Page 277

1      A.  Yes.
2      Q.  Show me where in this article that
3  might be.
4      A.  It was everywhere.
5      Q.  Everywhere?
6      A.  I applied the entire, the entire
7  thing, except for the examination of the Google
8  regime, to this case.  So, and we can go through it,
9  line by line, and I can explain to you how that
10  would all fit in.
11      Now, I didn't provide any new theoretical
12  model for an expert report because, well, it's here,
13  in this paper; and so I just describe the intuition
14  in that expert report so that people would see where
15  my statements came from.
16      So we can either go through the
17  argument -- article, and I can describe that fully,
18  or you can just read what I wrote, which was meant
19  to be that description.
20      Q.  Sure.  Let's stick to your expert
21  report in this case.
22      A.  Okay.
23      Q.  Let's look at that again, please.
24  Back on page 7?
25      A.  Yes.

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 278

1    Q.   The next sentence where we last left
2  off, you say: (as read)
3          "For instance, I compared
4          situations where there was no
5          copyright protection, full
6          copyright protection, and what I've
7          termed fair use and remix rights
8          with compensation."
9     I'm leaving out the parentheticals.
10        What situations did you compare under each
11 of those different regimes?
12        MR. BOOTH: Objection to form.
13     A.   It was -- the situation that I said,
14 it was always -- it was where you had an original
15 copyright -- original provider of some work who put
16 in some effort to create, in terms of costs, to
17 create a work of better quality.
18        And you had a what I termed in the paper
19 "remixer," who put in effort to take some of that
20 work and make it into a distinct work that may have
21 value to them, commercial value to them, and also
22 may have potential detriment to the original
23 creator.
24     Q.   The situations you refer to, though,
25 those aren't real-world situations that you

Page 279

1  analyzed, these are theoretical concepts?
2        MR. BOOTH: Objection.
3        BY MR. MILLER:
4     Q.   Is that right?
5        MR. BOOTH: Objection.
6     A.   They are abstract use of essential
7  elements of real world situation except for remix
8  rights with compensation, which I invented.
9        BY MR. MILLER:
10    Q.   Has your research model been tested
11 by other economists, to your knowledge?
12        MR. BOOTH: Objection.
13     A.   I have not actually looked to see
14 where this paper has been cited.
15        BY MR. MILLER:
16    Q.   Do you know if it's been cited by
17 other papers?
18     A.   I believe --
19        MR. BOOTH: Objection, asked and answered.
20     A.   I believe it has been cited but I do
21 not know. I haven't looked closely at it. I've had
22 other things that I've been doing.
23        Would this be tested? It might be tested
24 at some point, but takes ages for a thing to come
25 up.

Page 280

1        BY MR. MILLER:
2     Q.   And your research model has never
3  been applied to a copyright infringement dispute
4  before, has it?
5        MR. BOOTH: Objection.
6     A.   To my knowledge it has not been
7  applied.
8     Q.   And a court's never accepted this
9  research model as expressed in this article as
10 reliable?
11        MR. BOOTH: Objection.
12        BY MR. MILLER:
13    Q.   Right?
14        MR. BOOTH: Objection.
15     A.   Everything has to start somewhere.
16        BY MR. MILLER:
17    Q.   So that's not an answer to my
18 question.
19     A.   To my knowledge, no court has
20 examined this article. To my knowledge.
21    Q.   And my question was: Has a court
22 ever accepted your research model as expressed in
23 this article as reliable?
24     A.   I can't see how a court would accept
25 a research model as reliable when they hadn't

Page 281

1  examined it. So I think that's a no.
2     Q.   So the answer is no?
3        Earlier this morning, we were talking
4  about the following paragraph on page 7, where you
5  say that: (as read)
6          "Boldly is a transformative work
7          of Go!, rather than a remix."
8     Right?
9     A.   I can't remember what we discussed
10 this morning.
11    Q.   Okay. Your report states: (as read)
12          "Boldly is a transformative work
13          of Go! rather than a remix"?
14     A.   It does.
15    Q.   What's your basis for that statement?
16     A.   Well, a remix is something that takes
17 explicitly, literally copies, some portion of
18 content and places it in another work.
19        Whereas Boldly does not take a copy of Go!
20 and place it in the other work, so it's not a remix
21 per se, but it -- I mean, obviously, we can get
22 philosophical about it -- takes inspiration,
23 elements, references, and transforms that into
24 another thing. But you can see, you can see where
25 it came from.

71 (Pages 278 - 281)

Exhibit 1, Page 49

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 318

1  from the Kickstarter page that says it's all taken
2  down and not happening.  It comes from counsel, who
3  says that's the reason we're here.
4          (Query by reporter)
5          Take down, yes.
6      Q.  Is that it?
7          MR. BOOTH:  Objection.
8      A.  If it had been published we could
9  have done a market analysis.
10         BY MR. MILLER:
11     Q.  Mm-hm.  What would that market
12 analysis have -- excuse me.  What would that market
13 analysis have looked like?
14         MR. BOOTH:  Objection to the form.
15     A.  What it would look like is we would
16 have got very detailed, granular data for sales of
17 all Dr. Seuss products all around the world.  And
18 then we would have published Oh, The Places You'll
19 Boldly Go! on a given date.
20         And we would have factored in what the
21 effect of that was on all of those things over a
22 period of two to five years.
23     Q.  Okay.  But because Oh, The Places
24 You'll Boldly Go! has not been published, that type
25 of analysis was not able to be done, correct?

Page 319

1      A.  It's not the only reason, but it's
2  the first reason.
3      Q.  Okay.  What are the other reasons
4  that analysis was not able to be done?
5      A.  No one has provided -- it's not clear
6  that Dr. Seuss knows its weekly sales data since the
7  publication of maybe Oh, The Places You'll Boldly
8  Go!.  I have seen no evidence to suggest that they
9  actually even know that.
10     Q.  Mm.  Do you know whether the
11 defendants in this case asked Dr. Seuss to produce
12 documents showing sales data on a weekly basis?
13         MR. BOOTH:  Objection.
14     A.  I do not know what they've asked to
15 produce prior to me becoming involved in this case.
16         BY MR. MILLER:
17     Q.  But again, you didn't review the
18 actual sales data that Dr.~Seuss did produce in
19 response to the defendants' requests in this case,
20 right?
21         MR. BOOTH:  Objection.
22     A.  As I, as I said, that sales data was
23 wholly uninformative for the task at hand.
24         BY MR. MILLER:
25     Q.  Okay.  So you didn't find the

Page 320

1  Dr. Seuss sales figures to be relevant to your
2  analysis at all?
3          MR. BOOTH:  Objection.
4          BY MR. MILLER:
5      Q.  Is that right?
6      A.  I've explained exactly why they're
7  not relevant, and no argument has been put forward
8  by anybody, including Dr. Dawson, why they might be
9  relevant.
10     Q.  Okay.  You say at the very bottom of
11 page 10:  (as read)
12         "Unlike Boldly, these derivative
13         works appear to target the same
14         market as Go!."
15         Two questions:  One, which derivative
16 works are you talking about in that statement?
17     A.  Oh, The Things You Don't Know! and
18 Oh, The Sh!t You Don't Know!.
19     Q.  And why do you believe that those
20 works appear to target the same market as Go!?
21     A.  Well, because they, they have... they
22 don't have any other reference to any other cultural
23 tropes or anything like that.  Whereas Boldly
24 references Star Trek.
25     Q.  So is --

Page 321

1      A.  Oh, The Places You'll Go! is not
2  targeted at Star Trek fans.
3      Q.  Right.  Oh, The Things You Don't
4  Know! and Oh, The Sh!t You Don't Know!, because they
5  do not reference Star Trek, are in the same target
6  market as Go!, is that your testimony?
7          MR. BOOTH:  Objection.
8      A.  Also that they have things like
9  targeting for college graduates.  So I regard that
10 as targeting a similar market to Go!
11         (Query by reporter)
12         A similar market to Go!  I said "appears."
13         BY MR. MILLER:
14     Q.  Mm-hm.  Do you think that's a
15 relevant distinction from Boldly?
16     A.  I think you should note that
17 distinction when you're trying to understand what
18 the impact of Boldly might be; in other words, that
19 my belief was, if these didn't have an impact, then
20 Boldly was unlikely to have an impact.
21     Q.  And you're basing that on what?
22         MR. BOOTH:  Objection.
23     A.  Because these appear to target the
24 same market as Go! whereas Boldly targets a
25 different market than Go!

81 (Pages 318 - 321)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 322

1  BY MR. MILLER:
2      Q.  Okay.  So two reasons that you've
3  stated for why you believe Oh, The Things You Don't
4  Know! and Oh, The Sh!t You Don't Know! target the
5  same market as Go!  One is that they don't reference
6  Star Trek, and two is that one of them is called the
7  "college graduate edition"; is that right?
8      A.  Correct.
9      Q.  Is there anything else that makes you
10  think or believe or support your conclusion that
11  those two books are in the same market as Go!
12      MR. BOOTH:  Objection.
13      A.  I said they appear to target the same
14  market as Go!, and no, there is nothing else.
15      BY MR. MILLER:
16      Q.  Okay.  But again, because Boldly
17  references Star Trek, that removes it from the same
18  targeting market as Go! --
19      MR. BOOTH:  Objection.
20      BY MR. MILLER:
21      Q.  -- in your opinion?
22      MR. BOOTH:  Objection.
23      A.  I believe that Boldly is targeting
24  Star Trek fans primarily.
25      BY MR. MILLER:

Page 323

1      Q.  Okay.  How many Star Trek fans are
2  there in the United States?
3      MR. BOOTH:  Objection.
4      A.  Well, on Facebook followers there's
5  3.6 million.  That's sort of worldwide.  The movies
6  have attracted several million viewers of it.
7      I don't know how many would be -- consider
8  themselves Star Trek fans.  I don't think that's,
9  you know, the obvious question.  But in the
10  millions.
11      Q.  You don't know the exact number?
12      MR. BOOTH:  Objection.
13      A.  No one knows the exact number of Star
14  Trek fans in the United States.
15      BY MR. MILLER:
16      Q.  You said just before that you believe
17  Boldly is targeting Star Trek fans primarily.
18      Do you associate some percentage of their
19  target market to Star Trek fans?
20      MR. BOOTH:  Objection.
21      A.  I believe 100 percent of their target
22  market are Star Trek fans.
23      BY MR. MILLER:
24      Q.  And why do you believe that?
25      A.  Because I believe this book would be

Page 324

1  of no interest to anyone who isn't a Star Trek fan.
2      Q.  Why do you believe that?
3      A.  Because if you --
4      MR. BOOTH:  Objection.
5      A.  -- look at the book, you can see that
6  it's just full of Star Trek.  Why would anyone be
7  interested in this book and all its Star Trek
8  references if they weren't a Star Trek fan?
9      The only people who could ever be
10  interested in this book are Star Trek fans unless
11  people discovered another use for books that I'm not
12  unaware of.
13      BY MR. MILLER:
14      Q.  Did you do any research to support
15  your belief that only Star Trek fans would be
16  interested in Boldly?
17      MR. BOOTH:  Objection.
18      A.  Apart from the -- my own experience
19  and knowledge of Star Trek going back how many
20  years, didn't do any explicit research into that.
21  But I would again stake my reputation that only Star
22  Trek fans are likely to buy this book, and that is a
23  fairly obvious thing that you don't even have to be
24  the greatest economic expert in the world to come up
25  with.

Page 325

1      BY MR. MILLER:
2      Q.  Yeah.  Yet here you are offering that
3  opinion.
4      MR. BOOTH:  Objection.
5      A.  Even though I'm not -- well, I might
6  be the greatest economic expert in the world.  We
7  haven't seen the evidence.
8      BY MR. MILLER:
9      Q.  Right.
10      There is no evidence to support your
11  belief, right?
12      MR. BOOTH:  Objection.
13      A.  Do you need evidence to support a
14  belief that you're the greatest person?
15      BY MR. MILLER:
16      Q.  I'm not asking about that belief.
17  I'm asking about your belief that only Star Trek
18  fans would be interested in purchasing Boldly.
19      A.  I think there is evidence.  I think
20  that the way that book was created and what it
21  references, when you look at it with any normal eye,
22  provides it as common sense that that is the case.
23      You may disagree with it.  That is your
24  right.  But I'm stating that as my evidence here.
25      Q.  All right.  Let's go back to page 11,

82 (Pages 322 - 325)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 326

1  please, of your expert report. So here you are
2  describing a screen shot that you've reproduced from
3  Amazon.com?
4      A.  Yes.
5      Q.  For the page for Oh, The Things You
6  Don't Know!?
7      A.  Yes.
8      Q.  And you refer to the section on the
9  page called "customers who bought this item also
10  bought," right?
11      A.  Yes.
12      Q.  And what is it in your report here
13  you're stating that "customers who also [sic] bought
14  this item also bought" identifies?
15      A.  It identifies the customers who
16  bought Oh, The Things You Don't Know! also bought oh
17  the things you -- Oh, The Sh!t You Don't Know!,
18  Seuss-isms, Oh, The Meetings You'll Go to!, Oh, The
19  Places You'll Go!, Mad Libs graduation edition, and
20  Oh, The Places I've Been! Journal.
21      Q.  Do you know the sequence of the
22  purchases?
23      MR. BOOTH:  Objection.
24      A.  Amazon does not discuss the sequences
25  of the purchases.

Page 327

1      BY MR. MILLER:
2      Q.  Does the sequence of the purchase
3  matter in terms of your analysis of whether these
4  works are complements or substitutes?
5      A.  The sequence --
6      MR. BOOTH:  Objection.
7      A.  The sequences of purchase do not
8  matter to the definitions of complements and
9  substitutes.
10      BY MR. MILLER:
11      Q.  Does the sequence of the purchases
12  matter to your opinion and your analysis in this
13  case?
14      A.  Not at all.
15      Q.  Do you know if advertisers can
16  purchase space to appear in the results for
17  "customers who bought this item also bought"?
18      MR. BOOTH:  Objection.
19      A.  Advertisers? No. They cannot.
20      Q.  Do you know if --
21      A.  Because Google -- Amazon has another
22  thing where advertisers do purchase, and it declares
23  that clearly, as was listed in the screen shot in
24  Dr. Dawson's report.
25      Q.  Mm-hm. So, again, do you know if

Page 328

1  advertisers can pay Amazon to appear in these
2  results under "customers who bought this item also
3  bought"?
4      MR. BOOTH:  Objection.
5      A.  They cannot.
6      BY MR. MILLER:
7      Q.  Do you know that for sure?
8      A.  For sure.
9      Q.  How do you know that?
10      A.  'Cause Amazon has a separate thing
11  saying "sponsored search," and it would be
12  misrepresenting the public to say that they've had
13  people buy that.
14      Q.  Okay. So you're just assuming that
15  because Amazon has a section below that's called
16  "sponsored results," that they don't allow --
17      MR. BOOTH:  Objection.
18      A.  Well, I think that's one reason.
19  That's one reason. But also, I am taking currently,
20  the way I am reading Amazon's web pages, as not
21  defrauding the public.
22      BY MR. MILLER:
23      Q.  Okay. But you don't know for sure?
24      MR. BOOTH:  Objection.
25      A.  I'm, I'm, I'm happy to assert that I,

Page 329

1  as a consumer when I purchase from Amazon, don't
2  believe they're defrauding me. I have not read any
3  suggestion ever in all my examination of Amazon,
4  that advertise -- that secretly allowing advertisers
5  to jimmy up the research results for these things.
6  Never. Never a single allegation of it. And so
7  that's a founded belief.
8      (Query by reporter)
9      Founded.
10      Q.  Right. Again, though you don't know
11  for sure, you haven't actually seen the algorithm to
12  verify for yourself whether or not sponsored
13  advertisers are one of the factors considered in the
14  results produced under "customers who also bought
15  this item"; is that right?
16      MR. BOOTH:  Objection, asked and answered.
17      A.  I do not know for a fact that we're
18  even in this room.
19      BY MR. MILLER:
20      Q.  Okay.
21      A.  So you are putting -- my point is --
22      (overspeaking)
23      Q.  Thank you for your non-answer,
24  Professor.
25      A.  My point is --

83 (Pages 326 - 329)

Exhibit 1, Page 52

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 330

1    Q.  I'm going to ask my question one more
2  time.
3        A.  No, I'm going to make my point.
4  (overspeaking, some indiscernible)
5        MR. BOOTH:  Let him finish his answer,
6        please.  He's in the middle of his answer.
7        A.  My point is, you are asking these
8  questions:  "Do you know with certainty?"  "Do you
9  have those sorts of things?"
10       I am telling you I have what I regard as
11  an informed belief that Amazon is not directly lying
12  to us regarding the content of these pages.
13       BY MR. MILLER:
14       Q.  Okay?
15       A.  And that is my answer to your
16  question.
17       Q.  Right.  And I am asking you if you
18  have actually seen with your own eyes objective
19  evidence of the question that I was asking you,
20  whether sponsored advertisers can appear in those
21  results.
22       MR. BOOTH:  Objection.
23       BY MR. MILLER:
24       Q.  It's a simple yes-or-no question.
25       MR. BOOTH:  Objection.

Page 331

1        A.  I have not seen objective evidence
2  that sponsored advertisers appear in those results.
3        MR. BOOTH:  Are you doing okay?  Are you
4  ready to take a break or?
5        THE WITNESS:  No, I'm fine.
6        MR. BOOTH:  Ready to roll.
7        THE WITNESS:  Peachy.
8        MR. BOOTH:  Even better.
9        BY MR. MILLER:
10       Q.  Please flip to page 13.
11       A.  Yes.
12       Q.  At the top of the page, you say that:
13  (as read)
14           "Amazon predicts and indicates
15           that consumers who purchase the
16           derivative work Oh, The Things You
17           Don't Know! were more likely to
18           purchase not the only original
19           works but other works by Dr. Seuss
20           and/or plaintiff's licensed
21           derivative works."
22       Right?
23       A.  I say that, yes.
24       Q.  You say: (as read)
25           "The same prediction also arose

Page 332

1           for purchasers of the college
2           edition."
3        And there's a footnote 5.
4        A.  Yes.
5        Q.  What is footnote 5?
6        A.  It's a URL.  If you click it, you'll
7  come to that, that web page where I did the search,
8  although obviously not at the time I did the search.
9        Q.  Why didn't you include the
10  screen shot that appears at that URL in your report?
11       A.  I decided I didn't want Oh, The Sh!t
12  You Don't Know! to get any more prominence in my
13  report.  It was a judgment call.
14       Q.  The next sentence you say:  (as read)
15           "Note also that Amazon
16           identified the original and
17           derivative work as 'frequently
18           bought together.'"
19       Right?
20       A.  Yes, I say that.  Yes.
21       Q.  "Frequently bought together" refers
22  to another of Amazon's algorithms; is that right?
23       A.  We discussed --
24       MR. BOOTH:  Objection.
25       A.  We discussed it before, whether it is

Page 333

1  an algorithm or a statement.
2        BY MR. MILLER:
3        Q.  Is it an algorithm?
4        MR. BOOTH:  Objection.
5        A.  I don't know.  It could be a
6  statement of representation to customers.
7        BY MR. MILLER:
8        Q.  Then you switch and say: (as read)
9           "By contrast, on an examination
10           of the Amazon page for Go!, the
11           derivative works published by third
12           parties do not appear as
13           recommended or likely potential
14           purchases."
15       Is that right?
16       A.  That's right.
17       Q.  There's no screen shot for the Amazon
18  page for Go!?
19       A.  I didn't -- I just represented that.
20  You could go to that and see it.  I represented what
21  I could do and anyone trained in the art of Web
22  browsing would be able to go and verify that.
23       Q.  Do you know what books appeared as
24  "customers who bought this item also bought" and
25  under "frequently bought together"?

84 (Pages 330 - 333)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 334

1    MR. BOOTH:  Objection.
2         A.   My belief is that they were mostly
3    Dr. Seuss books, but I can't remember exactly what
4    books were there.
5         BY MR. MILLER:
6         Q.   In the next sentence, you say:  (as
7    read).
8              "This indicates that,
9              conditional on purchasing Go!,
10             Amazon customers are not very
11             likely to purchase the derivative
12             works published by third parties."
13   What's the basis for that conclusion?
14        MR. BOOTH:  Objection.
15        A.   Amazon saying basically that same
16   thing.
17        BY MR. MILLER:
18        Q.   So because the Amazon prediction
19   didn't include derivative works published by third
20   parties, you conclude that Amazon customers are not
21   very likely to make a purchase of those?
22        A.   If they've purchased -- if they --
23   given that they've purchased Go!, they're not very
24   likely to purchase the derivative work.  But if they
25   purchased the derivative work, they're very likely

Page 335

1    to have purchased other Dr. Seuss works.  That's
2    what this analysis is saying.
3         Q.   Okay.  Did you consider any other
4    purchasing context besides Amazon as part of your
5    research in forming your expert opinion in this
6    case?
7         MR. BOOTH:  Objection.
8         A.   No, my -- in terms of online book
9    selling, which could access the -- provides this
10   sort of representation, I'm not aware of other ones
11   that do the same thing.  For instance, Barnes &
12   Noble rarely put in the "customers also bought this
13   item" thing on their web page.  Most online stores,
14   for instance, there's 600,000 through Shopify, do
15   not have this functionality.
16        Q.   So is that a "no," you didn't
17   consider anything beyond Amazon?
18        A.   I couldn't --
19        MR. BOOTH:  Objection.
20        A.   I couldn't -- I couldn't --
21        BY MR. MILLER:
22        Q.   Let me finish my question, please,
23   which is:  Did you consider anything, any other
24   purchasing context, besides Amazon in the context of
25   forming your opinions in this matter?

Page 336

1    MR. BOOTH:  Objection.
2         A.   I -- for the purposes of examining
3    this part, I did not consider anything other than
4    Amazon because I do not believe a comparable public
5    representation exists.
6         I should note that Dr. Dawson confirmed
7    what -- my findings when she did her replication.
8         BY MR. MILLER:
9         Q.   I'd like to ask about the next
10   paragraph, which says, starting the sentence:  (as
11   read)
12             "This evidence is to me strongly
13             suggestive that Go! and the other
14             Dr. Seuss books, and works
15             derivative or transformative
16             thereof, are likely to serve as
17             complements rather than substitutes
18             in the eyes of consumers."
19   Did I state that accurately?
20        A.   Yes.
21        Q.   And again, just to be clear, the
22   evidence that you're referring to is your
23   investigation of the Amazon product pages for Oh,
24   The Things You Don't Know! and Oh, The Sh!t You
25   Don't Know!; is that right?

Page 337

1    MR. BOOTH:  Objection.
2         A.   And other things in parodied work
3    that I did as part of that investigation but didn't
4    report here.
5         BY MR. MILLER:
6         Q.   Ah.  And what is that?
7         A.   Well, I looked at other parody works,
8    some of them which were listed in that other
9    document that you showed me earlier.  You know, I
10   was interested in whether the Goodnight Moon
11   parodies had similar things and stuff like that, and
12   they do.  It looks much the same.
13        So it doesn't matter what sort of parody
14   work you have, you have this same pattern of Amazon
15   recommendations coming up.
16        Q.   And did you look at other Amazon
17   pages for the products you're referring to here that
18   are not listed in your report?
19        A.   Yeah.
20        Q.   You did?
21        A.   Mm-hm.
22        Q.   Did you consider them in forming your
23   opinion?
24        A.   I considered them as part of it but I
25   thought that the main thing was to show a clean

85 (Pages 334 - 337)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 338

1  example of it so that you could see it and that's
2  why I put this screen shot in.  It wasn't that -- it
3  was just a -- I only wanted to put one.  I had
4  limited time, and that's what I did.
5        My charge was to find evidence.  This was
6  evidence; I found it; I put it in.  You asked me did
7  I consider other things.  I said yes, but I found
8  the same thing.
9        Q.  But you didn't put those into your
10  report?
11       A.  They, they -- I -- finding some
12  evidence didn't mean I had to find all evidence.
13       Q.  Mm-hm.  But did you consider that
14  other evidence in forming your opinion?
15       A.  I gained comfort from the fact that
16  this seemed to be a general thing that was occurring
17  with parody works, yes.
18       Q.  So, yes, you considered that other
19  evidence in forming your opinion?
20       A.  I cannot say that I did not consider
21  it.  But I, I did not -- everything I've outlined
22  here is my opinion.
23       Q.  Why is your language "strongly
24  suggestive"?  Why are you using that phrase,
25  "strongly suggestive"?

Page 339

1        MR. BOOTH:  Objection.
2        A.  Because I do not know that they've
3  complements.
4        BY MR. MILLER:
5        Q.  Okay.
6        A.  I do not have the certitude.  I look
7  for -- I regard evidence as things that are
8  confirming or consisting of a -- consistent with a
9  hypothesis.  But evidence can only falsify a theory,
10  it cannot prove one.  And so, since these ones were
11  supporting the complementarity theory, I wrote that
12  language.
13       But, that being said, as I said earlier, I
14  didn't know what I was going to find when I started
15  conducting this analysis.  And it turned out that
16  this was evidence supporting of the theory, but it
17  may well have not been that.
18       Q.  The next sentence says:  (as read)
19           "When works are complements, the
20           availability of one will increase
21           purchases of the other."
22       A.  Yes.
23       Q.  What's the basis for that statement?
24       A.  That's a definition of "complements."
25       Q.  Is that a definition that you came up

Page 340

1  with?
2        A.  No.  It's the standard economic
3  definition.
4        Q.  Okay.  Why didn't you cite any
5  material for it?
6        A.  It's so standard I don't need to cite
7  that.  I did not believe any other economist would
8  dispute this definition.
9        Q.  How do you normally test for whether
10  products are complements of one another?
11       A.  What you do is you get detailed
12  granular time series sales data across a variety of
13  products.  You get a whole lot of demographic and
14  other market-relevant information.  You get detailed
15  information on pricing.  You ensure you've got a
16  context where the prices of at least one or some set
17  of the prices are exogenously altered.  And then you
18  see whether things are complements or substitutes.
19       There's a paper by Barry Levinson and
20  Pakes that describes the methods by which one would
21  do -- use that data to do that.  And that's what
22  economists may well do if they had access to that
23  data.
24       Q.  Did you apply that method in this
25  case?

Page 341

1        A.  I did not have -- as I told you
2  earlier, I have not had access to even the starting
3  point of any data that would even look to that sort
4  of thing.  And I don't know if that data exists.
5  And Boldly wasn't published.
6        Q.  You say, next sentence:  (as read)
7           "In this regard, the Amazon
8           information regarding previously
9           published third-party derivative
10           works of Go! strongly indicates
11           that there will be a complementary
12           relationship between Go! and
13           Boldly."
14       A.  Yes.
15       Q.  So, because you didn't apply the
16  standard tests to determine whether two products are
17  complementary, you're relying on the Amazon
18  information as a substitute for the actual market
19  data?
20       MR. BOOTH:  Objection.
21       BY MR. MILLER:
22       Q.  Is that right?
23       MR. BOOTH:  Objection.
24       A.  I'm riding on the Amazon information
25  as the only evidence that has been available to

86 (Pages 338 - 341)

Exhibit 1, Page 55

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 342

1  analyze this question.
2       BY MR. MILLER:
3       Q.  And you say it would -- "it is
4  certainly --" sorry.  Strike that.
5            "And that it certainly is
6       unlikely that there will be a
7       substitutable relationship between
8       them"?
9       A.  Correct.
10      Q.  And again, that's based on the Amazon
11  evidence?
12      MR. BOOTH:  Objection to form.
13      A.  That's -- that statement is based on
14  the Amazon evidence, as I say here.
15      BY MR. MILLER:
16      Q.  Okay.  Right.  We're about to run out
17  of tape, so let's just take a quick break.
18      THE VIDEOGRAPHER:  This marks the end of
19      need I can't number 4 in the deposition of
20      Dr. Joshua S. Gans.  Going off the record
21      at 4:37 p.m.
22  --- Upon recessing at 4:37 p.m.
23  --- Upon resuming at 4:43 p.m.
24      THE VIDEOGRAPHER:  Here begins Media
25      Number 5 in the deposition of Dr. Joshua

Page 343

1       S. Gans.  Back on the record at 4:43 p.m.
2       BY MR. MILLER:
3       Q.  Professor, one of the things I just
4  wanted to follow up real quick on that you mentioned
5  in our last segment was in the context of the model
6  that's expressed in your article that you're
7  applying in this case.  You said something about a
8  negotiation between the parties; is that right?
9       A.  Yes, there is a negotiation stage in
10  the model.
11      Q.  What's the negotiation that happened
12  between the parties in this case?
13      A.  I don't know the full details of it,
14  but my understanding was there was a demand by
15  Dr. Seuss, and that was the -- there were some
16  requirements and then a refusal.  And then there was
17  a court case.
18       So there was, I guess, short negotiations,
19  is my understanding, but I don't know the full
20  details.  I know a negotiation according to sort of
21  the economic definition took place, and certainly
22  was not precluded.
23      Q.  Did you review the letter that
24  Dr. Seuss sent to the defendants?
25      A.  No.  I mean, the part of my model

Page 344

1  that's important is that there exists the
2  opportunity to negotiate.
3       Q.  And you believe that there was an
4  opportunity to negotiate between the parties here?
5       A.  Yes.  I think they did negotiate.
6       Q.  You think they did negotiate?
7       A.  Yes.
8       Q.  How?
9       A.  They had an exchange of letters with
10  demands.
11      Q.  You're familiar with the term
12  "cease-and-desist"?
13      A.  I've heard that term.
14      Q.  Do you know whether the letter -- or
15  I should say, do you know that Dr. Seuss sent
16  multiple letters to the defendants concerning
17  Boldly?
18      A.  It may have, yes, sure.  That's a
19  negotiation.
20      Q.  Do you know what that letter stated?
21      A.  No.
22      Q.  Do you know whether the parties
23  actually discussed any terms of a licence agreement
24  for creating Boldly?
25      MR. BOOTH:  Objection.

Page 345

1       A.  I don't know, as I said, of any other
2  things.  My only assumption was that there was the
3  opportunity to negotiate.  Obviously, for a
4  negotiation to actually take place, both parties
5  have to assent to it, and then for a negotiation to
6  result in an agreement, both parties have to agree.
7       BY MR. MILLER:
8       Q.  And by "assent to," what you're
9  saying that both parties have to be interested in
10  negotiating with one another; was that what you
11  mean?
12      A.  That's right.  But my model only
13  requires that negotiations not be precluded by, say,
14  the law, or by distance, language barriers.
15      Q.  Do you know whether Dr. Seuss was
16  interested in negotiating with the defendants about
17  the publication of Boldly?
18      MR. BOOTH:  Objection, asked and answered.
19      A.  As I said, I don't know any of the
20  details of the negotiations.
21      BY MR. MILLER:
22      Q.  So on what evidence are you basing
23  your opinion that a negotiation between the parties
24  occurred?
25      A.  My understanding is that it was not a

87 (Pages 342 - 345)

Exhibit 1, Page 56

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 346

1  requirement of the parties to go Court.
2      Q.  I don't know what you mean by that.
3      A.  Well, that sometime -- when you have
4  a copyright or another dispute, you can have
5  interactions, and if you choose, you can choose to
6  settle and not go to court.
7      That's my understanding of legal processes
8  in every country I'm aware of.
9      Q.  Were you told to assume that a
10 negotiation between the parties occurred?
11     MR. BOOTH:  Objection.
12     A.  No, I was not told to assume it.  But
13 I believe that the opportunity to negotiate was not
14 prohibited in this case.
15     BY MR. MILLER:
16     Q.  And you believe that an assertion of
17 a claim of copyright infringement and trademark
18 infringement constitutes a willingness to negotiate?
19     MR. BOOTH:  Objection.
20     A.  I think it constitutes a negotiation.
21 Don't mind my economic definition; a "negotiation"
22 could be a letter saying "Do what we want and that's
23 it.  And that's my only offer."  That's a
24 negotiation from an economics point of view.
25     Q.  You didn't speak to the defendants

Page 347

1  about whether they were interested in taking a
2  licence from Dr. Seuss, did you?
3      A.  I did not.
4      MR. BOOTH:  Objection.
5      A.  I did not; it wasn't relevant to my
6  examination.
7      BY MR. MILLER:
8      Q.  And you didn't review the letter that
9  the defendants sent back to Dr.~Seuss either, did
10 you?
11     MR. BOOTH:  Objection.
12     A.  I did not.  I did not.
13     BY MR. MILLER:
14     Q.  Was that relevant to your expert
15 opinion?
16     MR. BOOTH:  Objection.
17     A.  It was not relevant to me, the
18 contents of that letter.
19     BY MR. MILLER:
20     Q.  Let's look at Exhibit 1 again, your
21 expert report, page 13, please.  The section heading
22 C, which is:
23         "The later work will not impede
24         the ability to strike licensing
25         deals"?

Page 348

1      A.  Yes.
2      Q.  It's your opinion that Boldly will
3  not impede Dr. Seuss' ability to strike licensing
4  deals; is that right?
5      A.  That is right.
6      Q.  And on what are you basing that
7  opinion?
8      A.  So, as I outline here, I'm basing it
9  on several things, several facts that I believe were
10 uncontested, that I believe that Dr. Seuss is an
11 extremely strong brand.
12     Q.  By what measure do you believe that
13 Drs. is an extremely strong brand?
14     MR. BOOTH:  Objection.
15     A.  Because it's the biggest seller of
16 children's books and maybe books ever.
17     BY MR. MILLER:
18     Q.  Okay?
19     A.  And that Star Trek is also a strong
20 brand in science fiction.
21     Q.  And on what do you base that
22 conclusion?
23     A.  Fifty years of continual being able
24 to produce document -- series, movies and
25 entertainment, and other things based on it.

Page 349

1      Q.  So, neither of the conclusions about
2  the strength of Dr. Seuss' brand and the Star Trek
3  brand are based on any documentary evidence; is that
4  right?
5      MR. BOOTH:  Objection.
6      A.  I, I would have to review again, but
7  my impression was that there were some statements
8  that I would regard as statements to brand made in
9  the original complaint.
10     BY MR. MILLER:
11     Q.  Okay.  So the original complaint is
12 your support for those statements?
13     A.  Yes.
14     MR. BOOTH:  Objection.
15     A.  For instance, paragraph 14. (as read)
16         "The Dr. Seuss books are iconic
17         and among the most popular
18         children's books of all time.  The
19         Dr. Seuss books have topped many
20         bestseller lists, sold over 650
21         million copies worldwide, and been
22         translated into more than a dozen
23         languages."
24     That's the sort of statement that I
25 believe is confirming of a strong brand.

88 (Pages 346 - 349)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 366

1    called on to opine on this issue.
2    BY MR. MILLER:
3    Q.   And do you believe that Boldly uses
4 the trademarks of CBS Studios, the owner of the IP
5 in Star Trek?
6    MR. BOOTH:  Objection.
7    A.   Again, I'm not a trademark lawyer so
8 I don't think it -- I don't think it ever mentions
9 the word "Star Trek" or uses, you know, terms all
10 the way through.  But I'm not a trademark lawyer, so
11 I don't know that it uses their trademarks.
12    BY MR. MILLER:
13    Q.   Mm-hm.  If Boldly used the trademarks
14 of either Dr.~Seuss or Star Trek, do you think that
15 it would have a better chance of competing with this
16 theoretical officially branded product?
17    MR. BOOTH: Objection.
18    A.   No.  I -- that's not the part I was
19 basing it on, it was more that the official nature.
20 I think that consumers often like to buy the product
21 that comes from, you know, that is regarded as
22 official rather than one that is disputed or thought
23 to be an imitator.
24    BY MR. MILLER:
25    Q.   All right.  Let's move on to section

Page 367

1 D of your expert report, page 15.
2    You state that: (as read)
3        "There is a limited scope for
4        future derivative or transformative
5        works."
6    Why do you believe that?
7    A.   For the reasons I state here.  Or do
8 I need to read through it again?
9    MR. BOOTH:  Do you have another question,
10 Marc?
11    BY MR. MILLER:
12    Q.   You said you were reading through
13 your report.
14    A.   No, no, no, I'm not readying it.  I
15 said the reasons are stated in my report, as the
16 answer to your question.
17    Q.   Okay.  And then you said "I'm going
18 to read through it."
19    A.   Oh no, no, I'm not.  I'm not.  I said
20 if you would like to read it.
21    Q.   Okay.  Fine.  So...  It says here in
22 the first sentence: (as read)
23        "The plaintiffs allege that
24        allowing publication of Boldly will
25        open up the floodgates for future

Page 368

1    derivative works."
2    What's your source for that statement?
3    A.   Oh.  I believe it's in here, so let
4 me look for it.
5    Q.   And again, that's the original
6 complaint that you picked up?
7    A.   Yes.
8    (witness perusing document)
9    Oh, I must have missed it.
10    (witness perusing document)
11    Q.   We've only got a few minutes left,
12 Professor.  I don't have time to sit here while you
13 read the complaint.
14    A.   Then let's go on.  I mean, it's
15 either --
16    (overspeaking - appeal by reporter)
17    Q.   The question is:  What's the source
18 for your statement that:  (as read)
19        "The plaintiffs allege allowing
20        publication of Boldly will open the
21        floodgates for future derivative
22        works"?
23    A.   My recollection was it was in the
24 complaints.  Might be the original or the amended.
25 That was my recollection.

Page 369

1    Q.   Okay.  And then you go on to say:
2 "This is far from obvious and seems unlikely"?
3    A.   That's right.
4    Q.   What are you basing that conclusion
5 on?
6    A.   Well, then I write that.  This is my
7 introductory paragraph that I write that.  My reason
8 are after.
9    Q.   Okay.  So why don't you tell me what
10 your reasons are for why you think it's unlikely
11 that there's going to be future derivative works
12 created.
13    A.   Necessarily in this --
14    MR. BOOTH:  Objection.
15    A.   Because Boldly is something that
16 built straight off Go! in -- it is very rare to find
17 a popular narrative that's so similarly based on
18 journeys, which is, if you read Oh, The Places
19 You'll Go! is the entire book, and Star Trek has
20 that.
21    So the probability of finding another
22 mash-up of Go! -- Oh, The Places You'll Go! that so
23 encapsulates the journey as this one has is very
24 low.
25    And so I don't think publishing this sort

93 (Pages 366 - 369)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 370

1 of thing would lead to the floodgates of hundreds of
2 others, Star Trek things, "Star Trek hears a who" or
3 something like that books, because the theme of the
4 book has to mash up. The theme of the two things.
5 And Dr. Seuss has a lot of themes but Star Trek has
6 one.
7        Q.   Mm-hm?
8        A.   And so you have to mash up that. And
9 that's all I was arguing here.
10       Q.   So you're only looking at this
11 through the lens of whether or not a future
12 derivative combining the works of Dr. Seuss and the
13 workers of Star Trek?
14       A.   No. I'm looking at Oh, The Places
15 You'll Go! being combined with something else. And
16 suddenly you'll have all these other "Places You'll
17 Go," you know, the things. And it's because Star
18 Trek -- so you wouldn't see, I don't think you would
19 have a Oh, The Places You'll Go! version of Star
20 Wars, nor would you have any concern, because Star
21 Wars is not about journey, it's about conflict.
22       Q.   Mm-mm?
23       A.   And Go! isn't. That's what I've said
24 here.
25       Q.   All right?

Page 371

1        A.   That's my opinion.
2        Q.   And your opinion is based on what?
3        MR. BOOTH: Objection.
4        A.   My opinions are based on reading the
5 two works and my knowledge of Star Trek.
6        BY MR. MILLER:
7        Q.   Okay. So you're just speculating
8 here?
9        MR. BOOTH: Objection.
10       A.   No, I'm -- that's my opinion. I
11 don't regard that as --
12       BY MR. MILLER:
13       Q.   It's based on what evidence?
14       MR. BOOTH: He's just stated. It's asked
15       and answered. Objection.
16       A.   It's based on my knowledge of Star
17 Trek, what it's about, and my reading of Go!
18       BY MR. MILLER:
19       Q.   Right; and it's based on nothing
20 beyond your own knowledge of --
21       A.   Go --
22       Q.   -- what Star Trek is about?
23       A.   Go! is, Go! is at a reading level for
24 a 6 year old, and I am 44 years beyond that, with a
25 reading level to boot, so I was able to understand

Page 372

1 Oh, The Places You'll Go!
2        Q.   Sure.
3        A.   And what its message is, and make an
4 inference for the future of derivative works and
5 where they may find themselves in popular culture.
6        And Star Trek was an extremely solid fit.
7 That's why you could have this title Oh, The Places
8 You'll Boldly Go!, and they shared that "go." They
9 shared that "go." I can't think of anything else
10 that shares that "go."
11       Q.   Okay. And so again, you didn't
12 consider any other evidence besides what's in your
13 own knowledge of Star Trek and Go! Correct?
14       A.   We can put that down to my --
15       MR. BOOTH: Objection. Objection.
16       A.   -- combination of experience and
17 economist expert about what market processes are
18 like for these sorts of things, is what is the basis
19 for that sort of statement.
20       BY MR. MILLER:
21       Q.   Sorry, what market processes are
22 like? What was that?
23       A.   As I write --
24       MR. BOOTH: Objection.
25       A.   As I write here, you have to think

Page 373

1 about what are the incentives for people to produce
2 additional works.
3        (Query by reporter)
4        What are the incentives for people to
5 produce additional works. They can't just pop them
6 out like nothing. They actually have to do work.
7 Even Oh, The Places You'll Boldly Go! took work to
8 produce, to write, to do. You can't write rhyming
9 couplets, a whole book's worth, just off the top of
10 your head.
11       BY MR. MILLER:
12       Q.   You don't know how much effort the
13 defendants expended to create Boldly, though, right?
14       MR. BOOTH: Objection.
15       A.   I don't know exactly how much effort
16 but they expended effort. It's not -- you can see
17 the effort.
18       BY MR. MILLER:
19       Q.   Yeah. Do you know how much money
20 they spent in creating Boldly?
21       A.   No.
22       MR. BOOTH: Objection.
23       A.   The money is part of it.
24       BY MR. MILLER:
25       Q.   Do you know how much time it took

94 (Pages 370 - 373)

Exhibit 1, Page 59

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 374

1 them to create Boldly?
2     MR. BOOTH: Objection.
3     A. No, but I've written books, so I'd
4 imagine it was a long time.
5     BY MR. MILLER:
6     Q. Right. So you don't know, you're
7 just speculating about what the cost was --
8     (Query by reporter)
9     You are just speculating about what the
10 cost was to the defendants to create Boldly; isn't
11 that right?
12     MR. BOOTH: Objection.
13     A. Well, now, you've got me. If any
14 idiot in a backyard can produce a thing that can
15 suddenly crush a $12.5 million success story like
16 Go!, I am wrong. But my experience for the last 25
17 years says that's not possible, which is why I have
18 this opinion.
19     BY MR. MILLER:
20     Q. Mm-hm.
21     A. And now we know what the demarcation
22 is.
23     Q. Mm-hm.
24     MR. MILLER: Given the time and the fact
25     that Dan wants to ask some questions, I

Page 375

1 will not ask any further questions about
2 the second expert report that was served
3 yesterday and will stand on our earlier
4 reservation to recall the Professor for
5 his complete testimony about the complete
6 scope of his opinions that are stated in
7 the second report.
8     MR. BOOTH: In the interests of --
9 actually, let me just ask: How much time
10 do we have left?
11     THE VIDEOGRAPHER: Nine minutes.
12     MR. BOOTH: Okay. So what's happened so
13 far is that we've had six hours and 51
14 minutes of your questions. You haven't
15 even -- to the extent that you haven't
16 been able to touch on the expert report
17 that was just served, if you want seven
18 minutes of questions on that, you're more
19 than welcome to them.
20     MR. MILLER: I'm going to reserve my seven
21 minutes for some follow-up based on
22 whatever questions you have, and I will
23 reserve the right to recall Professor Gans
24 about the expert report that was served
25 yesterday.

Page 376

1     MR. BOOTH: How many -- how long do you
2 have for questions related to the expert
3 report that was served yesterday?
4     MR. MILLER: I don't know, Dan. It was
5 served yesterday. Didn't really have a
6 lot of time to consider it and think about
7 all the questions that we might want to
8 ask. Didn't have a chance to review it
9 with our expert.
10     So I can't really answer that
11 question, which is why we're making the
12 reservation.
13     MR. BOOTH: And because you've spent six
14 hours and 51 minutes asking questions just
15 about the first report, and you haven't
16 had time in those -- in that to touch on
17 this report, we will object to any rec--
18 any subsequent deposition.
19     MR. MILLER: Fine. We're going to reserve
20 our rights. If we need go seek the
21 Court's guidance on resolving the issue,
22 if it becomes an issue, we'll do so.
23     MR. BOOTH: Understood. I do have a few
24 follow-up questions that relate
25 specifically to topics that were addressed

Page 377

1 in the first six hours and 51 minutes. I
2 would like to get those addressed now.
3 But since I don't believe that we have
4 cause for a subsequent deposition, if I
5 may, I'd like to trade places.
6     MR. MILLER: Trade places? Like, you
7 would literally like to sit over here?
8     MR. BOOTH: Yeah, I think it makes sense
9 so that I can continue to ask from that
10 vantage point.
11     MR. MILLER: That's a waste of time, Dan.
12 Just ask your questions. We haven't done
13 that in any of the past depositions.
14     MR. BOOTH: Fair enough.
15     MR. MILLER: Just ask them.
16     MR. BOOTH: In the interests of time, I
17 will ask the questions from this vantage
18 point.
19     Do you want a break before I begin?
20     THE WITNESS: That's fine.
21     MR. BOOTH: All right.
22     THE WITNESS: I'll try and answer them
23 this way.
24     (Request by reporter that witness face camera)
25 EXAMINATION BY MR. BOOTH:

95 (Pages 374 - 377)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 378

1    Q.   So now let's begin with Exhibit 11,
2    which was your working paper on remix rights. And
3    it also was discussed in the context of the
4    resulting paper that was then published from it the
5    following month.
6        Was this document peer-reviewed?
7        A.   Yes.
8        Q.   Do you recall who those peers were?
9        A.   I -- it's anonymous.
10       Q.   Fair enough. You started to explain
11   how proposition 4 in this document maps on to the
12   facts in this case, but I don't know that we fully
13   got to that. That's on page 12. Could you walk us
14   through that.
15       A.   Yes. What it is... sorry, it's a
16   little late in the day, to remember what my notation
17   is. Right.
18       So in a situation where -- what that says
19   is: In a situation where an original creator is
20   getting no commercial return, it's not a good idea
21   to have fair use, according to the definitions I
22   looked at in the paper.
23       In the situation where there's a really,
24   really large commercial return going to the original
25   creator, it's optimal for our policy makers to set

Page 379

1    fair use and allow some content or some
2    transformation to occur without any permission from
3    the original creator.
4        Q.   Thank you. In discussing both your
5    prior work on other cases and also in this case, the
6    issues of complements and substitutes came up.
7        Can you just give us a definition of a
8    "complement" and of a "substitute"?
9        A.   Yes. A complement is a product where
10   the number of units purchased of that product goes
11   up when the price of the other product falls. A
12   substitute is a product where the number of
13   purchases of a product goes down when the price of
14   the other product that we're considering goes down.
15       Q.   Thank you.
16       Is there an economic basis that you are
17   aware of to presume that Boldly would be a
18   substitute for Go!?
19       MR. MILLER: Objection to form.
20       A.   As a theoretical basis, it was
21   possible that Boldly and -- any product, might be
22   competing for the same customers as Go!. From my
23   looking at the evidence of what Boldly was, and
24   things related to the customers it was targeting,
25   the knowledge that was required, et cetera, as well

Page 380

1    as other things that we had discussed, such as the
2    strength of Go! as an iconic product, I did not see
3    that it was likely that in fact Boldly would be a
4    substitute for Go! or vice versa.
5        Q.   You have read Dr. Dawson's rebuttal
6    report?
7        A.   Yes.
8        Q.   Does Dr. Dawson provide any evidence
9    that Boldly is a substitute for Go! or vice versa?
10       A.   She provides no evidence of any kind.
11       Q.   Are you aware of any evidence that
12   Boldly is a complement to Go!?
13       A.   The evidence that I -- I don't have
14   any direct evidence of that since Boldly wasn't
15   launched. The only evidence that I have, that is
16   that I make an inference from other parody works to
17   Go!, and the Amazon data we described earlier that
18   they may well be complements, those two products.
19       Q.   Is there a market for Dr. Seuss
20   books?
21       MR. MILLER: Objection to form.
22       A.   Yes. In the sense that there are
23   buyers and sellers of Dr. Seuss books, or there's a
24   seller of Dr. Seuss book and buyers of them.
25       BY MR. BOOTH:

Page 381

1        Q.   And do you believe there would be a
2    market for Boldly?
3        MR. MILLER: Objection to form.
4        A.   Yes, I think that for the same
5    reason, the definition of "market," there will be a
6    seller of Boldly and buyers of it, possibly.
7        BY MR. BOOTH:
8        Q.   Do you have evidence that
9    transformative works are complements?
10       MR. MILLER: Objection to form.
11       A.   There is evidence in some situations
12   that transformative works have been complements.
13       There are -- some of the classic ones that
14   when I was doing my research that came up was, there
15   was this song that was used in a wedding video where
16   the -- they all danced, and then that was posted to
17   YouTube. And that song hadn't been popular, and
18   then it had a huge volume of sales. After it was
19   purchased, copyright infringed on YouTube. So
20   that's an indication of complements. It was a
21   transformative work of that thing to add this
22   dancing to it. That helped sell that music.
23       And so that can happen. But you do have
24   to look at the particulars of the case to see
25   whether you think it's likely to happen or not.

96 (Pages 378 - 381)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 386

1    Dr. Joshua S. Gans.  The original tapes
2    will be retained by Veritext Legal
3    Solutions.  We're going off the record at
4    5:33 p.m.
5    --- Whereupon proceedings concluded at 5:33 p.m.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 387

1              REPORTER'S CERTIFICATE
2
3        I, KARIN A. JENKNER, RPR, CRR, CSR (ONT.),
4    Certified Shorthand Reporter, certify:
5        That the foregoing proceedings were taken
6    before me at the time and place therein set forth,
7    at which time the deponent was put under oath by me;
8        That the testimony of the deponent and all
9    objections made at the time of the examination were
10   recorded stenographically by me and were thereafter
11   transcribed;
12       That the foregoing is a true and correct
13   transcript of my shorthand notes so taken.
14       I further certify that I am not a relative
15   or employee of any attorney or of any of the
16   parties, nor financially interested in the action.
17       I declare that the foregoing is true and
18   correct.
19       Dated this 14th day of November, 2018.
20
21   _____
22   Karin A. Jenkner, CRR, RPR, CSR (Ontario)
23   (My Commissioner of Oaths expires July 19, 2019.)
24
25

Page 388

1              INSTRUCTIONS TO WITNESS
2
3        Read your deposition over carefully.  It is
4    your right to read your deposition and make changes
5    in form or substance.  You should assign a reason on
6    the errata sheet in the appropriate column for any
7    change made.
8
9        After making any changes in form or substance,
10   and which have been noted on the following errata
11   sheet, along with the reason for any change, sign
12   your name on the errata sheet and date it.
13
14       Then sign your deposition at the end of your
15   testimony in the space provided.  You are signing it
16   subject to the changes you have made in the errata
17   sheet, which will be attached to the deposition
18   before filing.  You must sign it in front of a
19   witness.  The witness need not be a notary public.
20   Any competent adult may witness your signature.
21
22       Return the original errata sheet to the
23   examining attorney (attorney questioning) promptly.
24   Court rules require filing within 30 days after you
25   receive the deposition.

Page 389

1            *** ERRATA SHEET ***
2
3    CASE:   Dr. Seuss Enterprises, L.P. v. ComicMix LLC
4    et al.
5    DATE OF DEPOSITION:  November 6, 2018
6    NAME OF WITNESS:  JOSHUA S. GANS, PH.D.
7
8    PAGE   LINE     FROM          TO
9    ____|_____|_____|_____|_____
10   ____|_____|_____|_____|_____
11   ____|_____|_____|_____|_____
12   ____|_____|_____|_____|_____
13   ____|_____|_____|_____|_____
14   ____|_____|_____|_____|_____
15   ____|_____|_____|_____|_____
16   ____|_____|_____|_____|_____
17   ____|_____|_____|_____|_____
18   ____|_____|_____|_____|_____
19   ____|_____|_____|_____|_____
20   ____|_____|_____|_____|_____
21   ____|_____|_____|_____|_____
22   ____|_____|_____|_____|_____
23
24   _____
25        JOSHUA S. GANS, PH.D.

98 (Pages 386 - 389)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 390

1              SIGNATURE PAGE

2                    OF

3              JOSHUA S. GANS, PH.D.

4

5          I, THE UNDERSIGNED, declare:

6

7          That I have read the foregoing transcript,

8   and I have made any and all corrections, additions

9   or deletions that I was desirous of making;

10

11         That the foregoing is a true and correct

12  transcript of my testimony contained therein.

13

14  SIGNATURE:    _____

15

16  WITNESSED BY: _____

17

18  DATE:         _____

19

20

21

22

23

24

25

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400
Exhibit 1, Page 63