# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: | No. 16-CV-2779 (JLS, BGS) |
| DR. SEUSS ENTERPRISES, L.P. v COMICMIX LLC and others | Hon. Janis L. Sammartino |
| This Document Relates To: | |
| MARKET IMPACT | |

**SECOND REPORT OF PROFESSOR JOSHUA GANS**

## I. CREDENTIALS

1. I am Joshua Gans, Professor of Strategic Management and holder of the Jeffrey S. Skoll Chair in Technical Innovation and Entrepreneurship at the Rotman School of Management and Professor (Honorary) in the Department of Economics, University of Toronto, where I have taught since 2011 and where I am Area Coordinator for Strategic Management and Chief Economist of the Creative Destruction Lab. I am also a Research Fellow at the Center for Digital Business at the Massachusetts Institute of Technology. Previously, I was a visiting scholar at Harvard University and Microsoft Research and a Professor of Management (Information Economics) at the University of Melbourne.

2. I earned a doctorate degree in economics from Stanford University in 1995 (on a Fulbright Scholarship). I received my bachelor's degree in economics from the University of Queensland in 1990.

3. I currently serve as department editor (Business Strategy) of *Management Science* and an associate editor of the *Journal of Industrial Economics*. I am also Managing Director of Core Economic Research Ltd.

4. The primary focus of my research activity has been on understanding the drivers of commercialization strategy by technology entrepreneurs and, in particular, the role of intellectual property protection and competition in this regard. I have also engaged in an extensive research program to understand the potential pro- and anti-competitive impacts of mergers, contracts, negotiations, outsourcing and vertical relationships. This involves both theoretical, policy and empirical work. On these topics and those in economics in general, I have had more than one hundred published papers in journals such as the *Journal of Political Economy*, *American Economic Review*, *RAND Journal of Economics*, *Journal*

*of Industrial Economics*, *International Journal of Industrial Organization*, *Journal of Economics and Management Strategy*, *Journal of Regulatory Economics*, *Information Economics and Policy*, *Management Science*, *Economics Letters*, *Journal of Economic Behavior and Organization*, *Economic Record*, *Economics of Innovation and New Technology*, *Small Business Economics*, *Research Policy*, *Journal of Public Economics*, *Social Science and Medicine*, and the *Australian Business Law Review*. I have published several books including *Publishing Economics*, *Principles of Economics*, *Core Economics for Managers*, *Finishing the Job, Information Wants to be Shared*, *The Disruption Dilemma*, *Scholarly Publishing and its Discontents*, *Survive and Thrive* and *Prediction Machines: The Simple Economics of Artificial Intelligence*.

5. I am a Fellow of the Australian Academy of Arts and Sciences. In 2006, I was the first economist to be awarded the Woodward Medal for Humanities and Social Sciences. In 2007, I was the inaugural recipient of the Economic Society of Australia's Young Economist Award, which is awarded once every two years to an outstanding Australian economist under the age of forty. In 2008, I won (with Dennis Carlton and Michael Waldman), the Robert F. Lanzillotti Prize for the Best Paper in Antitrust Economics. In 2017, I received the Roger Martin Award for Excellence in Research and a Prose Award for best business book.

6. I have had considerable experience in the application of economics in both law and policy. Among other things, I have testified at trial in the United States District Court for the Northern District of Ohio regarding economic loss as measured by conjoint analysis. I have also testified before the U.S. Copyright Royalty Board, the Supreme Court of Victoria, the Australian Administrative Appeals Tribunal, the Australian Competition Tribunal, the

Australian Copyright Tribunal and the House of Representatives Standing Committee on Economics, Finance and Public Administration. Over the years, I have also consulted on competition matters for numerous companies and government organizations around the world. My curriculum vita (including testimony) is attached as Appendix A to my First Report.

**II.    ASSIGNMENT**

7.   This is a supplementary report to my First Report filed in this matter.

8.   Counsel for the Defendants have asked me to respond to the statements made by Dr Na Dawson in her rebuttal report of October 12, 2018.

**III.   SUMMARY**

9.   Dr Dawson alleges that:

   a.   The theoretical model that motivates my arguments is not suited to this matter.

   b.   That I do not consider the market impact of *Boldly* on DSE's broad commercial endeavors.

   c.   That I provide no evidence to support some of my conclusions on market impact.

10.  In this report, I show that Dr Dawson's statements are demonstrably false and her conclusions misleading.

   a.   The theoretical model does, in fact, apply a standard approach to the economics of fair use. Moreover, the negotiation framework is supported by the facts of the case.

   b.   I do, in fact, consider the broad commercial interests of DSE and explicitly so in my analysis of the Amazon information.

    c.    My assumptions and statements are supported by Court filings from both parties and that Dr Dawson does not, in fact, dispute any of them.

## IV. DR DAWSON MISUNDERSTANDS AND MISAPPLIES THE WORK IN MY THEORETICAL RESEARCH

11. In my first report, I describe my research that led to the 2015 peer-reviewed academic journal article, "Remix rights and negotiations over the use of copy-protected works." As I stated in my initial report, while I was motivated by market considerations that had emerged up to 2015, the model did, in fact, capture the essential elements of this matter and so was informative to the issue of market impact. In particular, that model accounted for the notion that the direct impact of a transformative work may be to reduce the market earnings of the copy-protected work or otherwise harm the commercial returns to the initial creator and yet found that concepts such as fair use could improve the operation of creative markets.

12. My understanding from counsel is that when the new work is transformative, any negative market effect that might fall directly on sales of the original work is not considered material to the fair use analysis. Instead, in such cases, the analysis focuses on any other commercial effects that the transformative work may have on the market for works derivative of the original work. So, with respect to Dr Dawson's claim as to this understanding (Dawson, 8, pp.3-4), that understanding comes from counsel and also my broad reading of the documents in this matter.

13. Nonetheless, it is important to note that the impact on direct sales for the transformative work is evidence that can be relevant for the impact on other commercial interests of the publisher. This is because it goes to the complements versus substitutes questions. Put

simply, if the publication of *Boldly* does not cognizably harm or improves the sales of *Go!* then, as a matter of economics, it is not reasonable to assume that it would have a negative impact on other works or commercial interests of the publisher. If there was a direct cognizable or material negative impact, that conclusion could not hold. Thus, Dr Dawson's statements here regarding the applicability of the evidence I laid out in my first report are incorrect as a matter of economics.

14. Dr Dawson also takes issue with my analysis of incentives and their applicability to this matter. However, she takes particular formulations very literally which, even in the academic article itself, is not how they are or should be interpreted.

   a. First, in the article, I use a single dimensional way of slicing up a copy-protected work and how it is used in transformative formulations. In this notion I was motivated by remixing which took samples of, say, music or video and placed them in the follow-on work. In this case, there is not a literal lifting of work from the original to the transformative. It is a more abstract notion. But, as is very clear in the paper, the key issue is what impact that has on the returns to each party rather than the specific mathematical formulation. Moreover, in so doing, I was following the only prior literature in this field.[1] This is common practice in academic work. The idea is to find a model that captures the economic impact of the law rather than a perfect description – even if that were possible. I note that Dr Dawson does not dispute that the use of "more" of a copy-protected work would have the direct effects that are assumed in the model.

   b. Dr Dawson claims that: (11, p.5)

---

[1] Miceli, T.J., Adelstein, R.P., 2006. An economic model of fair use. Inf. Econ. Policy 18 (4), 359–373.

> *In this Action, there was no negotiation between the copyright owner (DSE) and the defendants for any amount of copying and defendants did not pay DSE any amount for any of their use.*

    c.    In stating this she does not say where this comes from. Is this a statement of fact or from counsel? In any respect, it is incorrect. My understanding is that DSE wrote an initial offer to the Defendants in this matter prior to the publication of the work. Then lawyers for each engaged in other exchanges. These are the type of things that economists would regard as a negotiation. There was no restraint on coming to a settlement, licensing arrangement or other agreement. In other words, the facts of this case match the negotiation and timing that was considered in my paper.

15.    In summary, Dr Dawson has made a number of demonstrably false statements and chosen to ignore the entire economic literature in formulating her critique. I am not sure if she is familiar with that literature or the modeling techniques but, as I spelled out in my first report, they were capable of being presented in an intuitive and common sense non-formal description of the forces at work.

### V.    DR DAWSON IS MISTAKEN WHEN SHE CLAIMS NO EVIDENCE IS PROVIDED ON MARKET IMPACT

16.    Dr Dawson claims that I have not supported my opinions with relevant evidence (12, p.6). This is false.

17.    First, I do cite professional experience in my report. The very first citation in my report is to my work in *Information Wants to be Shared* published in 2012 by Harvard Business Review Press.[2] Dr Dawson did not consider this work when writing her report. Had she

---

[2] In addition, I have two other books on publishing economics (*Publishing Economics* and *Scholarly Publishing and its Discontents*). I have written on these topics in popular outlets and have been asked to discuss research on these topics at academic conferences such as the NBER Summer Institute.

    done so she would have seen an entire chapter on the economics of book publishing in the digital age. In addition, she does not appear to regard the research that went into my 2015 IJIO paper as experience. In fact, in order to satisfy referees for applied work such as that, you have to demonstrate your expertise and understanding of the real-world market forces and policy decisions at work. In other words, Dr Dawson appears to hold some narrow view that to opine on market impact in cases such as this you need a career in publishing. As a person who has been hired by Dr Dawson's own firm to conduct market impact analyses in markets that I had no career in, I regard this imagined requirement as unsupported and the entire paragraph as an attempt to falsely claim that I do not have the expertise as stated in my first report.

18. In paragraph 13, Dr Dawson lists a set of statements that were in my original report that she claims had no evidence cited. In fact, for each of them I cited the Original Complaint from the Plaintiffs. While that is not deposition testimony, I regard claims of fact by the Plaintiffs as facts I can rely upon in formulating my opinion.

19. Dr Dawson then claims (14) that I should have used market evidence or a consumer survey to determine whether *Boldly* would only be of interest to those versed in *Star Trek*. While some would regard this as a common-sense statement given the intentions of the authors as listed on their cancelled Kickstarter page, Dr Dawson is setting an impossible bar for any case such as this. She does not appear to realize that the proposed work cannot be shown to anyone who has not signed the relevant court orders in this matter. Thus, there is no means by which a survey could be conducted, reviewers could be contacted and other things that would give rise to that evidence. In addition, the publication of *Boldly* was successfully halted and so it was not possible to find market evidence as it never reached

the market. In setting this standard, Dr Dawson is claiming that market impact can never be assessed unless a work were permitted to reach market; something that is my understanding that the Plaintiffs are explicitly against happening.

20. In summary, I believe that my statements are substantiated by the cited filings by both Plaintiffs and Defendants as cited in my original report. I believe that they can be used as a means of drawing useful inference for factfinders.

## VI. AMAZON EVIDENCE IS INFORMATIVE

21. In the absence of a market launch of *Boldly*, I looked for similar cases as evidence of likely market impact. In this regard, I used Amazon's statements based on their algorithms as to whether other derivative works to *Go!* were bought alongside *Go!*. If they were substitutes, you would not expect them to be "frequently bought together" while if they were complements you might expect them to be "frequently bought together."

22. Dr Dawson claims that I only look for evidence that the derivative work impacted on the original work. This is false. On pages 12-13 of my original report and the screenshots provided, I show that people who bought the derivative work are more likely to buy several of DSE's other works and not simply the original work. In other words, she simply asserts something that was not in my report and that I was very clear about.

23. Dr Dawson provides other screenshots saying that Amazon changes its offerings depending on different browsers and such. If you look, however, at her exhibit, it shows that a person – someone named "Jordan" – was logged in at the time. This prevents me from replicating her screenshot but it may be a particular setting related to "Jordan."

24. By contrast, I was aware of these issues and in order to provide proper evidence I used multiple browsers and ensured that no one was logged in to Amazon on any of them. The screenshot given does have "the customers who bought this item also bought" tab but you can see that it is shifted to the left and does not appear in the screenshot for some reason. In addition, many other screen elements are missing from the screenshot. This suggests to me that insufficient care was taken in this analysis by Dr Dawson and her conclusions on para 20 are unreliable.

25. In para 22, Dr Dawson argues that there may be quantity effects that distort the Amazon algorithms. In particular, she claims that if everyone who purchased *Oh, The Things You Don't Know!* also purchased *Go!*, then *Seuss-isms* may rank highly in the searches for both. This is true but it is precisely because all of the people who purchased the transformative work, purchased the original work. In other words, Dr Dawson is claiming that if the original and transformative works are complements, then Amazon will realize that customers of both will be more likely to have bought other DSE products and so will show them those options. In other words, I do not see how the example here would change the conclusions of the factfinder. In any case, I took a screenshot of an Amazon search for *Go!* (below) and you will see that *Seuss-isms* does not appear which supports my argument.



Screenshot on 26th October 2018 (9:32am) (https://www.amazon.com/Oh-Places-Youll-Dr-Seuss/dp/0679805273/ref=sr_1_2?ie=UTF8&qid=1540560053&sr=8-2&keywords=oh%2C+the+places+you%27ll+go+by+dr.+seuss)

26. In relation to the effect on future licensing deals, Dr Dawson once again claims that statements are unsubstantiated but my understanding remains that there was no cross-licensing deal between DSE and *Star Trek* (and Dr Dawson does not dispute it), there is no co-branded product like *Boldly* (and Dr Dawson does not dispute it), that Dr Seuss and *Star*

-11-

*Trek* are strong brands (and Dr Dawson does not dispute it), that competition causes inferior works to lose to superior works (which is a standard statement in economics that Dr Dawson does not dispute), that the trade-marks of Dr Seuss and *Star Trek* are valuable (and Dr Dawson does not dispute it) and my expert experience that strong brands are more likely to succeed than small brands (which is my expert experience and Dr Dawson does not dispute it). In other words, Dr Dawson does not herself claim that any of these understandings are not reliable bases to formulate economic opinions from and does not provide evidence that statements made in Court filings by Plaintiffs in this matter should not be relied upon.

27. In addition (at 26) Dr Dawson claims the market effects I opined are "reasonably unlikely." In so doing, not only does she provide no evidence to base this on but also, at no point, spells out the economic forces at work that would allow this conclusion to be opined upon.

_____
Joshua Gans
5th November 2018