GINA L. DURHAM (Bar No. 295910)
gina.durham@dlapiper.com
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, California  94105-2933
Tel:  415.836.2500
Fax:  415.836.2501

STANLEY J. PANIKOWSKI (Bar No. 224232)
stanley.panikowski@dlapiper.com
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel:  619.699.2700
Fax:  619.699.2701

ANDREW L. DEUTSCH (Bar No. 319286)
andrew.deutsch@dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067-4704
Tel:  310.595.3000
Fax:  310.595.3300

Tamar Y. Duvdevani (admitted *pro hac vice*)
tamar.duvdevani@dlapiper.com
Marc E. Miller (admitted *pro hac vice*)
marc.miller@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York  10020-1104
Tel:  212.335.4500
Fax:  212.335.4501

Ryan Compton (admitted *pro hac vice*)
ryan.compton@dlapiper.com
James Stewart (admitted *pro hac vice*)
james.stewart@dlapiper.com
DLA PIPER LLP (US)
500 Eight Street, NW
Washington, D.C. 20004
Tel:  202.799.4000
Fax:  202.799.5000

*Attorneys for Plaintiff*
*Dr. Seuss Enterprises, L.P.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DR. SEUSS ENTERPRISES, L.P., a California limited partnership,

Plaintiff,

v.

COMICMIX LLC, a Connecticut limited liability company; MR. GLENN HAUMAN, an individual; MR. DAVID JERROLD FRIEDMAN A/K/A DAVID GERROLD, an individual; and MR. TY TEMPLETON, an individual,

Defendants.

Case No. 14-cv-02779-JLS-BGS

**PLAINTIFF DR. SEUSS ENTERPRISES L.P.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

███████████

Date:  January 31, 2019
Time:  1:30 pm
Courtroom:  4D
Judge:  The Hon. Janis L. Sammaritno

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ................................................................................ 1

II.   FACTS NOT SUBJECT TO GENUINE DISPUTE ................................ 2

    A.    DSE And Its Copyrighted Works ........................................... 2

    B.    Defendants' Infringing Conduct ............................................. 4

        1.    Conception and Development of *Boldly* ...................... 4

        2.    Plans to Publish and Sell *Boldly*, and Kickstarter ..... 7

        3.    DSE's Demand Letters & Defendants' Reaction .......... 9

III.   ARGUMENT .................................................................................. 10

    A.    *Boldly* Infringes DSE's Copyrights ................................... 11

        1.    Legal Standard For Copyright Infringement ............. 11

        2.    DSE Owns Valid Copyrights In the DSE Works ....... 12

        3.    Defendants Admit Substantial Copying Of The DSE Works ........................................................................ 13

    B.    *Boldly* Is Not A Fair Use of DSE's Copyrights .................. 14

        1.    Defendants' Use Is Highly Commercial, Not Transformative, And Done In Bad Faith ................... 14

           a.    *Boldly* Is Highly Commercial In Nature ........ 15

           b.    *Boldly* Is Not Transformative ......................... 16

           c.    Defendants Acted In Bad Faith ...................... 17

           d.    Boldly Is Derivative of Go! ............................. 18

        2.    The DSE Works Are Highly Creative ....................... 20

        3.    Defendants Admit That They Took More From The DSE Works Than Was Necessary ...................................... 20

        4.    *Boldly* Harms the Marketplace for Go! and its Derivatives, including Authorized Collaborative Works ........ 22

    C.    Defendants Willfully Infringed the DSE Works .................. 24

IV.   CONCLUSION .............................................................................. 25

DLA PIPER LLP (US)
SAN DIEGO

-i-

1

# <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

CASES

4

*Anderson v. Liberty Lobby, Inc.*,

5
   477 U.S. 242 (1986) ............................................................................... 10, 11

6

*Apple, Inc. v. Psystar Corp.*,

7
   673 F. Supp. 2d 931 (N.D. Cal. 2009) ......................................................... 19

8

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,

9
   585 F.3d 267 (6th Cir. 2009) ....................................................................... 25

10

*Campbell v. Acuff-Rose Music, Inc.*,

11
   510 U.S. 569 (1994) ......................................................................... 14, 22, 24

12

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*,

13
   150 F.3d 132 (2d Cir. 1998) ........................................................................ 19

14

*Celotex Corp. v. Catrett*,

15
   477 U.S. 317 (1986) ............................................................................... 10, 11

*Dr. Seuss Enters. v. Penguin Book USA*,

16
   109 F.3d 1394 (9th Cir. 1997) ..................................................................... 21

17

*DSE v. ComicMix*,

18
   2018 WL 2298197 (S.D. Cal. May 21, 2018) ......................................... 12, 22

19

*DSE v. ComicMix*,

20
   256 F. Supp. 3d 1099 (S.D. Cal. 2017) ................................................. passim

21

*DSE v. ComicMix*,

22
   300 F. Supp. 3d 1073 (S.D. Cal. 2017) ................................................. 14, 21

23

*Fabric Selection, Inc. v. NNW Import, Inc.*,
   2018 WL 1779334 (C.D. Ca. Apr. 11, 2018) ............................................. 25

24

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,

25
   499 U.S. 340, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991) ............................ 11

26

*Funky Films, Inc. v. Time Warner Entm't Co.*,

27
   462 F.3d 1072 (9th Cir. 2006) ............................................................ 11, 12, 13

28

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Harper & Row Publishers v. Nation Enterprises*,
  471 U.S. 539 (1985) ................................................................ 20, 22

*Kaseberg v. Conaco, LLC*,
  260 F. Supp. 3d 1229 (S.D. Cal. 2017) ........................................ 24

*Kienitz v. Sconnie Nation LLC*,
  766 F.3d 756 (7th Cir. 2014) ....................................................... 19

*Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc*.,
  658 F.3d 936 (9th Cir. 2011) ....................................................... 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,
  475 U.S. 574 (1986) .................................................................... 11

*Mattel, Inc. v. Walking Mountain Prods.*,
  353 F.3d 792 (9th Cir. 2003) ....................................................... 11

*Micro Star v. Formgen Inc.*,
  154 F.3d 1107 (9th Cir. 1998) ............................................ 12, 19, 22

*Monge v. Maya Magazines, Inc.*,
  688 F.3d 1164 (9th Cir. 2012) ..................................................... 23

*Oracle America, Inc. v. Google LLC*,
  886 F.3d 1179 (Fed. Cir. 2018) .............................................. passim

*Paramount Pictures Corp. v. Axanar Prods., Inc.*,
  2017 WL 83506 (C.D. Cal. Jan. 3, 2017) ............................ 16, 20, 23

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) ..................................................... 17

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ..................................................... 13

*Twentieth Century Fox Film Corp. v. Dastar Corp.*,
  2000 WL 35503106 (C.D. Cal. Aug. 29, 2000) .............................. 25

*Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ...................................................... 25

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
  853 F.3d 980 (9th Cir. 2017) ........................................................................ 11, 24

*United Fabrics Int'l., Inc. v. C&J Wear, Inc.*,
  630 F.3d 1255 (9th Cir. 2011) ............................................................................. 12

*Washington Shoe Co. v. A-Z Sporting Goods Inc.*,
  704 F.3d 668 (9th Cir. 2012) .............................................................................. 24

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) ............................................................................ 22

**STATUTES**

17 U.S.C. § 101 ........................................................................................................ 18

17 U.S.C. § 106(2) .................................................................................................. 18

17 U.S.C. § 107 ................................................................................................ 14, 18

17 U.S.C. § 411(b)(2) .............................................................................................. 12

Copyright Act § 504(c)(2) ....................................................................................... 24

**OTHER AUTHORITIES**

4 Patry on Copyright § 10:21 .................................................................................. 16

Fed. R. Civ. P. 12 ...................................................................................................... 2

Fed. R. Civ. P. 56(a) ............................................................................................... 10

Nimmer on Copyright § 1404[B][3][a] .................................................................. 25

## I.    INTRODUCTION

In the spring of 2016, defendant David Gerrold, a *Star Trek* writer, had an idea.  He reached out to defendant Glen Hauman, another "Trekkie" and the president of defendant ComicMix LLC, saying "*if we could get a license*, we should do a Star Trek Primer."  (emphasis added.)  This planted the seed for what was to become the infringing work, *Oh, The Places You'll Boldly Go!* ("*Boldly*"). Defendants never thought of this book as a commentary, criticism, or parody of Dr. Seuss or his books.  Indeed, before they decided to use Dr. Seuss's *Oh, The Places You'll Go!* ("*Go!*") as the vehicle for their *Star Trek* story, they considered using other illustrated books, like *Goodnight Moon, Pat The Bunny,* and *The Very Hungry Caterpillar*.  After they settled on *Go!*, they brought in defendant Ty Templeton, an illustrator, to "slavishly" copy illustrations from *Go!* and other Dr. Seuss books. Templeton proclaimed, "I'm totally in," and "[t]he title is like printing money."

From there, Defendants were off to the races: ordering and sharing scanned copies of *Go!,* using *Go!*'s cover as a mock-up for *Boldly*'s cover, writing *Boldly*'s text to "match" the structure, spirit, and message of *Go!,* "meticulously" copying Dr. Seuss's illustrations to have the Seussian "look and feel," discussing sequels also based on Dr. Seuss works, ("*Picard Hears a Q*," for example), and planning for *Boldly*-related consumer products.  Defendants knew that *Go!* is widely given as a graduation gift, and had multiple discussions with third-parties about publishing in time to "compete" for that graduation business.

But amongst all of this flurry of activity, Defendants deliberately failed to follow up on Gerrold's original thought: the need for a *license*.  They rationalized their absence of permission by calling their rip-off a "parody," which the Court has already found it is not.  That is not to say that the need for a license did not come up.  To the contrary, it was raised time and time again by Defendants and third-parties.  Whether it was a reckless disregard for Dr. Seuss's rights, hubris, or both, /////

1  Defendants never once consulted a lawyer to advise whether their use of *Go!* and

2  the other Dr. Seuss works was a parody and a fair use.

3      After Defendants' second Rule 12 motion was denied, discovery

4  commenced, and the documents and testimony adduced from Defendants have been

5  nothing short of astounding.  Defendants' communications, their processes for

6  creating *Boldly,* their acknowledgements of "slavish" copying after discussing and

7  rejecting alternative ways to illustrate their book without taking so much from *Go!*,

8  and their willful blindness to the infringing nature of this conduct, all conclusively

9  demonstrate a clear violation of Dr. Seuss's rights that is not shielded by any

10  defense, let alone fair use.

11      Given this damning evidence of willful and inexcusable infringement, the

12  clarification of the fair use defense in case law decided since the Court last

13  considered fair use, and plaintiff Dr. Seuss Enterprises L.P.'s ("DSE") extensive

14  proof of its licensing program and collaborations where Dr. Seuss and third-party

15  intellectual property are combined into a single work, no reasonable trier of fact

16  could find Defendants' extensive copying to be fair use.  Defendants fail on all four

17  factors: their use is not one recognized as a traditional fair use; *Go!* and the other

18  affected Dr. Seuss books are highly creative and deserving of greater protection;

19  they have taken extensively from *Go*; and they are preempting DSE's existing

20  market for collaborative works as well as seeking to compete with *Go!* itself for

21  graduation business.  This Court should therefore grant summary judgment to DSE

22  on its claims of copyright infringement of *Go!*, *How the Grinch Stole Christmas*,

23  and *Sneetches and Other Stories*, and find not only that Defendants are not shielded

24  by the fair use doctrine, but that their infringement was willful.

25  **II.    FACTS NOT SUBJECT TO GENUINE DISPUTE**

26      **A.    DSE And Its Copyrighted Works**

27      DSE is the owner, by assignment, of the copyrights to the works of Theodor

28  S. Geisel, the author and illustrator of the books written under the pseudonym

"Dr. Seuss."  (SOF ¶¶ 1-4.)  Geisel wrote and illustrated the works at issue here: *Go!*; *How the Grinch Stole Christmas!* ("*Grinch*"); and *The Sneetches and Other Stories* ("*Sneetches*") (collectively, the "DSE Works").  (SOF ¶¶ 2-7.)  The DSE Works are duly registered for copyright with the Copyright Office and all copyrights remain in force.  (SOF ¶¶ 2-4.)  Although Geisel passed away in 1991, DSE oversees a robust publishing program, working closely with its publishers to release anniversary editions, reissues in new formats or sizes, and updated editions of the iconic Dr. Seuss books, including the DSE Works.  (SOF ¶¶ 50, 127-136.)

DSE also licenses authors and illustrators to publish additional works under the Dr. Seuss brand.  (SOF ¶¶ 50, 133-134.)  For example, the DSE series *The Cat In The Hat Learning Library*, includes books written and illustrated by other authors that are based upon and incorporate Geisel's works.  (SOF ¶ 133.)  This series includes titles such as *Oh, The Things You Can Do That Are Good For You!*, *There's No Place Like Space!*, and *Oh, The Pets You Can Get!*.  (SOF ¶ 134.)  DSE has also licensed the publication of several books that are derivative of the DSE Works, including *Go!*: *Oh, Baby! Go, Baby!; Oh, the Places I'll Go! By ME, Myself*; *Oh, Baby, the Places You'll Go!*; and *Oh, the Places I've Been! Journal*.  (SOF ¶ 141.)  These books continue the style of the original Dr. Seuss books, and DSE provides close quality control to ensure consistency of style and quality.  (SOF ¶¶ 128-130.)

While children may be the intended readers for many of Dr. Seuss's works, adults buy them, and DSE therefore markets the works to both children and adults.  (SOF ¶¶ 145-148.)  Other Dr. Seuss works, including *Go!*, are aimed at teenagers and adults, and are marketed to both age groups.  (SOF ¶¶ 146-147.)  *Go!* is a very popular gift for graduates.  It is DSE's best-selling book, and the perennial number-one selling book on *The New York Times* Best Sellers list each spring during graduation season.  (SOF ¶¶ 140, 147.)

1    DSE is not just a publisher; it is also in the entertainment business, licensing

2    Dr. Seuss works for development of films, television, stage productions, theme

3    parks, and museum exhibitions.  (SOF ¶ 137.)  DSE also runs an extensive product

4    licensing and merchandising program.  (SOF ¶¶ 137-138, 143.)  In fact, in 2017,

5    DSE was named the top licensed book brand according to NPD, a market industry

6    research firm.  (SOF ¶ 158.)  Importantly for purposes of this case, DSE

7    collaborates with other intellectual property holders on collaborations that combine

8    Dr. Seuss's works with those holders' creations to develop new works and products

9    that have combined appeal to larger audiences.  (SOF ¶¶ 149-155.)  For example,

10   DSE and its partners have created *The Wubbulous World Of Dr. Seuss*, a television

11   and book series with The Jim Henson Company that featured "muppetized" Dr.

12   Seuss characters, *Grinch Panda Pop*, a digital game that combines Jam City's

13   Panda character with the Grinch character, Dr. Seuss Funko figurines, which

14   combine Funko Inc.'s distinctive toy designs with Dr. Seuss characters, and a line

15   of Comme des Garçons clothing combining Comme des Garçons' well-known heart

16   design with *Grinch* artwork.  Many more collaborations are in the works.  (SOF ¶¶

17   153-55.)

18       DSE receives numerous offers from parties wishing to work with DSE on a

19   collaboration or license DSE's intellectual property.  (SOF ¶ 156.)  DSE approaches

20   these offers selectively, and when DSE considers whether to pursue a collaboration

21   with another intellectual property holder, it first carefully vets the collaborator.

22   (SOF ¶ 129.)  If it decides to move forward, DSE works extensively with the

23   collaborator and maintains tight control over the work.  (SOF ¶ 128, 130.)

24       **B.     Defendants' Infringing Conduct**

25              **1.     Conception and Development of *Boldly***

26       Defendant Gerrold has written *Star Trek* episodes for Paramount Pictures, the

27   producer of the *Star Trek* television show.  In May 2016, he suggested to fellow

28   "Trekkie" defendant Hauman, "if we could get a license, we should do a Star Trek

Primer." (SOF ¶ 8.)  The original idea was to combine *Star Trek* themes with the pre-school book *Pat The Bunny*.  (SOF ¶ 9.)  From the start, Gerrold and Hauman were concerned about their project's legal risk, but (without consulting a lawyer) rationalized their proposed takings as a "parody."  (SOF ¶¶ 10-12, 16-18, 23-24.)

Despite throwing the word "parody" around, it was clear that Defendants, none of whom are lawyers, did not know what a parody was, because they were never seeking to comment on, criticize, or make fun of any of the famous children's books they considered using.  Rather, Hauman advised Gerrold that "what we can do as a parody…is pretty dang broad as long as we aren't doing too much trademark infringement," and that "[i]f we're parodying TWO things (Pat The Bunny and Trek) we're on safer ground, I think.  Still, a license may be available. Let me think on it."  (SOF ¶ 11.)  He also proclaimed that Defendants were "less likely to be sued thanks to [Gerrold's] arrangement with Paramount."  (SOF ¶ 12.) Gerrold later admitted that "there is no legal arrangement with Paramount," and that he never bothered to "correct" Hauman's misguided assumption.  (SOF ¶ 13.)

Defendants' intent was always to steal the familiar illustration style and prose/poetry style of well-known children's books to make their *Star Trek* story more appealing and salable.  (SOF ¶ 38.)  Thus, they considered using *Pat the Bunny*, *Fun with Dick & Jane*,[1] *Goodnight Moon*, and *The Very Hungry Caterpillar*, before finally settling on *Go!*.  (SOF ¶15.)  On May 28, 2016, Hauman e-mailed Gerrold a mock-up of a proposed *Boldly* cover, which he copied directly from *Go!*, stating: "Well, if you're not doing this, I am."  (SOF ¶ 20.)  Gerrold replied, "I am SOOO in!"  (SOF ¶ 22.)

Defendant Templeton is an illustrator with an apparent gift for copying other illustrators' works.  (SOF ¶31.)  In June 2016, Hauman invited Templeton to join

---

[1] A third-party had beaten Defendants to this with *Fun With Kirk & Spock,* which Hauman realized was licensed, but nevertheless concluded that his similar idea should proceed unlicensed because it was a "parody."  (SOF ¶¶ 14, 16.)

the project, instructing Templeton that "this would be Seuss-style TOS [(*Star Trek: The Original Series*)] backgrounds," and that "we're going to want the cover and at least a background art piece for promotions, as well as be able to use the cover for posters, mugs, and all the merchandise that will push this thing over the top." (SOF ¶¶ 28-29.) Templeton responded, "Holy CRAP that's a cool idea. The title is like printing money. I'm totally in." (SOF ¶ 30.)

With the team in place, Defendants set out to create *Boldly*. They admitted in response to DSE's request for admissions that they accessed and copied from the DSE Works to create *Boldly*. (SOF ¶ 51.) Each Defendant also testified that he copied the DSE Works to create *Boldly*. (SOF ¶¶ 33, 51-54, 56, 64.) Indeed, Hauman scanned to Gerrold a copy of *Go!* because he "want[ed] to parallel [*Go!*] as close as [he] can." (SOF ¶ 33.)

The more they worked, the more *Boldly* became a copy of *Go!*. Gerrold had written his first draft "from scratch," without access to *Go!*, and "focus[ed] on the *Star Trek* aspect more than the specific parallels with anything in the Seuss book." (SOF ¶ 34.) Gerrold eventually changed tacks and rewrote *Boldly*'s text to closely match *Go!*'s text. (*Id.*) Hauman created a side-by-side comparison of *Go!*'s and *Boldly*'s text to assist he and Gerrold in their concerted effort "to try and match the structure of *Go!*." (SOF ¶ 33, 56.) This side-by-side text comparison shows that *Boldly* closely tracks *Go!*'s story. (*Id.*) Templeton noted that *Go!*'s point "is that life is an adventure but it WILL be tough and there WILL be setbacks, and you should not despair of them," which is "why *Go!* resonates so much, especially as a graduation gift for folks who grew up reading Seuss." Templeton stated that "we have to keep to that sentiment to make the parody and spirit work." (SOF ¶ 37.)

Templeton testified as to his process for illustrating *Boldly*:

> I would have the original book open to what I was looking at. I would rough out the positions the characters are in. After I was satisfied with the position that the characters are in being similar enough to evoke the original source material, I would render them as carefully as I could.

(SOF ¶ 48-49.)  Templeton further testified that his "copying" of one page took him "about seven hours" because he "painstakingly attempted to make" his illustration "nearly identical" to Seuss's.  (SOF ¶ 52.)  And although Templeton testified that he "would study the page," and then "meticulously try to reproduce as much of the line work," as he could, his first drafts were not "close enough;" Hauman instructed him to "go closer to" *Go!*.  (SOF ¶ 36, 48, 52.)  Templeton later admitted, "I did, in fact, slavishly copy from Seuss," to illustrate *Boldly*.  (SOF ¶ 53.)

### 2.    Plans to Publish and Sell *Boldly*, and Kickstarter

In July 2016, Hauman contacted John Frazier, a merchant at ecommerce retailer ThinkGeek, to assess interest in handling "merchandise, printing and distribution," for *Boldly*.  (SOF ¶ 40.)  Frazier advised Hauman that, while ThinkGeek did not manufacture books, it could handle distribution for *Boldly*, but stated: "It goes without saying you've got the license, though, right?"  (SOF ¶ 41.)  Hauman replied to Frazier, "[n]o license, this is straight parody fair use of both Seuss and Trek," and attempted to "reassure" Frazier that ThinkGeek could distribute the book without a license because Gerrold "is grandfathered in on Star Trek books, having to do with some arcane licensing issues from back in the day." (SOF ¶¶ 42.)  Yet Gerrold later testified that "there is no legal arrangement with Paramount."  (SOF ¶¶ 13, 44.)  Hauman also stated to Frazier, "I realize this may complicate matters for you and cause you to pass," and that "if so, I completely understand and no hard feelings."  (SOF ¶ 42.)

Frazier replied to Hauman that ThinkGeek "can certainly carry the book if it fell under [Gerrold]'s blanket license, though we'd probably have to back away from distribution to maintain the relationship with CBS."  (SOF ¶ 44.)  ThinkGeek eventually ordered 5,000 copies of *Boldly*, if they could be printed and delivered in time for Christmas sales.  (SOF ¶ 92.)  On July 19, 2016, Hauman wrote an e-mail to another third-party stating: "[H]ad a conversation with the senior buyer for ThinkGeek, and we'll be selling them a lot of stuff.  (I was hoping they'd even

1  handle fulfillment on merchandise, but since this is unlicensed it seems unlikely.).”

2  (SOF ¶ 45.)

3       On August 31, 2016, Defendants launched a fundraising campaign on

4  Kickstarter.com to pay for the production costs and fixed costs for creating *Boldly*.

5  (SOF ¶ 65.)  Defendants never contacted DSE or CBS/Paramount for a license.

6  (SOF ¶ 10.)  Rather, they told the public, in the “Risks and Challenges” section:

7         While we firmly believe that our parody, created with

8         love and affection, fully falls within the boundary of fair
   use, there may be some people who believe that this

9         might be in violation of their intellectual property rights.
   And we may have to spend time and money proving it to

10         people in black robes. And we may even lose that.

11  (SOF ¶ 66.)  Hauman testified that he did not consult with legal counsel before

12  writing this language even though he was aware of the legal risks.  (SOF ¶ 67.)  The

13  Kickstarter campaign ran through September 30, 2016, netting 727 backers who

14  pledged $29,575 to the project.  (SOF ¶ 65.)

15       Allison Adler, an editor at publisher Andrews McMeel Publishing (“AMP”),

16  saw the Kickstarter page, reached out to Defendants, and subsequently ███████

17  ████████████████████████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████  (SOF ¶¶ 72-76, 79.)

20       Hauman and Adler spoke and exchanged several e-mails concerning AMP’s

21  proposal.  (SOF ¶¶ 71, 81-84, 86-87, 89.)  Hauman disclosed to Adler ███

22  ████████████████████████████████████████

23  ███████████████████████████████████████

24  ████████████████████████████████████████

25  ████████████████████████

26       On September 19, 2016, AMP sent Hauman an offer to publish *Boldly*, and

27  following several rounds of correspondence, on September 21, the parties reached a

28  “letter of agreement” on the principal terms.  (SOF ¶¶ 86-89.)  ████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████ (SOF ¶ 91.)

### 3.    DSE's Demand Letters & Defendants' Reaction

After learning about *Boldly*, DSE sent to Defendants three letters, dated September 28, October 7, and October 25, 2016, demanding that Defendants immediately cease all use of the DSE Works.  (SOF ¶¶ 103-105.) DSE also sent a DMCA takedown notice to Kickstarter on October 7, 2016.  (SOF ¶ 68.)

Defendants did not respond to the letters until October 28, 2016.  (SOF ¶ 107.)  Defendants' failure to respond was purposeful.  On September 28, Templeton asked Hauman: "Are we ignoring the cease and desist letter to keep the [publishing] schedule?"  (SOF ¶ 112.).  However, their hand was forced by their partners.  On September 28, Hauman forwarded the first DSE letter to Adler of AMP.  (SOF ¶ 93.) ████████████████████████████████████████

████████████████████████████████ (SOF ¶¶ 94-96.)

Defendants then pushed ThinkGeek to move forward on a direct sale publication, yet intentionally failed to tell ThinkGeek about DSE's letters and AMP's withdrawal until three weeks after the first letter.  (SOF ¶¶ 115-116.) Hauman wrote that, "[i]f we have to pull the order from [ThinkGeek], we can smooth things over with them by explaining that we're dealing with legal matters and didn't want to expose them to it, which I'm sure they'll appreciate, and they'll have new orders in time for school graduations."  (SOF ¶ 120.)

On October 26, 2018, Templeton's wife and office manager told Hauman that "[g]iven the content of the letter [from DSE], doesn't seem like you can proceed with any ThinkGeek deal in good faith.  And if they don't hear from someone, they're basically saying they're continuing onto a lawsuit."  (SOF ¶ 121.) Defendants finally retained counsel on October 26, 2018 and sent DSE a letter on October 28, which refused DSE's demands, threatened legal claims, and advised that Defendants would be sending a counter-notice to Kickstarter to reinstate its

1   campaign, which they did on October 31, 2016.  (SOF ¶ 106-108.)

2          Seeing no alternative, DSE filed this infringement action on November 10,

3   2016.  (ECF No. 1.)  After receiving the complaint, Defendants discussed ways to

4   modify *Boldly* that avoided "slavishly" copying *Go!*.  (SOF ¶ 123.)  On November

5   14, 2016, Gerrold suggested that re-drawing the illustrations could be a "way out":

6              A lot of our artwork is based on Dr. Seuss's artwork.
               What if we did whole new artwork, not specifically based
7              on any individual drawing by Seuss, but close enough to
               his style to match the text.  If we replace the stuff that's
8              too dead on – yes, its extra work for Ty [Templeton], but
               it really weakens their case.
9

10  (*Id.*)  Templeton admitted that he "did, in fact, slavishly copy from Seuss," and

11  noted that "[i]n my original layouts for our book, I was ignoring the layouts for

12  OTPYG [*Go!*] book, and just trying for a Suessian [sic] art style."  (*Id.*)  Templeton

13  offered to revert to those layouts if it "helped."  (*Id.*)  But those  revisions were

14  never made.  (*Id.*)

15         On November 15, 2016, Hauman notified ThinkGeek about DSE's claims.

16  (SOF ¶ 124.)  On February 2, 2017, ThinkGeek contacted Hauman for an update, as

17  it would "LOVE to be able to offer [*Boldly*] for Graduation."  (SOF ¶ 102.)

18  Hauman replied: "I would LOVE to offer it to you, but the lawsuit grinds on."  (*Id.*)

19  **III.   ARGUMENT**

20         A party may move for summary judgment as to a claim or defense or part of

21  a claim or defense.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate where

22  the court is satisfied that there is "no genuine dispute as to any material fact and the

23  movant is entitled to judgment as a matter of law."  *Id.*; *Celotex Corp. v. Catrett*,

24  477 U.S. 317, 322 (1986).  Material facts are those that may affect the outcome of

25  the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine

26  dispute of material fact exists only if "the evidence is such that a reasonable jury

27  could return a verdict for the nonmoving party."  *Id.*

28         The moving party bears the burden on establishing the absence of a genuine

1    issue of material fact, and may meet this burden by identifying the "portions of 'the

2    pleadings, depositions, answers to interrogatories, and admissions on file, together

3    with the affidavits, if any,'" that show an absence of dispute regarding a material

4    fact.  *Id*.  The nonmoving party must then identify specific facts showing that there

5    is a genuine dispute for trial, *Celotex*, 477 U.S. at 324, which requires "more than

6    simply show[ing] that there is some metaphysical doubt as to the material facts."

7    *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  To

8    survive, the nonmoving party must designate specific facts that would allow a

9    reasonable fact finder to return a verdict in its favor.  *Celotex*, 477 U.S. at 324.

10   "[R]est[ing] upon the mere allegations or denials of his pleadings" is insufficient to

11   defeat summary judgment.  *Anderson*, 477 U.S. at 256.

12          Courts in the Ninth Circuit grant summary judgment on copyright claims, as

13   well as fair use affirmative defenses where: (1) the works are so overwhelmingly

14   identical that the possibility of independent creation is precluded; and (2) the

15   material facts about the fair use factors are not in dispute.  *See Unicolors, Inc. v.*

16   *Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017); *Mattel, Inc. v. Walking*

17   *Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003).  Here, Defendants admit they

18   extensively copied from the DSE Works, and the undisputed facts show that no

19   reasonable jury could find that this copying was fair use.  Summary judgment on

20   DSE's copyright claim should therefore be granted.

21          **A.**     ***Boldly* Infringes DSE's Copyrights**

22                   **1.     Legal Standard For Copyright Infringement**

23          To prevail on copyright infringement, DSE must demonstrate "'(1)

24   ownership of a valid copyright, and (2) copying of constituent elements of the work

25   that are original.'"  *Funky Films, Inc. v. Time Warner Entm't Co*., 462 F.3d 1072,

26   1076 (9th Cir. 2006) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co*., 499 U.S.

27   340, 361, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)).  A certificate of registration

28   from the U.S. Copyright Office for each of the DSE Works raises a presumption

1   that the copyright is valid and owned by the named registrant. *Micro Star v.*

2   *Formgen Inc.*, 154 F.3d 1107, 1110 (9th Cir. 1998).  To establish copying, DSE

3   must either provide "evidence of direct copying" or show that Defendants had

4   "access" to the DSE Works and that *Boldly* is "substantially similar" thereto.

5   *Funky Films,* 462 F.3d at 1074.  In this Circuit, substantial similarity is measured

6   via the "extrinsic" and "intrinsic" tests.  *Id.* at 1077.  Courts apply the "extrinsic

7   test" to determine whether substantial similarity (or striking similarity) exists as a

8   matter of law, while the "intrinsic test" evaluates "an ordinary person's subjective

9   impressions of the similarities between two works," and "is exclusively the

10  province of the jury." *Id*.

11              **2.      DSE Owns Valid Copyrights In the DSE Works**

12          DSE owns the copyrights in the DSE Works and has produced their

13  copyright registration certificates, which are presumed valid.  (SOF ¶¶ 2-4.)  While

14  an infringement defendant may attempt to "rebut[] the facts set forth in the

15  copyright certificate," by offering "some evidence or proof to dispute or deny the

16  plaintiff's prima facie case of infringement," *United Fabrics Int'l, Inc. v. C&J*

17  *Wear, Inc*., 630 F.3d 1255, 1257 (9th Cir. 2011), these Defendants cannot rebut the

18  presumption favoring DSE.  The Court already denied Defendants' 17 U.S.C.

19  § 411(b)(2) motion, holding that (1) the *Sneetches* copyright was not based on

20  inaccurate information; and (2) the publication of the "Economic Situation" was not

21  required to be disclosed in *Go!*'s application.  *DSE v. ComicMix*, 2018 WL

22  2298197, at *4-6 (S.D. Cal. May 21, 2018).  No facts developed in discovery alter

23  the Court's finding that DSE's registrations are valid.

24          Nor can Defendants raise a genuine dispute that DSE owns the copyrights in

25  the DSE Works (the basis of their Eleventh Affirmative Defense), as DSE has

26  produced unrefuted evidence showing it is the owner by assignment of the DSE

27  Works.  (SOF ¶¶ 2-4.)

28

### 3.     Defendants Admit Substantial Copying Of The DSE Works

Where a defendant has admitted direct copying, a court need not undertake an extrinsic test analysis to establish substantial similarity. *Funky Films,* 462 F.3d at 1076. The remaining hurdle is "unlawful appropriation" (*i.e.*, actionable copying), and is established where the similarities between the two works are "substantial" and "involve protected elements of the plaintiff's work." *Rentmeester v. Nike, Inc*., 883 F.3d 1111, 1117 (9th Cir. 2018).

Here, Defendants not only readily admit access and copying of the DSE Works in their responses to DSE's requests for admission, (SOF ¶¶ 33, 51-54, 56, 64), Defendants testified that Dr. Seuss's protected elements were substantially copied to create *Boldly*. (*Id*.) Hauman scanned a copy of *Go!* to Gerrold because Gerrold "want[ed] to parallel it as close as [he] can." (SOF ¶ 33, 56.) Templeton "meticulously" and "painstakingly" copied the DSE Works so that they were "nearly identical" to Seuss's illustrations, including Seuss's distinctive "machine[s]," flora and fauna (*i.e.*, trees with "big, long, loopy circles" and characters with the same noses, eyes, "spindly" necks, and "boneless" feet as Dr. Seuss), and "cross-hatching," all in order "to make the layouts" as "accurate to the originals" as possible. (SOF ¶¶ 48-49, 51-54.) Hauman even told Templeton to "go closer to" *Go!*. (SOF ¶ 36, 48, 52.) Templeton admitted that he "did, in fact, slavishly copy from Seuss," to illustrate *Boldly*. (SOF ¶ 53.)

The undisputed facts, as well as a side-by-side comparison of the DSE Works and *Boldly*, show that there is no genuine dispute that: (1) DSE owns valid copyrights in the DSE Works; and (2) Defendants directly and substantially copied from the DSE Works to create *Boldly*. Defendants have therefore infringed DSE's copyrights. Accordingly, the only remaining inquiry prior to granting summary judgment on copyright infringement is whether Defendants' infringement is excused by fair use.

### B.    *Boldly* Is Not A Fair Use of DSE's Copyrights

The Court's conclusion that "after again weighing the four fair use factors, the Court finds that Defendants' fair use affirmative defense fails as a matter of law," *DSE v. ComicMix,* 300 F. Supp. 3d 1073, 1082 (S.D. Cal. 2017) ("*ComicMix II*"), is only reinforced by the undisputed facts developed in discovery, and provide additional support for the Court's finding of no fair use.  These four factors are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576 (1994).

### 1.    Defendants' Use Is Highly Commercial, Not Transformative, And Done In Bad Faith

While the Court initially found that the first fair use factor favored Defendants, the Court should reconsider that finding in light of further legal developments.  After the Court's ruling, the Federal Circuit decided *Oracle America, Inc. v. Google LLC,* 886 F.3d 1179 (Fed. Cir. 2018), an appeal from a Northern District of California action concerning Google's alleged infringement of Oracle's copyrights.  *Oracle* concerned infringement claims over Oracle's API Java software.  In particular, Google copied 37 of the 166 Java SE API packages and created its own implementing code to create its Android platform.  *Oracle,* 886 F.3d at 1200-01.  In *Oracle*, the Federal Circuit reversed the fair use finding, holding that, under Ninth Circuit law, Google's use of Oracle's copyrighted works was not a fair one.  *Id.  Oracle* provides an important clarification of the first fair use factor, and, as applied to the facts developed in discovery, shows that the first factor weighs against fair use.

*Oracle* outlines three inquiries for the court to consider in weighing the first

factor: (1) "whether the use is commercial in nature;" (2) "whether the new work is transformative or simply supplants the original;" and (3) whether the facts show "that the infringer acted in bad faith."[2]  *Oracle*, 886 F.3d at 1196.  Here, *Boldly* loses on all three counts: *Boldly* is highly commercial, it is not "transformative" as the term is applied in fair use, and Defendants acted in bad faith.

### a.    *Boldly* Is Highly Commercial In Nature

Under *Oracle*, "[a]nalysis of the first factor *requires* inquiry into the commercial nature of the use," and there the Court held that Google's commercial use cut against fair use.  *Id.* at 1196-98 (emphasis added).  In *ComicMix I*, the Court found that Defendants created *Boldly* for profit, but gave that finding "slight" weight in light of the Court's pre-discovery view that *Boldly* was transformative and would not adversely affect the market for *Go!* or the other DSE Works.  *DSE v. ComicMix,* 256 F. Supp. 3d 1099, 1110 (S.D. Cal. 2017) ("*ComicMix I*")   As discussed *infra* at Sec. III(B)(4), however, discovery has shown that *Boldly* is likely to supplant the market for *Go!* as well as its derivatives.

Defendants' sole purpose in copying the DSE Works was commercial.  The project was *not* born out of a desire to parody or comment on *Go!* or Dr. Seuss. Instead, Defendants wanted to write a *Star Trek* book presented as "a 50th Anniversary reprinting of a classic children's book, as if it had existed in the past." (SOF ¶ 8.)  *Go!* was just one of several vehicles Defendants considered for a *Star Trek* work, but once Defendants settled on *Go!*, they planned various ways to profit from the success of DSE's Works, including selling *Boldly* during graduation season to compete with *Go!* and free-ride on *Go!*'s perennial success*,* writing sequels based on other Dr. Seuss works ("*Picard Hears a Q*" and "*One Kirk, Two Kirk, Red Shirt, Blue Shirt*"), and creating commercial products to compliment

---

[2] An additional, although "not dispositive" consideration is that the use does not fit into § 107 preamble's examples of fair use, like "criticism, or comment, or news reporting, and the like."  *Oracle*, 886 F.3d at 1199 (int. quote omitted).  *Boldly* is likewise not akin to any of the works enumerated in the preamble.

*Boldly*. (SOF ¶ 71.)  The evidence demonstrates that Defendants were driven by profit, and a willful disregard for DSE's rights.  Thus, under *Oracle*, Defendants' heavy emphasis on profiting off of DSE's works weighs against fair use.

### b.  *Boldly* Is Not Transformative

*Oracle* clarifies the limits of transformativeness and shows that *Boldly* is not a transformative work.  *Oracle* held that that Google's use of Oracle's Java program was not transformative, despite the fact that Google only used 37 of the 166 Java SE API packages and created its own implementing code.  *Oracle*, 886 F.3d at 1200-01.  The court explained that the "fact that Google created exact copies of the declaring code and SSO and used those copies for the same purpose as the original material seriously weakens [the] claimed fair use," and that only using some of the copyrighted material does not make a use transformative, as "no plagiarist can excuse the wrong by showing how much of his work he did not pirate."  *Id*.; *see also Paramount Pictures Corp. v. Axanar Prods., Inc*., 2017 WL 83506, at *7 (C.D. Cal. Jan. 3, 2017) (holding that defendants' works were neither transformative nor fair use); 4 Patry on Copyright § 10:21 ("The transformation encompassed by fair use employs the original work not necessarily in a changed form, but rather for a different purpose or objective, in order to communicate a different message.").  The court noted that Google's use might have been transformative if Google used Oracle's work for some other "purpose," like "teaching how to design an API."  886 F.3d at 1200-01.

Like Google, Defendants here "painstakingly" and "meticulously" copied Dr. Seuss's work for profit, "paralleling" *Go!*, to create an illustrated book that kept *Go!*'s "sentiment" and tracks its overwhelming success as a graduation gift.  (SOF ¶¶ 33, 37.)  Hauman's side by side comparison of the text of both works, (SOF ¶¶ 33, 56), reinforces the point that *Boldly*, which the Court has already held is not parodic, has the same intrinsic purpose and function as *Go!*, to entertain readers with an illustrated book that provides an uplifting message of exploration and

1  growth (which is why both works would appeal to graduates).  Indeed, *Boldly*

2  simply retells *Go!*'s story and conveys *Go!*'s message, using *Star Trek* intellectual

3  property.  (*Id.*)  And, as *Oracle* explains, that Defendants only took portions of the

4  DSE Works and added new illustrations does not "excuse the wrong" of

5  Defendants' copying of Dr. Seuss's original work, as "no plagiarist can excuse the

6  wrong by showing how much of the work he did not pirate."  *Id.*

7      *Oracle* is also instructive on what sorts of "purposes" are considered

8  transformative, *i.e.*, criticism, comment, news reporting, teaching, scholarship, or

9  research.  886 F.3d at 1200-01.  There, Google argued that the purpose of its use, to

10  create a groundbreaking platform for smartphones, was different from Oracle's

11  work's purpose.  This argument failed because Google's use of Oracle's API on its

12  Android platform had the same "intrinsic" purpose and function as the original—

13  shortcuts to build certain functions into their own programs—and thus was not

14  transformative.  *Oracle*, 886 F.3d at 1198; *compare Perfect 10, Inc. v. Amazon.com,*

15  *Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (Thumbnail versions of copyrighted

16  images "highly transformative" because, "[a]lthough an image may have been

17  created originally to serve an entertainment, aesthetic, or informative function, a

18  search engine transforms the image into a pointer directing a user to a source of

19  information" and "serves a different function than the original work.").

20      While Defendants contend that their "mash-up" infuses the DSE Works with

21  a new purpose, and is thus transformative, they are wrong as a matter of law.  Much

22  like Google's use of Oracle's works, Defendants' use of *Go!* has the same intrinsic

23  purpose and function as *Go!* does: providing an illustrated book, with the same

24  uplifting  message that would appeal to graduating high school and college seniors.

25      In sum, because *Boldly* has the same intrinsic purpose and function as the

26  DSE Works, *Boldly* is not transformative.

27          **c.   Defendants Acted In Bad Faith**

28  "[A] party claiming fair use must act in a manner generally compatible with

principles of good faith and fair dealing." *Oracle*, 886 F.3d at 1202. *Oracle* explains that this is because fair use presupposes good faith and fair dealing, and "one who acts in bad faith should be barred from invoking the equitable defense of fair use." *Id*. In *Oracle,* Google's bad faith included intentional copying and proceeding despite knowing that it required a license from Oracle. *Id*. at 1203.

The Court could not consider whether Defendants acted in bad faith in its pre-discovery rulings. Discovery has since shown that Defendants did act in bad faith, extensively copying from *Go!* and working with partners to publish *Boldly* while knowing that they needed and did not have a license. As set forth in Section II(B), prior to and during *Boldly*'s creation, the issue of a license was repeatedly raised between Defendants and by third parties. (SOF ¶¶ 8-12, 16-17, 23-24, 41, 125.) Hauman continued to make legal assertions of fair use to his partners, despite his admission that he never sought advice of legal counsel as to whether the project was actually a "fair use parody." (SOF ¶¶ 17, 114.) Despite his bravado, it is evident that Hauman was aware from the outset that a license was necessary. This evidence of bad faith cuts sharply against fair use. *Oracle*, 886 F.3a at 1202-04.

### d.   *Boldly* Is Derivative of *Go!*

In *ComicMix I*, this Court determined that *Boldly* is transformative because, while the DSE Works "are often copied by *Boldly*," the "copied elements are always interspersed with original writing and illustrations." *ComicMix I*, at 1106. As *Oracle* shows, however, copying only some elements and adding to them does not make a work transformative. Nor did Defendants infuse *Go!* with a different function or intrinsic "purpose" by creating a "mash-up." *Boldly* is rather a "derivative work" of the DSE Works.

Pursuant to 17 U.S.C. § 106(2), a copyright owner has the exclusive rights to create, or authorize the creation of, derivative works based on the work. The Copyright Act defines a derivative work as:

a work based upon one or more preexisting works . . . in

which a work may be recast, *transformed*, or adapted. A work consisting of editorial revisions, annotations, elaborations, *or other modifications which, as a whole, represent an original work of authorship, is a 'derivative work'*.

17 U.S.C. § 101 (emphasis added).

"[A]sking exclusively whether something is 'transformative' not only replaces the list in § 107 but also could override 17 U.S.C. § 106(2), which protects derivative works.  To say that a new use transforms the work is precisely to say that it is derivative and thus, one might suppose, protected under § 106(2)."  *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014); *see also, e.g., Apple, Inc. v. Psystar Corp.*, 673 F. Supp. 2d 931, 938 (N.D. Cal. 2009) (use and modification of Apple copyrights was deemed a violation of a derivative right, and not a fair use).

For a work to be derivative, it "must exist in a concrete or permanent form, and must substantially incorporate protected material from the preexisting work." *MicroStar*, 154 F.3d at 1110-11 (int. quote omitted).

*Boldly* is, without question, an unauthorized derivative work.  It exists in a concrete form (an illustrated book) and substantially incorporates protected material from the DSE Works.  (*See supra* at Sec. III(B)(3).)  "Although derivative works that are subject to the author's copyright transform an original work into a new mode of presentation, such works—unlike works of fair use—take expression for purposes that are not 'transformative.'"  *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 143 (2d Cir. 1998) (*Seinfeld* glossary an unauthorized derivative work, not a fair use, in part because "purpose" of work was not to comment on *Seinfeld* but rather to appeal to its fans).

Indeed, a review of DSE's authorized derivative works demonstrates that *Boldly* is simply an unauthorized derivative work.  As discussed in Section II(A), DSE licensed the publication of several books that are derivative of the DSE Works, including derivatives of *Go!*, and has licensed, and remains open to future,

1    "collabs" or "mash-ups" with other rights holders.  (SOF ¶¶ 155-156.)  Defendants'

2    transformation of *Go!* and the DSE Works is not parodic, *ComicMix I*, at 1108, and

3    such a "collab" is precisely the type that DSE might consider.  (*Id*.)

4         As discovery has shown, *Boldly* is highly commercial, is not transformative,

5    was developed in bad faith, and violates DSE's right to create derivative works.

6    The Court should therefore conclude, on the basis of a full record, that the first fair

7    use factor favors DSE.

8        **2.**     **The DSE Works Are Highly Creative**

9         The DSE Works are indisputably highly creative.  *See Paramount Pictures*,

10   2017 WL83506 at *8.  In *ComicMix I*, the Court found that this second factor

11   favors DSE, and no subsequent precedent or discovery provides a reason to alter

12   this finding.  *ComicMix I,* at 1105.

13       **3.**     **Defendants Admit That They Took More From The DSE**
14               **Works Than Was Necessary**

15        The third factor focuses on the amount and substantiality of the portion used

16   in the context of the copyrighted work, *not* the infringing work.  Indeed, the

17   statutory language makes clear that "a taking may not be excused merely because it

18   is insubstantial with respect to the *infringing* work."  *Harper & Row Publishers v.*

19   *Nation Enterprises,* 471 U.S. 539, 565 (1985).  "[T]he fact that a substantial portion

20   of the infringing work was copied verbatim [from the original work] is evidence of

21   the qualitative value of the copied material, both to the originator and to the

22   plagiarist who seeks to profit from marketing someone else's copyrighted

23   expression."  *Id.*

24        In *ComicMix I*, the Court found that although *Boldly* copies "many aspects"

25   of *Go!* and the other DSE Works, the third factor cuts in favor of fair use because

26   Defendants added new content and took only what was necessary for their purpose.

27   *ComicMix I,* at 1107.  As *Oracle* makes clear however, Defendants' addition of

28   new content stolen from another copyright holder (*Star Trek* trademarks and

references) does not lessen the substantiality of the taking from DSE. *Oracle*, 886 F.3d at 1201. Defendants justify their use in the name of a "parody mash-up," but the Court found that *Boldly* is not a parody, and no precedent exists for the idea that taking highly-recognizable works and adding new copyrighted content from another nonconsenting owner somehow results in a fair use. *See Oracle*, 886 F.3d 1206-1207 ("[T]here is no inherent right to copy in order to capitalize on the popularity of the copyrighted work" and "[t]aking those aspects . . . that were familiar to software developers to create a similar work designed to be popular with those same developers is not fair use.") (citing *Dr. Seuss Enters. v. Penguin Book USA*, 109 F.3d 1394, 1401 (9th Cir. 1997)).

Even if a "mash-up" were a protected form of fair use, Defendants took far more from *Go!* than they needed to create a Dr. Seuss-*Star Trek* mash-up, as their own admissions show. Gerrold told his co-defendants that "there is a way out of this," explaining:

> A lot of our artwork is based on Dr. Seuss's artwork. What if we did whole new artwork, not specifically based on any individual drawing by Seuss, but close enough to his style to match the text. *If we replace the stuff that's too dead on – yes, its extra work for Ty,* but it really weakens their case.

(SOF ¶ 123.) (emphasis added.) Templeton responds to this e-mail by acknowledging his "slavish[]" copying and pointing out that "[i]n my original layouts for our book, I was ignoring the layouts for [*Go!*], and just trying for a Suessian [sic] art style," and offering to revert to those layouts, "if it helped." (*Id.*) Defendants thus admit that they could have taken far less from *Go!* to create a "mash-up." But they did not: they wanted to "avoid the drudgery in working up something fresh"—or, as Gerrold phrases it, avoiding "extra work for Ty"—and instead used as much as possible of Dr. Seuss's creativity. *Dr. Seuss Enters.*, 109 F.3d at 1401.

In light of this evidence, the third factor weighs heavily against fair use.

-21-

### 4. *Boldly* Harms the Marketplace for *Go!* and its Derivatives, including Authorized Collaborative Works

In *ComicMix I and II*, the Court found that this factor favored DSE. *ComicMix I*, at 1108, *ComicMix II*, at 1080-1082 .  The developed record shows even more strongly the adverse effects of *Boldly* and works like *Boldly* on the actual and potential markets for authorized collaborative works incorporating elements of *Go!*.  The Court should thus again rule in DSE's favor on this "single most important element of fair use."  *Harper &*, 471 U.S. at 566 .

For this factor, courts "consider not only the extent of market harm caused by … the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact [of market substitution] for the original" and for derivative works.  *Campbell*, 510 U.S. at 587, 590 (internal quotation marks and alteration omitted).  "A court can therefore consider the challenged use's impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets."  *Oracle*, 886 F.3d at 1208)(int. quote omitted).  "Also relevant to the inquiry is the fact that a copyright holder has the exclusive right to determine "when, whether and in what form to release the copyrighted work into new markets, whether on its own or via a licensing agreement."  *Oracle,* 886 F.3d at 1208 (int. quote omitted).  "Indeed, the Ninth Circuit has recognized that '[e]ven an author who had disavowed any intention to publish his work during his lifetime' was entitled to copyright protection because: (1) 'the relevant consideration was the 'potential market' and (2) 'he has the right to change his mind.'"  *Id.* (quoting *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110 (9th Cir. 2000)); *see also Micro Star*, 154 F.3d at 1113 (Only the copyright holder "has the right to enter that market; whether it chooses to do so is entirely its business").

*Go!* is a favorite and best-selling gift for graduating students, and *Boldly* was designed to target the same market.  (SOF ¶¶ 100-101, 140, 147.)  Defendants

1   intended to market Boldly as a "48 pages, 8.5x11," hardcover book "to match the

2   look and feel of Seuss books," and Gerrold even admitted that looking at *Boldly*'s

3   cover leads one to think it "looks like it is a Star Trek children's book that has a Dr.

4   Seuss style or you could even say it looks like it was produced by Dr. Seuss…."

5   (SOF ¶ 99.) ████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████████████████

7   ████████████████████████   (SOF ¶ 74.)  Hauman planned to get *Boldly* to ThinkGeek

8   "in time for school graduations."  (SOF ¶ 120.)  Indeed, even after this action was

9   filed, ThinkGeek contacted Hauman because it would "LOVE to be able to offer

10  [it] for Graduation . . ."  (SOF ¶ 102.)  *Boldly* was intended to compete with, and

11  thus supplant, *Go!* in the market for graduation gifts, and, given the enduring

12  popularity of *Star Trek* over the last 50 years, it is reasonable to assume that some

13  prospective *Go!* buyers would instead buy *Boldly* because the purchaser or the gift

14  recipient is a *Star Trek* fan.  "Under these facts, Defendants evidently intend for

15  their work to effectively function as a market substitution to [*Go!*]."  *Paramount*,

16  2017 WL 83506, at *9.

17       DSE has also published several books that are derivative of the DSE Works,

18  including derivatives of *Go!*.  (SOF ¶ 141.)  DSE also works with other rights

19  holders on collaborations that combine Dr. Seuss's works with another property to

20  create new works.  (SOF ¶¶ 153-156.)  Combining the DSE Works with *Star Trek*

21  intellectual property to create a new illustrated work is exactly the type of "collab"

22  project that DSE might license.  (*Id*.)  DSE, as the copyright holder, has the

23  exclusive right to create (or reject) such a "collab" with CBS/Paramount.  *See*

24  *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1182 (9th Cir. 2012).  DSE

25  carefully selects and rejects its projects, and chooses whether to enter a market, or

26  not, depending on the circumstances.  (SOF ¶¶ 128-129, 156.)  That DSE has not

27  yet collaborated with CBS/Paramount  certainly does not entitle Defendants to

28  "usurp" that opportunity from DSE.

1    Finally, *Boldly* would not only preempt sales of *Go!* and its derivatives, but if

2    third parties could freely create collaborative mash-ups without permission of the

3    affected copyright holders, DSE would not be the only one harmed: the entire

4    market for authorized collaborative works would be threatened.  *Campbell*, 510

5    U.S. at 587, 590.

6        In light of the above, Defendants' creation of *Boldly* presents a substantial

7    risk of harm to the market for *Go!* and to DSE's derivative market.  Defendants'

8    conduct, if left unchecked, would permit Defendants and other third parties to

9    infringe upon DSE's market, and create works based on, and substantially similar

10   to, the DSE Works.  This would seriously harm DSE's robust licensing program.

11       In sum, all four factors weigh against fair use.  Defendants' copyright

12   infringement of the DSE Works is unexcused and established as a matter of law.

13   **C.    Defendants Willfully Infringed the DSE Works**

14       DSE seeks statutory damages for Defendants' infringement of the DSE

15   Works.  (ECF No. 39 at 27.)  Under § 504(c)(2) of the Copyright Act, a court may

16   increase an award of statutory damages for copyright infringement upon a showing

17   of willfulness.  To prove willfulness, DSE must show (1) that Defendants were

18   actually aware of their infringing activity, *or* (2) that their actions were the result of

19   "reckless disregard" for, or "willful blindness" to, the copyright holder's rights.

20   *Kaseberg v. Conaco, LLC*, 260 F. Supp. 3d 1229, 1248 (S.D. Cal. 2017) (quoting

21   *Washington Shoe Co. v. A-Z Sporting Goods Inc*., 704 F.3d 668, 674 (9th Cir.

22   2012) (quoting *Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc*., 658 F.3d 936,

23   944 (9th Cir. 2011)).  "As we have repeatedly held, a finding of willful

24   infringement does not require a showing of actual knowledge; a showing of

25   recklessness or willful blindness is sufficient."  *Unicolors, Inc.*, 853 F.3d at 992.

26   Where the relevant facts are undisputed, willfulness can be appropriately resolved

27   on summary judgment.  *Id*.

28       At the very least, Defendants demonstrated a reckless disregard for DSE's

rights.  Defendants, led by Hauman: (1) recognized the need for a license yet went forward without one, even when questioned about licenses by third parties; (2) never consulted a lawyer as to whether *Boldly* was indeed a fair use; (3) ignored DSE's letters in order "to keep the [publishing] schedule"; (3) opted for a version of *Boldly* that "meticulously" copied *Go!* despite discussed alternatives; and even (4) publicly acknowledged that they might get sued and "might even lose."  (SOF ¶¶ 8-12, 16-19, 23-24, 41, 48, 66, 112, 125)  *See, e.g., Fabric Selection, Inc. v. NNW Import, Inc.*, 2018 WL 1779334, at *10 (C.D. Cal. Apr. 11, 2018) ("[R]ecklessness or willful blindness is typically demonstrated … when a defendant ignores a warning letter sent by plaintiff's counsel.") (citing NIMMER ON COPYRIGHT § 1404[B][3][a]); *Twentieth Century Fox Film Corp. v. Dastar Corp*., 2000 WL 35503106, at *10 (C.D. Cal. Aug. 29, 2000) (Defendants acted willfully as they "did not consult with a lawyer to determine whether the release … would infringe anyone's rights—although they falsely represented to plaintiffs that they had.").

Defendants plowed ahead, stubbornly maintaining the untenable position that *Boldly* was a fair use.  But willful blindness to the law is not good faith, because a defendant must take "reasonable steps to assure fair use before infringement." *Bridgeport Music, Inc. v. UMG Recordings, Inc*., 585 F.3d 267, 279 (6th Cir. 2009); *see also, e.g., Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1382 (2d Cir. 1993) (affirming willfulness finding where defendant contended that it knowingly copied in the belief that it was engaging in fair use). Defendants here took no steps to assess whether their guess that *Boldly* was a "parody" was a reasonable interpretation of the law.  Accordingly, as Defendants' infringement was willful as a matter of law, DSE should be awarded enhanced statutory damages of $30,000-150,000 per DSE Work infringed, along with DSE's attorneys fees.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant DSE summary judgment.

1

2      Dated:  Dec. 11, 2018                    Respectfully submitted,

3                                              By  /s/ Tamar Duvdevani
                                                  TAMAR DUVDEVANI
4                                                 DLA Piper LLP (US)

5                                              *Attorneys for Plaintiff*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 11, 2018, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/ECF registrants.

_/s/ Tamar Duvdevani_
Tamar Duvdevani