GINA L. DURHAM (Bar No. 295910)
gina.durham@dlapiper.com
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, California 94105-2933
Tel: 415.836.2500
Fax: 415.836.2501

STANLEY J. PANIKOWSKI (Bar No. 224232)
stanley.panikowski@dlapiper.com
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
Tel: 619.699.2700
Fax: 619.699.2701

ANDREW L. DEUTSCH (Bar No. 319286)
andrew.deutsch@dlapiper.com
DLA PIPER LLP (US)
2000 Avenue of the Stars
Suite 400, North Tower
Los Angeles, CA 90067-4704
Tel: 310.595.3000
Fax: 310.595.3300

Tamar Y. Duvdevani (admitted *pro hac vice*)
tamar.duvdevani@dlapiper.com
Marc E. Miller (admitted *pro hac vice*)
marc.miller@dlapiper.com
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: 212.335.4500
Fax: 212.335.4501

Ryan Compton (admitted *pro hac vice*)
ryan.compton@dlapiper.com
James Stewart (admitted *pro hac vice*)
james.stewart@dlapiper.com
DLA PIPER LLP (US)
500 Eight Street, NW
Washington, D.C. 20004
Tel: 202.799.4000
Fax: 202.799.5000

*Attorneys for Plaintiff*
*Dr. Seuss Enterprises, L.P.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DR. SEUSS ENTERPRISES, L.P., a California limited partnership,

Plaintiff,

v.

COMICMIX LLC, a Connecticut limited liability company; MR. GLENN HAUMAN, an individual; MR. DAVID JERROLD FRIEDMAN A/K/A DAVID GERROLD, an individual; and MR. TY TEMPLETON, an individual,

Defendants.

Case No. 16-cv-02779 JLS BGS

**PLAINTIFF DR. SEUSS ENTERPRISES L.P.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date: January 31, 2019
Time: 1:30 pm
Courtroom: 4D
Judge: Hon. Janis L. Sammartino

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................... 1

II.  FACTS NOT SUBJECT TO GENUINE DISPUTE ................................... 3

    A.   The DSE Intellectual Property ....................................................... 3

    B.   Defendants' Infringing Conduct .................................................... 5

    C.   The Unrebutted Poret Likelihood of Confusion Survey ................ 8

    D.   Defendants' Unreliable Expert Witness ......................................... 9

III. ARGUMENT .......................................................................................... 10

    A.   The Court Should Grant Summary Judgment To DSE on its
        Copyright Claims ......................................................................... 10

        1.   *Boldly* Infringes DSE's Copyrights ................................... 10

        2.   *Boldly* Is Not A Fair Use of DSE's Protected Expression ........ 10

            a.   The First Three Fair Use Factors Favor DSE ............... 10

            b.   The Fourth Factor Also Favors DSE ............................ 11

    B.   The Court Should Deny Defendants' Summary Judgment
        Motion Relating to DSE's Trademark Claims .............................. 15

        1.   Legal Standard For Trademark Infringement ......................... 15

        2.   DSE Owns Protectable Rights in the DSE Marks ................... 15

        3.   The *Rogers* Test And The First Amendment Do Not
            Shield Defendants From DSE's Infringement Claims ............ 22

IV.  CONCLUSION ...................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Am., Inc. v. Skechers USA, Inc.*,
5       890 F.3d 747 (9th Cir. 2018)...........................................................................17

6

*Bach v. Forever Living Products U.S., Inc.*,
7       473 F. Supp. 2d 1110 (W.D. Wash. 2007)......................................................19

8

*Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*,
9       2009 WL 10674087 (S.D. Cal. May 12, 2009)...........................................18, 19

10

*Brown v. Electronic Arts, Inc.*,
        724 F.3d 1235 (9th Cir. 2013)........................................................................25
11

12

*Campbell v. Acuff-Rose Music, Inc.*,
        510 U.S. 569 (1994)..................................................................................12, 13
13

14

*Castle Rock Entm't, Inc. v. Carol Pub. Grp.*,
        150 F.3d 132 (2d Cir. 1998).............................................................................14

15

*Daimler AG v. A-Z Wheels LLC*,
16       334 F. Supp. 3d 1087 (S.D. Cal. 2018) ..........................................................15

17

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
18       539 U.S. 23 (2003)..........................................................................................16

19

*Dr. Seuss Enter., L.P. v. ComicMix LLC*,
20       300 F. Supp. 3d (S.D. Cal. 2017) .............................................................17, 18

21

*Dr. Seuss Enter., L.P. v. ComicMix LLC*,
22       256 F. Supp. 3d 1099 (S.D. Cal. 2017) ...........................................................11

23

*E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*,
        547 F.3d 1095 (9th Cir. 2008)....................................................................19, 25
24

25

*Elliott v. Google, Inc.*,
        860 F.3d 1151 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 362 (2017)..................21

26

*Entrepreneur Media, Inc. v. Smith*,
27       279 F.3d 1135 (9th Cir. 2002).........................................................................15

28

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*,
198 F.3d 1143 (9th Cir. 1999)..................................................................16

*Galerie Furstenberg v. Coffaro*,
697 F. Supp. 1282 (S.D.N.Y. 1988) .......................................................20

*Gordon v. Drape Creative, Inc.*,
909 F.3d 257 (9th Cir. 2018).............................................................passim

*Gordon v. Drape Creative, Inc.*,
No. 15 Civ. 4905, ECF No. 94 ...............................................................22

*Guadiana v. State Farm Fire & Cas. Co.*
2009 WL 3763693 (D. Ariz. Nov. 10, 2009).........................................11

*Harlequin Enterprises Ltd. v. Gulf & Western Corp.*,
644 F.2d 946 (2d Cir. 1981)....................................................................20

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985)................................................................................12

*Hartford House, Ltd. v. Hallmark Cards, Inc.*,
846 F.2d 1268 (10th Cir. 1988)..............................................................20

*Hughes v. Design Look Inc.*,
693 F. Supp. 1500 (S.D.N.Y.1988) ........................................................20

*LandscapeForms, Inc. v. Columbia Cascade Co.*,
113 F.3d 373 (2d Cir. 1997)....................................................................20

*Leigh v. Warner Bros., a Div. of Time Warner Entertainment Co., L.P.*,
10 F. Supp. 2d 1371 (S.D. Ga. 1998), *aff'd in part, rev'd in part on
other grounds*, 212 F.3d 1210 (11th Cir. 2000) .....................................20

*Lombardo v. Dr. Seuss Enterprises, L.P.*,
729 F. App'x 131 (2d Cir. 2018)............................................................14

*Moldex-Metric, Inc. v. McKeon Products, Inc.*,
891 F.3d 878 (9th Cir. 2018)..................................................................16

1
2

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

**Page(s)**

3
4

*Monge v. Maya Magazines, Inc.*,
   688 F.3d 1164 (9th Cir. 2012)...........................................................10

5
6

*Munro v. Lucy Activewear, Inc.*,
   2016 WL 5660422 (D. Minn. Sept. 29, 2016), aff'd in part, rev'd in
   part 899 F.3d 585 (8th Cir. 2018)......................................................20

7
8

*Paramount Pictures, Corp. v. Axanar Productions, Inc.*,
   2017 WL 83506 (C.D. Cal. Jan. 3, 2017) .....................................12, 14

9
10

*Peralta v. Dillard*,
   744 F.3d 1076 (9th Cir. 2014).............................................................11

11
12

*Qualitex Co. v. Jacobson Products Co., Inc.*,
   514 U.S. 159 (1995).............................................................................16

13
14

*Romm Art Creations Ltd. v. Simcha Intern., Inc.*,
   786 F. Supp. 1126 (S.D.N.Y. 1992) .............................................18, 19

15
16

*Salinger v. Colting*,
   641 F. Supp. 2d 250 (S.D.N.Y. 2009) .................................................14

17
18

*Salinger v. Random House, Inc.*,
   811 F.2d 90 (2d Cir. 1987)...................................................................14

19

*Skydive Arizona, Inc. v. Quattrocchi*,
   2009 WL 6597892 (D. Ariz. Feb. 2, 2009).........................................16

20
21

*Star Indus., Inc. v. Bacardi & Co.*,
   412 F.3d 373 (2d Cir. 2005).................................................................21

22
23

*The Coca-Cola Co. v. Gemini Rising*,
   346 F. Supp. 1183 (E.D.N.Y. 1972).....................................................21

24
25

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
   768 F.2d 1001 (9th Cir. 1985)..............................................................16

26
27

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992).............................................................................16

28

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Vision Sports, Inc. v. Melville Corp*.,
　888 F.2d 609 (9th Cir. 1989) ............................................................................... 18

*Warner Bros. Entm't v. Global Asylum, Inc.*,
　2012 WL 6951315 (C.D. Cal. Dec. 10, 2012), *aff'd without
　published opinion,* 2013 WL 5814731 (9th Cir. Oct. 30, 2013) ......................... 18

**STATUTES**

15 U.S.C. § 1125(a) ...................................................................................... 16, 20

15 U.S.C. § 1127 .................................................................................................. 16

**OTHER AUTHORITIES**

2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:59 (5th
　ed. 2018) ............................................................................................................ 21

# I.   INTRODUCTION

In their motion for summary judgment, Defendants ask the Court to find that (1) their extensive taking from DSE's copyrighted works is fair use and (2) their copying of Dr. Seuss's unique illustration style and distinctive font is not trademark infringement, either because the style and font are not legally protected or because the *Rogers* exception to infringement applies.  These arguments fail, because they misconstrue the law and ignore the facts developed in discovery.  The Court should deny Defendants' summary judgment motion, and grant partial summary judgment in DSE's favor that (1) Defendants have infringed DSE's copyrights, and (2) the DSE Marks are valid and protectable.

Defendants, who bear the burden of proof on copyright fair use, initially argue that the Court's analysis of the first and third fair use factors, at the pleading stage, is "settled."  This is not the law.  A court is not bound on summary judgment by its prior rulings on a motion to dismiss, where the only question presented was whether the complaint pleads a plausible claim.  Moreover, fair use is inherently a factual inquiry, and the factual record developed in discovery shows that all four factors strongly favor DSE's position, and that no reasonable juror could excuse Defendants' infringing conduct as a fair use.

In particular, Defendants fail to carry their burden on the "most important" fourth factor: the negative impact on actual and potential markets for Dr. Seuss books and derivatives were Defendants and others allowed to infringe at will.  DSE has provided ample proof of likely economic harm, including a history of licensing collaborative derivative works where Seuss creations appear in the same work as other parties' creations, just as *Oh, The Places You'll Boldly Go!* ("*Boldly*") intermingles Seuss and *Star Trek*.  DSE has also shown that Defendants intentionally aimed *Boldly* at DSE's *Oh, The Places You'll Go!*'s ("*Go!*") core graduation market, and planned to sell *Boldly* in the same channels of trade, demonstrating that *Boldly* would likely usurp a material portion of that market.

Defendants ignore these facts and counter with the unsworn and inadmissible opinions of their proffered expert, Joshua S. Gans.  But as set forth in DSE's *Daubert* motion, Gans's opinions are unsupported by facts and follow no accepted methodology for assessing market impact.  Gans's unreliable opinions should be excluded, and the Court should find that the fourth factor strongly favors DSE.

On DSE's trademark infringement claims, Defendants contend that unique illustration styles and distinctive fonts cannot function as trademarks.  The law, however, says that they can be protectable trademarks if they have acquired secondary meaning.  The factual record shows ample evidence of secondary meaning: the consuming public strongly associate Seuss's illustration style, and the font consistently used by him and DSE, with Seuss and no other source.

Nor can Defendants argue that *Rogers* protects their deliberate trademark use, in light of the Ninth Circuit's recent decision in *Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018).  *Gordon* reversed an order dismissing a trademark infringement claim on *Rogers* grounds.  It held that use of another's mark in an expressive work may be "explicitly misleading," and therefore infringing, without an affirmative statement that the mark owner authorized the use. *Gordon* held that where the junior user uses the mark in the same market and "similar artistic expressions" as the senior user, this usage has an "especially strong" potential to mislead consumers.  This case presents just such a scenario, as Defendants deliberately used the DSE Marks without material alteration, and used these marks in the same way as Seuss did, and DSE does—to denote the source of books and other licensed goods—and on works that were intended to compete in the same market as Seuss's works, namely as gifts for graduating students.

For these reasons, discussed in detail below, Defendants' motion for summary judgment should be denied in its entirety, and partial summary judgment entered in DSE's favor that (1) Defendants have infringed DSE's copyrights, and (2) the DSE Marks are valid and protectable.

## II.   FACTS NOT SUBJECT TO GENUINE DISPUTE

### A.   The DSE Intellectual Property

DSE is the owner, by assignment, of the intellectual property relating to the works of Theodor S. Geisel, the author and illustrator of the books written under the pseudonym "Dr. Seuss."  (Statement of Additional Undisputed Material Facts ("SOAF") ¶ 1.)  Geisel wrote and illustrated the copyrighted works at issue here: *Go!*; *How the Grinch Stole Christmas!* ("*Grinch*"); and *The Sneetches and Other Stories* (collectively, the "DSE Works").  (ECF No. 107-2 ("SOF") ¶¶ 2-7.)

DSE claims protectable rights in the Unregistered Dr. Seuss Marks, defined in its First Amended Complaint as: "(1) the title OH, THE PLACES YOU'LL GO!; (2) the stylized font used consistently on the front and back covers, spine, and title page of the Dr. Seuss books such that this use of the stylized font has come to be recognized by consumers as a source identifier for Dr. Seuss; and (3) the unique illustration style of the characters and backgrounds found throughout Dr. Seuss books."  (ECF No. 39 at ¶17.)  On May 21, 2018, the Court granted in part Defendants' motion for partial judgment on the pleadings, dismissing DSE's trademark claims as they relate to Defendants' unauthorized use of the title OH, THE PLACES YOU'LL GO!.  (ECF No. 89.)  DSE's trademark claims on the remaining Unregistered Dr. Seuss Marks—the "Seussian style" and the "Seussian font" (collectively, the "DSE Marks")—proceeded through discovery.[1]

DSE oversees a robust publishing program, working closely with its publishers as well as with consumer product companies that utilize DSE's intellectual property.  (SOF ¶¶ 128-137.)  As part of this program, DSE licenses authors and illustrators to publish additional works under the Dr. Seuss brand

---

[1] "Seussian style" refers to the unique illustration style of the characters and backgrounds found throughout Dr. Seuss books and "Seussian font" refers to the stylized font used consistently on the front and back covers, spine, and title page of the Dr. Seuss books.  (ECF No. 39 at ¶ 17.)

utilizing, among other DSE trademarks, the DSE Marks.  (*Id.*)  DSE has also

licensed book collaborations, such as the *Wubbulous World of Dr. Seuss*, which

combine Seuss works with another party's property.  (SOF ¶ 150-155.)  These

works utilize indicia, including the DSE Marks, that signal to consumers that DSE

is the source.  (*Id.*; SOAF ¶ 25.)  DSE asserts close quality control over its licensed

partners to ensure that their books and other products are of a consistent and high

level of style and quality.  (SOF ¶¶ 128-131; SOAF ¶¶ 2-3.)  As DSE's President,

Susan Brandt, explained, "████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████"  (SOAF ¶ 2.)

DSE is also in the entertainment business, licensing its intellectual property

for use in films, television, stage productions, theme parks, and museum

exhibitions.  (SOF ¶ 138.)  DSE's product licensing and merchandising program

offers a wide array of goods bearing DSE's trademarks, including the DSE Marks.

(SOF ¶¶ 138-139, 144.)  In 2017, market research firm NPD named DSE the top

licensed book brand.  (SOF ¶ 159.)

Given its obligations as a trademark owner to maintain consistency across its

licensees' use of its trademarks, DSE created a Style Guide for its licensees and

partners, which provides extensive direction on maintaining and meeting the

Seussian style.  (SOAF ¶¶ 6-16; 18-22.)  The consistent look and style of its

licensees' books and other products is so vital to DSE to denote the Dr. Seuss brand

that DSE also has specific style guides that instruct on the permissible colors,

designs, and images for the licensed work.  (*Id.*)

As a result of this consistency across works, the Seussian style is so well-

known by the consuming public that "Seussian" is defined by Merriam-Webster as

"of, relating to, or suggestive of the works of Dr. Seuss (Theodore Geisel)

especially: having a playfully inventive or outlandish quality typical or reminiscent

of the … images found in children's stories like *The Cat in the Hat* and *How the Grinch Stole Christmas*."  (SOAF ¶ 23.)

The Seussian style is evident when looking at Dr. Seuss's body of work, including *Go!*.  (SOAF ¶ 24.)  Examples of elements that comprise the style include: (1) the appearance of his characters, including their "half-moon" pupils, unique button noses, and hair drawn to give the appearance of "moving forward," their faces almost always drawn at three-quarter profile or complete profile, with distinctive, pear-shaped bodies; (2) his distinctive line weight, shading, cross-hatching, patterns, and color combinations; (3) his use of surrealistic architecture and machinery; and (4) the appearance of his backgrounds and his landscapes, such as mountains drawn like waves of water and organic shrubbery and trees.  (SOF ¶ 52; SOAF ¶ 17.)  As defendant Hauman testified when acknowledging the distinctiveness of the Seussian style: "you know it when you see it."  (SOAF ¶ 30.)

DSE's Style Guide also ███████████████████████████████████ ███████████████████████████████" which are based on the hand-lettered titles that Dr. Seuss drew for the cover art to each of his books.  (SOAF ¶¶ 4-5, 11-13.)  These fonts are "unique and proprietary" to DSE.  (*Id*.)  DSE and its licensees use these fonts consistently across books, DSE's website, and on licensed products and packaging to indicate that DSE is the source of the goods.  (*Id*.)

## B.    Defendants' Infringing Conduct

When Hauman was contemplating ideas for his Star Trek primer, he told defendant Gerold that "what we can do as a parody…is pretty dang broad as long as we aren't doing *too much* trademark infringement."  (SOF ¶ 11 (emphasis added.))  In creating *Boldly*, Defendants made a concerted effort to utilize the DSE Marks to ensure that *Boldly* would "match the look and feel of Seuss books," and appear to the consumer as though it was a "50th Anniversary reprinting of a classic children's book, as if it had existed in the past."  (SOF ¶¶ 8, 36, 37, 49-50, 52-55, 60, 84; SOAF ¶¶ 36-42, 43-46.)  Hauman searched for an illustrator that could "draw in a

Seussian style" because he "wanted to make sure that [Defendants] worked with the style of [*Go!*]" in order for *Boldly* to be "[e]vocative of Dr. Seuss." (SOAF ¶¶ 26, 31-36, 42.) Hauman admitted that he "certainly intended" for *Boldly* to be "Seussian," and that "Seuss's artwork is expressive in a particular way." (*Id*.)

Hauman chose defendant Templeton to illustrate *Boldly* because Hauman considered Templeton adept at copying other artists' styles. (SOAF ¶¶ 27, 34.) Templeton made sure that his illustrations for *Boldly* were in the "Seussian" style by sending to the other Defendants his "prelim and rough sketches," showing his "attempts at learning how to Seuss up" the characters. (SOAF ¶ 35.) Templeton testified that Hauman instructed him to make his illustrations "closer to" *Go!* and so he "started matching drawings from the original." (SOF ¶¶ 36-37.) Templeton "practiced how to illustrate in Dr. Seuss's illustration style," and by the time he was nearly finished with *Boldly*, he had rounded out his mastery of the "Seussian style" by reviewing "twenty Seuss books and counting." (SOAF ¶¶ 28-31, 38-39.)

Throughout *Boldly*, Templeton copied the "look and feel" of the Seussian style, which Defendants admit is distinctive. (SOAF ¶¶ 36-37.) He added "flat colors" for "a Seussian look" and copied the "Seussian art style," including by: (i) adopting Dr. Seuss's "physical movement state" in order to use Seuss's unique technique of "cross-hatching" in "a similar way"; (ii) drawing eyes in the same way as Seuss; (iii) adopting Seuss's "fondness for the button nose"; (iv) drawing trees with "big long loopy circles"; and (v) adopting Seuss's "imprecise quality" in drawing circle and lines, among many other techniques that make Seuss's works uniquely Seussian. (SOAF ¶¶ 39, 48; SOF ¶ 52.) Templeton frankly said that "I did, in fact, slavishly copy from Seuss," in illustrating *Boldly*. (SOF ¶ 54.)

To complete their deliberate copying, Defendants used a "version of the Doctor Soos font"—an unauthorized third party font that imitates the recognizable hand-lettering that Dr. Seuss created for his books—for the title and Gerrold's and Templeton's names on a mockup of *Boldly*'s cover. (SOAF ¶¶ 41-42.) Hauman

testified that he chose this font because it was "deliberatively evocative of a Seussian style" and had a "similarity to existing Dr. Seuss samples." (*Id.*)  Hauman then "modified" the Doctor Soos font to make it look even more "Seussian." (*Id.*)  For *Boldly*'s cover, Templeton drew the lettering by hand, copying "as a model" the font on *Go!*'s cover.  (SOAF ¶ 43.)

When *Boldly* was being finalized for printing with Defendants' original publishing partner, Andrews McMeel Publishing ("AMP"), an AMP editor asked Hauman whether the cover was "going to be the same image as shown in the proposal or…one that more closely resembles the original [*Go!*]." (SOAF ¶ 45.) Hauman sent a modified cover of *Boldly*, placing it side-by-side with *Go!* and stated "[p]retty close to what you see, which is pretty darn close to the original." (*Id.*)  And Gerrold admitted that, looking at *Boldly*'s cover, "you could even say it looks like it was produced by Dr. Seuss."  (SOAF ¶ 46.)

Defendants knew that *Go!* was a book marketed as a gift for graduates, and admitted their intent for *Boldly* to target DSE's market for *Go!*, the perennial best-selling book on *The New York Times* Best Sellers list during graduation season. (SOAF ¶¶ 49-52.)  Defendants' prospective publisher saw graduation as *Boldly*'s primary market, too, and described the target for *Boldly* as "███████████████ ██████████████████████████████████████████████████████████." (SOF ¶¶ 72-76, 79; SOAF ¶ 53.)  After Defendants and AMP reached an agreement to publish *Boldly*, AMP selected on ██████████████████████████ ██████████████████████████████" (SOF ¶ 91; SOAF ¶ 53.)

AMP backed out of its agreement to publish *Boldly*, so Defendants pushed another third-party, ThinkGeek, to publish before graduation season arrived.  (SOF ¶¶ 116-126.)  Hauman did not promptly notify ThinkGeek about DSE's claims, rationalizing to the other Defendants, "[i]f we have to pull the order from [ThinkGeek], we can smooth things over with them by explaining that we're dealing with legal matters and didn't want to expose them to it, which I'm sure

they'll appreciate, and they'll have new orders in time for school graduations."
(SOF ¶ 121.)  ThinkGeek was eventually notified of the instant litigation, and on
February 2, 2017, ThinkGeek and Hauman discussed the prospects of offering
*Boldly* in time for graduation. (SOF ¶ 103.)  Defendants also planned to offer
*Boldly* for sale at the same retailers as DSE's books, including Barnes & Noble and
Amazon.  (SOAF ¶¶ 49-50.)

### C.   The Unrebutted Poret Likelihood of Confusion Survey

DSE has also provided substantial evidence showing that Defendants'
deliberate use of the DSE Marks is likely to cause consumer confusion.  DSE's
expert, Hal Poret, provided a report dated September 27, 2018 (the "Poret Report"),
which is unrebutted.  (SOAF ¶ 55.)  Mr. Poret describes the consumer survey that
he designed and conducted in order to test the extent to which *Boldly*'s illustration
style and font "causes prospective consumers to mistakenly believe that the work is
created or published by Seuss or that it is sponsored or endorsed by Seuss."  (SOAF
¶ 56.)  The survey had a Test Group, who saw *Boldly*, and a Control Group, who
saw an altered version of *Boldly* created under Mr. Poret's direction by an artist
retained by DSE (the "Control Work").  (SOAF ¶¶ 57-58.)  The Control Work
includes the identical title, story, and prose as *Boldly* (and even its disclaimer), but
employs an illustration style and font that does not use the DSE Marks.  (SOAF ¶
58.)  Examples of the Control Work, as compared to *Boldly*, are seen below:

/////
/////
/////
/////
/////
/////
/////
/////

| *Boldly* | Control Work |
|---|---|



The Control Group and Control Work were used to isolate and eliminate consumer confusion that could arise for reasons other than use of the DSE Marks, such as similarities in title, story or other prose.  (SOAF ¶ 59.)  After exposure to the specific work, the Test Group was asked who they believed created, sponsored or endorsed *Boldly*, and the Control Group was asked who they believed created, sponsored or endorsed or the Control Work.  (SOAF ¶¶ 60-62.)

The survey results demonstrate a statistically and legally significant finding of consumer confusion.  39.7% of the Test Group registered as confused as to source, compared with 15.7% of the Control Group.  (SOAF ¶¶ 63-64.)  Subtracting the latter as "noise," Mr. Poret found a final net confusion rate of 24%.  (SOAF ¶ 65.)  Mr. Poret thus concluded that "the illustration style and font of *Boldly* creates a substantial likelihood of confusion with respect to Dr. Seuss."  (SOAF ¶ 66.)

### D.    Defendants' Unreliable Expert Witness

Defendants designated Joshua S. Gans, an Australian citizen who teaches economics in Canada, as their sole expert in this case.  (ECF No. 104-4 at 2.)  The

subject of Gans's proposed opinions is "what likely effect [*Boldly*] will have on the potential market for or value of certain works by Dr. Seuss … and licensed derivative works thereof." (*Id*. at 4.)  Gans does not offer any opinion in support of Defendants' defense to DSE's trademark claims. (*Id*.)  Because Gans's proposed opinions do not even meet the minimum standards of reliability for admissible expert testimony under the Federal Rules of Evidence and *Daubert*, DSE has moved to exclude him and his proposed opinions from this case.[2]  (ECF No. 104.)

## III.   ARGUMENT

### A.    The Court Should Grant Summary Judgment To DSE on its Copyright Claims

#### 1.    *Boldly* Infringes DSE's Copyrights

As shown in DSE's motion for summary judgment, there is no genuine dispute that: (1) DSE owns valid copyrights in the DSE Works; and (2) Defendants directly and substantially copied from the DSE Works to create *Boldly*.  (ECF No. 107 at Sec. III(A).)  Having moved on only their fair use defense, Defendants effectively concede DSE's *prima facie* case of infringement: in this Circuit, "[t]his affirmative defense presumes that unauthorized copying has occurred, and is instead aimed at whether the defendant's use was fair." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2012).  "As with all affirmative defenses, [Defendants] bear the burden of proof." *Id*.  And because Defendants have not carried their burden and DSE has established in its motion that no fair use defense is available, the Court should deny Defendants' motion and grant DSE's motion.

#### 2.    *Boldly* Is Not A Fair Use of DSE's Protected Expression

##### a.    The First Three Fair Use Factors Favor DSE

Defendants conclude, without supporting authority or even rationale, that the

---

[2] As set forth in DSE's contemporaneously-filed motion to strike, the Gans expert reports are also unsworn and, therefore, inadmissible.

"Court's analysis of three of the four statutory fair use factors is settled" and may not be revisited on summary judgment.  (Br. at 7.)  To the extent Defendants are relying on the "law of the case" doctrine for this conclusion, they are wrong. Rulings made on a motion to dismiss consider only whether the well-pleaded allegations of a complaint state a claim.  Because a summary judgment motion considers the entire evidentiary record developed in discovery, prior rulings have no binding effect.  *Peralta v. Dillard*, 744 F.3d 1076, 1088 (9th Cir. 2014).

As explained by *Guadiana v. State Farm Fire & Cas. Co.*:

> [L]aw of the case ordinarily does not apply to issues raised on summary judgment after they were rejected on a motion to dismiss because motions for summary judgment are subject to a different standard.  On a motion to dismiss, the court considers whether the plaintiff has stated a claim upon which relief may be granted assuming allegations in the complaint are true.  On summary judgment, the court considers whether there is a genuine issue of material fact in light of the evidence uncovered during discovery.

2009 WL 3763693, at *6 (D. Ariz. Nov. 10, 2009).

Fair use is an inherently fact-intensive inquiry, *Dr. Seuss Enter., L.P. v. ComicMix LLC*, 256 F. Supp. 3d 1099, 1104 (S.D. Cal. 2017), and as shown in DSE's summary judgment motion, based on the extensive record, *Boldly* is highly commercial, not transformative, was developed in bad faith, and violates DSE's right to create derivative works, and, thus, the first factor favors DSE.  (ECF No. 107 at Sec. III(B)(1).)  The record also reinforces the conclusion that DSE's copyrighted works are highly creative, and, thus, the second factor also favors DSE. (*Id.* at Sec. III(B)(2).)  And the record shows that Defendants took far more from *Go!* than needed to create *Boldly* (even surmising a "way out" of the suit by taking less), and, thus, the third factor favors DSE as well.  (*Id.* at Sec. III(B)(3).)

### b.    The Fourth Factor Also Favors DSE

DSE's motion also shows that *Boldly* is likely to harm the market for *Go!* and its derivatives.  (ECF No. 107 at Sec. III(B)(4).)  Defendants' contention that "the

market effect of Boldly would likely be neutral, if not positive, toward DSE's work," is neither supported by the law nor the factual record, and thus does not "tip the balance" on this "most important" factor in favor of fair use towards Defendants. *See Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 566 (1985). Defendants misconstrue the law on which party bears the burden of proof on this factor, ignore the undisputed record, and criticize DSE for not bringing forward probative evidence of harm in an existing market or any impact on reasonably likely to be developed markets. (Br. 7-8.) These arguments all fail.

As the Supreme Court has made clear, "[s]ince fair use is an affirmative defense, its proponent [(Defendants here)] would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). Defendants cannot carry their burden because they do not offer a shred of admissible evidence about the relevant markets for *Go!*, derivatives of the DSE Works, and *Boldly*.

Defendants' citation to the Court's pre-discovery finding on factor one that *Boldly* does not substitute for *Go!* (Br. at 8) ignores the very different picture developed in discovery. The facts show that *Boldly* was designed to serve the exact same market function as *Go!*, from its extensive use of the DSE Marks and copyrighted expression to convey the same message as *Go!* and to reach the same audience of graduates and graduation gift-buyers, while selling through the same channels as *Go!*. (SOF ¶¶ 36-38, 49-50, 52, 55, 60, 75, 84, 86, 92, 100-101, 103, 121, 124, 141, 143-144, 148; SOAF ¶¶ 26, 28, 36, 39, 41-44, 49-54.) "Under these facts, Defendants evidently intend for their work to effectively function as a market substitution to [*Go!*]." *Paramount Pictures, Corp. v. Axanar Productions, Inc.*, 2017 WL 83506, at *9 (C.D. Cal. Jan. 3, 2017).

Rather than address the undisputed evidence, Defendants rely on Dr. Gans's unsupported opinion that "*Boldly* addresses a different market and market function

-12-

from *Go!* and the other 'Dr. Seuss' books and products, does not impact their target market." (Br. at 9.).  Gans's proposed opinions, however, can neither overcome the undisputed factual evidence on this factor, nor meet the minimum standards of reliability for admissible expert testimony, as shown in DSE's motion to exclude Gans from testifying in this action.  (ECF No. 104-1 at Secs. III(B)(1)-(4).)  The Court should not consider this unreliable and inadmissible testimony.[3]

Defendants also contend that *Boldly* would not harm DSE's derivative or licensing market, because DSE has purportedly "pointed to no comparable licensed hybrid work of its own." (Br. at 12.)  According to Gans, "the absence from the marketplace of DSE-licensed hybrids like *Boldly*, is evidence that *Boldly* is not in a market that DSE traditionally or reasonably would enter, or is likely to develop on its own." (*Id.*)  Gans is unqualified to offer this expert opinion,  (ECF No. 104-1 at Sec. III(B)(3)), and also ignores the undisputed facts that: (1) DSE has published several books that are derivative of the DSE Works, including derivatives of *Go!* (SOF ¶¶ 142-143); (2) DSE oversees a robust licensing program for the DSE Works (SOF ¶¶ 129-130; SOAF ¶ 2); (3) DSE has partnered, and will partner, with other rights holders on licensed "collaborations" that combine Dr. Seuss's works with another property to create new works (SOF ¶¶ 153-157); and (4) *Boldly* is ***exactly*** the type of derivative collaboration that DSE might license.  (*Id.*)

Worse, Defendants proceed from an erroneous legal assertion: where potential markets are at issue, the fourth factor favors only the copyright owner who already had plans to produce a derivative work that is either identical to, or substantially the same as, the infringing work.  (Br. at 11-12.)  The law is exactly the opposite: "[I]t is the 'potential market' for the copyrighted work and its

---

[3] Defendants and Gans further contend that *Boldly* is fair because it would have a "positive impact" on sales of Seuss books.  (Br. at 9.)  Gans's conclusion is both unreliable and not supported by the law, as "the boon to the [Dr. Seuss works] does not make [Defendants'] copying fair." *Campbell*, 510 U.S. at 591 n.21.

derivatives that must be examined, even if the 'author has disavowed any intention to publish them during his lifetime,' given that an author 'has the right to change his mind' and is 'entitled to protect his opportunity to sell his derivative works.'" *Salinger v. Colting*, 641 F. Supp. 2d 250, 267-68 (S.D.N.Y. 2009) (quoting *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987)) *rev'd on other grounds*, 607 F.3d 68 (2d Cir. 2010); *see also*, *Castle Rock Entm't, Inc. v. Carol Pub. Grp.*, 150 F.3d 132, 145-46 (2d Cir. 1998) (fourth factor favored plaintiff even where it "evidenced little if any interest in exploiting this market for derivative works" because the law "respect[s] that creative and economic choice."). The same rule prevails in the Ninth Circuit. *See e.g.*, *Paramount*, 2017 WL 83506, at *9 ("Judging by the success of Defendants' fundraisers, the Axanar Works are the type of work for which there is a separate demand that Plaintiffs may one day seek to exploit.") (int. quote omitted).

Accordingly, the fourth factor favors DSE even if DSE has not yet collaborated with CBS on a work that is identical, or close, to *Boldly,* or chooses not to license a book to compete directly with *Go!*, its perennial best-seller. *Id*. Authors have the exclusive right to create—or choose not to create—derivatives of an original work, *Salinger*, 641 F. Supp. 2d at 267-68, and a work like *Boldly*, mixing Seuss's works with the well-known *Star Trek* franchise, is exactly the type of work that DSE might reasonably license. (SOF ¶¶ 153-157.)

Defendants also assert that there already exist "complementary" works derived from *Go!*, a book called "*Oh the Meetings You'll Go To!*" (stating on the cover "a parody by Dr. Suits"), and a play (based on *Grinch*) called "*Who's Holiday*."[4] And even though Gans failed to follow any accepted methodology for determining whether products are complements or substitutes of one another (ECF

---

[4] *Lombardo v. Dr. Seuss Enterprises, L.P.*, 729 F. App'x 131, 132 (2d Cir. 2018) determined that *Who's Holiday* is a fair use parody.

No. 104-1 at Sec. III(B)(1)), and did not even mention these two parodies, Defendants cite Gans's proposed testimony as the sole factual evidence suggesting that "works derivative or transformative [of *Go!*] are likely to serve as complements rather than substitutes in the eyes of consumers." (Br. at 9.) But *Boldly* is not a parody, and, as discussed above, Defendants themselves sought to make *Boldly* a substitute purchase for *Go!* in the graduation gift market.

For all of these reasons, the undisputed evidence relating to the fourth factor thus strongly tips in DSE's favor. Accordingly, Defendants' motion should be denied, and summary judgment should be granted to DSE on its copyright claims.

### B.  The Court Should Deny Defendants' Summary Judgment Motion Relating to DSE's Trademark Claims

#### 1.  Legal Standard For Trademark Infringement

"To state a valid cause of action for trademark infringement under the Lanham Act, a plaintiff must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion." *Daimler AG v. A-Z Wheels LLC,* 334 F. Supp. 3d 1087, 1095 (S.D. Cal. 2018) (int. quotation marks omitted). Because "summary judgment is generally disfavored in the trademark arena" due to "the intensely factual nature of trademark disputes" in assessing "the ultimate question of likelihood of confusion," *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1140 (9th Cir. 2002), DSE has not moved for summary judgment on its remaining trademark claims.

Defendants, however, seek summary judgment that the DSE Marks are not valid and on their *Rogers* defense. (Br. at 13-18.) But DSE has proven in discovery that the DSE Marks are valid, and, as shown by the Ninth Circuit's very recent decision in *Gordon*, 909 F.3d at 257, triable issues of fact remain on whether Defendants' unauthorized use would be shielded by *Rogers*.

#### 2.  DSE Owns Protectable Rights in the DSE Marks

The Lanham Act is intended to "prevent[ ] competitors from copying a

source-identifying mark." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003); *see also* 15 U.S.C. § 1125(a).  The Act expansively defines a trademark as "any word, term, name, symbol, or device, or any combination thereof" used "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."  15 U.S.C. § 1127.  The Supreme Court has observed the breadth of this definition, noting that the Act "describes that universe in the broadest of terms.  . . . . Since human beings might use as a 'symbol' or 'device' almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive."  *Qualitex Co. v. Jacobson Products Co., Inc.*, 514 U.S. 159, 162 (1995).

A mark is valid so long as it is capable of distinguishing goods (and, in the case of trade dress, if it is nonfunctional).  *See Skydive Arizona, Inc. v. Quattrocchi*, 2009 WL 6597892 at *18 (D. Ariz. Feb. 2, 2009) (for a mark to be valid, it "must be distinctive, i.e., capable of distinguishing the applicant's goods from those of others.") (citing *Two Pesos, Inc. v. Taco Cabana, Inc*., 505 U.S. 763, 768 (1992)); *Moldex-Metric, Inc. v. McKeon Products, Inc*., 891 F.3d 878, 881 (9th Cir. 2018) ("No protection under the Lanham Act is available if the claimed trade dress is functional.").  In this Circuit, secondary meaning can be established in several ways, including "direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant."  *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999).  Consumer confusion is another factor indicative of secondary meaning.  *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985).

DSE's First Amended Complaint alleges with particularity that DSE owns protectable rights in the DSE Marks: the stylized font used consistently on the front

and back covers, spine, and title page of the Dr. Seuss books and the unique illustration style of the characters and backgrounds found throughout Dr. Seuss books.  (ECF No. 39 at ¶17.)  And the undisputed evidence amply supports DSE's allegations that the DSE Marks are distinctive and have acquired secondary meaning in the mind of the public, and are readily associated with DSE.

The Dr. Seuss books, which utilize the DSE Marks, are iconic, and among the most popular children's books of all time.  (SOF ¶ 137.)  These books have topped many bestseller lists, sold over 650 million copies worldwide, and been translated into more than a dozen languages.  (*Id*.)  In 2017, DSE was named the top licensed book brand according to market industry research firm NPD (SOF ¶ 159), and the Seussian style is so well-known by the consuming public that "Seussian" is a defined term in the Merriam-Webster dictionary as the distinct style emanating from Dr. Seuss.  (SOAF ¶ 23.)  DSE maintains strict quality control over its licensees' use of the DSE Marks, and distributes a Style Guide to ensure uniformity of style and quality across products authorized to use the DSE Marks.  (SOAF ¶¶ 2-22.)

Defendants do not dispute how recognizable the Seussian style has become in the minds of the public: indeed, each Defendant admitted this fact.  (SOAF ¶¶ 30-31, 37.)  Defendants further admitted that they made a concerted effort to copy and use the DSE Marks to ensure that *Boldly* would "match the look and feel of Seuss books."  (SOF 48-50, 61 84; SOAF ¶¶ 29, 36, 38-39, 41-44)  Defendants also intentionally copied the Seussian font of *Go!*'s title to make *Boldly* (and its cover) look as similar as possible to a Dr. Seuss work.[5]  (SOAF ¶¶ 41-44.)  This intentional copying of the distinctive DSE Marks is evidence that they have secondary meaning.  *See adidas Am., Inc. v. Skechers USA, Inc*., 890 F.3d 747, 755

---

[5] This Court has already found that "[t]he look of the lettering is unquestionably identical on both books, down to the shape of the exclamation point."  *Dr. Seuss Enter.*, 300 F. Supp. 3d at 1090.

(9th Cir. 2018) (quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989)).

Importantly, the unrebutted Poret Survey demonstrates that when a group of consumers are shown *Boldly*, and a separate control group are shown version of *Boldly* that removes only the DSE Marks, a far lower percentage of the control group believed that *Boldly* is associated with Seuss.  (SOAF ¶¶ 63-64.)  Having stripped out this "noise," Poret showed that 24% of consumers are confused as to origin *because* Defendants deliberately used the DSE Marks, which is legally probative of confusion.[6]  (SOAF ¶ 65.)  This finding of confusion is demonstrative of secondary meaning, and thus distinctiveness.  *Dr. Seuss Enter., L.P. v. ComicMix LLC*, 300 F. Supp. 3d at 1083 (S.D. Cal. 2017) (distinctiveness can be proven through secondary meaning); *Brighton Collectibles, Inc. v. Marc Chantal USA, Inc.*, 2009 WL 10674087, at *6 (S.D. Cal. May 12, 2009) ("Consumer confusion is another factor to show secondary meaning.").  Poret also opines that "the net rate of 24.0% of respondents confusing *Boldly* with Seuss due to the illustration style and font confirms that there is a significant degree of association of the illustration style and font with Seuss." (SOAF ¶ 67.)

Defendants contend that secondary meaning cannot attach to an illustration style or a distinctive font.  (Br. at 14-15.)  While no reported case has involved these precise facts, Defendants have conversely cited no decision holding such marks unprotectible.  As shown above, illustrative style and font meet the Lanham Act's intentionally broad definition of marks.

Defendants also ignore *Romm Art Creations Ltd. v. Simcha Intern., Inc.*, 786

---

[6] *See, e.g., adidas*, 890 F.3d at 756–57 (affirming finding of irreparable harm where survey showed a 20% net confusion rate); *Warner Bros. Entm't v. Global Asylum, Inc.*, 2012 WL 6951315 (C.D. Cal. Dec. 10, 2012), *aff'd without published opinion*, 2013 WL 5814731 (9th Cir. Oct. 30, 2013) (recognizing a likelihood of confusion based, in part, on a survey showing a net confusion rate of 16-24%).

F. Supp. 1126 (S.D.N.Y. 1992), an illustrative case analyzing trademark rights in an illustration style, which is discussed in the McCarthy treatise Defendants cite.

In *Romm*, the court issued a preliminary injunction on plaintiff's Lanham Act Section 43(a) claims.  Plaintiff alleged that the infringing works, comprised of posters, silk screens or limited editions of reproductions of certain paintings, were "slavishly similar" to plaintiff's works, prepared with "the intention of causing potential customers and purchasers to confuse them with [plaintiff's works]," and sold for the "willful and calculated purpose of trading upon plaintiffs' goodwill" and "the secondary meaning created by [the artist's] unique and distinctive style and appearance."  *Id*. at 1131.  In granting the injunction, the court observed that "courts have long recognized that recovery under § 43(a) is not restricted to federally registered trademarks, but extends to 'words, symbols, *collections of colors and designs*, or advertising materials or techniques' that the purchasing public has come to associate with a single source" and generally found no reason to reject plaintiff's "artistic style" claims so long as, *inter alia*, secondary meaning were proven.  *Id*. at 1134 (emphasis in original).  While plaintiff in *Romm* asserted unregistered trade dress under Section 43(a) and DSE pleaded its common law rights under the more general umbrella of "trademark infringement,"  "[t]he goal of [both] trademark and trade dress law is to protect the 'public interest in avoiding consumer confusion.'"  *Brighton Collectibles*, 2009 WL 10674087, at *4 (citing *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008).[7]  Relatedly, and in addition to *Romm*, Lanham Act protection has also been awarded to book covers.  *See Bach v. Forever Living Products U.S., Inc.*, 473 F.

---

[7] During oral argument on Defendants' second motion to dismiss, DSE explained that DSE's trademark claims relating to the Seussian style and font are akin to trade dress.  [ECF No. 52, at 12:2-15-6]  To the extent the Court characterizes the DSE Marks as trade dress (a category of trademarks), there is no reasonable dispute that they are nonfunctional, and therefore capable of protection so long as secondary meaning exists.

Supp. 2d 1110, 1122 (W.D. Wash. 2007) (Lanham Act protection afforded to book cover consisting of "a white seagull in silhouette against a blue background"); *see also, e.g., Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946 (2d Cir. 1981) (affirming preliminary injunction under § 1125(a) where overall features of book cover design of "Silhouette Romance" found likely to cause confusion with cover design of "Harlequin Presents" books); *Hughes v. Design Look Inc*., 693 F. Supp. 1500, 1505-1506 (S.D.N.Y.1988) (section 1125[a] applicable in case of fine art poster calendar).

Defendants cite the McCarthy treatise and two cases mentioned in the treatise as showing that an illustration style cannot function as a source identifier.  The cases that he cites as well as those found in McCarthy are limited to their particular facts and do not support Plaintiffs' sweeping generalization.  In *Hughes,* 693 F. Supp. at 1505, the Andy Warhol artworks at issue were never used in association with the promotion of any goods or services, and the court concluded that "in light of the fact that the Plaintiffs have to date produced no similar products, indeed no products at all, bearing similar images, secondary meaning cannot be claimed."  In *Hartford House, Ltd. v. Hallmark Cards, Inc*., 846 F.2d 1268 (10th Cir. 1988), the Tenth Circuit affirmed an injunction and noted in passing that plaintiff was not seeking to protect an artistic style.  In *Leigh v. Warner Bros., a Div. of Time Warner Entertainment Co., L.P.*, 10 F. Supp. 2d 1371 (S.D. Ga. 1998), *aff'd in part, rev'd in part on other grounds*, 212 F.3d 1210 (11th Cir. 2000), plaintiff failed to show it had used its artwork as a trademark prior to the alleged infringement.  And, in *LandscapeForms, Inc. v. Columbia Cascade Co*., 113 F.3d 373 (2d Cir. 1997), plaintiff failed to sufficiently define its trade dress in furniture, describing it "abstractly" as "at once massive, yet appears to float." *Id*. at 382.[8]

---

[8] *See also Munro v. Lucy Activewear, Inc.*, 2016 WL 5660422, at *4-6 (D. Minn. Sept. 29, 2016), aff'd in part, rev'd in part and remanded, 899 F.3d 585 (8th Cir. 2018) (Defendants sought to use the Lanham Act to protect entire light display art

Because the Lanham Act protects artistic styles when they have been used as trademarks in connection with goods and services (*e.g.*, books) and DSE has established secondary meaning in the Seussian illustration style, because the Lanham Act purposefully defines trademarks broadly, and because there exists precedent that an artistic style can function as a trademark, Defendants' validity argument fails.

Defendants' validity argument related to the Seussian font fails for similar reasons. The same trademark treatise cited by Defendants states that "Federal trademark protection for a distinctive typeface or lettering design would not be preempted, pursuant to Copyright Act." *See* 2 McCarthy on Trademarks and Unfair Competition § 12:59 (5th ed. 2018); *see also, Star Indus., Inc. v. Bacardi & Co.,* 412 F.3d 373, 382 (2d Cir. 2005) ("[S]tylized shapes or letters may qualify [as inherently distinctive], provided the design is not commonplace but rather unique or unusual in the relevant market."); *cf The Coca-Cola Co. v. Gemini Rising*, 346 F. Supp. 1183, 1187 (E.D.N.Y. 1972) (although "the word 'Coca-Cola' as such does not appear anywhere on the [infringing] poster one would have to be a visitor from another planet not to recognize immediately the familiar 'Coca' in its stylized script and accompanying words, colors and design."). Defendants admit that the font is recognizable as Seussian, which is why they copied it. (SOAF ¶¶ 41-44.) Because the font uniquely functions as a source identifier, it is entitled to protection.

In sum, Defendants' invalidity arguments should be rejected, and partial summary judgment granted in DSE's favor that the Seussian illustration style and fonts are protectable as a matter of law. *Elliott v. Google, Inc.,* 860 F.3d 1151, 1162 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 362 (2017) (affirming summary judgment for Google that its mark is valid).

---

exhibit, not just source identifying aspects of that exhibit); *Galerie Furstenberg v. Coffaro*, 697 F. Supp. 1282, 1289-90 (S.D.N.Y. 1988) (dismissing trademark claim related to counterfeit Salvador Dali paintings as the subject of copyright).

### 3. The *Rogers* Test And The First Amendment Do Not Shield Defendants From DSE's Infringement Claims

After the Court dismissed Count II on *Rogers* grounds, the Ninth Circuit issued its most relevant *Rogers* analysis yet in *Gordon*, 909 F.3d at 257. In *Gordon*, the owner of the trademarks "Honey Badger Don't Care" and "Honey Badger Don't Give a Sh—" (the "HBDC Marks") sued defendants for infringement over the unauthorized use of the HBDC Marks in their greeting cards, a product that is also sold by plaintiff's licensees. *Id.* at 263. Defendants' greeting cards used variations on the HBDC Marks, but contained no explicit indication that the cards were created, sponsored, or otherwise endorsed by the owner of the HBDC Marks. *Id.* Defendants' greeting cards also contained defendants' own trademark "Recycled Paper Greetings" and listed defendants' websites. *Id.*

The district court granted summary judgment for defendants, applying the *Rogers* test to bar Gordon's claims. *Id.* at 264. On *Rogers*'s first prong, the court found that defendants' greeting cards were expressive works and their use of the HBDC Marks related thereto, and, on *Rogers*'s second prong, found that defendants did not explicitly mislead consumers because it made no affirmative statement of sponsorship by plaintiff and the cards included defendants' own name and websites. *Gordon v. Drape Creative, Inc.,* No. 15 Civ. 4905, ECF No. 94 (Civil Minutes).

The Ninth Circuit reversed and remanded. It held that while greeting cards qualify as expressive works, satisfying *Rogers*'s first prong, a triable issue of fact existed on *Rogers*'s second prong with regard to whether defendants' use of the HBDC Marks explicitly misleads consumers. *Gordon*, 909 F.3d at 268. In so holding, *Gordon* noted that, in applying *Rogers*'s second prong, courts "must remain mindful of the purpose of the *Rogers* test, which is to balance 'the public interest in avoiding consumer confusion' against 'the public interest in free expression.'" *Id.* at 269 (quoting *Rogers*, 875 F.2d at 999). The Court further noted that *Rogers*'s second prong "is not a mechanical test," and that "'all of the

relevant facts and circumstances' must be considered." *Id.* (quoting *Rogers*, 875 F.2d at 1000 n.6.)  Thus, *Gordon* "reject[ed] the district court's rigid requirement that, to be explicitly misleading, the defendant must make an 'affirmative statement of the plaintiff's sponsorship or endorsement.'" *Id.* at 269.

*Gordon* distinguished the Ninth Circuit's prior *Rogers* decisions by pointing out that in those cases where dismissal was affirmed, the "mere use of a trademark alone" did not suffice to make such use explicitly misleading because in those cases "it was clear that consumers would not view the mark alone as identifying the source of the artistic work." *Id.* at 270.  But such reasoning, according to *Gordon*, "does not extend to instances in which consumers *would* expect the use of a mark alone to identify the source." *Id.* (emphasis in original).

*Gordon* explained that "[a] more relevant consideration is the degree to which the junior user uses the mark in the same way as the senior user." *Id.*  In the Ninth Circuit's prior *Rogers* decisions, "the junior user has employed the mark in a different context—often in an entirely different market—than the senior user." *Id.* ("consumers would not view the mark alone as identifying the source of the artistic work" because consumers would not expect that a song or a photograph titled "Barbie" was created by Mattel, or that a strip club owner produced a video game). Where the junior user uses the mark in the same market and location as the senior user, as the defendant did in *Gordon*, "such identical usage could reflect the type of 'explicitly misleading description' of source that *Rogers* condemns." *Id.* (quoting *Rogers*, 875 F.2d at 999–1000).  Notably, *Gordon* cautioned against "reflexively apply[ing] *Rogers*'s second prong [to excuse infringement] in this circumstance," because such an application "would turn trademark law on its head." *Id.* at 270.

The facts of this case mirror those found in *Gordon,* and Defendants' motion should be denied for the same reasons that the Ninth Circuit reversed the *Gordon* summary judgment grant.  It is undisputed that *Boldly*, like *Go!* and the other Dr. Seuss books, is an illustrated book, *i.e.*, Defendants have employed the DSE Marks

in the exact same context that DSE and its authorized licensees regularly employ the DSE Marks.  (SOAF ¶¶ 6, 17, 28, 36, 39, 41-44, 48-54.)  And as discussed in DSE's motion for summary judgment, and above in Sec. III(A)(2)(b), *Boldly* was designed to serve the exact same market by slavishly copying *Go!* and the DSE Marks therein in order to compete for graduation business through the same channels of trade.  (SOF ¶¶ 54, 100-101, 141, 148; SOAF ¶¶ 49-54.)

This is not a case where Defendants made a "disparate use" of the DSE Marks, *Gordon*, 909 F.3d at 270; rather Defendants and DSE both use the DSE Marks in highly similar artistic expressions, on books destined for the same market, and often where books are bought as a gift (and the familiarity of the illustration style and font would be a particularly strong selling point to the purchaser). Accordingly, "the potential for explicitly misleading usage is especially strong." *Id.* at 270.  Defendants' assertion that their use of the DSE Marks "is both in a different manner, and with a different market function than the 'Dr. Seuss' books" (Br. at 18) ignores the evidence and *Gordon's* holding.  To the contrary, in light of the look and feel of *Boldly* (an illustrated work), which uses the DSE Marks, Defendants' slavish copying of every aspect of the DSE works, and their plans to sell *Boldly* through the same channels of trade and to the same market of graduation gift buyers, a reasonable jury could easily conclude that Defendants' unauthorized use of the DSE Marks in *Boldly* is explicitly misleading as to its source despite the absence of an affirmative statement that DSE published or authorized the book.

Defendants' minimization of their use of the DSE Marks as "only one component of Defendants' larger expressive creation," is wrong and ignores the undisputed record.  Defendants admitted to their concerted effort to utilize the DSE Marks to ensure that *Boldly* would "match the look and feel of Seuss books." (SOAF ¶¶ 36, 44)  Hauman hired Templeton because he wanted to illustrate *Boldly* in a "Seussian style."  (SOF ¶ 28-29, 31; SOAF ¶ 34.)  Defendants also set out to make *Boldly's* cover match the look and feel of a Seuss book by copying the

artwork and using the "Seussian font."  (SOF ¶¶ 49, 52; SOAF ¶¶ 29, 40-44)
Templeton drew the lettering of the *Boldly* cover by hand, slavishly copying "as a
model" the font on the cover of *Go!*.  (SOF ¶ 49; SOAF ¶¶ 40, 43.)  Defendants'
publishing partner, AMP, even pushed Defendants to create a cover for Boldly that
was "one that more closely resembles the original [*Go!*]."  (SOAF ¶ 45.).

This case is not at all like *E.S.S.* because Defendants' use of the DSE Marks
was hardly "incidental to the overall story" of *Boldly*, and *Boldly*'s "Seussian" look
and feel is, by Defendants' admissions, its "main selling point."  *Cf. E.S.S.*, 547
F.3d at 1100-01.  (SOF ¶ 38.)  This case is also not at all like *Brown* because the
Defendants do not use "thousands" of other marks in order to create a universe with
verisimilitude.  Defendants stole from two, and only two, properties: Seuss and *Star
Trek*.  And the DSE Marks are deliberately placed front and center.  *Brown v.
Electronic Arts, Inc.*, 724 F.3d 1235, 1244-46 (9th Cir. 2013).  In stark contrast to
this Circuit's prior *Rogers* decisions, *Boldly*'s cover and its extensive use of the
DSE Marks, explicitly and intentionally fosters consumer misunderstanding.

In sum, DSE has introduced substantial evidence from which a jury could
conclude that Defendants' use of the DSE Marks in *Boldly* is explicitly misleading.
*Gordon* clarifies that an absence of an "affirmative" statement of DSE's
sponsorship or endorsement, and the inclusion of Defendants' names in *Boldly*, is
by no means dispositive of *Rogers*'s second prong, especially where the marks are
both used on illustrated books aimed at the same market.  Defendants are therefore
not entitled to summary judgment and their motion should be denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion, and
should enter partial summary judgment (1) rejecting the fair use defense and
holding that Defendants have infringed DSE's copyrights, and (2) declaring and
determining that the DSE Marks are protectable pursuant to Fed. R. Civ. P. 56(f).
Finally, the Court should direct a jury trial on Defendants' *Rogers* defense.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated:  January 3, 2019

Respectfully submitted,

By  */s/ Tamar Duvdevani*
TAMAR DUVDEVANI
DLA Piper LLP (US)

*Attorneys for Plaintiff*