Dan Booth (MA Bar No. 672090)
BOOTH SWEET LLP
32R Essex Street
Cambridge, MA 02139
dbooth@boothsweet.com
(617) 250-8602
*Admitted Pro Hac Vice*

Michael Licari (SBN 265241)
SPRINKLE LLOYD & LICARI LLP
2801 B Street, Unit 556
San Diego, CA 92102
mike@SL2Law.com
(858) 717-0013
*Local Counsel*

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DR. SEUSS ENTERPRISES, L.P.**, <br><br> Plaintiff, <br><br> v. <br><br> **COMICMIX LLC**; **GLENN HAUMAN**; **DAVID JERROLD FRIEDMAN** a/k/a **DAVID GERROLD**; and **TY TEMPLETON**, <br><br> Defendants. | Case No.: 3:16-cv-02779-JLS-BGS <br><br> **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE GANS TESTIMONY** <br><br> Assigned to Hon. Janis L. Sammartino United States District Judge <br><br> Hearing Date: January 31, 2019 <br> Hearing Time: 1:30 p.m. <br> Hearing Place: Schwartz Courthouse, Courtroom 4D |

Pursuant to Rule 702 of the Federal Rules of Evidence and CivLR 7.1(f), defendants ComicMix LLC ("ComicMix"), Glenn Hauman ("Hauman"), David Gerrold ("Gerrold"), and Ty Templeton ("Templeton") (collectively "Defendants")

1

hereby oppose Plaintiff Dr. Seuss Enterprises, L.P.'s ("DSE") motion to exclude the testimony of Defendants' economics expert witness, Dr. Joshua Gans (ECF No. 104; the "Motion"). Dr. Gans's proposed testimony is reliable, well-grounded, and would assist the Court in determining critical facts regarding any effect Defendants' unpublished book may have on DSE's books and products. In opposition to the Motion, Defendants state as follows.

**A.    Introduction**

Defendants' unpublished, transformative mash-up book *Oh, the Places You'll Boldly Go!* ("*Boldly*") combines elements of certain Dr. Seuss books with elements of the original *Star Trek* series. DSE alleges that *Boldly* infringes its copyrights in certain Dr. Seuss books, chiefly *Oh, the Places You'll Go!* ("*Go!*"). Defendants assert the fair use defense, and designated Dr. Gans as an expert witness to testify as to the fourth factor of the fair use analysis, namely, any effect *Boldly* or similar works may have on the potential market value for, or value of, the allegedly infringed books, and licensed derivative works thereof. 17 U.S.C. § 107(4).

DSE's assault on Dr. Gans' analysis and conclusions amounts to impeachment, not an attack on admissibility. "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable. The district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Alaska Rent-a-Car, Inc. v. Avis Budget Group, Inc.*, 709 F.3d 872, 883 (9th Cir. 2013). His testimony should not be excluded.

**B.    Legal Standard.**

Testimony by a qualified expert witness is admissible when it is relevant and reliable and would "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

"Though *Daubert* is sometimes loosely spoken of as though it established the court's 'gatekeeping' function, that is not quite right." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). "Trial courts have always had a gatekeeping function for opinion evidence. *Daubert* held that Federal Rule of Evidence 702 replaces the old *Frye* [*v. United States*, 293 F. 1013 (D.C. Cir. 1923)] gatekeeping test, 'general acceptance in the particular field,' with a different test which is, in some respects, more open to opinion evidence." *Id.* "For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one." *Id.* (citing *Daubert*, 509 U.S. at 592-94). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (citing *Daubert*, 509 U.S. at 596). And "as the Court stated in *Daubert*, the test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

**C.     Dr. Gans Is a Highly Qualified, Relevant Expert Witness in Economics.**

Dr. Gans is unusually qualified to provide expert testimony relevant to this matter. He is the Professor of Strategic Management and holder of the Jeffrey S. Skoll Chair in Technical Innovation and Entrepreneurship at the Rotman School of Management, and Professor (Honorary) in the Department of Economics at the University of Toronto, and Area Coordinator for Strategic Management and Chief Economist for the Creative Destruction Lab. See ECF No. 104-4 ("Gans Report") pp. 3 & 18. He is also a Research Affiliate at the Center for Digital Business at Massachusetts Institute of Technology's Sloan School of Management and a Research Associate for the National Bureau of Economic Research (NBER). *Id*. Before Toronto, he was a Professor of Management (Information Economics) at the University of Melbourne, a Visiting Researcher at Microsoft Research, and a Visiting Scholar at Harvard University in Economics and at NBER. *Id.* He is the

3

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE     Case No. 16-cv-2779-JLS-BGS

author or co-author of a dozen books and more than one hundred published papers on economics. *Id.* at 3-4 & 24-31.

Of particular note, Dr. Gans is the author of one of the few published economics papers on copyright fair use, in 2015, particularly looking at how fair use interacts with derivative works: "Remix Rights and Negotiations over the use of Copy-Protected Works," *International Journal of Industrial Organization* 76-83 (July 2015). He notes that it was, to his knowledge, "the first paper to consider the incentives of original creators and remixers in world where there were different property rights regimes available," assessing the effect of varying degrees of creator control over the incentives to create, for example, remix or fair use works. Gans Report p. 8; see Exhibit A to Declaration of Dan Booth ("Gans Transcript") filed herewith, at 267:23-268:22. And "from an economic perspective, the potential market effects modelled in my research are the same as those alleged by the Plaintiff[]." Gans Report p. 9.

Dr. Gans has special experience related to digital economics. As he testified, he has "spent a number of years working on the economics of advertising markets," is an author of a book on "the economy of attention on the internet and how that interacts with things such as search and advertising," and has studied Amazon and its digitization strategy for two decades; in particular, he has recently supervised a Ph. D. student studying Amazon' algorithms that indicate when people who bought a given product also bought another product. ECF No. 104-3 ("Gans Transcript") at 100:15-18, 30:3-15, 30:22-31:4 & 37:13-18; see also Gans Report at pp. 4 & 24 (referencing *Prediction Machines: The Simple Economics of Artificial Intelligence* (Harvard Business Review Press 2018)). He also has "a long-standing research interest in how information is used and reused," as explored in his book *Information Wants to Be Shared* (Harvard Business Review Press 2012), which includes "an entire chapter on the economics of book publishing in the digital age." Gans Report at 7 & 24; Gans Transcript at 259:4-260:13. He has spoken with Ph.

D. economists who work on Amazon's algorithms about how the algorithms work, at the NBER's annual Economics and Digitization conferences. Gans Transcript at 30:14-19, 31:14-32:7. He has seen "all of the publicly available information regarding what [Amazon's] algorithms purport to do." *Id.* at 31:5-8. He explained in depth the artificial-intelligence behind Amazon's machine learning algorithms. *Id.* at 38:14-44:5. Amazon recruited Dr. Gans for work as an economist, and though he did take on that work, he "knows as much as any digital economist on this subject" outside of Amazon. *Id.* at 30:29-30, 37:13-24, 44:6-9. DSE does not dispute it.

Nevertheless, DSE asserts that Dr. Gans "lacks the experience necessary to qualify him as an expert on the subject of his opinions." Memo. p. 8. The basis seems to be that Dr. Gans is an economics professor, not a member of the "marketing, licensing, or the book publishing industry," and that he did not consult members of those industries, including the Defendants (or their testimony or produced documents), as a basis of his opinions. *Id.* DSE cannot plausibly contend that Dr. Gans's extensive experience in economics, or his research in fair use works, is irrelevant to assessing and opining on market effects. DSE does not dispute that Dr. Gans consulted a wide variety of publishers, agents, and authors in his research on the book publishing industry. See Gans Transcript at 260:14-261:13. And DSE does not identify any aspect of Dr. Gans's opinion, expert reports, or testimony that is less than well founded in his expertise.

**D.    DSE Identifies No Sound Reason to Find Dr. Gans Less Than Reliable.**

Dr. Gans produced an expert report on September 28, 2018 and a supplemental report on November 5, 2018, and DSE deposed him on November 6, 2018. DSE now contends that his testimony must be wholly excluded as unreliable. ECF No. 104-1 (Memorandum of Law in Support of Motion; "Memo.") p. 5.

DSE raises five grounds for excluding Dr. Gans' testimony; to wit, that he (1) grounded his analysis in the Court's findings about the forms of potential

5
DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE    Case No. 16-cv-2779-JLS-BGS

market harm at issue, leaving no need to consider any direct market effects as to *Go!* and the other original Dr. Seuss works; (2) presumed that DSE has a market for its derivative products, leaving no need to review DSE-produced documents establishing such a market; (3) did not review, *because DSE did not produce*, any documents showing that DSE's derivative products are in the same market as any mash-up or other fair use work, or sales data for the derivative products sufficiently granular to model the effects of a transformative work; (4) did not consider Defendants' documents or testimony concerning *Boldly*'s marketing and planned audience, or third-party documents concerning third-party plans for sales of *Boldly*; and (5) considered evidence gleaned from Amazon to support his hypothesis that if published, *Boldly* would serve as a complement to DSE works, not a substitute.

None of those five grounds is a sound basis to exclude or limit any testimony Dr. Gans will offer, as explained below.

### 1. Dr. Gans' Analysis of Potential Market Effects Is Grounded in the Court's Findings.

Dr. Gans stated in his expert report, "It is my understanding that because the later work in this action, *Boldly*, is a transformative work, it is not considered a direct market substitute for the original work (*Go!* and the other Dr. Seuss books) under United States law, and that any market effect on the original work itself is not considered in assessing the market impact in this action." Gans Report p. 9. DSE takes issue with that statement as if it were an inconsidered opinion. Memo. p. 9. But that amounts to an accurate summary of the Court's findings in this action.

The Court found *Boldly* "is no doubt transformative." *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 256 F. Supp. 3d 1099, 1106 (S.D. Cal. 2017) ("*ComicMix I*"). And the Court found it to be a "fact that *Boldly* does not substitute for the original and serves a different market function than *Go!*." *Id.* at 1108. Further, the Court explained, *Boldly* is "a highly transformative work that … will not impinge on the original market for Plaintiff's underlying work." *Id.* at 1109. When DSE amended

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE   Case No. 16-cv-2779-JLS-BGS

its complaint, the Court found plausible its allegations of "potential harm to the market for Plaintiff's derivative works," *Dr. Seuss Enters., L.P. v. ComicMix LLC*, 300 F. Supp. 3d 1073, 1082 (S.D. Cal. 2017) ("*ComicMix II*"), but did not alter its finding that *Boldly* does not implicate the market for Dr. Seuss original works.

So, Dr. Gans's statement that *Boldly* is not a direct market substitute directly reflects the Court's initial and unaltered determinations. DSE does not deny that the statement follows from the Court's asssessment. Dr. Gans cannot be faulted for focusing his report on the derivative-work issues that remained after the Court's review of DSE's Complaint and First Amended Complaint.

Likewise, Dr. Gans cannot be faulted for finding that "[a]n appreciation of *Boldly* requires knowledge of Star Trek." Gans Report p. 10. The Court perceived that "*Boldly*'s market relies on consumers who have already read and greatly appreciated *Go!* and Dr. Seuss's other works, and who simultaneously have a strong working knowledge of the *Star Trek* series." *ComicMix I*, at 1108. The book itself, rife with knowing *Star Trek* references, provides ample evidence in support of both the Court's assessment and Dr. Gans's opinion.

**2. Dr. Gans Accepted as True DSE's Allegations of an Extensive Market for *Go!* and for Books Derivative of *Go!*, for Purposes of His Report.**

In preparing his expert report, other than the evidence from Amazon, Dr. Gans reviewed his own 2015 article on fair use; the complaint and the amended complaint in this action; copies of *Boldly* and *Go!*; the *ComicMix I* Order, and a May 17, 2016 *Slate* article about *Go!* providing sales information. Gans Transcript at 125:7-24; 132:1-133:12. Ruth Graham's *Slate* article (entitled "*Oh, the Places You'll Go!* Is the Top-Selling Book for Graduates. Too Bad it Doesn't Offer Great Advice") describes *Go!* as a perennial best-seller that had sold "more than 12.5 million copies in all formats, with sales increasing each of the past four years. It is Seuss' bestselling book of all time, and yes, it's mostly thanks to graduations." Gans Transcript at 144:19-145:1; Gans Report at 5-6. Dr. Gans referenced this data

7

in his report "to confirm what I thought I already knew about Dr. Seuss, which was it was tremendously successful in book publishing." Gans Transcript at 137:16-23. DSE has since stated as fact that "*Go!* is DSE's best-selling book," and has touted exactly the same data that he cited from *Slate*. ECF No. 107-2 ¶ 141; see Exhibit 108 to Tamar Duvdevani Declaration in Support of DSE's Motion for Summary Judgment, at DSE0000956. For purposes of his expert report, Dr. Gans accepted that *Go!* is a best-seller, as DSE claimed, and as reflected on Amazon. *See* Gans Transcript at 152:23-153:9, 144:4-145:1. DSE cannot reasonably fault him for relying on data that it proclaims is accurate.

DSE produced annual sales records for certain Dr. Seuss books over the last few years. DSE notes that Dr. Gans did not consider the annual "detailed sales information for" *Go!* and the other works at issue that DSE produced. Memo. p. 6. But once Dr. Gans accepted, as stated in the complaint (and First Amended Complaint) that the Dr. Seuss books are best-sellers, he did not believe that the annual sales data would have been useful to "altering or refining" his opinion. Gans Transcript at 152:7-153:2 (the number of books sold by *Go!* "would have literally no impact"). DSE points to nothing relevant that Dr. Gans should have gleaned from that data, rather than from the *Slate* article or DSE's complaints. It was proper and sufficient for Dr. Gans to base his opinions on the evidence he considered.

**3. DSE Did Not Produce the Weekly Sales Data that Dr. Gans Would Have Found Relevant, or Any Evidence That DSE's Products Are in the Same Market as any Transformative Work, So Dr. Gans Could Not Review It.**

DSE does not identify any document, produced by DSE or any third party, that Dr. Gans did not consider, that would have altered his analysis in any way. As Dr. Gans stated in his deposition, having ascertained that DSE "is a terrific brand that has bestselling books [and] that is a formidable player in this market," he did not believe that further information (for example, about annual sales data for *Go!* rather than an aggregate total) would have changed his opinion. Gans Transcript at

150:18-151:13 ("However, if you are willing to represent to me that you have a document that I should have considered and I would have come to a conclusion … that Dr. Seuss isn't as successful as I make it out here, please put forward."). In Dr. Gans' opinion, "[a]ggregate sales figures of Dr. Seuss are not useful for the analysis of market impact of transformative works. Very simple as that." *Id.* at 155:18-20.

As Dr. Gans noted, a precise analysis of the effect of publishing a transformative work like *Boldly* on DSE's products would require, for starters, "data with sufficient time granularity to be able to detect the effects of entry of transformative works on those products," along with data about the precise dates of entry of previous transformative products. Gans Transcript at 156:24-157:10. "And none of that data was available." *Id.* at 157:11.

DSE did not produce such detailed, weekly sales data. See Gans Transcript at 133:16-136:24; *id.* at 147:14-148:6 ("In order to analyze the market impact of a transformative work of the likely small scale of something like *Oh, the Places You'll Boldly Go!*, I felt I would need weekly data stretching back all the way to the publication of *Oh, The Places You'll Go* on it and all other Dr. Seuss products, and, also, to be able to relate that at least to the timing of entry of other transformative works which we do know existed.").

DSE notes that it produced records of its licensing royalties and agreements and produced documents and provided Rule 30(b)(6) testimony concerning its "marketing, consumer targeting, and publishing program." Memo. p. 6. DSE asserts that such information "may have informed a reliable analysis of market impact." *Id.* p. 5. But Dr. Gans testified that it would not have done so, because DSE did not provide the granular sales data or the timing or relevant third-party publications that, he made clear, were necessary elements of a thorough market impact analysis.

DSE's extensive evidence that it has derivative markets for products derived from Dr. Seuss books, though undisputed, is not evidence that those products are in the same market with such a transformative work as *Boldly*. DSE's failure to

9

produce evidence toward that central issue of market effects is not a valid basis to exclude Dr. Gans's testimony.

### 4. Dr. Gans Reasonably Relies on *Boldly* to Understand its Likely Market.

Dr. Gans testified that *Boldly* "is in the book market," not in the children's book market. Gans Transcript at 193:18-194:5. The testimony is well founded and had a reasonable basis: *Boldly* itself, and Dr. Gans's knowledge of the marketing of *Star Trek* and related products. See *id.* at 197:13-199:10.

Upon reviewing *Boldly*, Dr. Gans reached the "understanding … that Boldly is a work that is targeted at adults and perhaps young adults." Gans Report p. 11. He stated that "[a]n appreciation for *Boldly* requires knowledge of Star Trek. In particular, *Boldly* contains many references throughout to specific episodes of the Original Series [of *Star Trek*], and, in my opinion, would be unlikely to hold any value or interest to a consumer who was not already versed in *Star Trek* Original Series tropes and characters, and in *Go!*." *Id.* His analysis and opinion is supported by, and consistent with, the Court's assessment that "*Boldly*'s market relies on consumers who have already read and greatly appreciated *Go*! and Dr. Seuss's other works, and who simultaneously have a strong working knowledge of the *Star Trek* series." *ComicMix I*, at 1108. Of course, Dr. Gans also reasonably relies on his review of *Boldly* itself to understand its likely market, as reasonably informed by his familiarity with *Star Trek*. Gans Transcript at 201:14-202:4. Dr. Gans testified that he knows *Star Trek* and "all of its elements, has watched every minute of it"; indeed, "all three of my children are named after Star Trek characters, so I obviously am a fan." *Id.* at 114:2-115:5. Dr. Gans further explained that *Star Trek* is not targeted at a young audience. *Star Trek* "is rated TV-PG, meaning it contains material parents may find unsuitable for younger children," so it "is not rated for young children." Gans Report at 6 & 11. Accordingly, Dr. Gans's understanding that *Boldly* is "targeted at adults and perhaps young adults" had a reasonable basis. Further, though Dr. Gans did not specifically rely on it in forming his opinion on

10

this issue, his book *Parentonomics* concerns "the economics of parenting" and, in substantial part, "how brands such as Dr. Seuss … marketed to parents and children." Gans Transcript at 190:1-17. He has more than sufficient basis to consider the market for *Boldly* in support of his ultimate opinions on market effects.

DSE objects that Dr. Gans did not consider Defendants' produced documents or testimony concerning *Boldly*'s marketing and planned audience, or third-party documents concerning third-party plans for sales of *Boldly*. Memo. p. 6. DSE does not point to anything in that evidence that would undermine or alter Dr. Gans's opinion that *Boldly* was or would be targeted to *Star Trek* fans, not young children.

Instead, DSE asserts that "the evidence in the case" would have shown Dr. Gans "that Defendants also planned to market *Boldly* to graduates and parents of graduates." Memo. at 17. There are three problems with the assertion. First, DSE has identified evidence of third party plans to market *Boldly* to graduates, not evidence that Defendants themselves had such plans. Second, Dr. Gans recognized that *Go!* is a book marketed "not only to children, but also as a gift to be given to college graduates and other graduates," and relied on evidence (the *Slate* article) indicating that *Go!* is marketed to graduates. See Gans Report at 10-11. Third, Dr. Gans did not dispute that those graduates might include *Star Trek* fans; instead, he found that the likely market for *Boldly*, consumers "already versed in" both *Star Trek* tropes and *Go!*, was not likely to impact the market for fresh readers of *Go!*. *Id.* DSE asserts that Dr. Gans's opinion is "that no one other than *Star Trek* fans would be interested in buying *Boldly*." Memo. p. 18. But Dr. Gans' opinion, as stated in his expert report, is that *Boldly* is not so absolute; he found it "unlikely" that *Boldly* would hold value or interest to one unversed in *Star Trek*. *Id.* Dr. Gans's findings and opinions on the topic are totally consistent with the Court's findings in *ComicMix I*, and are not unreliable.

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE    Case No. 16-cv-2779-JLS-BGS

### 5. Dr. Gans' Report Offers Useful Evidence of Market Effects Gleaned from Amazon About DSE Books and Third-Party Works.

In the absence of the detailed sales data and other data that would have supported a thorough analysis of *Boldly*'s potential market effects, Dr. Gans developed an alternative means to assess the complementarity or substitutability of transformative works like *Boldly*. He conducted an independent investigation of market data available on Amazon through search queries for various Dr. Seuss books and for books that are transformative of Dr. Seuss books. Gans Transcript at 154:5-15; Gans Report at 11-14. He found that certain unlicensed, transformative or derivative works are "frequently bought" with DSE-licensed works, but that the converse is not true: "on an examination of the Amazon page for *Go!*, the derivative works published by third parties do not appear as recommended or likely potential purchases." *Id.* at 14. This was "strongly suggestive evidence," he submitted, that works derivative or transformative of *Go!* and the other allegedly infringed Dr. Seuss books "are likely to serve as complements rather than substitutes in the eyes of consumers." *Id.*

Dr. Gans's opinion is well supported. "[A]ccording to Amazon, its website merely informs users, 'based on aggregate sales correlations, that customers who previously bought a product the user chose to view or buy also bought another product.'" *Pinpoint Inc. v. Amazon.com*, No. 03 C 4954, 2004 U.S. Dist. LEXIS 17641, *6 (N.D. Ill. Aug. 31, 2004). Dr. Gans reasonably concluded, based on his knowledge of Amazon (including his communications with Amazon's economists on the subject of Amazon's algorithms), that Amazon's "Frequently bought together and "Customers who bought this item also bought" sections mean what they say. See Gans Transcript at 38:8-45:19.

DSE asserts that Dr. Gans "made the entirely unsupported assumption that just because two items are sometimes bought together, the availability of one product can never have an adverse impact on the market for the other product."

DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE   Case No. 16-cv-2779-JLS-BGS

Memo. p. 7. But DSE cites no such assertion in Dr. Gans' report or testimony, because he made no such assumption. Instead, he noted that "Amazon predicts and indicates that consumers who purchased this derivative work *Oh, the Things You Don't Know!* were *more likely* to purchase not only the original work [*Go!*] but other works by Dr. Seuss and/or Plaintiff's licensed derivative works" (for example, *Seuss-isms!* and *Oh, the Places I've Been! Journal*). Gans Report at 13-14 (emphasis added). Dr. Gans' analysis is that "Amazon customers are *not very likely* to purchase the derivative works published by third parties," *id.* (emphasis added). His opinion is more measured than the claims DSE seeks to put in his mouth.

DSE asserts that the Dr. Gans' use of the Amazon search evidence was improper because "Internet search results by two people for the *same subject* can be very different, with variations due to the individual who is conducting the search, that individual's search history, and other circumstances that dynamically affect search results based on the search engine's algorithms." Memo. p. 7. The argument would be better put to Defendants' rebuttal expert Na Dawson, who specifically failed to control for these variations, unlike Dr. Gans, who identified the concern and logged out of Amazon before conducting his search, so his search results could be replicated without such a "distortion." Gans Transcript at 27:5 to 28:18.

### E. Conclusion

Wherefore, Defendants respectfully request that the Court deny DSE's Motion, find that Dr. Gans's testimony is reliable, and admit it on its merits.

Respectfully submitted,

/s/ Dan Booth
Dan Booth (admitted *pro hac vice*)
Booth Sweet LLP

Michael Licari (SBN 265241)
Sprinkle Lloyd & Licari LLP
*Attorneys for Defendants*

13

**CERTIFICATE OF SERVICE**

I hereby certify that on this January 8, 2019 I electronically filed the foregoing document by using the Court's ECF system, thereby causing a true copy thereof to be served upon counsel of record for Plaintiff Dr. Seuss Enterprises, L.P., as identified on the Notice of Electronic Filing.

/s/ Dan Booth