HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 1

1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF CALIFORNIA

3      ────────────────────────────────────────

4      DR. SEUSS ENTERPRISES, L.P., a      )
       California limited partnership,     )

5                                          )
                    Plaintiff,             ) Case No.

6                                          )
                                  )   3:16-cv-02779-JLS-BGS

7           v.                             )
                                           )

8      COMICMIX, LLC, a Connecticut        )
       Limited liability company; MR.      )

9      GLENN HAUMAN, an individual;        )
       MR. DAVID JERROLD FRIEDMAN A/K/A    )

10     DAVID GERROLD, an individual; and   )
       MR. TY TEMPLETON, an individual.    )

11                                         )
                    Defendants.            )

12     ────────────────────────────────    )

13

14

                HIGHLY CONFIDENTIAL TRANSCRIPT

15                       (FULL)

16

17        Videotaped oral deposition of JOSHUA S. GANS,

18     Ph.D., called by the Plaintiff herein, held before a

19     stenographic court reporter at the offices of DLA

20     Piper LLP (Canada), 1 First Canadian Place, Ste.

21     6000, Toronto, Ontario, Canada on Tuesday, the 6th

22     day of November, 2018, at 9:00 a.m. EST.

23

24

25

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 2

1  A P P E A R A N C E S :
2  For Plaintiff:
3  DLA PIPER LLP (US)
4  BY: MARC E. MILLER, ESQ.
5    1251 Avenue of the Americas
6    New York, NY 10020-1104
7    Tel: 212-335-4500
8    Fax: 212-335-4501
9    marc.miller@dlapiper.com
10
11  For Defendants:
12  BOOTH, SWEET LLP
13  BY: DAN BOOTH, ESQ.
14    32 R Essex Street
15    Cambridge, MA 02139
16    Tel. 617-250-8602
17    Fax: 617-250-8883
18    dbooth@boothsweet.com
19
20
21
22
23
24  ALSO PRESENT:
25  Peter Goodale, CLVS - Videographer

Page 3

1        INDEX OF PROCEEDINGS
2
3  WITNESS: JOSHUA SAMUEL GANS, Ph.D.: SWORN
4  EXAMINATION                    PAGE
5    By Mr. Miller          9
6    By Mr. Booth           378
7
8
9      INDEX OF SPECIALLY DESIGNATED SECTIONS
10            From p/l  To p/l
11  Confidential section       88/22   89/4
12  Highly confidential section   219/23   387
13
14
15  QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER: n/a
16  INFORMATION TO BE SUPPLIED: n/a
17
18
19
20
21
22
23
24
25

Page 4

1           INDEX OF EXHIBITS
2  NO./ DESCRIPTION                PAGE.
3  EXHIBIT 1 marked for identification:     11
4    Expert Report of Professor Joshua
5    Gans
6  EXHIBIT 2 marked for identification:     11
7    Second Report of Professor Joshua
8    Gans
9  EXHIBIT 3 marked for identification:     24
10    Rebuttal Expert Report of Dr. Na
11    Dawson, dated October 12, 2018
12  EXHIBIT 4 marked for identification:    140
13    Plaintiff's Notice of Video
14    Deposition of Joshua S. Gans
15  EXHIBIT 5 marked for identification:    143
16    Web page printout containing
17    header: "Oh, the Places You'll Go
18    is the top-selling book for
19    graduation season, but it doesn't
20    actually offer great advice" (6
21    pp.)
22  EXHIBIT 6 marked for identification:    172
23    Complaint for 1. Copyright
24    Infringement; 2. Trademark
25    Infringement; and 3. Unfair

Page 5

1    Competition Demand for Jury Trial
2  EXHIBIT 7 marked for identification:    172
3    First Amended Complaint for 1.
4    Copyright Infringement; 2.
5    Trademark Infringement; and 3.
6    Unfair Competition Demand for
7    Jury Trial
8  EXHIBIT 8 marked for identification:    219
9    E-mail marked Highly Confidential
10    - Outside Attorneys' Eyes Only,
11    Bates AMU 6-29-2018 Production
12    000003-08
13  EXHIBIT 9 marked for identification:    249
14    E-mail from Robert Nash to Glenn
15    Hauman dated 2/2/2017 7:29:35
16    a.m., Bates GEEKNET000445
17  EXHIBIT 10 marked for identification:    255
18    Book entitled: "Information
19    Wants to be Shared"
20  EXHIBIT 11 marked for identification:    265
21    Article "Remix Rights and
22    Negotiations Over the Use of
23    Copy-Protected Works" by Joshua
24    S. Gans, University of Toronto
25    and NBER, June 2015

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 6

1  --- Upon commencing at 8:56 a.m.
2      THE VIDEOGRAPHER: Good morning. We are
3  going on the record at 8:56 a.m. on
4  Tuesday, November 6, 2018. Please note
5  that the microphones are sensitive and may
6  pick up whispering, private conversations,
7  and cellular interference.
8      Please turn off all cellphones or
9  place them away from the microphones, as
10  they can interfere with the deposition
11  audio. Audio and video recording will
12  continue to take place unless all parties
13  agree to go off the record.
14      This is Media Number 1 of the
15  video-recorded deposition of Dr. Joshua
16  Samuel Gans, taken by counsel for the
17  plaintiff -- is that correct?
18  MR. MILLER: That's right.
19  THE VIDEOGRAPHER: Thank you -- in the
20  matter of Dr.~Seuss Enterprises, L.P.
21  versus ComicMix LLC et al., filed in the
22  United States District Court for the
23  Southern District of California, Case No.
24  16-CV-02779-JLS-BGS.
25      This deposition is being held at DLA

Page 7

1  Piper, LLP, First Canadian Place 100 King
2  Street West, Suite 6000, Toronto, Ontario,
3  Canada.
4      My name is Peter Goodale, Certified
5  Legal Videographer, and the certified
6  court reporter is Karin Jenkner, both from
7  the firm Veritext Legal Solutions.
8      I am not authorized to administer an
9  oath. I'm not related to any party in
10  this action, nor am I financially
11  interested in the outcome.
12      Counsel and all present in the room
13  will now state their appearances and
14  affiliations for the record.
15  MR. MILLER: Marc Miller, from DLA Piper,
16  on behalf of plaintiff Dr.~Seuss
17  Enterprises, L.P.
18  MR. BOOTH: Dan Booth, counsel for the
19  defendants, of Booth Sweet LLP.
20  THE VIDEOGRAPHER: Thank you. Will the
21  court reporter please swear in or affirm
22  the witness.
23  --- REPORTER'S NOTE: Witness was sworn
24  THE VIDEOGRAPHER: Please begin.
25  MR. MILLER: Okay. Just real quick before

Page 8

1  we get started, I'd like to put on the
2  record that yesterday, November 5th, 2018,
3  at approximately 11:25 a.m. Eastern Time,
4  the defendants served, via e-mail, a
5  second expert report of Professor Gans.
6      Defendants' tactic of serving
7  Professor Gans' second expert report
8  yesterday morning has robbed plaintiff
9  Dr.~Seuss Enterprises, L.P. of any
10  reasonable amount of time to review the
11  second report and digest its contents in
12  advance of today's deposition; and,
13  therefore, has prejudiced DSE's ability to
14  depose Doc--- Professor Gans regarding the
15  entire substance of his opinions and his
16  planned testimony in this action.
17      Accordingly, DSE reserves the right
18  to continue Professor Gans' deposition and
19  recall Professor Gans for another session
20  at defendants' expense.
21  MR. BOOTH: And I'll put on the record
22  that this was not a tactic, and the
23  defendants utterly oppose that
24  characterization and would oppose any
25  further deposition, and the report was

Page 9

1  provided when it was available.
2      And if there are further questions,
3  we're certainly open to discussing, a
4  subsequent discussion, about how those
5  questions might be addressed, but another
6  deposition shouldn't be necessary.
7  MR. MILLER: Okay. I appreciate your
8  position. We have ours. We'll reserve
9  our rights, and we'll see how we do today.
10      And I'll be asking the Professor as
11  many questions as I can about his second
12  report. But if we need to carry on the
13  deposition, we will reserve our right and
14  insist that we do so.
15  MR. BOOTH: We'll reserve our right to
16  object. Thank you.
17      JOSHUA SAMUEL GANS, PH.D.,
18      having been duly sworn,
19  was examined and testified as follows:
20  EXAMINATION BY MR. MILLER:
21  Q. All right. Good morning. Please
22  state your full name for the record.
23  A. Joshua Samuel Gans.
24  Q. Is it okay if I call you Professor?
25  A. Sure.

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 26

1  today on this date.
2      Q. All right. Let's look back at
3  Exhibit 2, your second expert report.
4      Did you do the first draft of your second
5  expert report?
6      A. I did the first draft at every
7  version of it.
8      Q. Did anyone assist you in drafting the
9  second expert report?
10     A. Mr. Booth looked over it and gave
11 some very minor suggestions.
12     Q. And when did you draft the second
13 expert report?
14     A. Last week. I believe last week.
15     Q. What did you do to prepare your
16 second expert report?
17     A. I read Dr. Dawson's report. I
18 re-read it with my first report, because it
19 referenced parts of it. I re-read the original
20 Complaint. And I also, as part of this, did some
21 checking of certain claims made, that she made about
22 what was going on on Amazon.
23     Oh, and I did re-read -- I did pull out
24 and look at, again, the Miceli and Adelstein paper.
25     Q. You said that you did some checking

Page 27

1  of certain claims that she made about what was going
2  on on Amazon --
3      A. Yes.
4      Q. -- what does that mean?
5      A. Well, let me take Exhibit 3. And if
6  we go here -- sorry, let me find the page. Ah.
7  Yes.
8      She had produced, not a screen shot but a
9  printout of an Amazon web page. It's on -- it's an
10 exhibit in her statement.
11     Q. Which exhibit?
12     A. Exhibit No. 1.
13     Q. Thank you.
14     A. And I was looking at that. And she
15 had made some claims about it, about that or about
16 what searches might come up.
17     And so I was trying to replicate it, which
18 is when I noticed that someone called Jordan was the
19 log-in on the account. And I did not know who
20 Jordan was, or anything about his history of
21 purchases on Amazon or searches or anything like
22 that.
23     And so that's what I was doing. And I
24 provided all what I would see without that
25 distortion.

Page 28

1      Q. Sorry, why is that a distortion?
2      A. Well, Amazon tailor various bits of
3  what gets served up from search results based on the
4  characteristics that it knows about the individual
5  who's logged in.
6      So that means that if I were to search
7  Amazon, do a search, I would come up with a
8  different web page than if you were to do it while
9  you were logged in.
10     So if someone were -- was schooled in
11 understanding, you know, what Amazon's pages were
12 and how they operate, they would want to provide
13 evidence that was not related to the computer or
14 log-in that only one person, a person unknown, might
15 provide and would in fact do perhaps what I did,
16 which is ensure that you are logged out at the time,
17 and provide the search, so that it could be
18 replicated, potentially.
19     Q. Thanks for the explanation. That was
20 a long answer. Why don't we break that down a
21 little bit.
22     So you said that "Amazon tailors various
23 bits of work get served up from search results based
24 on the characteristics it knows about the individual
25 who's logged in."

Page 29

1      What do you mean? What "various bits" get
2  tailored based on the individual that's logged in?
3      MR. BOOTH: Objection.
4      A. Well, there has been discussion for
5  many years of Amazon doing a number of things.
6  First of all, it will, when you do your initial
7  search, it will put things in a rank order based on
8  what they think you're searching for.
9      And it could well be that some
10 characteristics of the individual, maybe that
11 they're male or female, maybe where they live, maybe
12 what they purchased in their past, might cause them
13 to serve something up in a different order.
14     Secondly, depending on what you put
15 forward, what your characteristics are, they may
16 actually even offer you a different price for the
17 products in those lists.
18     Depending on whether you're an Amazon
19 Prime customer, they may present things somewhat
20 differently.
21     And they also may take into account -- and
22 we don't know, I don't know specifically in this
23 particular case whether they would; but they would
24 take into account other aspects of other things you
25 were purchasing to be able to recognize what you

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 30

1 might be perhaps shopping for, in case it was not
2 just one thing but several things.
3        Q.  How do you know how Amazon designs
4 its algorithms?
5        A.  So I have been studying digitization
6 for now over two decades.  Amazon right from its
7 beginning.  I've written numerous things about
8 Amazon and other search behavior in digital markets.
9 I have been -- written many papers regarding digital
10 advertising.
11        I have written an entire book regarding
12 the economy of attention on the Internet and how
13 that interacts with things such as search and
14 advertising.  I've participated in every single
15 summer economics and digitization conference --
16        (Query by reporter)
17        A.  Conference, economics and
18 digitization conference at the NBER, which has
19 included many works from Amazon.
20        I have been recruited by Amazon to act as
21 an economist for them, which I did not proceed with.
22        And I have recently supervised a Ph.D.
23 student who studied the Amazon algorithms of
24 determining, in particular, these people who bought
25 this product bought another product, and the

Page 31

1 mechanics of those.  And I supervised that Ph.D.
2 student for six years.
3        And so that's how I come to know this
4 stuff about Amazon.
5        Q.  So you've seen Amazon's algorithms?
6        A.  No.  What I have seen is all of the
7 publicly-available information regarding what those
8 algorithms purport to do.
9        And in some -- in one particular market,
10 because of -- by virtue of that Ph.D. thesis that I
11 supervised, I was able to see a very in-depth
12 analysis of those products and the sorts of results
13 that were being served up.
14        Q.  Have you ever spoken to anyone that
15 works at Amazon on those algorithms about how they
16 work?
17        MR. BOOTH:  Objection.
18        A.  Yes.
19        BY MR. MILLER:
20        Q.  When was that?
21        A.  At the Economics of Digitization
22 meetings.  You may not know, but Amazon employs 150
23 Ph.D. economists.  Usually a dozen of them turn up
24 to those meetings, and we discuss things such as the
25 operations of algorithms and other things like that,

Page 32

1 to the extent that they could tell us.
2        And there have been a number of people who
3 I've talked to over the years regarding those
4 things.  And I haven't, in those interactions, heard
5 anything that caused me to doubt that the
6 plain-language meaning of the statements that they
7 make with regard to those algorithms was not true.
8        Q.  What do you mean, the plain language
9 of the meaning?
10        A.  Well, if we go back to my --
11        Q.  Hold on.  Let me just -- let me get
12 my question up.
13        You said "the plain-language meaning of
14 the statements that they make with regard to those
15 algorithms."
16        A.  Yes.
17        Q.  What does that mean?
18        A.  All right; that's what I'm going to
19 show you.
20        If we go back to my original statement,
21 which is Exhibit 1, and we go to page 12.
22        You'll see that in the screen shot of the
23 page that I talk -- actually, it's the top half of
24 the page -- is "frequently bought together."
25        But that's not an algorithm, that's just

Page 33

1 telling you whether these two things were
2 "frequently bought together" in the same basket.
3        Q.  That's not an algorithm?
4        A.  Well, you could call it -- I don't --
5 I'm not -- okay.  So there are --
6        MR. BOOTH:  Objection.
7        A.  -- there are -- algorithms are -- all
8 right.  I guess it's an algorithm, yes.  But it's a
9 statement, it seems to me.  Whereas --
10        BY MR. MILLER:
11        Q.  Let me ask you a question about that.
12 "Frequently bought together"?
13        A.  Yes.
14        Q.  So the items that appear below that
15 heading --
16        A.  Yes.
17        Q.  -- how are they generated?  How does
18 Amazon generate what products appear under that
19 heading?
20        A.  So what they look at is, if someone
21 has bought Oh, The Things You Don't Know!, what is
22 the most likely thing they included in the same
23 basket or cart as that product.
24        And what it's saying, that of the people
25 who bought Oh, The Things You Don't Know! -- I don't

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 34

1 know if it's the top item or whatever, because
2 "frequently" is a bit loose, but I -- thing that is
3 normally also purchased in that same cart is Oh! The
4 Places You'll Go.
5     Q. Do you know that for sure?
6     A. That was my understanding based on my
7 informal interactions at these conferences.
8         (Query by reporter)
9     Informal.
10 BY MR. MILLER:
11     Q. Have you ever studied the algorithm
12 that generates the "frequently bought together"
13 results?
14     MR. BOOTH: Objection.
15     A. That would require Amazon to disclose
16 it to me.
17     BY MR. MILLER:
18     Q. And Amazon has never disclosed the
19 algorithm for the "frequently bought together"
20 results; is that right?
21     I do not, I do not believe it's been
22 publicly disclosed, what their precise algorithm and
23 code are for any of these things.
24     Q. So you don't know with certainty how
25 algorithm gen -- sorry, how Amazon's algorithms

Page 35

1 generate the results under the "frequently bought
2 together" heading; is that right?
3     MR. BOOTH: Objection.
4     A. As I said, my informal discussions,
5 confirmed with "frequently bought together," meant
6 these things were "frequently bought together," and
7 they were not misleading the public in that.
8     Q. So let me ask my question again. I
9 don't think that you've answered it.
10     Do you know for certain how Amazon
11 generates the products that appear under the
12 "frequently bought together" heading?
13     MR. BOOTH: Objection.
14     A. As I am not an employee of Amazon and
15 I've not been disclosed that information, I do not
16 know for certain whether they misrep -- whether
17 their representations are true.
18     Q. So you are merely speculating about
19 how Amazon generates the "frequently bought
20 together" results?
21     MR. BOOTH: Objection.
22     A. I don't think it's speculation. I
23 think when a company makes billions of statements of
24 the same kind, it is not unreasonable to, at a first
25 likelihood, believe that they are true, especially

Page 36

1 when there is no obvious reason for them to be
2 lying.
3     BY MR. MILLER:
4     Q. But you don't know, one way or the
5 other, whether it's true or whether they're
6 misleading or lying, as you say?
7     MR. BOOTH: Objection.
8     A. I am not a person who's able to look
9 at a web page of an established company and know for
10 certain that their representations are 100 percent
11 true.
12     BY MR. MILLER:
13     Q. So, again, you're just speculating
14 about what Amazon's "frequently bought together"
15 results, how those are generated; is that right?
16     MR. BOOTH: Objection.
17     A. What do you mean by "speculation"?
18     Q. What do you mean by "speculation?"
19 What does that word mean to you?
20     MR. BOOTH: Objection.
21     A. Speculation means to me to be
22 guessing without any context, understanding,
23 expertise, knowledge, et cetera.
24     In that regard, I do not believe I'm
25 speculating when saying to you that my belief is

Page 37

1 that the plain-language meaning -- meaning of
2 "frequently bought together" is as, as Amazon is
3 representing it.
4     BY MR. MILLER:
5     Q. Are you an expert in Amazon's
6 algorithms?
7     MR. BOOTH: Objection.
8     A. What do you regard as an expert?
9     BY MR. MILLER:
10     Q. I'll just flip the question back to
11 you. What do you regard as an expert?
12     MR. BOOTH: Objection.
13     A. I have studied Amazon, its
14 entrepreneurial strategy, its digitization strategy,
15 its book-selling strategy, for two decades. I pay
16 very close attention, whenever I interact with
17 Amazon products, on what is going on with those
18 things.
19     I have not been disclosed, nor have I
20 asked to be disclosed, Amazon's actual algorithms,
21 and so I haven't studied those explicitly. But,
22 standing as a pure outsider, without any special
23 access, I believe I know as much as any digital
24 economist on this subject.
25     Q. So if I understand what you're

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 38

1  saying, you believe that you understand Amazon's
2  business strategy in the way that they conduct their
3  business; is that right?
4        A.  I --
5        MR. BOOTH:  Objection.
6        A.  I do.
7        BY MR. MILLER:
8        Q.  But are you an expert in the
9  algorithms that they use to generate the results
10 under these headings, "frequently bought together,"
11 "customers who bought this item also bought"?
12       MR. BOOTH:  Objection.
13       BY MR. MILLER:
14       Q.  Are you an expert in those
15 algorithms?
16       MR. BOOTH:  Objection.
17       A.  This is going to take a while, this
18 answer.
19       BY MR. MILLER:
20       Q.  Go ahead.
21       A.  So if we go back to when Amazon
22 began, it started out as a company that was focused
23 exclusively on book selling and was, at its initial
24 time in doing so, trying to beat the
25 brick-and-mortars -- bricks-and-mortar stores by

Page 39

1  having the ability to send to customers not books
2  that were -- would have been in stock in a store,
3  which would have been between 25 to a small --
4  25,000 for a small bookstore, 50,000 for your, say,
5  Barnes & Noble, or a hundred thousand different
6  books in, say, a Borders.
7        Instead, it listed a million and then 2
8  million, et cetera, books that were available.
9        Over time, that allowed it to get a sense
10 of what sort of books different customers were
11 buying and to start gathering data on that, and
12 keeping that data.  And it did so from its founding
13 in 1994, and it still does it through to the present
14 day.
15       Back in 2000 -- well, back in the 1990s,
16 or actually even in the 1980s, an
17 artificial-intelligence pioneer called Jeffrey
18 Hinton pioneered a whole lot of new techniques in
19 what was called neural networks.
20       Neural networks were a way of doing
21 artificial intelligence that have been around and
22 conceived on from the '50s and '60s, but hadn't
23 actually produced anything of use.
24       What they had done is the neural networks
25 had tried to provide a way of contextualizing large

Page 40

1  amounts of information by modeling on the human
2  brain, hence the word "neural networks," and also on
3  sort of how they thought the brain would work.
4        So those developments were occurring in
5  parallel to the developments of Amazon and many
6  other Internet companies gathering large corpuses of
7  data.
8        But what happened in the 2000s, was a
9  bunch of artificial intelligence scientists decided
10 to take these neural networks, which were just a
11 layer of meshed classifications, and start to have
12 them have layer upon layer of information.
13       You can think about it as one of those
14 little Pachinko things where you see the little
15 balls go and get sorted, and they just added more
16 layers.
17       They hadn't been able to do that -- they
18 thought this would be sort of a good thing.  They
19 hadn't been able to do it previously because the
20 processing speeds hadn't been fast enough, and also
21 because there hadn't been enough data to really have
22 these things some -- give some bite.
23       But when they were able to do it, firstly
24 with images and then things like natural-language
25 processing, they were able to develop algorithms

Page 41

1  that were able to do one specific function, and that
2  they could predict things, they could take
3  information that we had and turn it into information
4  we need.
5        So when you were looking at -- gave a
6  computer an image, it would be able to tell you what
7  a human would think in that image -- would think is
8  in that image:  A dog, a cat, a frisbee, a child,
9  what have you.  And it did that because it used this
10 trained data set of millions of tagged images.  And
11 then it could get a completely new image and predict
12 what someone would say the image was.
13       From the perspective --
14       (Query by reporter)
15       A.  From the perspective of a company
16 like Amazon, these new techniques allowed them to
17 take this corpus of millions of millions of
18 transactions, all tagged by individuals, boxes, time
19 of day, et cetera, based on what they saw on the web
20 page, and things like that, and be able to use them
21 to predict various things.
22       And so all the algorithms that Amazon
23 tends to use are based in this artificial
24 intelligence or machine learning, that they are
25 called.  That's where the 150 economists are coming

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 98

1  BY MR. MILLER:
2      Q. Are you familiar with others?
3      MR. BOOTH: Objection.
4      A. During the course of various bits of
5  research into licensing and the markets for ideas,
6  one of the things we once thought of investigating
7  was what went on at these licensing-trade shows,
8  'cause I'm aware that they occur in all sorts of
9  industries all around the place.
10     (Query by reporter)
11     A. Occur in all sorts of industries
12 around the place. And I don't remember precisely
13 why we decided not to pursue that angle. But we
14 didn't. So that's the extent of my awareness.
15     BY MR. MILLER:
16     Q. Have you ever read any
17 licensing-industry trade publications?
18     MR. BOOTH: Objection.
19     A. I have but I can't recall specific
20 things. I've read them in the way that I sort of
21 had to read them for something, and then I don't
22 have any other recollection of them.
23     BY MR. MILLER:
24     Q. Have you ever read License Global?
25     MR. BOOTH: Objection.

Page 99

1  BY MR. MILLER:
2      Q. Or heard of that?
3      A. I have not.
4      Q. You don't have any prior experience
5  working in the retail industry; is that right?
6      MR. BOOTH: Objection.
7      A. Prior experience? No. Apart from my
8  consulting work that might have involved retail
9  firms, I have not, except for my failed fashion
10 brand, which was a retail excursion.
11     And I've been recently -- it's not on here
12 'cause it's recent -- been doing some work for
13 Shopify, which is a large Canadian online platform
14 that serves retailers, and so I've been having some
15 experience from that end of it.
16     BY MR. MILLER:
17     Q. You're consulting for Shopify right
18 now?
19     A. Yes, that is correct.
20     Q. Not listed on your c.v.?
21     A. It's not listed, it's not listed
22 because I just didn't update it. It only occurred
23 to me now. Doesn't have any intellectual-property
24 angles to it.
25     Q. You don't have any prior experience

Page 100

1  working in the marketing field, right?
2      MR. BOOTH: Objection.
3      A. What do you mean by "working in the
4  marketing field"?
5      BY MR. MILLER:
6      Q. What do you understand "marketing" to
7  mean?
8      A. So as a --
9      MR. BOOTH: Objection.
10     A. -- as an academic field, marketing is
11 actually quite closely related to economics. There
12 are issues in pricing, there are issues in
13 advertising, branding, distribution, customer
14 relationships.
15     So I spent a number of years working on
16 the economics of advertising markets, and so that,
17 you know, that basically was tightly integrated in
18 with the marketing discipline.
19     (Query by reporter)
20     A. Discipline.
21     One of my co-authors is a marketing
22 professor on several things, including a recent
23 paper on complaints to airlines, which is a
24 marketing function.
25     And -- but I haven't, I haven't been

Page 101

1  employed by a marketing firm.
2      BY MR. MILLER:
3      Q. And you haven't worked in some other
4  companies, a private company's marketing department,
5  right?
6      A. No, I've had to market my own
7  consulting services, obviously, but as I said, I've
8  been an academic my whole life.
9      That said, yeah, we all get drawn into the
10 academic marketing in our academic -- sorry,
11 academic services. And, of course, as an author,
12 I've had to market my own books and things like
13 that.
14     BY MR. MILLER:
15     Q. Okay. Other than this current
16 engagement, this case, have you ever been retained
17 to consult in a dispute or litigation involving
18 books before?
19     MR. BOOTH: Objection.
20     A. There was a matter I recall, but I
21 don't think it went anywhere, where I did a little
22 bit of work, but I didn't -- it was such a little
23 bit of work that I didn't -- I don't even know if I
24 put it on this c.v. It was to do with book sales
25 and the seasonality. Remember, we were playing a

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 114

1    A.   Yes.
2    Q.   Is there anything else in your
3 background that you believe qualifies you to offer
4 an opinion in this case?
5    A.   Okay. So the first was that, you
6 know, this article. The second was that I've had a
7 broad interest in book publishing per se and it's
8 reflected in some books of mine. And then the third
9 part was the subject matter here.
10    And that this was -- I mean, I didn't have
11 to be told very much when Mr. Booth said here's what
12 the title of the transformative work, it's Oh, The
13 Places You'll Boldly Go!, I knew which two elements
14 that that was coming into play.
15    Now --
16    Q.   Why is that?
17    A.   Well, the reason being is because own
18 how you get formal expertise in Star Trek. I don't
19 know what would qualify someone. But if you were to
20 search the world for an economist who was as
21 knowledgeable about Star Trek, all of its elements,
22 has watched every minute of it, understands all of
23 that stuff, has looked into the industry of it, et
24 cetera, there would be two or three names on the
25 list, and I would be one of them.

Page 115

1    Not only that -- and you know, aside from
2 the fact that I've got all three of my children are
3 named after Star Trek characters, so I obviously am
4 a fan. I don't know if that makes you an expert bit
5 makes you definitely familiar.
6    And the third, and of course --
7 similarly -- I don't think I'm unique to this as a
8 parent, I have read the complete works of Dr.~Seuss
9 out loud00 hundreds of times, so I was familiar with
10 what that was.
11    Now, this is a luxury I do not normally
12 get when am testifying before the courts on market
13 impact and other things like that. Normally, I'm
14 not as steeped in the, in the, in the cultural
15 milieu of this thing. But this time I was. Which
16 is what you asked before: Why did I think I was a
17 good fit for this case? It was precisely because
18 not only had I written these articles but the
19 subject matter played into -- we can call it
20 personal interest, but a very deep personal
21 interest.
22    Q.   So are you claiming to be an expert
23 in Star Trek in this case?
24    MR. BOOTH: Objection.
25    A.   I'm not claiming to -- I don't -- as

Page 116

1 I said, I don't know what an expert in Star Trek is.
2 But if the threshold for being an expert in Star
3 Trek was being able to take Oh, The Places You'll
4 Boldly Go! and immediately be able to identify by
5 name all of the Easter -- not Easter eggs, the
6 things that the places on each page were represented
7 in. And there was probably about 80 or -- 80 or so
8 of those throughout the whole book, and I'd probably
9 get 80 or 90 percent of them. And of what, what the
10 author was communicating to me.
11    I also realize that doesn't make me a very
12 large target market, but I was able to do that.
13 Which I don't know if anybody else can other than
14 the authors in this proceeding.
15    I don't know if that makes me an expert.
16 But what that allowed me to do was to look at this
17 and say, well, you know, I know what market Star
18 Trek is targeted at, what sort of people. I know
19 what sort of people Dr.~Seuss is targeted at. And
20 moreover, in both cases there's other evidence of
21 those sorts of things.
22    So that, at least from my perspective,
23 dramatically lowered my cost of being able to get
24 into this case and provide expert advice.
25    Q.   All right. I'll have a few questions

Page 117

1 for you about the target markets for the various
2 properties you mentioned, but let me ask a few
3 questions before we get there.
4    Actually, hold on. I'm not sure that you
5 answered my question previously, which is: Are you
6 claiming to be an expert on Star Trek in this
7 matter?
8    MR. BOOTH: Objection, asked and answered.
9    BY MR. MILLER:
10    Q.   It's a yes-or-no question.
11    A.   I don't know what an expert on Star
12 Trek is.
13    Q.   So the answer is no?
14    MR. BOOTH: Objection.
15    A.   So I'm not making that claim.
16    BY MR. MILLER:
17    Q.   Okay. Aside from being an economist,
18 is there anything else in your background that
19 qualifies you to provide the expert testimony that
20 you are providing in this matter?
21    MR. BOOTH: Objection, asked, answered.
22    A.   I think, you know, it's just not
23 economics but also digital economics. Which is why
24 I looked at some of the things that I looked at and
25 we discussed earlier regarding Amazon, and why I

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 130

1    case. I mean, I was providing the expert report.
2        BY MR. MILLER:
3        Q.  Everything's disclosed in your report
4    that you considered?
5        A.  Every document related to this case
6    that I considered, apart from the order that I
7    clearly didn't put in this, has been disclosed in
8    this report.
9        Q.  Did you select the materials that you
10   reviewed in forming your opinion?
11       MR. BOOTH: Objection.
12       A.  I -- so did I review every single
13   document in this case?
14       Q.  No, that was not my question. My
15   question was, did you select the materials you
16   reviewed to form your opinion in this case?
17       MR. BOOTH: Objection.
18       A.  I asked for materials where the
19   plaintiffs had explicitly discussed market impact
20   variables.
21       BY MR. MILLER:
22       Q.  And what materials were you given in
23   response to your inquiry?
24       A.  The original complaint --
25       MR. BOOTH: Objection.

Page 131

1        A.  I was given the original complaint.
2        BY MR. MILLER:
3        Q.  Are you aware that there has been an
4    amended complaint filed by the plaintiff in this
5    action?
6        A.  I was probably given the amend....
7            (Query by reporter)
8            Yes, I was given that.  By -- I regard the
9    amended complaint as the complaint.
10       Q.  Right. But you referred to the
11   "original complaint," which is different from the
12   amended complaint.
13       A.  Right.
14       Q.  So which is it that you reviewed?
15       A.  Oh, in the ones I listed in the
16   footnote, it was the original complaint, but I
17   believe there were the same references in -- the
18   same statements went unamended in the amended
19   complaint.
20       Q.  Did you review the amended complaint?
21       A.  Yeah, I must have, but isn't that the
22   same document?
23       Q.  No?
24       A.  Oh, okay.  All right. Well, I'm not
25   a lawyer.

Page 132

1        Q.  Right.  Did you -- so let me ask the
2    question again.
3        Did you review the amended complaint in
4    this action?
5        A.  Yes.
6        Q.  And why is it not listed in your
7    expert report?
8        A.  Because I --
9        MR. BOOTH: Objection.
10       A.  Because I regarded that as the
11   complaint. I'm not a lawyer.
12       BY MR. MILLER:
13       Q.  Did you, did you ask counsel what was
14   different about the two documents?
15       MR. BOOTH: Objection.
16       A.  I looked and I saw what was different
17   about the two documents.
18       BY MR. MILLER:
19       Q.  But you assumed that they were --
20       A.  I wanted to make sure.
21       Q.  Let me ask my question.
22       Did you assume that they were the same
23   after you looked at them?
24       MR. BOOTH: Objection.
25       A.  No.

Page 133

1        BY MR. MILLER:
2        Q.  So which one did you rely on in
3    forming your opinion?
4        MR. BOOTH: Objection.
5        A.  I relied on the original complaint,
6    and I recall checking the amended complaint to see
7    if plaintiffs had changed their statements that I
8    was relying on between that complaint and the
9    amended complaint.
10       BY MR. MILLER:
11       Q.  And what was your conclusion?
12       A.  They had not.
13       Q.  Were there any other materials that
14   you asked counsel for in order to -- let me strike
15   that.
16       Were there any other materials that you
17   wanted to review to form your opinion that you asked
18   counsel for that you were not given?
19       MR. BOOTH: Objection. To the extent that
20       the -- that you can answer without
21       disclosing confidential or privileged
22       communications, you may answer.
23       A.  At some stage I would have asked, you
24   know, I wasn't -- I asked, you know, what sort of
25   things might have been disclosed had -- one thing

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 134

1  was, you know: Do you have detailed sales
2  information regarding Dr.~Seuss books, and other
3  things like that.
4      BY MR. MILLER:
5      Q.  Mm-hm?
6      A.  I asked if counsel had had that, and
7  they had not got that information, was my
8  recollection.
9      Q.  You were told that Dr.~Seuss hadn't
10  produced any sales records in this case?
11      MR. BOOTH: Objection.
12      A.  I am not sure what -- it was, it was
13  stuff about -- it was during an earlier
14  conversation, so I don't require (sic) but it was
15  like, I wondered what had been made available.
16      BY MR. MILLER:
17      Q.  Mm-hm?
18      A.  Regarding detailed sales things,
19  including timing and other things that might allow
20  us, if it turned out that there was another work, to
21  analyze things. But I don't believe that was
22  available. I'm not sure what the reason was.
23      I haven't seen a -- you can tell me now if
24  it was in a document that I've seen, but I never saw
25  any detailed sales information.

Page 135

1      Q.  So I will represent to you that
2  Dr.~Seuss produced many documents that contained
3  sales figures for its works in addition to its --
4  the other products that it --
5      A.  Let me be very specific. A time
6  series.
7      Q.  What do you mean by "a time series?"
8      A.  A time series is the sales by, you
9  know, week, going back to the publication of Oh, The
10  Places You'll Go!
11      Q.  Mm-hm?
12      A.  Because you have to be able to look
13  at that time series to understand the sales cycles.
14      Q.  So you wanted to see sales by week?
15      A.  Yes.
16      Q.  Of Oh, The Places You'll Go!
17      A.  Yes.
18      Q.  In order to develop your opinion in
19  this case?
20      A.  No. I was saying that when I was
21  doing the initial thoughts about what sort of
22  evidence might be available to be of use to the
23  Court, one of the discussions that had was: Were
24  there very, very detailed sales figures produced by
25  DSE? And my understanding is that had not been

Page 136

1  produced.
2      And so I thought, okay, well, that
3  evidence isn't available. I will look for other
4  evidence. And the other evidence is what I produced
5  in my report.
6      Q.  Right. But you didn't look at the
7  evidence that was actually produced by DSE in this
8  case, right?
9      MR. BOOTH: Objection.
10      A.  I looked at any evidence that was
11  referenced by -- no. When -- in the original
12  complaint, there was none of that reference -- none
13  of that evidence was referenced. Or the amended
14  complaint, for that matter.
15      BY MR. MILLER:
16      Q.  Right. But you didn't look at any of
17  the documents produced during discovery by DSE in
18  this case; isn't that right?
19      A.  I --
20      MR. BOOTH: Objection.
21      A.  All I can tell you is, I asked were
22  there detailed sales figures of the sort that I was
23  looking for, produced, I guess, in discovery, and
24  was told no.
25      BY MR. MILLER:

Page 137

1      Q.  And counsel didn't give you the
2  reports that DSE produced in this case, is that
3  right?
4      MR. BOOTH: Objection.
5      A.  I presume it was not given to me
6  because it would -- did not have what I asked for.
7  That was my assumption. But I didn't need it, in
8  the end, to form my opinion.
9      Q.  You didn't think it was important to
10  review Dr. Seuss' sales figures to develop your
11  opinion about the market --
12      MR. BOOTH: Objection.
13      BY MR. MILLER:
14      Q.  -- for Dr. Seuss' works?
15      MR. BOOTH: Objection.
16      A.  Well, I did, and I reviewed publicly
17  available figures that I referenced in my report,
18  but I...
19      (Query by reporter)
20      That I referenced in my report to confirm
21  what I thought I already knew about Dr. Seuss, which
22  was it was tremendously successful in book
23  publishing.
24      Q.  Mm-hm. You didn't think it was
25  important to review the documents produced by

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 138

1  Dr.~Seuss in this case?
2      MR. BOOTH:  Objection.
3      A.  If the documents had anything to do
4  with market impact, that would have informed on it,
5  they would have -- it would have been useful to
6  review.  But I didn't need them to form my opinion.
7      If you would like to put something to me
8  and ask about it, I'm happy to do so.  I'm really
9  only here to help.
10     MR. BOOTH:  If I may, Marc, I had
11     mentioned earlier that Dr. Gans has -- had
12     hoped to be available at noon in a
13     separate matter.  If it's possible, as
14     that's about 15 minutes from now, I'm not
15     sure how many questions you might have --
16     MR. MILLER:  Sure.  Let me wrap up this
17     particular segment, take a few minutes.
18     MR. BOOTH:  Thank you much.
19  BY MR. MILLER:
20     Q.  Did you speak with anyone else
21  besides counsel in forming your expert opinion in
22  this case?
23     MR. BOOTH:  Objection.
24     A.  No.
25     BY MR. MILLER:

Page 139

1      Q.  You didn't speak with any other
2  experts that were retained by the defendants?
3      MR. BOOTH:  Objection.
4      A.  The -- there were other experts?  No,
5  I don't.  Didn't.
6  BY MR. MILLER:
7      Q.  Did you speak with any consultants
8  that were retained by the defendants?
9      MR. BOOTH:  Objection.
10     A.  No.
11  BY MR. MILLER:
12     Q.  Did you speak with anyone that works
13  for defendant ComicMix?
14     A.  No.
15     MR. BOOTH:  Ob...
16  BY MR. MILLER:
17     Q.  Did you speak with anyone that works
18  in the book publishing industry?
19     MR. BOOTH:  Objection.
20  BY MR. MILLER:
21     Q.  In forming your opinion in this case?
22     MR. BOOTH:  Objection.
23     A.  I spoke to no one, no one outside of
24  counsel in this case.
25     BY MR. MILLER:

Page 140

1      Q.  Did you review any of the expert
2  reports that were served in this case?
3      A.  No.
4      Q.  Did you review Dr. Dawson's report?
5      A.  Oh, Dr. Dawson's, yes.  Sorry.
6      Q.  Did you review any of the other
7  reports that were served in this case?
8      A.  No.
9      MR. MILLER:  All right.  Why don't we take
10     a break.  You can make your phone call.
11     THE VIDEOGRAPHER:  This marks the end of
12     Media Number 2 in the deposition of
13     Dr. Joshua S. Gans.  We're going off the
14     record at 11:48.
15  --- Luncheon taken at 11:48 a.m.
16  --- Upon resuming at 12:45 p.m.
17     THE VIDEOGRAPHER:  Here begins Media
18     Number 3 in the deposition of Dr. Joshua
19     S. Gans.  We're back on the record at
20     12:45 p.m.
21     MR. MILLER:  We're going to mark the next
22     exhibit.
23     THE REPORTER:  This will be 4.
24  EXHIBIT 4 marked for identification:  Plaintiff's
25     Notice of Video Deposition of Joshua

Page 141

1      S. Gans
2  BY MR. MILLER:
3      Q.  Okay, Professor, do you recognize the
4  document that's been marked as Exhibit 4 and handed
5  to you by the court reporter?
6      A.  Yes.
7      Q.  What is that document?
8      A.  Oh, no, I don't recognize it.  I've
9  never seen it before.
10     Q.  Okay.
11     A.  When would I have seen this?
12     Q.  Did your counsel share that document
13  with you?
14     A.  I don't --
15     MR. BOOTH:  Objection.
16     A.  I don't think so.
17     BY MR. MILLER:
18     Q.  Okay.  That's a deposition notice.
19     A.  Okay.
20     Q.  Which sets out that we're going to be
21  holding this deposition today, starting this morning
22  at 9.
23     A.  Okay.
24     Q.  You haven't seen that before?
25     A.  No.

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 142

1    Q. Okay.
2    MR. BOOTH: I'd like to note for the
3    record that this deposition notice was --
4    is dated November 2nd, 2008 (sic) which
5    was Friday, and the parties had already
6    agreed that the deposition would be held
7    here at this location starting at 9
8    o'clock today.
9    MR. MILLER: Okay. Thanks for that
10    clarification.
11    Q. Professor, what did you do to prepare
12    for today's deposition?
13    A. I met with counsel yesterday for an
14    hour. I re-read my first expert report. And I had
15    another look at Oh, The Places You'll Boldly Go!,
16    the PDF.
17    Q. Did you work on your second expert
18    report? Were you still working on it yesterday
19    while you were preparing for today's deposition?
20    A. Oh, I, I had finished that off. I
21    wasn't -- but I hadn't started any preparation for
22    the deposition.
23    Q. Did you review your second report in
24    preparation for today's deposition?
25    A. No, I only finished it yesterday.

Page 143

1    Q. Anything else that you did in
2    preparation for today?
3    A. No.
4    Q. Speak to anyone else?
5    A. No.
6    Q. All right. Let's look at Exhibit 1,
7    which is your first expert report.
8    A. Okay.
9    Q. I'll turn your attention to page 4,
10    section 3, which is titled: "Basic Facts."
11    A. Yes.
12    Q. What materials did you review and
13    consider in forming the statements that appear in
14    section 3 of your report?
15    A. The things that I reviewed were, apart
16    from stuff that I had in memory, I looked at this
17    Slate article, which was the thing that came up in a
18    search just for understanding how many copies of Oh,
19    The Places You'll Go! had sold.
20    Q. Let's just mark that Slate article.
21    Thank you.
22    EXHIBIT 5 marked for identification: Web page
23    printout containing header: "Oh, the
24    Places You'll Go is the top-selling
25    book for graduation season, but it

Page 144

1    doesn't actually offer great advice"
2    (6 pp.)
3    BY MR. MILLER:
4    Q. Professor, what is the document
5    marked as Exhibit 5 that the court reporter has just
6    handed to you?
7    A. This looks like a printout of the
8    Slate article I referenced in footnote 1.
9    Q. Why did you select this article?
10    A. I selected this article -- I had
11    actually read this article before. I selected this
12    article because it had... Where is the thing?
13    It had the reference to 12 point (sic)
14    million copies sold of Oh, The Places You'll Go!
15    Q. Show me where in this article you're
16    referring to?
17    A. So on page 2, in the second
18    paragraph, it said:
19    "In 26 years, Oh, The Places
20    You'll Go! has sold more than 12.5
21    million copies in all formats, with
22    sales increasing each of the past
23    four years. It is Seuss'
24    bestselling book of all time, and
25    yes, it's mostly thanks to

Page 145

1    graduations."
2    (Query by reporter)
3    THE WITNESS: "Thanks."
4    BY MR. MILLER:
5    Q. Do you know how many copies of Oh,
6    The Places You'll Go! were sold last year?
7    A. No.
8    Q. Do you know how many copies were sold
9    the year before that?
10    A. No, my -- this article was only up to
11    2016, and I'm not even sure it included 2016.
12    Q. Mm. Do you know how many copies were
13    sold in 2016?
14    A. No.
15    Q. Do you know how many copies of Oh,
16    The Places You'll Go! were sold in any given year?
17    A. In any given year?
18    Q. Mm-hm?
19    MR. BOOTH: Objection.
20    A. No.
21    BY MR. MILLER:
22    Q. And you didn't review any of the
23    sales documents that Dr.~Seuss produced in this
24    action, right?
25    A. I only reviewed documents that would

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 146

1  be informative to the questions I had at hand.
2       Q.  Mm-hm.  So you're relying on an
3  article from Slate for your information that
4  Dr.~Seuss' Oh, The Places You'll Go! is a bestseller
5  every year?
6            MR. BOOTH:  Objection.
7       BY MR. MILLER:
8       Q.  Is that right?
9            MR. BOOTH:  Objection.
10      A.  That is what I'm relying on, yes.
11           BY MR. MILLER:
12      Q.  And you didn't think it would be
13  relevant to look at Dr.~Seuss' actual sales figures
14  to determine independent of some article from the
15  Internet?
16      A.  Let me explain to you --
17           MR. BOOTH:  Objection.
18      A.  -- how expert -- how expert reports
19  go.  They normally have an initial section that lays
20  out the context.  That's all I was doing here.
21           BY MR. MILLER:
22      Q.  Mm-hm.  But you didn't think that it
23  would be relevant to actually review the evidence
24  produced in this case in laying out the context of
25  your expert report?

Page 147

1            MR. BOOTH:  Objection.
2       A.  I'm sorry, where was the evidence?
3       BY MR. MILLER:
4       Q.  The evidence are the documents that
5  were produced by the parties in this case, and the
6  deposition testimony that was proffered.
7       A.  Can you describe to me more of what
8  they had?
9       I mean, I just don't have the memory you
10  have for all the documents, and I haven't seen all
11  of them, but I'm happy to -- if you ask me about any
12  given one, to tell you why it is likely I didn't
13  consider it.
14      Q.  Sure.  Are you aware that Dr.~Seuss
15  produced sales reports for its books in this case?
16      A.  I'm not aware precisely of what they
17  produced.  I am -- my only understanding was they
18  hadn't produced the data that I would find useful,
19  which I spelled out when I initially was discussing
20  this case.
21      Q.  And again, you wanted -- remind me
22  again what you thought was useful data?
23      A.  In order to analyze the market impact
24  of a transformative work of the likely small scale
25  of something like Oh, The Places You'll Boldly Go!,

Page 148

1  I felt I would need weekly data stretching back all
2  the way to the publications of Oh, The Places You'll
3  Go! on it and all other Dr.~Seuss products, and,
4  also, to be able to relate that at least to the
5  timing of entry of other transformative works which
6  we do know existed.
7       Q.  And that information was not, to your
8  knowledge, available to you; is that right?
9       A.  To my knowledge, it was not available
10  to me, nor has it been submitted in this case to my
11  knowledge.
12      Q.  But you didn't actually review any of
13  the evidence that was submitted in this case, right?
14           MR. BOOTH:  Objection.
15      A.  I reviewed certain parts.  I
16  certainly reviewed the original and, obviously,
17  amended statements of claim -- or complaints, I'm
18  sorry.  And, you know, that -- if that had
19  referenced anything, such things, I probably would
20  have asked for it if they'd referenced the data I'd
21  wanted.
22           BY MR. MILLER:
23      Q.  What's your understanding of what's
24  included in a complaint in a U.S. lawsuit?
25           MR. BOOTH:  Objection.

Page 149

1       A.  My understanding is, it is a set of
2  claims that the -- well, in this case the plaintiffs
3  believe are factually correct or they are going to
4  prove are factually correct in this matter to
5  support their overall case.
6       Q.  Do you know what the word
7  "allegation" means?
8            MR. BOOTH:  Objection.
9       A.  I know what the word "allegation" is,
10  yes.
11           BY MR. MILLER:
12      Q.  What is an allegation?
13      A.  It means a conjecture of a state of
14  truth.
15      Q.  And are you aware that the
16  complaints, both the original and the amended, that
17  were filed by Dr.~Seuss in this case contain
18  allegations?
19           MR. BOOTH:  Objection.
20      A.  I didn't think they contained -- when
21  it was in reference to their own business, I didn't
22  regard them as allegations.  When they claimed that
23  they were a bestselling brand, I thought that's
24  what they believed.
25      Q.  Did you want to review any of the

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 150

1  underlying documents to see whether or not
2  Dr.~Seuss' allegations were supported?
3       A. It was --
4       MR. BOOTH: Objection.
5       A. I only have to review underlying
6  evidence if I think it will be likely to be material
7  in the question I was trying to answer.
8       BY MR. MILLER:
9       Q. Mm-hm.
10      A. And I'm, as I said, if you're
11 happy -- you know, Dr. Dawson did not indicate a
12 single bit of evidence that she thought I failed to
13 consider. You have thus far not put any before me.
14 That raises confidence that my initial request that
15 what was available and the stuff that I used was the
16 economical way to approach the question in this
17 matter.
18      Q. You didn't think that it was relevant
19 to look at the sales reports of Dr.~Seuss' books
20 over, let's say, the past five years?
21      MR. BOOTH: Objection --
22      BY MR. MILLER:
23      Q. In considering the market for
24 Dr.~Seuss' works?
25      MR. BOOTH: Objection.

Page 151

1       A. Was it going to change my opinion
2  that Dr.~Seuss is a terrific brand that has
3  bestselling books, that is a formidable player in
4  this market? I did not believe that knowing year by
5  year as opposed to aggregate, or anything more than
6  was in this Slate article, was going to change my
7  opinion on that.
8       However, if you are willing to represent
9  to me that you have a document that I should have
10 considered and that I would have come to a
11 conclusion -- you believe, even if you believe, come
12 to a conclusion that Dr.~Seuss isn't as successful
13 as I make it out here, please put forward.
14      BY MR. MILLER:
15      Q. Mm-hm. Why didn't you look at any of
16 the documents that were produced by Dr.~Seuss in
17 this case?
18      MR. BOOTH: Objection.
19      A. There were many matters and issues
20 associated with this case that I was only looking at
21 documents that was my understanding were going to be
22 useful for the assessment of market impact. And
23 given that Dr.~Seuss to my knowledge had not
24 secretly published this book and had a market test
25 of it, there was nothing for me to look at.

Page 152

1       Q. Mm-hm. Did you ask your counsel if
2  there were market reports produced by Dr.~Seuss in
3  this case?
4       MR. BOOTH: Objection.
5       A. Market reports about what?
6       BY MR. MILLER:
7       Q. Sales of Dr.~Seuss' books, for
8  example?
9       A. No, I only asked for sales figures
10 that I thought would be applicable to the analysis
11 of the market impact of a transformative work.
12      Q. Mm-hm. And short of the weekly sales
13 figures that you believe are most relevant, did you
14 ask to see any of the sales reports or market data
15 that was produced in this case?
16      A. No. I didn't think that any of that
17 information would be useful to altering or refining
18 my opinion in this -- as I've had in my reports.
19      Q. Mm-hm. You didn't think the number
20 of books for Oh, The Places You'll Go!, for example,
21 that Dr.~Seuss sold?
22      A. It would have literally no impact.
23 No impact. Unless it turned out -- and I will admit
24 this, it wasn't a bestseller. But I had no reason
25 to believe it wasn't a bestseller because in the

Page 153

1  statement of claim it was claimed to be a
2  bestseller.
3       Q. Mm-hm?
4       A. And no one has claimed otherwise.
5  And in fact, on the days that I was writing my
6  report, it was a bestseller literally that day.
7       Q. How do you know that?
8       A. If you go to Amazon, you can see that
9  it is currently a bestseller.
10      Q. Mm-hm. Did you rely on that in
11 forming your opinion?
12      A. No.
13      Q. So you didn't rely on any market data
14 in forming your opinion besides this Slate article;
15 is that right?
16      MR. BOOTH: Objection.
17      A. I relied on all the market data I
18 thought was available that was of relevance.
19      BY MR. MILLER:
20      Q. Which in your opinion is this Slate
21 article that you cite in your report?
22      A. No.
23      MR. BOOTH: Objection.
24      A. The Slate article, as I said, was
25 just a thing that I cited for the actual number of

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 154

1  sales of Oh, The Places You'll Go! or some sense of
2  it. The reason is because no sales, overall
3  cumulative sales figures, were listed in the
4  original statement of claim.
5        Q.  Again, aside from the Slate article,
6  you did not review any market data in forming your
7  opinion in this case; is that correct?
8        A.  I --
9        MR. BOOTH:  Objection.
10       A.  Yes, I did review market data. I did
11  my interrogation of Amazon's system. I regard that
12  as market data.
13       BY MR. MILLER:
14       Q.  You looked at Amazon's website?
15       A.  Mm-hm.
16       Q.  You didn't look at any sales data or
17  purchasing data from Amazon; is that right?
18       MR. BOOTH:  Objection. Asked and
19       answered.
20       A.  Let's list through all the things
21  that I did not get.
22       BY MR. MILLER:
23       Q.  Mm-hm?
24       A.  Okay. I did not look at demographic
25  information regarding the population of children

Page 155

1  born in each month going back, forwards, and of
2  school-aged children.
3        I did not look at the movie sales of
4  Dr.~Seuss movies.
5        I did not look at the ticket sales that
6  were driven in Universal Studios by the Dr.~Seuss
7  little part.
8        I did not look at electoral votes and
9  college votes of Republicans and Democrats, going
10  back, forward, far back.
11       I did not look at detailed oceanographic
12  data to indicate weather patterns. I did not
13  look...
14       Shall we go on?
15       I only looked at things that were going to
16  be useful for my analysis.
17            (overspeaking)
18       Aggregate sales figures of Dr.~Seuss are
19  not useful for the analysis of market impact of
20  transformative works. Very simple as that.
21       Q.  I appreciate your humour.
22       A.  And not useful of it.
23       Q.  I appreciate your humour. However,
24  my question is simple. You're here to opine, as an
25  expert, an economist, correct?

Page 156

1        A.  Yes.
2        Q.  And the subject of your testimony is
3  the market impact that the Accused Work would have
4  on Dr.~Seuss' works; is that correct?
5        A.  Yes.
6        Q.  And you're telling me that in forming
7  your opinion on market impact, you did not consider
8  any market data that was produced by the parties in
9  this case; is that right?
10       MR. BOOTH:  Objection.
11       A.  The data that as I understand and
12  also from what you're telling me now that was
13  produced in this case, was not market data that
14  would be useful to a economist in forming their
15  opinion about market impact. And so I did not use
16  it.
17       BY MR. MILLER:
18       Q.  Okay. So the only thing that you're
19  telling me that would have been useful in terms of
20  market data in forming your opinion is what? Please
21  repeat it.
22       A.  So...
23       MR. BOOTH:  Objection.
24       A.  In order to have analyzed what the
25  total quantum of impact on each and every one of

Page 157

1  Dr.~Seuss' products, both now and in the future,
2  from a transformative work, you need two things.
3        You need data with sufficient time series
4  granularity to be able to detect the effects of
5  entry of transformative works on those products.
6  This is just a start.
7        And you need examples of the precise date
8  of entry of some of those transformative products,
9  and probably of, also, competitive products in the
10  broader space to Dr.~Seuss to even get started.
11       And none of that data was available.
12       Q.  So if none of that data was
13  available, on what are you basing your expert
14  opinion in this case?
15       A.  I am basing my expert opinion on the
16  evidence that I've presented in my report.
17       Q.  Which is none of the data that you
18  would find to be useful in actually developing this
19  opinion; is that right?
20       A.  You didn't ask that, you asked about
21  market data provided by Dr.~Seuss. I did not use
22  market data provided by Dr.~Seuss as evidence,
23  except insofar as I relied on statements that you
24  regard as allegations in this original claim that I
25  took to be factual.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 190

1    A.  Not just that.  For my sins, another
2  book that I wrote previously was on the economics of
3  parenting.  And a substantial amount of that were
4  how brands such as Dr.~Seuss, and there are others,
5  marketed to parents and children.
6    And so I took a, for a number of years
7  there, a keen interest in those sorts of things.
8    BY MR. MILLER:
9    Q.  Mm-hm.  Did you rely on that book?
10  What was it called, the parenting book?
11    A.  No, it's called Parentonomics.
12    Q.  Parentonomics.  Did you rely on
13  Parentonomics in forming your opinion in this case?
14    MR. BOOTH:  Objection.
15    A.  No, I didn't rely on that explicitly,
16  it's just as part of the mix that of the things that
17  make up me.
18    Q.  Mm-hm?
19    A.  I'm just saying it was not purely
20  personal, my experience with Dr.~Seuss.  Also, it
21  goes back because I of course had those things when
22  I was a child as well, as you probably did as well.
23    Q.  Mm-hm.  Were you aware that Dr.~Seuss
24  sells fine art products?
25    A.  Actually, yes.  But they're sort

Page 191

1  of -- well, I don't know.  With all these things,
2  there might be some adults that purchase it for
3  themselves but my recollection of them were they
4  were expensive but they were aimed at being able to
5  decorate a child's room.  That's my recollection of
6  them.
7    Q.  Mm-hm.  What's that based on?
8    MR. BOOTH:  Objection.
9    A.  It's my memory because you brought
10  them up right now.  I did not consider -- I do not
11  believe -- I will say this right now -- that the
12  publication of Oh, The Places You'll Boldly Go!
13  would have any impact whatsoever on the fine art
14  sales or anything that might come from Dr.~Seuss, or
15  some of those fine art are not produced by Dr.~Seuss
16  themselves but are produced by other artists that
17  are transformative works, and I don't think they'll
18  impact on those either.
19    BY MR. MILLER:
20    Q.  So -- all right.  Let's break down
21  that statement.
22    One, on what are you basing your opinion
23  that you don't think the publication of Oh, The
24  Places You'll Boldly Go! would have any impact on
25  fine art sales?

Page 192

1    MR. BOOTH:  Objection.
2    A.  It's a book.  And my belief is that a
3  book will not impact on the fine arts sales of --
4  that might be based on a different book.  I think
5  those are distinct markets.  I think that if I was
6  testifying in an antitrust matter about market
7  definition, I would not constitute a conjoined book
8  and fine art market, I can't imagine ever.
9    BY MR. MILLER:
10    Q.  Did you... Are you opining on market
11  definition in this case?
12    MR. BOOTH:  Objection.
13    A.  I'm opining on market impact in this
14  case.  You put forward to me a market definition
15  question which I was happy to opine on.
16    BY MR. MILLER:
17    Q.  Are you opining on market definition
18  in this case?
19    A.  No.
20    MR. BOOTH:  Objection.
21    A.  No, I'm not.  I'm opining on market
22  impact.
23    BY MR. MILLER:
24    Q.  So your statement that the
25  publication of Oh, The Places You'll Boldly Go!

Page 193

1  would not have any impact whatsoever on fine art
2  sales is based on just a belief?
3    MR. BOOTH:  Objection.
4    BY MR. MILLER:
5    Q.  Is that right?
6    MR. BOOTH:  Objection.
7    A.  I think in 25 years as an economist,
8  with a Ph.D. from Stanford, 130 published articles,
9  more books now than I can count, that I can sensibly
10  apply economics to understand when products are in
11  distinct markets, when those markets are
12  sufficiently far distance from one another.
13    And what I'm willing to opine now, based
14  on all that experience, is that the book market for
15  children's books, specifically Oh, The Places You'll
16  Boldly Go!, operates in a completely distinct and
17  unrelated market to the market for fine art.
18    Q.  Is Oh, The Places You'll Boldly Go!
19  in the children's book market?
20    MR. BOOTH:  Objection.
21    A.  No, Oh, The Places You'll Boldly Go!
22  is in the, is in the book market.
23    BY MR. MILLER:
24    Q.  I think you're confusing yourself,
25  Professor.

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 194

1      A. Okay.
2      Q. You just said that Oh, The Places
3  You'll Boldly Go! is in the children's book market.
4      A. I'm sorry. Then let me clarify. Oh,
5  The Places You'll Boldly Go! is in the book market.
6      Q. Mm-hm. And you don't think that the
7  publication of Oh, The Places You'll Boldly Go!
8  would have any impact on, in that example, the fine
9  art products that Dr.~Seuss licenses?
10      A. That is my... I'm willing to bet my
11 reputation on it.
12      Q. Okay. You didn't review any evidence
13 to support that, you're just basing it on your
14 belief, based on your experience; is that right?
15      MR. BOOTH: Objection.
16      A. This is experience that you have to
17 have in -- basically, half of the job is
18 understanding and getting a sense of what have got
19 to be complements and substitutes and what are in
20 the same markets. And what you have to have
21 described to you is some sort of similar economic
22 functional related products.
23      Q. Mm-hm?
24      A. And as far as I can tell, there is no
25 relationship between the fine art market and the

Page 195

1  market for these sorts of books. It's as simple as
2  that. Not as substitutes.
3      Q. But again, you didn't study any
4  evidence regarding Dr.~Seuss' fine art in the
5  context of --
6      A. There is no evidence --
7      Q. Let me finish my question -- in the
8  context of forming your opinion in this case; is
9  that right?
10      MR. BOOTH: Objection.
11      A. My belief that there is no evidence
12 regarding Dr.~Seuss' fine arts activities in this
13 case.
14      BY MR. MILLER:
15      Q. Mm-hm. Did you review any licence
16 agreements that Dr.~Seuss produced in this case?
17      MR. BOOTH: Objection.
18      A. I am unaware of any licence
19 agreements to Dr.~Seuss produced in this case.
20      BY MR. MILLER:
21      Q. You're unaware of them?
22      A. I'm unaware of them.
23      Q. Did you ask to see any of them?
24      A. No, I only asked for things that were
25 material for the questions that I was looking at,

Page 196

1  and that wasn't.
2      Q. Did you ask to see any of the
3  financial records of Dr.~Seuss Enterprises
4  regarding, for example, royalties earned from the
5  sales of licensed products?
6      MR. BOOTH: Objection.
7      A. I only looked at evidence that would
8  be of importance for the -- for this case.
9      BY MR. MILLER:
10      Q. Mm-hm. Is Dr.~Seuss' revenues not
11 important for assessing market impact in this case?
12      A. It is not because just having a
13 blanket revenue number doesn't give you any
14 information.
15      Q. Mm-hm. Are revenues related to
16 specific licensed products that Dr.~Seuss has
17 authorized to be sold relevant to your assessment of
18 market impact?
19      MR. BOOTH: Objection.
20      A. During my discussion initially about
21 evidence that might be available, I believe I did
22 make a question, although I believed it not to be
23 the -- to exist: Had Dr. Seuss had any licensing
24 agreements with science fiction characters and
25 brands?

Page 197

1      BY MR. MILLER:
2      Q. Why did you think that that would be
3  relevant?
4      A. I would think that that would be
5  relevant because it would indicate that there might
6  be -- that might have been relevant because it might
7  indicate whether Dr. Seuss had an interest in
8  pursuing science fiction markets and marketing.
9      Q. Mm-hm?
10      A. But I have never heard of that. But
11 I did ask as part of the brainstorming initially on
12 what evidence might be available.
13      Q. Let's go back your report where we
14 left off at page 10.
15      A. Yeah.
16      Q. The next para---
17      MR. BOOTH: Which report? Is this the
18 first or second?
19      MR. MILLER: First report, Exhibit 1, page
20 10?
21      MR. BOOTH: Thank you.
22      BY MR. MILLER:
23      Q. The next paragraph starting with "by
24 contrast," can you read that sentence, please?
25      A. (as read).

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 198

```
1          "By contrast, my understanding
2       is that Boldly is a work targeted
3       at adults and perhaps young
4       adults."
5       Q.  What's your source for that
6  statement?
7       MR. BOOTH:  Objection.
8       A.  Two sources.  One is, Boldly was
9  produced to me, and I read it.
10      BY MR. MILLER:
11      Q.  Hold on.  Let me ask you a question.
12  You read Boldly.  Did you list it in your
13  report as something that you considered?
14      MR. BOOTH:  Objection.
15      A.  Did I list Boldly as something I
16  considered?
17      BY MR. MILLER:
18      Q.  Mm-hm?
19      A.  It was produced to me.  And I've
20  referenced it numerous times here, of what was
21  inside it, so obviously it's listed.
22      Q.  Okay, so the question -- let me just
23  ask you the question.
24      Did you consider -- sorry.  Did you read
25  Boldly in forming your expert opinion in this case?
```

Page 199

```
1       A.  Yes.
2       Q.  Okay.  Go ahead.  You were going to
3  continue on with that sentence.
4       A.  That's what it was.  I can't recall
5  other things.  I think that was the main thing.
6       It's not very hard, when you read Boldly,
7  to see what it's targeted at.  I mean, it doesn't
8  take a genius.  I mean, let's be very clear; it
9  deals with death, which none of the Dr. Seuss books
10 that I recall had ever done.
11      Q.  Mm-hm.  Did you know what the
12 defendants' plans were with respect to Boldly in
13 terms of who they were marketing and targeting as
14 readers?
15      MR. BOOTH:  Objection.
16      A.  I understood them to have a
17 Kickstarter campaign that's now been pulled off
18 because of this matter.
19      My understanding of it was -- but I'm not
20 going to recall where it came from -- that it was
21 marketed to people who would appreciate what they
22 had done in that book; that they were marketing it
23 as a, as a, as a, as a work that would -- that
24 people who were familiar with various things would
25 treat it as opposed to some other message for the
```

Page 200

```
1  world that you might write in some other bits of
2  literature.
3       It seems to me that if you look at it, it
4  was plainly apparent that the expectation was that
5  people familiar with Star Trek would be purchasers
6  of this book.
7       Q.  And you're basing that solely on your
8  reading of the book?
9       MR. BOOTH:  Objection.
10      BY MR. MILLER:
11      Q.  Is that right?
12      A.  Well, it's not just my reading.  It's
13 also, you know, when you look at what the book is
14 about, and you look at the language of the book, and
15 you look at the pictures in the book.  It's not,
16 it's not a -- you know, it's just the same way that
17 when I look at an apple, I know that's being, you
18 know, a piece of food.  It's just something you
19 would come.
20      My, my belief is that anyone who
21 understands -- looks at this book will understand
22 that an appreciation of Star Trek is one of the
23 assumptions of the readers in this book.
24      Q.  Mm-hm.  So let me ask my original
25 question again because I don't think you've answered
```

Page 201

```
1  it.
2       Do you know what the -- excuse me.
3       Do you know what the defendants' plans
4  were with respect to marketing Boldly?
5       MR. BOOTH:  Objection.
6       A.  I do not know what their plans were.
7       BY MR. MILLER:
8       Q.  Do you know what the defendants'
9  plans were with respect to the readers that they
10 were targeting?
11      MR. BOOTH:  Objection.
12      A.  I do not know what their plans were.
13      BY MR. MILLER:
14      Q.  On page 10 of Exhibit 1, a little bit
15 further down in that paragraph we were just looking
16 at, you say: (as read)
17           "In particular, Boldly contains
18       many references throughout to
19       specific episodes of the original
20       series, and, in my opinion, would
21       be unlikely to hold any value or
22       interest to a consumer who was not
23       already versed in Star Trek
24       original series tropes and
25       characters and in Go!."
```

51 (Pages 198 - 201)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 202

1    What's your opinion based on there?
2        MR. BOOTH: Objection.
3        A.  My reading -- it's based on my
4    reading of Boldly and my knowledge of Star Trek.
5        BY MR. MILLER:
6        Q.  Did you think it would be helpful to
7    conduct a survey of consumers to see and gauge what
8    their interest in this book might be?
9        MR. BOOTH: Objection.
10        BY MR. MILLER:
11        Q.  Would that have been relevant to
12    forming your expert opinion here?
13        MR. BOOTH: Objection.
14        A.  No, I do not believe it would have,
15    in terms of the market impact.  Surveys are
16    imprecise instruments.  They can be used in certain
17    times to inform things.  But for a speculative
18    product like this, without data, I couldn't do.  The
19    best thing, if we'd really been serious about market
20    impact, would have been to publish Boldly and then
21    done a very detailed examination of its impact on
22    Dr. Seuss.
23        Q.  Mm-hm.  And in the absence of
24    publishing Boldly, would you have perhaps tried to
25    simulate market conditions?

Page 203

1        A.  You can't --
2        MR. BOOTH: Objection.
3        A.  You can't simulate -- creative works
4    are not great for quantitative simulation of market
5    conditions.
6        (Query by reporter)
7        Creative works.
8        Q.  Mm-hm?
9        A.  No, what you would want to do is you
10    would want to understand broad issues of market.
11        Sometimes you can look at the various
12    products and where they're being positioned, and you
13    can draw enough information to know what the likely
14    impact is going to be.  And that's what I was doing
15    here.
16        Q.  You were looking at various products
17    and where they were being positioned?  That's how
18    you --
19        A.  Yes.
20        Q.  -- formed your opinion here?
21        A.  Yes.
22        MR. BOOTH: Objection.
23        A.  But you can -- the -- let me put it
24    very clearly to you.
25        The inference being drawn is of the

Page 204

1    separate markets that these books were being target
2    at.  If, there, someone had done, you know, found a
3    way of which I can't imagine yet had brightly come
4    entertain anything that you might have brightly come
5    up with that placed these things squarely in
6    competition with one another, that would cause me to
7    revise my basic understanding of which those were
8    targeted.
9        However, even so, the main issue of this
10    case was not on the sales of Go! and on the
11    different targeting of those, but the different
12    between Boldly and other Dr. Seuss products.
13        And Boldly is not a toy.  It's not a piece
14    of fine art.  It's not a -- it's not a thing with
15    clothes.  It's not a thing that goes in a house.
16    It's not something you would put on a mouse.  Oh,
17    I'm sorry, it's too late in the afternoon.  But
18    they're not those things.
19        Q.  But you're --
20        A.  And that is -- and that is a plain
21    reading of it.  And I've seen literally, and you've
22    put nothing before me, and neither did Dr. Dawson,
23    to suggest otherwise.
24        Q.  Mm-hm?
25        A.  And so I'm not going to change my

Page 205

1    opinion based on clear reading of the -- of what is
2    going on here.
3        Q.  So you're aware that Dr. Seuss is
4    alleging that the defendants have infringed the
5    copyright in the book Oh, The Places You'll Go!; is
6    that right?
7        A.  I believe that's an allegation, yes.
8        Q.  So why are you saying that the book
9    itself, Oh, The Places You'll Go!, in its sales and
10    market impact in relation to it, is not relevant to
11    this case?
12        MR. BOOTH: Objection.
13        A.  My understanding that the market
14    impact segment of a fair use proceeding is not to do
15    with the impact on the original work that is being
16    derived from but on other things that might be part
17    of the creator's commercial interests.
18        BY MR. MILLER:
19        Q.  Have you been told to assume that by
20    counsel?
21        A.  I have been told both by counsel and
22    also it was reaffirmed very clearly that Dr. Dawson
23    was told the same thing and she stated it in her
24    report.
25        Q.  Mm-hm.  I'm asking what you were

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 258

1    A.  And that's really all I was trying to
2  describe here.
3    Q.  Okay.  But it's referenced in your
4  report, and so what I want to know is:  Is there
5  something in your book Information Wants to be
6  Shared that is specifically applied to the facts and
7  the opinion you're expressing in this case?
8        MR. BOOTH:  Objection.
9    A.  No, I did not explicitly or, you
10  know, having that in mind to do so.  The only time
11  that it came up again was in my second report, when
12  I reacted to Dr. Dawson's contention that I -- that
13  appeared to be making out that I had no connection
14  to book publishing or research in it.
15        And I would remind that I was, you know,
16  in fact I was, I was pleasantly surprised to see
17  that I had actually explicitly mentioned Information
18  Wants to be Shared in my first report; otherwise I
19  would have just had to brought it out from my c.v.
20        But other than that, I didn't do anything.
21        BY MR. MILLER:
22    Q.  So -- okay.  Let's flip to your
23  second report real quick.  Exhibit 2.
24    A.  Mm-hm.
25    Q.  I think the paragraph you just

Page 259

1  referenced is paragraph number 17 there?  Is that
2  correct?
3    A.  Yes.
4    Q.  Okay.  So you say here:  (as read)
5        "Dr. Dawson did not consider
6        this book, 'Information Wants to be
7        Shared,' when writing her report"?
8    A.  Yes.
9    Q.  (as read)
10        "And had she done so she would
11        have seen an entire chapter on the
12        economics of book publishing in the
13        digital age"?
14    A.  She would have.
15    Q.  Are you saying that the chapter on
16  book publishing in the digital age is relevant to
17  the facts and the expert opinion that you're
18  providing in this case?
19    A.  So, because Dr. Dawson brought it up
20  that she said I had nothing to do with the book
21  industry, I felt that I should point out that I had
22  studied the book industry with not one but arguably
23  three books, which she had clearly chosen to
24  willfully ignore in making her statements.  And
25  that's why I mentioned that here.

Page 260

1        It isn't relevant for the particulars of
2  this, to my knowledge, for this case, but what she
3  made, I think, relevant because she said it was the
4  fact that I have studied book publishing and that I
5  have books that demonstrate that.  And if I had had
6  the time, I could have also pointed to many, many
7  blog posts, also published and cited, that have that
8  too.
9        So I took natural offence to a statement,
10  especially when the book was literally one of the
11  few things I cited of my own in my initial
12  statement, that she chose to just willfully ignore
13  it.
14    Q.  So you've done research on the book
15  publishing industry?
16    A.  I have.
17    Q.  In connection with your research on
18  the book publishing industry, did you speak to
19  actual book publishers?
20    A.  Yes.
21    Q.  Yeah?  Who did you speak to?
22    A.  I spoke to Harvard Business School
23  Press.  I spoke to people at Basic Books, Princeton
24  University Press, MIT Press, Stanford University
25  Press, numerous book agents, and numerous authors.

Page 261

1        Plus also read many secondary materials:
2  History of books, history of book publishing.  All
3  of those.  All manner of things.  Talked to
4  librarians.  Went to a librarian science conference.
5  Things like that.
6    Q.  Did you spend any time working in the
7  publishing industry as part of your research for
8  those books?
9        MR. BOOTH:  Objection.
10    A.  It is not typical for people who are
11  doing research to go and actually get a job in the
12  industry that they are researching in.  And as I
13  said before, no.
14        BY MR. MILLER:
15    Q.  So, besides the chapter on book
16  publishing, and actually I'm still not clear on the
17  answer to my question about whether that's relevant
18  to the facts in this case and the expert opinion
19  that you're giving in this case, but...
20    A.  I think everybody could benefit from
21  reading it.
22    Q.  Sure.  I understand the pride in
23  authorship that you have over your book.
24    A.  I mean, I'll send this to you.
25  Sorry.

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 262

1    Q.  That's okay.
2    MR. BOOTH:  Talk about building a brand.
3    THE WITNESS:  Have you seen its Amazon
4    ranking?
5        (Query by reporter)
6        Have you seen its Amazon ranking?
7    BY MR. MILLER:
8    Q.  All right.  I have -- excuse me.  I
9  have one last question about your book.
10   A.  Okay.
11   Q.  In the forward of the book --
12   A.  Yes.
13   Q.  -- which I don't have in front of me
14 any longer but?
15   A.  Okay.  Preface.  Yes.
16   Q.  Yeah?
17   A.  Yes.
18   Q.  Towards the bottom, you have a
19 sentence there that says that:  "The style of this
20 book is speculative."
21   A.  Yes.
22   Q.  What does that mean?
23   A.  Well, what I was doing was something
24 that, you know, you don't always do as academics,
25 and sort of say, like, here's a thesis about how one

Page 263

1  might look at the world.  And, and, and I'm going to
2  go and I'm going to write a book advocating for that
3  thesis.
4        Now, that doesn't mean I don't consider
5  evidence or what have you.  But you can see that
6  this book is very brief, is, you know, to really,
7  really -- so I was trying to put this out there as
8  an idea, with some things to bolster up for it.  But
9  I wasn't presenting this as, well, this is a
10 formative academic work of research.  This is a book
11 intended to provoke thought.  That's what I meant by
12 that.
13   Q.  All right.  Moving back to your first
14 expert report, back to page 6.
15   A.  Yes.
16   Q.  The next paragraph under "Theoretical
17 Considerations" begins to speak about 2014.  And you
18 say that: (as read).
19        "I became interested in a push
20        on the Internet to give users a
21        right to remix content."
22        What is it that you are describing here in
23 these few paragraph -- sorry, these few sentences in
24 this paragraph on your report?
25   MR. BOOTH:  Objection to form.

Page 264

1    A.  So there was a group launched in
2  Europe called something like "Right to Remix."  And
3  they were advocating a change to copyright laws that
4  would give people a right to take content and remix
5  it and transform it and do so without ever asking
6  the copyright holders anything about it.  And I was
7  interested in -- so there was that idea, and I
8  understood why they were saying that.
9        But I was interested in the fact that some
10 companies such as Google had sort of put in place
11 things that were in the spirit of that but not quite
12 a right to remix.  And I wondered what the sort of
13 economic forces were there, and what that would
14 suggest to us about, you know, how we should think
15 about copyright law and how we might modify it.
16        And so that's what really was motivating
17 me there.
18   Q.  Mm-hm?
19   A.  So there was a phenomena.  People
20 were putting out an argument out there.  There was
21 certainly remixing going on.  And so I sort of said,
22 well, this is kind of like, as I said, sharing
23 information.  Let me see if I can work out what all
24 this means.
25   Q.  Mm-hm?

Page 265

1    A.  And so that's what I'm describing
2  there.
3    Q.  And this is what led you to your
4  research that was published in the article you cite?
5    A.  Yes.
6    Q.  In your report here?
7    A.  Yes.
8    Q.  All right.  Let's mark that article.
9    A.  Looks like you got the working paper
10 version, not the actually published version.  But
11 that's okay.  It's probably going to be fine.  It's
12 sometimes hard to get published versions 'cause --
13   Q.  Well, why don't I give you the copy
14 and we can talk about it.
15   A.  Yeah.  That's fine.  I just want to
16 point that out in case anyone gets confused.  It's
17 'cause of copyright law.
18        (Query by reporter)
19        Oh.  Sorry.
20 EXHIBIT 11 marked for identification:  Article
21        "Remix Rights and Negotiations Over
22        the Use of Copy-Protected Works" by
23        Joshua S. Gans, University of Toronto
24        and NBER, June 2015
25   THE REPORTER:  Exhibit 11.

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 266

1    MR. MILLER: Sorry, this is 11, not 10?
2    MR. BOOTH: 10 was the book.
3    THE REPORTER: This is 11.
4    THE WITNESS: 10 was the book.
5    MR. MILLER: Thank you.
6    Q. Okay, Professor. The document that's
7 been marked as Exhibit 11, what is this?
8    A. This is probably the final working
9 paper version of my IJ--- International Journal of
10 Industrial Organization article.
11    Q. Mm-hm. Is it different from the
12 version of the work that you cited and relied upon
13 in your expert report?
14    A. I don't believe so.
15    Q. Okay. Let's look at your expert
16 report on page 7.
17    A. Oh, okay.
18    Q. Exhibit 1.
19    A. Mm-hm.
20    Q. So at the very top you say: (as
21 read)
22       "In 2015, I published my
23       research in the International
24       Journal of Industrial Organization,
25       footnote 2."

Page 267

1 Citing this article that's at Exhibit 11, right?"
2    A. Yeah.
3    MR. BOOTH: Objection.
4    A. Yes.
5    MR. BOOTH: Objection, he's made a
6    distinction, though, between the working
7    paper and the published.
8    BY MR. MILLER:
9    Q. I believe you just testified -- and
10 let me just ask him again.
11    Doctor, Dr. Gans, is the document marked
12 as Exhibit 11 the same, substantively speaking, as
13 the article referenced in footnote 2 of your report?
14    A. I believe so.
15    Q. Okay. Do you have any reason to
16 doubt that this Exhibit 11 document is inaccurate in
17 some way?
18    A. No.
19    Q. It's not representative of your
20 article that's been published in the International
21 Journal of Industrial Organization?
22    A. I do not.
23    Q. Okay. You say, "It was my --" (as
24 read)
25       "It was to my knowledge the

Page 268

1       first paper to consider the
2       incentives of original creators and
3       remixers in a world where there
4       were different property rights
5       regimes available."
6    What does that mean?
7    A. That means that -- exactly what it
8 says, that no paper that I was aware of considered
9 those incentives where there were different property
10 rights regimes.
11    Q. What do you mean by "different
12 property rights regimes"?
13    A. Well, as I said, as you follow on
14 there, one property right regime is that there's is
15 no copyright protection. Another is that there's
16 full copyright protection. Then there is something
17 called fair use, or that I call. And then there was
18 another called remix rights with compensation, which
19 was one that I came up with.
20    And so I looked at the different
21 incentives of original creators and what I call
22 remixers under each of those regimes.
23    Q. Are you applying the specific
24 copyright laws of some jurisdiction to this article?
25    MR. BOOTH: Objection.

Page 269

1    A. No, I was not. I was inspired by it.
2 Most places such as Australia has full copyright
3 protection without fair use. The United States has
4 copyright protection with fair use. I'm under -- I
5 don't believe there are remix rights anywhere in the
6 world.
7    BY MR. MILLER:
8    Q. So were you making some assumptions
9 about the legal doctrines that you're discussing
10 here in this article?
11    MR. BOOTH: Objection.
12    A. No.
13    Q. What's the basis for your knowledge
14 of copyright law in these various jurisdictions?
15    A. Oh --
16    MR. BOOTH: Objection.
17    A. I was -- in my article I just don't
18 discuss copyright law in jurisdictions, any
19 jurisdictions. The thing that I just said to you --
20    BY MR. MILLER:
21    Q. Mm-hm?
22    A. -- my basis was, you know, I've been
23 working in various aspects of copyright economics
24 for some time, so the idea that Australia doesn't
25 have a fair use doctrine is well known to me. I

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 386

```
 1        Dr. Joshua S. Gans.  The original tapes
 2     will be retained by Veritext Legal
 3     Solutions.  We're going off the record at
 4     5:33 p.m.
 5  --- Whereupon proceedings concluded at 5:33 p.m.
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 388

INSTRUCTIONS TO WITNESS

```
 2
 3        Read your deposition over carefully.  It is
 4     your right to read your deposition and make changes
 5     in form or substance.  You should assign a reason on
 6     the errata sheet in the appropriate column for any
 7     change made.
 8
 9        After making any changes in form or substance,
10     and which have been noted on the following errata
11     sheet, along with the reason for any change, sign
12     your name on the errata sheet and date it.
13
14        Then sign your deposition at the end of your
15     testimony in the space provided.  You are signing it
16     subject to the changes you have made in the errata
17     sheet, which will be attached to the deposition
18     before filing.  You must sign it in front of a
19     witness.  The witness need not be a notary public.
20     Any competent adult may witness your signature.
21
22        Return the original errata sheet to the
23     examining attorney (attorney questioning) promptly.
24     Court rules require filing within 30 days after you
25     receive the deposition.
```

Page 387

REPORTER'S CERTIFICATE

```
 2
 3        I, KARIN A. JENKNER, RPR, CRR, CSR (ONT.),
 4     Certified Shorthand Reporter, certify:
 5        That the foregoing proceedings were taken
 6     before me at the time and place therein set forth,
 7     at which time the deponent was put under oath by me;
 8        That the testimony of the deponent and all
 9     objections made at the time of the examination were
10     recorded stenographically by me and were thereafter
11     transcribed;
12        That the foregoing is a true and correct
13     transcript of my shorthand notes so taken.
14        I further certify that I am not a relative
15     or employee of any attorney or of any of the
16     parties, nor financially interested in the action.
17        I declare that the foregoing is true and
18     correct.
19        Dated this 14th day of November, 2018.
20
21     _____
22     Karin A. Jenkner, CRR, RPR, CSR (Ontario)
23     (My Commissioner of Oaths expires July 19, 2019.)
24
25
```

Page 389

```
 1     *** ERRATA SHEET ***
 2
 3     CASE:   Dr. Seuss Enterprises, L.P. v. ComicMix LLC
 4     et al.
 5     DATE OF DEPOSITION:  November 6, 2018
 6     NAME OF WITNESS: JOSHUA S. GANS, PH.D.
 7
 8     PAGE  LINE    FROM          TO
 9     ___|___|_____|_____
10     ___|___|_____|_____
11     ___|___|_____|_____
12     ___|___|_____|_____
13     ___|___|_____|_____
14     ___|___|_____|_____
15     ___|___|_____|_____
16     ___|___|_____|_____
17     ___|___|_____|_____
18     ___|___|_____|_____
19     ___|___|_____|_____
20     ___|___|_____|_____
21     ___|___|_____|_____
22     ___|___|_____|_____
23
24     _____
25        JOSHUA S. GANS, PH.D.
```

98 (Pages 386 - 389)

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Page 390

1       SIGNATURE PAGE
2               OF
3       JOSHUA S. GANS, PH.D.
4
5       I, THE UNDERSIGNED, declare:
6
7       That I have read the foregoing transcript,
8   and I have made any and all corrections, additions
9   or deletions that I was desirous of making;
10
11      That the foregoing is a true and correct
12  transcript of my testimony contained therein.
13
14  SIGNATURE: _____
15
16  WITNESSED BY: _____
17
18  DATE: _____
19
20
21
22
23
24
25

99 (Page 390)