UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DR. SEUSS ENTERPRISES, L.P., a California limited partnership<br><br>                                   Plaintiff,<br><br>v.<br><br>COMICMIX LLC, a Connecticut limited liability company; GLENN HAUMAN, an individual; DAVID JERROLD FRIEDMAN a/k/a DAVID GERROLD, and individual; and TY TEMPLETON, an individual,<br><br>                                   Defendants. | Case No.:  16-CV-2779 JLS (BGS)<br><br>**ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (2) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND (3) DENYING AS MOOT PLAINTIFF'S MOTIONS TO STRIKE AND TO EXCLUDE**<br><br>(ECF Nos. 104, 107, 108, 116) |

        Presently before the Court are Plaintiff Dr. Seuss Enterprises, L.P.'s Motions to Exclude Gans Testimony Under Federal Rule of Evidence 702 ("Mot. to Exclude," ECF No. 104), for Summary Judgment ("Pl.'s MSJ," ECF Nos. 107, 109, 115[1]), and to Strike Declaration of Dan Booth ("Mot. to Strike," ECF No. 116) and Defendants ComicMix

---

[1] The Court granted the Parties leave to file several of their filings under seal on the grounds that they had been designed "Confidential" or "Highly Confidential" under the Protective Order in this case.  *See* ECF Nos. 114, 123, 134, 142.

1

LLC, Glenn Hauman, David Jerrold Friedman a/k/a David Gerrold, and Ty Templeton's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 ("Defs.' MSJ," ECF Nos. 108, 110). Also before the Court are Plaintiff's response in opposition to Defendants' Motion for Summary Judgment ("Pl.'s MSJ Opp'n," ECF Nos. 119, 124); Defendants' responses in opposition to Plaintiff's Motion for Summary Judgment ("Defs.' MSJ Opp'n," ECF Nos. 120, 125), Motion to Exclude (ECF No. 126), and Motion to Strike (ECF No. 133); Plaintiff's replies in support of its Motion to Exclude (ECF No. 141), Motion for Summary Judgment ("Pl.'s MSJ Reply," ECF Nos. 140, 143), and Motion to Strike (ECF No. 145); and Defendants' reply in support of their Motion for Summary Judgment ("Defs.' MSJ Reply," ECF Nos. 130, 135). The Court heard oral argument on February 7, 2019. Having considered the Parties' arguments, the law, and the record, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 108), **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 107), and **DENIES AS MOOT** Plaintiff's Motions to Exclude (ECF No. 104) and to Strike (ECF No. 116).

## BACKGROUND

### I.   Undisputed Facts[2]

#### A.   *Plaintiff and Its Copyrighted Works*

Plaintiff is the owner, by assignment, of the copyrights to the works of Theodor S. Geisel, the author and illustrator of the books written under the pseudonym "Dr. Seuss." Pl.'s Statement of Undisputed Material Facts in Support of Pl.'s MSJ ("SOF"), ECF No. 115-1, ¶¶ 1–4. Mr. Geisel wrote and illustrated the works at issue here: *Oh, the Places You'll Go!* ("*Go!*"); *How the Grinch Stole Christmas!* ("*Grinch*"); and *The Sneetches and Other Stories* ("*Sneetches*") (collectively, the "Copyrighted Works"). *Id.* ¶¶ 2–7. The Copyrighted Works are duly registered for copyright with the Copyright Office and all copyrights remain in force. *Id.* ¶¶ 2–4. Although Mr. Geisel passed away in 1991, Plaintiff

---

[2] Plaintiff's recitation of the facts is largely undisputed. Accordingly, the Court borrows liberally from Plaintiff's recitation of the facts, *see* Pl.'s MSJ at 2–10, and Defendants' response. *See* Defs.' MSJ Opp'n at 3–15.

oversees a robust publishing program, working closely with its publishers to release anniversary editions, reissues in new formats or sizes, and updated editions of the iconic Dr. Seuss books, including the Copyrighted Works. *Id.* ¶¶ 51, 128–37.

Plaintiff also licenses authors and illustrators to publish additional works under the Dr. Seuss brand. *Id.* ¶¶ 51, 134–35. For example, Plaintiff's series *The Cat In The Hat Learning Library* includes books written and illustrated by other authors that are based upon and incorporate Mr. Geisel's works. *Id.* ¶ 134. This series includes titles such as *Oh, the Things You Can Do That Are Good For You!*, *There's No Place Like Space!*, and *Oh, the Pets You Can Get!* *Id.* ¶ 135. Plaintiff has also licensed the publication of several books that are derivative of the Copyrighted Works, including *Go!: Oh, Baby! Go, Baby!*; *Oh, the Places I'll Go! By ME, Myself*; *Oh, Baby, the Places You'll Go!*; and *Oh, the Places I've Been! Journal*. *Id.* ¶ 142. These books continue the style of the original Dr. Seuss books, and Plaintiff provides close quality control to ensure consistency of style and quality. *Id.* ¶¶ 129–31.

While children may be the intended readers for many of Dr. Seuss' works, adults buy them, too, and Plaintiff therefore markets the works to both children and adults. *Id.* ¶¶ 146–49. Other Dr. Seuss works, including *Go!*, are also aimed at teenagers and adults, and are therefore marketed to both age groups. *Id.* ¶¶ 147–48. Additionally, *Go!* is a very popular gift for graduates, and is Plaintiff's best-selling book, and the perennial number one selling book on *The New York Times* Best Sellers list each spring during graduation season. *Id.* ¶¶ 141, 148.

Plaintiff is not just a publisher; it is also in the entertainment business, licensing Dr. Seuss works for development of films, television, stage productions, theme parks, and museum exhibitions. *Id.* ¶ 138. Plaintiff also runs an extensive product licensing and merchandising program. *Id.* ¶¶ 138–39, 144. In fact, in 2017, Plaintiff was named the top licensed book brand according to NPD, a market industry research firm. *Id.* ¶ 159. Importantly for purposes of this case, Plaintiff collaborates with other intellectual property holders on collaborations that combine Dr. Seuss' works with those holders' creations to

3

develop new works and products that have combined appeal to larger audiences.  *Id.* ¶¶ 150–56.  For example, Plaintiff and its partners have created *The Wubbulous World of Dr. Seuss*, a television and book series with The Jim Henson Company that featured "muppetized" Dr. Seuss characters; *Grinch Panda Pop*, a digital game that combines Jam City's Panda character with the Grinch character; Dr. Seuss Funko figurines, which combine Funko Inc.'s distinctive toy designs with Dr. Seuss characters; and a line of Comme des Garçons clothing combining Comme des Garçons' well-known heart design with *Grinch* artwork.  *Id.* ¶¶ 154–56.  Many more collaborations are in the works.  *Id.* ¶ 156.

Plaintiff receives numerous offers from parties wishing to work with DSE on a collaboration or license Plaintiff's intellectual property.  *Id.* ¶ 157.  Plaintiff approaches these offers selectively, and when Plaintiff considers whether to pursue a collaboration with another intellectual property holder, it first carefully vets the collaborator.  *Id.* ¶ 130. If Plaintiff decides to move forward, it works extensively with the collaborator and maintains tight control over the work.  *Id.* ¶ 129, 131.

### B.   *Defendants and* **Boldly**

#### 1.   *Conception and Development of* Oh, the Places You'll Boldly Go!

Mr. Gerrold has written *Star Trek* episodes for Paramount Pictures, the producer of the *Star Trek* television show.  Declaration of Tamar Duvdevani in Support of Pl.'s MSJ ("Duvdevani Decl.") Ex. 2, ECF No. 107-24, at 16:14–17:24.  In May 2016, Mr. Gerrold suggested to Mr. Hauman that, "if we could get a license, we should do a Star Trek Primer." SOF ¶ 8.  The original idea was to combine Star Trek themes with the pre-school book *Pat the Bunny*, *id.* ¶ 9, although they also considered using *Fun with Dick & Jane*, *Goodnight Moon*, and *The Very Hungry Caterpillar*, *id.* ¶ 15, before finally settling on *Go!*

Mr. Templeton is an illustrator adept at copying other illustrators' styles.  *Id.* ¶ 32. In June 2016, Mr. Hauman invited Mr. Templeton to join the project, instructing Mr. Templeton that "this would be Seuss-style [(*Star Trek*: The Original Series)] / / /

backgrounds," Duvdevani Decl. Ex. 25, ECF No. 107-39, at 423,[3] and that "we're going to want the cover and at least a background art piece for promotions, as well as be able to use the cover for posters, mugs, and all the merchandise that will push this thing over the top." *Id.* at 424.  Mr. Templeton responded, "Holy CRAP that's a cool idea.  The title is like printing money.  I'm totally in."  SOF ¶ 30.

With the team in place, Defendants set out to create *Oh, the Places You'll Boldly Go!* ("*Boldly*").  Although concerned about their project's legal risk, Mr. Gerrold and Mr. Hauman concluded that their proposed project would likely qualify as a "parody" of the source material and therefore constitute a fair use.  *Id.* ¶¶ 10–12, 16–18, 23–24.  Each of Mr. Templeton, Mr. Gerrold, and Mr. Hauman testified that he considered *Boldly* a parody, a mash-up, and a transformative work.  *See, e.g.*, Duvdevani Decl. Ex. 1, ECF No. 107-23, at 120:14–23; Duvdevani Decl. Ex. 2 at 68:7–8, 77:19–78; Duvdevani Decl. Ex. 3, ECF No. 107-25, at 75:23–76:11.  They also did not anticipate that *Boldly* would compete with *Go!* or any other of the Copyrighted Works.  *See, e.g.*, Duvdevani Decl. Ex. 2 at 43:3–45:1; Duvdevani Decl. Ex. 3 at 185:18–186:3.

But each Defendant also testified that he copied from the Copyrighted Works to create *Boldly*.  SOF ¶¶ 33–34, 52–55, 57, 65.  Indeed, Mr. Hauman scanned a copy of *Go!* to Mr. Gerrold because he wanted to "parallel [*Go!*] as close as [he] c[ould]."  *Id.* ¶ 34.  Although Mr. Gerrold had written his first draft "from scratch" and without access to *Go!*, he later rewrote *Boldly*'s text to more closely match *Go! Id.* ¶ 35.  Mr. Hauman created a side-by-side comparison of *Go!*'s and *Boldly*'s text, *id.* ¶¶ 34, 57, to assist himself and Mr. Gerrold in their effort "to parallel the structure of [*Go!*]."  Duvdevani Decl. Ex. 2 at 95:7–8.

/ / /

/ / /

---

[3] Those of Plaintiff's exhibits lacking native pagination will be cited according to the pagination Plaintiff has provided.

Mr. Templeton testified as to his process for illustrating *Boldly*:

> I would have the original book open to what I was looking at. I would rough out the positions the characters are in. After I was satisfied with the position that the characters are in being similar enough to evoke the original source material, I would render them as carefully as I could.

Duvdevani Decl. Ex. 1 at 171:3–9. For example, Mr. Templeton's illustration of one page took him about seven hours because he "painstakingly attempted to make" his illustration "nearly identical" in certain respects to one illustrated by Dr. Seuss. *Id.* at 167:1–17. Mr. Hauman instructed Mr. Templeton to "go closer to" *Go!*, SOF ¶¶ 37, 49, 53, and Mr. Templeton later admitted, "I did, in fact, slavishly copy from Seuss," to illustrate *Boldly*. *Id.* ¶ 54. This was because it was "essential to the parody . . . that people recognize the source material in poses since they WON'T be seeing the Grinch or the Whos or the Gox" or any other character from Dr. Seuss, and Mr. Templeton was therefore "concerned if we try to completely ignore everything about the source material the gags fall apart." Duvdevani Decl. Ex. 68, ECF No. 107-64, at 609.

Defendants included two disclaimers on the copyright page of the unpublished, "completed" draft of *Boldly*. Duvdevani Decl. Ex. 31, ECF No. 115-11, at 452. The first read: "This is a work of fair use, and is not associated with or endorsed by CBS Studio or Dr. Seuss Enterprises, L.P." *Id.* The second disclaimer read, "Copyright Disclaimer under section 107 of the Copyright Act 1976, allowance is made for 'fair use' for purposes such as criticism, comment, news reporting, teaching, scholarship, education, research, and parody." *Id.* The copyright page further attributes the copyright and trademarks in *Boldly* to Mr. Gerrold and Mr. Templeton—not to Plaintiff. *Id.*

### 2. *Plans to Publish and Sell* Boldly

In July 2016, Mr. Hauman contacted John Frazier, a merchant at ecommerce retailer ThinkGeek, to assess interest in handling merchandise, printing and distribution for *Boldly*. SOF ¶ 41. Mr. Frazier advised Mr. Hauman that, while ThinkGeek did not manufacture books, it could handle distribution for Boldly, but stated: "It goes without saying you've

got the license, though, right?"  Duvdevani Decl. Ex. 29, ECF No. 107-42, at 441.
Mr. Hauman replied to Mr. Frazier, "No license, this is straight parody fair use of both
Seuss and Trek," but "I realize this may complicate matters for you and cause you to pass"
and, "if so, I completely understand and no hard feelings."  *Id.*

ThinkGeek eventually ordered 5,000 copies of *Boldly*, if they could be printed and
delivered in time for Christmas sales.  SOF ¶ 93.  On July 19, 2016, Mr. Hauman wrote an
e-mail to another third-party stating:  "[H]ad a conversation with the senior buyer for
ThinkGeek, and we'll be selling them a lot of stuff.  (I was hoping they'd even handle
fulfillment on merchandise, but since this is unlicensed it seems unlikely.)."  Duvdevani
Decl. Ex. 30, ECF No. 107-43, at 444.

On August 31, 2016, Defendants launched a fundraising campaign on
Kickstarter.com to pay for the production costs and fixed costs for creating *Boldly*.  SOF
¶ 66.  Defendants never contacted Plaintiff or CBS/Paramount for a license, *id.* ¶ 10, but
told the public, in the "Risks and Challenges" section of their Kickstarter campaign:

> While we firmly believe that our parody, created with love and
> affection, fully falls within the boundary of fair use, there may
> be some people who believe that this might be in violation of
> their intellectual property rights.  And we may have to spend time
> and money proving it to people in black robes.  And we may even
> lose that.

*Id.* ¶ 67.  The Kickstarter campaign ran through September 30, 2016, netting 727 backers
who pledged $29,575 to the project.  *See* Duvdevani Decl. Ex. 40, ECF No. 107-50, at 522.

Allison Adler, an editor at publisher Andrews McMeel Publishing ("AMP"), saw
the Kickstarter page, reached out to Defendants, and subsequently presented a proposal to
AMP's Acquisitions Committee for publishing *Boldly*, describing the intended audience as
"Graduates and parents of graduates (college, high school, 8th grade); fans of Star Trek;
fans of Dr. Seuss."  *Id.* ¶¶ 73–77, 80.

Mr. Hauman and Ms. Adler spoke and exchanged several e-mails.  *Id.* ¶¶ 80, 82–85,
87–88, 90.  Mr. Hauman disclosed to Ms. Adler his discussions with ThinkGeek, that

Defendants were considering sequels to *Boldly* ("Picard Hears A Q" and "One Kirk, Two Kirk, Red Shirt, Blue Shirt"), and that Defendants wanted to create merchandise for *Boldly*, depending on "what can be done legally with and without permission." *Id.* ¶¶ 72, 85.

On September 19, 2016, AMP sent Mr. Hauman an offer to publish *Boldly* and, following several rounds of correspondence, the parties reached a "letter of agreement" on the principal terms on September 21, 2016. *Id.* ¶¶ 87–90. By September 27, 2016, AMP's VP of Sales advised Ms. Adler to "do an on-sale date" of February 28, 2017, "for the trade," Duvdevani Decl. Ex. 57, ECF No. 115-22, at 583, so "we can try and capture some grad biz." Duvdevani Decl. Ex. 58, ECF No. 115-23, at 586.

### 3. *Plaintiff's Demand Letters and Litigation*

After learning about *Boldly*, Plaintiff sent Defendants three letters, dated September 28, October 7, and October 25, 2016, demanding that Defendants immediately cease all use of the Copyrighted Works. SOF ¶¶ 104–06. Plaintiff also sent a DMCA takedown notice to Kickstarter on October 7, 2016. *Id.* ¶ 69.

On September 28, 2016—the date the first letter was sent to Defendants— Mr. Hauman forwarded it to Ms. Adler of AMP. *Id.* ¶ 94. The next day, AMP's President advised that "the risk of moving forward is not something we can take on," and AMP withdrew from the project. *Id.* ¶¶ 95–97. Defendants did not send the letters to ThinkGeek. *See id.* ¶ 118.

Defendants retained counsel on October 26, 2018, and sent Plaintiff a responsive letter on October 28, 2016, which refused DSE's demands, threatened legal claims, and advised that Defendants would be sending a counter-notice to Kickstarter to reinstate its campaign, which they did on October 31, 2016. *Id.* ¶ 107–09.

Plaintiff filed this infringement action on November 10, 2016. ECF No. 1. After receiving the Complaint, Mr. Gerrold suggested that re-drawing the illustrations could be a "way out" of the litigation:

/ / /

/ / /

> A lot of our artwork is based on Dr. Seuss's artwork. What if we did whole new artwork, not specifically based on any individual drawing by Seuss, but close enough to his style to match the text. If we replace the stuff that's too dead on – yes, its extra work for Ty [Templeton], but it really weakens their case.

Duvdevani Decl. Ex. 24, ECF No. 107-38, at 421. Mr. Templeton admitted that he "did, in fact, slavishly copy from Seuss," and noted that "[i]n my original layouts for our book, I was ignoring the layouts for [*Go!*] book, and just trying for a S[eu]ssian art style." *Id.* Mr. Templeton offered to revise the artwork to follow *Go!* less closely. *Id.*

On November 15, 2016, Mr. Hauman notified ThinkGeek about Plaintiff's claims. SOF ¶ 125. On February 2, 2017, ThinkGeek contacted Mr. Hauman for an update, as it would "LOVE to be able to offer [*Boldly*] for Graduation." Duvdevani Decl. Ex. 66, ECF No. 107-62, at 605. Mr. Hauman replied, "I would LOVE to offer it to you, but the lawsuit grinds on." *Id. Boldly* remains unpublished. *See, e.g.*, Duvdevani Decl. Ex. 3 at 139:6–140:3.

## II.   Procedural Background

Many of the issues raised by Plaintiff's and Defendants' Motions for Summary Judgment have been addressed previously in the course of the extensive motion practice in this case.

### A.   *Defendants' First Motion to Dismiss*

Following the filing of Plaintiff's Complaint on November 10, 2016, *see* ECF No. 1, Defendants moved to dismiss Plaintiff's copyright claims on the grounds of fair use and its trademark claims on the grounds that Plaintiff held no cognizable trademark rights in the title, artistic style, or fonts used in *Go!* and, if it did, Defendants' use was protected by the First Amendment under *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), and constituted a nominative fair use. *See* ECF No. 8.

On June 9, 2017, the Court granted in part and denied in part Defendants' first motion to dismiss. *See generally* ECF No. 38. Regarding Defendants' fair use defense, the Court found that *Boldly* is "a highly transformative work that takes no more than

necessary to accomplish its transformative purpose and will not impinge on the original market for Plaintiff's underlying work." *Id.* at 12. Although the Court declined to find that *Boldly* is a parody, the Court concluded that *Boldly* "is no doubt transformative." *Id.* at 8. Acknowledging that Defendants did intend to profit from *Boldly*, the Court concluded that the weight given Defendants' commercial purpose "is slight given both the transformative nature of the work . . . and the fact that *Boldly* does not supplant the market for *Go!* or the other relevant Dr. Seuss works." *Id.* The Court concluded that the creative nature of the Copyrighted Works weighed slightly in Plaintiff's favor, *id.* at 9, while the amount and substantiality of the Copyrighted Works Defendants used did "not weigh against Defendants" because *Boldly* did not copy elements from *Go!* and the other Copyrighted works "in their entirety" and did not "copy more than is necessary to accomplish its transformative purpose." *Id.* at 9–10. Finally, accepting Plaintiff's allegations as true, the Court concluded that the Court had to presume some degree of harm to Plaintiff's licensing opportunities, although "this presumed harm is neutralized somewhat by the fact that *Boldly* does not substitute for the original and serves a different market function than Go!" because "*Boldly*'s market relies on consumers who have already read and greatly appreciated *Go!* and Dr. Seuss's other works, and who simultaneously have a strong working knowledge of the Star Trek series," rendering it "unlikely that *Boldly* would severely impact the market for Dr. Seuss's works." *Id.* at 11. "Ultimately, given the procedural posture of this motion and near-perfect balancing of the factors, the Court" denied Defendants' first motion as to fair use. *Id.* at 13.

As to Plaintiff's trademark and unfair competition claims, the Court recognized that the *Rogers* test was applicable, *see id.* at 14–16, concluding that "there is no question that Defendants' invocation of Plaintiff's alleged trademarks is relevant to *Boldly*'s artistic purpose," *id.* at 15, and that "*Boldly* does not explicitly mislead as to its source or contents." *Id.* at 16. Nonetheless, the Court declined to grant Defendants' motion regarding Plaintiff's alleged trademark in *Go!*'s title because Defendants failed to address Plaintiff's argument concerning confusingly similar titles. *Id.* at 17. The Court granted Defendants' motion to

dismiss Plaintiff's trademark claims on nominative fair use grounds because Plaintiff failed to oppose Defendants' arguments on the merits. *Id.* at 18–19. Given the dismissal of Plaintiff's trademark claims, the Court also dismissed its unfair competition claims. *Id.* at 19. Nonetheless, the Court granted Plaintiff leave to file an amended complaint regarding its trademark and unfair competition causes of action. *See id.* at 20.

### B. *Defendants' Second Motion to Dismiss*

Plaintiff filed the operative Amended Complaint on June 22, 2017, *see* ECF No. 39, which Defendants again moved to dismiss. *See* ECF No. 41. The Court denied Defendants' motion. *See generally* ECF No. 51. As to Defendants' fair use defense, although the Court found no "reason to alter its analysis regarding the first three factors," *see id.* at 6, the Court re-examined the fourth factor, concluding that it would "not presume market harm" because it had found that *Boldly* was transformative. *Id.* at 9. Based on Plaintiff's allegations, however, the Court concluded that there was "potential harm to the market for Plaintiff's derivative works" and that the factor favored Plaintiff. *Id.*

As for Plaintiff's trademark and unfair competition claims, the Court concluded that the title of *Go!* may be entitled to trademark protection, *id.* at 13, but that "Plaintiff's claimed general 'illustration style' is not protectable." *Id.* at 15. The Court therefore focused on Plaintiff's allegations concerning the use of the title of *Go!* and its font in analyzing Defendants' nominative fair use arguments. *Id.* Although the Court determined that there was no descriptive substitute for the title of the book and it was necessary for *Boldly* to use *Go!*'s title, *id.* at 19, and that Defendants did "nothing in conjunction with the use of the mark to suggest a sponsorship or endorsement by Plaintiff," *id.* at 23, the Court concluded that "it was unnecessary for Defendants to use the distinctive font as used on *Go!* to communicate their message (i.e., that *Boldly* is a mash-up of the *Go!* and Star Trek universes)." *Id.* at 21–22. As before, the same result was applicable to Plaintiff's unfair competition claims. *See id.* at 23–24.

/ / /

/ / /

11

### C. Defendants' Motions for Judgment on the Pleadings and Issuance of a Request to the Register of Copyrights Pursuant to 17 U.S.C. § 411(b)(2)

On December 21, 2017, Defendants answered the First Amended Complaint, *see* ECF No. 53, and moved for judgment on the pleadings of Plaintiff's trademark and unfair competition claims under *Rogers* as applied by the Ninth Circuit's recent decision in *Twentieth Century Fox Television v. Empire Distribution, Inc.*, No. 16-55577 (9th Cir. Nov. 16, 2017). *See* ECF No. 54. On December 22, 2017, Defendants also filed a motion for issuance of request to the register of copyrights pursuant to 17 U.S.C. § 411(b)(2), on the basis that Mr. Geisel's copyright registration applications for *Go!* and *Sneetches* were knowingly and materially inaccurate and incomplete. *See* ECF No. 57.

On May 21, 2018, the Court denied Defendants' motion for issuance of a request to the register of copyrights, *see* ECF No. 88, and granted in part and denied in part Defendants' motion for judgment on the pleadings. *See* ECF No. 89. With respect to the motion for judgment on the pleadings, as before, the Court concluded that Defendants' invocation of Plaintiff's trademarks was relevant to *Boldly*'s artistic purpose and content. *Id.* at 6–7. The Court also concluded that "Defendants' use of the text and design of *Go!*'s title is not enough to be an 'explicit misstatement'" as to the source or content of the work. *Id.* at 7–8. The Court therefore concluded that "the title of *Boldly* does not violate the Lanham Act" and dismissed Plaintiff's trademark and unfair competition claims to the extent they related to the title of *Boldly*. *Id.* at 8–9. The Court explicitly reserved judgment as to "whether or not Plaintiff has protectable trademark rights in the font and illustration style of *Go!*" *Id.* at 8.

As for Defendants' motion under Section 411(b)(2), Defendants claimed that "The Sneetches" was published in a July 1953 issue of *Redbook* and that "The Zax" was published in the March 1954 issue, but that Mr. Geisel failed timely to renew the copyright for either story. ECF No. 57 at 3–4. Further, when Mr. Geisel applied to register the copyright in *Sneetches*, he failed to indicate that *Sneetches* contained these previously published works. *Id.* at 4–5. *Go!* also included a page derived from Mr. Geisel's previously

1   published work "The Economic Situation Clarified: A Prognostic Re-Evaluation," *id.* at 7–
2   8, the prior publication of which was not identified in the registration application for *Go!*
3   *Id.* at 10–11.   Defendants therefore requested that the Court request the Register of
4   Copyrights to advise whether the inaccurate information in the registration applications for
5   *Sneetches* and *Go!*, if known, would have caused her to refuse the registrations.   *See*
6   *generally* ECF No. 57.   The Court rejected Defendants' arguments, concluding that the
7   *Redbook* stories "were not a 'substantial part' of the" *Sneetches*, ECF No. 88 at 8, and that
8   "*Go!* did not incorporate a substantial amount of preexisting material from 'Economic
9   Situation.'"   *Id.* at 9.

**MOTIONS FOR SUMMARY JUDGMENT**

**I.   Legal Standard**

12         Under Federal Rule of Civil Procedure 56(a), a party may move for summary
13   judgment as to a claim or defense or part of a claim or defense.   Summary judgment is
14   appropriate where the Court is satisfied that there is "no genuine dispute as to any material
15   fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a);
16   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   Material facts are those that may affect
17   the outcome of the case.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A
18   genuine dispute of material fact exists only if "the evidence is such that a reasonable jury
19   could return a verdict for the nonmoving party."   *Id.*   When the Court considers the
20   evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and
21   all justifiable inferences are to be drawn in his favor."   *Id.* at 255 (citing *Adickes v. S. H.*
22   *Kress & Co.*, 398 U.S. 144, 158–159 (1970)).

23         The initial burden of establishing the absence of a genuine issue of material fact falls
24   on the moving party.   *Celotex*, 477 U.S. at 323.   The moving party may meet this burden
25   by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and
26   admissions on file, together with the affidavits, if any,'" that show an absence of dispute
27   regarding a material fact.   *Id.* (quoting Fed. R. Civ. P. 56(c)).   When a plaintiff seeks
28   summary judgment as to an element for which it bears the burden of proof, "it must come

forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts'" that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 259.

## II.   Analysis

### A.   *Defendants' Motion for Summary Judgment*

Defendants seek summary judgment as to all of Plaintiff's surviving claims on the grounds that Defendants are entitled to summary adjudication on their Twelfth and Thirty-Seventh Affirmative Defenses for Fair Use and First Amendment, respectively. Defs.' MSJ Notice at 1.

#### 1.   *Copyright Infringement and Fair Use*

Defendants seek summary adjudication on Plaintiff's copyright infringement claim on the grounds that *Boldly* is a fair use. *See* Defs.' MSJ at 7–12. As the Court has previously explained, *see* ECF No. 38 at 4 (citing 17 U.S.C. § 107; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 576–77 (1994)), "the doctrine of 'fair use' shields from infringement particular uses of a copyrighted work."

> In codifying the fair use doctrine, Congress set forth four non-exclusive factors for courts to consider in evaluating whether a particular use of a copyrighted work is fair:

(1)     the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2)     the nature of the copyrighted work;

(3)     the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4)     the effect of the use upon the potential market for or value of the copyrighted work.

. . . "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'" . . . Accordingly, "the analysis is a flexible one[,]" to be "perform[ed] on a case-by-case basis" and "in light of the copyright law's purpose 'to promote the progress of science and art by protecting artistic and scientific works while encouraging the development and evolution of new works.'"

ECF No. 38 at 5 (quoting 17 U.S.C. § 107; *Campbell*, 510 U.S. at 577; *Ledsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 529 (9th Cir. 2008)).

a.     First Factor: The Purpose and Character of the Use

As the Court previously explained,

"The central purpose of this [factor] is to see . . . whether the new work merely 'supersede[s] the objects' of the original creation . . . or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" . . . Because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works[,]" the "more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." . . . "[A]n allegedly infringing work is

15

typically viewed as transformative as long as new expressive content or message is apparent." . . . "This is so even where . . . the allegedly infringing work makes few physical changes to the original or fails to comment on the original." . . . However, even when a new use is transformative, "the degree to which the new user exploits the copyright for commercial gain—as opposed to incidental use as part of a commercial enterprise"—affects the overall balance of this factor.

ECF No. 38 at 6–7 (quoting *Campbell*, 510 U.S. at 579; *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177–78 (9th Cir. 2013)). At the motion-to-dismiss stage, the Court concluded that, "although *Boldly* fails to qualify as a parody[,] it is no doubt transformative." *Id.* at 8. Further, while "there is no question that Defendants created their work for profit[,] . . . weigh[ing] against Defendants . . . , its weight is slight given both the transformative nature of the work . . . and the fact that *Boldly* does not supplant the market for *Go!* or other relevant Dr. Seuss works." *Id.* Accordingly, the Court concluded that, "on balance, this factor weighs in favor of finding Defendants' use to be fair." *Id.*

Not surprisingly, Defendants argue that "[t]he Court's analysis of [this] . . . fair use factor[] is settled," Defs.' MSJ at 7, while Plaintiff urges the Court to "reconsider [its] finding in light of further legal developments," specifically, the Federal Circuit's subsequent decision in *Oracle America, Inc. v. Google LLC*, 886 F.3d 1179 (Fed. Cir. 2018). Pl.'s MSJ at 14. Specifically, Plaintiff claims that "*Oracle* outlines three inquiries for the court to consider in weighting the first factor: (1) 'whether the use is commercial in nature;' (2) 'whether the new work is transformative or simply supplants the original;' and (3) whether the facts show 'that the infringer acted in bad faith.'" *Id.* at 14–15 (quoting *Oracle*, 886 F.3d at 1196). Plaintiff contends that "*Boldly* loses on all three counts" because it "is highly commercial, . . . is not 'transformative' as the term is applied in fair use, and Defendants acted in bad faith." *Id.* at 15.

The Court does not find *Oracle* persuasive. Plaintiff argues that "*Oracle* held that . . . Google's use of Oracle's Java program was not transformative, despite the fact that Google only used 37 of the 166 Java SE API packages and created its own implementing

code." Pl.'s MSJ at 16 (citing *Oracle*, 886 F.3d at 1200–01). This may be true, but there is a key distinction: in *Oracle*, the Defendants copied the 37 SE API packages wholesale, while in *Boldly* "the copied elements are always interspersed with original writing and illustrations that transform *Go!*'s pages into repurposed, *Star-Trek*-centric ones." *See* ECF No. 38 at 8. Defendants did not copy verbatim text from *Go!* in writing *Boldly*, nor did they replicate entire illustrations from *Go!* Although Defendants certainly borrowed from *Go!*—at times liberally—the elements borrowed were always adapted or transformed. The Court therefore concludes, as it did previously, *see id.*, that Defendants' work, while commercial, is highly transformative.

Further, the Court is not persuaded that *Boldly* "has the same intrinsic purpose and function as *Go!*," *i.e.*, "providing an illustrated book, with the same uplifting message that would appeal to graduating high school and college seniors," *see* Pl.'s MSJ at 17, or that Defendants "act[ed] in bad faith." *See id.* at 17. While *Boldly* may be an illustrated book with an uplifting message (something over which Plaintiff cannot exercise a monopoly), it is one tailored to fans of *Star Trek*'s Original Series. *See, e.g.*, Duvdevani Decl. Ex. 2 at 67:1–68:3. Further, that Defendants discussed the necessity of a license and determined that *Boldly* was a "fair use parody" without seeking the advice of counsel does not amount to bad faith. *See, e.g.*, *Campbell*, 510 U.S. at 585 n.18 ("Even if [bad] faith were central to fair use, [Defendants'] actions do not necessarily suggest that they believed their version was not fair use."); *see also Henley v. DeVore*, 733 F. Supp. 2d 1144, 1166 (C.D. Cal. 2010) ("The Court declines to hold that an infringer must, as a matter of law, consult an attorney or investigate complicated fair use doctrine to avoid a finding of willfulness."). There is no evidence here that Defendants "knew that [they] needed a license to use [the Copyrighted Works]." *Cf. Oracle*, 886 F.3d at 1203.

Finally, Plaintiff's argument that *Boldly* is a derivative work misses the mark, as a derivative work is not foreclosed from being transformative (or constituting a fair use). The Copyright Act defines a "derivative work" as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization,

fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101.  "Subject to sections 107 through 122, the owner of copyright . . . has the exclusive rights to do and to authorize . . . [the] prepar[ation of] derivative works based upon the copyrighted work."  17 U.S.C. § 106(2).  The Court need not resolve whether *Boldly* is a derivative work for purposes of Sections 101 and 106(2), however, because Plaintiff has overlooked the critical introductory clause to Section 106(2), which limits the "exclusive right[]" to prepare derivative works by, among other exceptions, the doctrine of fair use.  *See* 17 U.S.C. § 107; *see also* H.R. Rep. No. 94-1476, at 61 (1976) ("[E]verything in section 106 is made 'subject to sections 107 through 118,' and must be read in conjunction with those provisions."), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5674. Consequently, even if *Boldly* were a derivative work, it could still be transformative—as the Court has found—and constitute a non-infringing fair use.[4]  The Court therefore reaffirms its prior conclusion and determines, on balance, that this factor weighs in favor of finding Defendants' use to be fair.

b.    Second Factor: The Nature of the Copyrighted Use

The Parties agree that there is no reason for the Court to alter its prior finding that "this factor as a whole . . . weighs only slightly in [Plaintiff's] favor."  *See* ECF No. 38 at 9 (quoting *Seltzer*, 725 F.3d at 1178); *see also* Pl.'s MSJ at 20; Defs.' MSJ at 7. Accordingly, because there is no dispute that the Copyrighted Works are highly creative but have also been long and widely published, the Court concludes as before that this factor slightly favors Plaintiff.

/ / /

/ / /

---

[4] If anything, the derivative works question appears to relate to the copyrightability of *Boldly*, *see, e.g.*, 17 U.S.C. § 103(a) (defining scope of copyright protection for derivative works); *see also* H.R. Rep. 94-1476, at 58 (1976) ("[T]he unauthorized reproduction of a work might be 'lawful' [for purposes of Section 103(a)] under the doctrine of fair use or an applicable foreign law, and if so the work incorporating it could be copyrighted."), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5671, which is not at issue in this action.

18

c.      Third Factor: The Amount and Substantiality of the Portion Used

In ruling on Defendants' first motion to dismiss, the Court found that, although "there is no dispute that *Boldly* copies many aspects of *Go!*'s and other Dr. Seuss illustrations[,] . . . *Boldly* does not copy them in their entirety[,]" but rather "infuse[s each] with new meaning and additional illustrations that reframe Seuss images from a unique *Star-Trek* viewpoint."  ECF No. 38 at 9.  The Court also found that *Boldly* did not "copy more than is necessary to accomplish its transformative purpose."  *Id.*  Consequently, the Court held that "this factor d[id] not weigh against Defendants."  *Id.* at 10 (citing *Seltzer*, 725 F.3d at 1178 ("[T]his factor will not weigh against an alleged infringer, even when he copies the whole work, if he takes no more than is necessary for his intended use.")).

Defendants urge the Court to stand by its earlier ruling, *see* Defs.' MSJ at 7, while Plaintiff again encourages the Court to reconsider its prior conclusion given the Federal Circuit's decision in *Oracle* and facts developed in discovery that it claims show "Defendants took far more from *Go!* than they needed to create a Dr. Seuss-*Star Trek* mash-up."  *See* Pl.'s MSJ at 20–21.  Specifically, Plaintiff claims that "*Oracle* makes clear . . . Defendants' addition of new content stolen from another copyright holder (*Star Trek* trademarks and references) does not lessen the substantiality of the taking from" Plaintiff. *Id.*  Plaintiff points to emails from Defendants, written after the filing of this lawsuit, weighing the possibility of creating "whole new artwork, not specifically based on any individual drawing by Seuss, but close enough to his style to match the text" as evidence that Defendants "could have taken far less from *Go!* to create a 'mash-up.'"  *Id.* at 21 (quoting Duvdevani Decl. Ex. 24, ECF No. 107-38).

The Court is unpersuaded.  There is always an argument to be made that an infringement defendant could have used less—otherwise the case would not be in litigation. The pertinent question is whether Defendants "only copie[d] as much *as [wa]s necessary for [their] intended use.*"  *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 941 (9th Cir. 2002) (emphasis added) (quoting *Kelly v. Arriba Soft Corp.*, 280 F.3d 934, 943 (9th Cir. 2002)).  Here, Defendants sought to "mash up" the *Star Trek* original series with *Go!* in

particular, rather than "Dr. Seuss" in general.  *See, e.g.*, Duvdevani Decl. Ex. 2 at 43:3–45:1.

Although the Court ultimately concluded that *Boldly* was not a parody, *see* ECF No. 38 at 8, the Court concludes that this case is most analogous to the situation in *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109 (2d Cir. 1998).  In *Leibovitz*, the defendant was alleged to have infringed a famous photograph of a nude, pregnant Demi Moore that appeared on the cover of the August 1991 issue of *Vanity Fair*.  *Id.* at 111.  The photo of Ms. Moore was itself "a well known pose evocative of Botticelli's *Birth of Venus*."  *Id.*  As part of an advertising campaign for an upcoming movie, the defendant commissioned a photographer to take a photo of another nude, pregnant woman in a similar pose, and "[g]reat effort was made to ensure that the photograph resembled in meticulous detail the one taken [of Ms. Moore] by [the plaintiff]," from the model's posture to her hand placement to the use of a large ring on the same finger.  *Id.*  The defendant's photograph was then digitally enhanced using a computer to make the skin tone and body shape more closely resemble that of Ms. Moore in the plaintiff's original photo.  *Id.* at 111–12.  Leslie Nielsen's face was superimposed on the model's body, "with his jaw and eyes positioned roughly at the same angle as Moore's, but with her serious look replaced by Nielsen's mischievous smirk."  *Id.* at 112.  The finished poster advertised that the movie was "DUE THIS MARCH."  *Id.* at 111.

The Second Circuit stressed that, "[i]n assessing the amount and substantiality of the portion used, [the court] must focus only on the protected elements of the original."  *Id.* at 115.  Consequently, the court reasoned, the plaintiff "is entitled to no protection for the appearance in her photograph of the body of a nude, pregnant female," *id.* at 115–16, but rather only "the particular way the body of Moore is portrayed."  *Id.* at 116.  The court clarified that, "[e]ven though the basic pose of a nude, pregnant body and the position of the hands, if ever protectable, were placed into the public domain by painters and sculptors long before Botticelli, [the plaintiff] is entitled to protection for such artistic elements as the particular lighting, the resulting skin tone of the subject, and the camera angle that she

selected." *Id.* (footnote omitted). The court ultimately concluded that the defendant "took more of the [plaintiff's] photograph than was minimally necessary to conjure it up, but" that there was "little, if any, weight against fair use so long as the first and fourth factors favor the" defendant. *Id.*

As in *Leibovitz*, the Court must take care in distinguishing precisely those elements of the Copyrighted Works to which Plaintiff is entitled copyright protection. Examining the cover of each work, for example, Plaintiff may claim copyright protection in the unique, rainbow-colored rings and tower on the cover of *Go!* Plaintiff, however, cannot claim copyright over *any* disc-shaped item tilted at a particular angle; to grant Plaintiff such broad protection would foreclose a photographer from taking a photo of the Space Needle just so, a result that is clearly untenable under—and antithetical to—copyright law.

But that is essentially what Plaintiff attempts to do here. Instead of replicating Plaintiff's rainbow-ringed disc, Defendants drew a similarly-shaped but decidedly non-Seussian spacecraft—the USS Enterprise—at the same angle and placed a red-and-pink striped planet where the larger of two background discs appears on the original cover. *See* Duvdevani Decl. Ex. 31, ECF No. 115-11, at 450. *Boldly*'s cover also features a figure whose arms and hands are posed similarly to those of Plaintiff's narrator and who sports a similar nose and eyes, but *Boldly*'s narrator has clearly been replaced by Captain Kirk, with his light, combed-over hair and gold shirt with black trim, dark trousers, and boots.[5] *Id.* Captain Kirk stands on a small moon or asteroid above the Enterprise and, although the movement of the moon evokes the tower or tube pictured on *Go!*'s cover, the resemblance is purely geometric. *Id.* Finally, instead of a Seussian landscape, *Boldly*'s cover is

---

[5] Plaintiff attempts to argue that *Boldly* uses a Dr. Seuss character: "the 'boy,'" Pl.'s MSJ Reply at 2, "a derivation of *Go!*'s protagonist." *Id.* at 9–10. Plaintiff cannot claim copyright protection for the use of any unidentified "boy" protagonist; its rights are limited only to the particular boy protagonist appearing in *Go!*, sporting a yellow cap and onesie. Although *Boldly*'s protagonist shares certain facial features with the "boy," such as his button nose, and mimics many of his poses, he is no longer the "boy" from *Go!*, but rather has been transformed into Captain Kirk from Star Trek. The Court therefore finds unavailing Plaintiff's claim that Defendants have used one of Plaintiff's "characters."

appropriately set in space, prominently featuring stars and planets.  *Id.*  In short, "portions of the old work are incorporated into the new work but emerge imbued with a different character."  *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 804 (9th Cir. 2003).

Further, Defendants here took less from Plaintiff's copyrighted works both quantitatively and qualitatively than the defendant in *Leibovitz*.  The defendant in *Leibovitz* incorporated nearly the entirety of the plaintiff's photograph, except for superimposing a different face onto the body.  137 F.3d at 111–12.  Here, by contrast, Defendants took discrete elements of the Copyrighted Works:  cross-hatching, object placements, certain distinctive facial features, lines written in anapestic tetrameter.  Yes, these are elements significant to the Copyrighted Works, but Defendants ultimately did not use Dr. Seuss' words, his character, or his universe.  The Court therefore stands by its prior conclusion that Defendants took no more from the Copyrighted Works than was necessary for Defendants' purposes, *i.e.*, a "mash-up" of *Go!* and *Star Trek*, and that, consequently, this factor does not weigh against Defendants.

### d.      Fourth Factor: The Market Effect of the Use

As the Court previously explained,

> This factor considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." . . . "Where the allegedly infringing use does not substitute for the original and serves a 'different market function,' such factor weighs in favor of fair use." . . .  However, "[t]his factor also considers any impact on 'traditional, reasonable, or likely to be developed markets.'"

ECF No. 38 at 10–11 (quoting *Campbell*, 510 U.S. at 590; *Seltzer*, 725 F.3d at 117).  Given Plaintiff's allegation in its original complaint that "[i]t is not uncommon for DSE to license" its works, including in "collaborations with other rights holders," *see* ECF No. 1

22

¶ 32, the Court concluded that potential harm to Plaintiff's licensing opportunities was to be presumed and that the factor favored Plaintiff, although "Defendants might well be able to ultimately disprove [Plaintiff's] statement [concerning its licensing of collaborations] as it applies [to] works of *Boldly*'s type." ECF No. 38 at 11. The Court added, however, that "this presumed harm is neutralized somewhat by the fact that *Boldly* does not substitute for the original and serves a different market function than *Go!*" because "*Boldly*'s market relies on consumers who have already read and greatly appreciated *Go!* and Dr. Seuss's other works, and who simultaneously have a strong working knowledge of the *Star Trek* series." *Id.* In denying Defendants' second motion, the Court recognized that because it had "previously found *Boldly* to be transformative[,] . . . [it] d[id] not presume market harm." ECF No. 51 at 9.

At oral argument, Plaintiff's counsel conceded that, if the Court concludes that *Boldly* is transformative, the burden is on Plaintiff to demonstrate a likelihood of future market harm. ECF No. 148 at 7:5–24, 12:20–22; *see also, e.g.*, *Campbell*, 510 U.S. at 591 ("[W]hen, on the contrary, the second use is transformative, market substitution is at least less certain, and market harm may not be so readily inferred."). Not only must Plaintiff introduce "[e]vidence of substantial harm to it," *see Campbell*, 510 U.S. at 593, but Plaintiff must make this showing "by a preponderance of the evidence." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984).

Given that this factor is often treated as the "single most important element of fair use," *see Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985), the parties hotly contest the inferences that can be drawn from the developed record. Plaintiff, on the one hand, contends that "*Boldly* was intended to compete with, and thus supplant, *Go!* in the market for graduation gifts, and, given the enduring popularity of *Star Trek* over the last 50 years, it is reasonable to assume that some prospective *Go!* buyers would instead buy *Boldly* because the purchaser or the gift recipient is a *Star Trek* fan." Pl.'s MSJ at 23. Plaintiff notes that it "has also published several books that are derivative of the DSE Works, including derivatives of *Go!*" and that "[c]ombining the DSE Works with *Star Trek*

intellectual property to create a new illustrated work is exactly the type of 'collab' project that DSE might license." *Id.* Further, Plaintiff raises the specter of a slippery slope, arguing that, "if third parties could freely create collaborative mash-ups without permission of the affected copyright holders, DSE would not be the only one harmed: the entire market for authorized collaborative works would be threatened." *Id.* at 24 (citing *Campbell*, 510 U.S. at 587, 590). Defendants, on the other hand, counter that Plaintiff "shows only that it has a market for its works, not that *Boldly* would affect that market." Defs.' MSJ Opp'n at 15. Defendants urge that Plaintiff's "suppositions are not a valid basis to accept its Doomsday scenarios, or to further delay Defendants' opportunity to publish their creative mashup." *Id.* at 21.

At the hearing, the Court asked Plaintiff to identify any record evidence that *Boldly* is likely to harm the market for *Go!* and Plaintiff's licensed derivatives. ECF No. 148 at 15:16–16:19; *see also id.* at 8:9–16, 11:2–12:12, 14:1–24. As in its papers, Plaintiff argued that, "had Defendants and their publisher and wholesalers acted on th[eir] plan to target 'fans of Seuss' and 'Trek' in Spring, a substantial number of purchasers would have bought *Boldly*, rather than *Go!*, as a graduation gift." Pl.'s MSJ Reply at 8; *see also* ECF No. 148 at 14:1–24. As for Plaintiff's market for derivative works, Plaintiff introduced undisputed evidence that it has published many derivatives of the Copyrighted Works—including collaborations with other rights holders—and has a "robust licensing program." Pl.'s MSJ at 9; *see also* ECF No. 148 at 9:9–11:18. Plaintiff also contends that "'unrestricted and widespread conduct of the sort engaged in by the defendant' would harm [Plaintiff]'s licensing program." Pl.'s MSJ at 10 (quoting *Campbell*, 510 U.S. at 590); *see also* ECF No. 148 at 11:19–12:12, 58:24–60:3 (quoting *Campbell*, 510 U.S. at 590).

Even viewing the undisputed evidence most favorably to Plaintiff, the Court concludes that Plaintiff has failed to sustain its burden to demonstrate by a preponderance of the evidence that *Boldly* is likely substantially to harm the market for *Go!* or licensed derivatives of *Go!* Instead, the "potential harm to [Plaintiff]'s market remains hypothetical." *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1168 (9th

Cir. 2007); *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d 1094, 1108 (C.D. Cal. 2015).

     *Equals Three* is instructive.  In *Equals Three*, a producer of online humor videos brought a declaratory relief action against the owner of an online library of user-generated video clips, seeking an injunction and declaratory judgment that its use of the owner's videos was a fair use.  139 F. Supp. 3d at 1098.  The owner countersued, asserting that the humorous videos infringed its copyrights.  *Id.*  The copyright owner was a media company that acquired user-generated internet video clips that it determined were likely to "go viral," obtaining a library of over 17,000 videos.  *Id.*  It capitalized on its video library through ad-supported and subscription-based syndication and through licensing the videos for use on television and cable shows.  *Id.*  Some of the owner's clips were used without a licensing agreement by the alleged infringer, which produced a short humor program broadcast on YouTube typically involving a host giving an introduction and then showing and remarking on several video clips.  *Id.* at 1099.

     In evaluating the alleged infringer's fair use defense, the district court determined that, although not parodic, the use of all but one of the videos was transformative and that the commercial nature of the use was outweighed by this transformativeness.[6]  *See id.* at 1104–05.  The court reasoned that "the jokes, narration, graphics, editing, and other elements that [the humorist] adds to [the copyright holder]'s videos add something new to [the copyright holder]'s videos with a different purpose and character."  *Id.* at 1105.

/ / /

---

[6] The one video that the district court determined was not transformative used a copyrighted "video of the first person to buy an iPhone 6 in Perth dropping the phone."  *Id.* at 1105.  In a declaration, the humorist claimed that it used the video "for the purpose of making two points: (1) 'don't be first at shit'; and (2) Apple Inc.'s method of packaging iPhones at the top of the box is absurd."  *Id.*  Because the alleged infringer "admit[ted] that its purpose of using [the copyright holder]'s video was to make two general, broad points that were not directly aimed at criticizing or commenting on the *video*," the court concluded that "[t]he use of [the copyright holder]'s footage to make these two points is akin to using news footage without adding anything transformative to what made the footage valuable."  *Id.*  Such is not the case here.  *See supra* Section II.A.1.a.

With respect to market harm, the copyright holder offered the "speculative conclusion" that its videos are most valuable shortly after publication and that this was when the alleged infringer copied its videos. *Id.* at 1107. The court noted that the copyright holder gave "no specific facts regarding the value of the videos at issue in the case before or after [the alleged infringer] used them" and that, "even assuming *arguendo* that the videos are more valuable shortly after publication, focusing on harm from [the alleged infringer]'s failure to pay a license risks circular reasoning—if [the alleged infringer]'s use is fair then no license fee is required by it or similar users." *Id.* The copyright holder also "argue[d] that [the alleged infringer]'s episodes usurp[ed] demand for [the copyright holder]'s videos[,] . . . offer[ing] evidence that it licenses its videos to shows which it claim[ed we]re similar to [the alleged infringer]'s." *Id.* Although the court recognized that there was "no cognizable derivative market for criticism," it "consider[ed] the possibility that [the alleged infringer]'s viewers use the episodes as a substitute for [the copyright holder]'s videos." *Id.* at 1108. As here, the copyright holder argued "that viewers no longer need to watch its videos after watching [the alleged infringer]'s episodes," while the alleged infringer argued "that its episodes actually increase [the copyright holder]'s views." *Id.* But "[n]either side submit[ted] admissible evidence strongly supporting its position." *Id.* The copyright holder, on the one hand, "relie[d] on [its Vice President of Content Operations]'s unfounded testimony that [the alleged infringer]'s viewers no longer need to watch [the copyright holder]'s videos" and "the conclusory statement of its Director of Licensing . . . that [the alleged infringer]'s use of [the copyright holder]'s videos decreases their licensing values." *Id.* On the other hand, the alleged infringer "relie[d] primarily on its employees' inadequately supported testimony and on unauthenticated statements purportedly from [its] viewers to show that its viewers also watch [the copyright holder]'s videos." *Id.* Although the court "c[ould] imagine a fine line between the demand for the humorous original and the humorous new work commenting thereon . . . , there [wa]s no actual evidence of any such harm." *Id.* "Thus, on this record, where any market harm

/ / /

remains hypothetical," the court found that the factor did "not favor either party." *Id.* (citing *Perfect 10*, 508 F.3d at 1168).

Similarly, in *Perfect 10*, the Ninth Circuit determined that Google's use of thumbnails of copyrighted images was highly transformative, *see* 508 F.3d at 1165, and consequently that "market harm c[ould ]not be presumed." *Id.* at 1168. Although the copyright holder argued that it had a market for reduced-sized images, such as those available through Google's search results, the plaintiff did not introduce any evidence that any downloads of Google's thumbnail search results for mobile phone use had actually taken place. *Id.* at 1166, 1168. Consequently, "[t]his potential harm to [the copyright holder]'s market remain[ed] hypothetical," and the Ninth Circuit reversed the district court and concluded that the fourth fair use factor "favor[ed] neither party." *Id.* at 1168.

As in *Perfect 10* and *Equals Three*, the Court has concluded that Defendants' use of the Copyrighted Works was transformative. *See supra* Section II.A.1.a. Accordingly, as Plaintiff itself has conceded, *see* ECF No. 148 at 7:5–24, 12:20–22, and as the Court has previously found, *see* ECF No. 51 at 9, harm to Plaintiff's potential market for *Go!* cannot be presumed. *See, e.g.*, *Campbell*, 510 U.S. at 591; *Perfect 10*, 508 F.3d at 1168; *Equals Tree*, 139 F. Supp. 3d at 1107. It was therefore incumbent upon Plaintiff to introduce sufficient evidence to demonstrate by a preponderance of the evidence that *Boldly* is likely substantially to harm the market for *Go!* or its licensed derivatives. This it has failed to do.

As before, *see* ECF No. 38 at 11 (citing *Kelly*, 336 F.3d at 821), the Court concludes on the record before it that *Boldly* is not likely to usurp *Go!*'s market as a children's book:

> *Boldly* does not substitute for the original and serves a different market function than *Go!* . . . Indeed, *Boldly*'s market relies on consumers who have already read and greatly appreciated *Go!* and Dr. Seuss's other works, and who simultaneously have a strong working knowledge of the *Star Trek* series. It is therefore unlikely that *Boldly* would severely impact the market for Dr. Seuss's works.

Yes, Defendants wanted *Boldly* to be "family friendly," but they "d[idn']t expect it to be read by 5 year olds"; they just wanted it to "be safe for them." Duvdevani Decl. Ex. 20,

27

ECF No. 107-35, at 362.  Even if *Boldly* appears "family friendly," *id.*, it still touches on more adult subjects, including "lovers . . . [who]'ll never be back for an episode two." Duvdevani Decl. Ex. 31 at 456.  Even the illustrations are imbued with sexual innuendo, with one page depicting a number of women (and possibly one man) with whom Captain Kirk has slept.  *See id.* at 469.  The illustration also features Captain Kirk pulling on his boots, *see id.*, which Mr. Templeton explains "is a common trope of Star Trek that after Captain Kirk has bedded a lovely alien lady, you will always see the scene afterwards, he will be pulling his boots back on.  That was the sort of shorthand in Star Trek for Captain Kirk got some. . . .  [The illustration]'s evocative of the Star Trek element of sex." Duvdevani Decl. Ex. 1 at 175:3–17.

This further cements the Court's prior conclusion that *Boldly* is targeted at those who have an appreciation of both *Go!* (or other Dr. Seuss works) and *Star Trek*'s Original Series.  As Mr. Gerrold testified, *Star Trek* "is a very adult show and was always from the very beginning . . . a commentary on social issues, it is about the challenges that adults face, and Star Trek is for a very adult demographic."  Duvdevani Decl. Ex. 2 at 43:12–18. *Boldly* was intended "for adults who are familiar with all the episodes [of *Star Trek*]" and "would not work for kids who have not seen the episode[s]."  *Id.* at 44:10–14.  Despite its admittedly Seussian appearance, *Boldly* is clearly not a children's book and there is a minimal risk that *Boldly* will usurp *Go!*'s market to the extent it is targeted to children (either directly or through their parents).

The closer question concerns *Go!*'s graduation and derivative markets.  *See, e.g.*, Pl.'s MSJ at 22–24.  Plaintiff claims, for example, that "*Boldly* was intended to compete with, and thus supplant, *Go!* in the market for graduation gifts."  *Id.* at 23.  It is clear that Defendants' publisher and distributor intended to market *Boldly* for, among other purposes, graduation,[7] *see, e.g.*, Duvdevani Decl. Ex. 48, ECF No. 115-19, at 550 (identifying the

---

[7] To the extent that Plaintiff argues Defendants originally intended to market *Boldly* to graduates, the Court is unpersuaded.  Rather, it seems clear that Defendants intended to market *Boldly* to fans of Star Trek, as demonstrated by their desire to have copies in time for World Con on August 17, 2016, *see, e.g.*,

possible audience as "[g]raduates and parents of graduates (college, high school, 8th grade); fans of *Star Trek*; fans of Dr. Seuss"); Duvdevani Decl. Ex. 66, ECF No. 107-62 ("[ThinkGeek woul]d LOVE to be able to offer [*Boldly*] for Graduation on the site."), but Plaintiff has introduced no evidence concerning the likely incidence of such purchases or the possible impact—if any—on its considerable licensing revenues.

What is clear is that *Go!* is Plaintiff's "best-selling book," *see* SOF ¶ 141, and that is it a "NY Times best seller each spring" with "[o]ver 12.5M copies sold with sales increasing the past 4 years!" *See* Duvdevani Decl. Ex. 108, ECF No. 115-52, at 1. Defendants, on the other hand, raised $29,575 from 727 backers for *Boldly* over a two-month period through Kickstarter, *see* Duvdevani Decl. Ex. 40, ECF No. 107-50, at 522, and ThinkGeek placed an order for 5,000 copies of *Boldly* for Christmas 2016 sales. *See* Duvdevani Decl. Ex. 59, ECF No. 115-24; Duvdevani Decl. Ex. 60, ECF No. 107-59. Although it is certainly conceivable that some would-be purchasers of *Go!* would instead purchase *Boldly* for a Trekkie graduate, there is a dearth of evidence or expert testimony permitting the Court to extrapolate the likely effect—if any—that *Boldly* may have on Plaintiff's sales of *Go!*

The same is true of Plaintiff's derivative market. It is undisputed that Plaintiff was the top book licensor in 2017, *see* Duvdevani Decl. Ex. 126, ECF No. 107-81, and that the "bulk" of Plaintiff's revenues comes from licensing, with approximately half of those revenues coming from publishing in "non-film year[s]." Duvdevani Decl. Ex. 4, ECF No. 115-2, at 59:6–60:2. It is also undisputed that Plaintiff has licensed books derivative of *Go!*, such as *Go!: Oh Baby! Go, Baby!*; *Oh, the Places I'll Go! by ME, Myself*; *Oh, Baby, the Places You'll Go!*; *Oh, the Places You'll Go (Pop-Up)*; and *Oh, the Places I've Been! Journal*, *see, e.g.*, *id.* at 75:7–79:22, 80:4–7; *see also* SOF ¶ 142, and that Plaintiff has

---

Duvdevani Decl. Ex. 27, ECF No. 107-41, at 434, and decision to partner with ThinkGeek, "which produces and sells a lot of material that is of . . . interest to fans of Star Trek, Dr. Who, Star Wars, what have you." Duvdevani Decl. Ex. 3 at 86:21–87:3; *see also Star Trek Merchandise*, Think Geek, https://www.thinkgeek.com/interests/startrek/ (last visited Feb. 1, 2019).

licensed collaborations in which Plaintiff's intellectual property is combined with another's intellectual property, such as *Wubbulous World of Dr. Seuss*, *Grinch Panda Pop*, a clothing line with Comme des Garçons, Dr. Seuss Funko figurines, and PBD-related books based on *The Cat in the Hat Knows a Lot About That*. *See, e.g.*, Duvdevani Decl. Ex. 4 at 125:2–129:2, 135:25–137:3, 142:19–146:19, 151:1–160:5, 166:4–168:12, 284:19–286:3; *see also* SOF ¶¶ 150–56.

As in *Perfect 10* and *Equals Three*, however, Plaintiff has introduced no evidence tending to show that it would lose licensing opportunities or revenues as a result of publication of *Boldly* or similar works. *See, e.g.*, *Perfect 10*, 508 F.3d at 1168 (no showing that users of search engine had downloaded thumbnail images for cell phone use, thus harming the plaintiff's market for cell phone downloads); *Equals Three*, 139 F. Supp. 3d at 1108 (no showing that potential licensees would be less likely to license copyrighted videos). And as in *Equals Three*, Plaintiff's argument "risks circular reasoning," *see* 139 F. Supp. 3d at 1107, in that "it is a given in every fair use case that plaintiff suffers a loss of a *potential* market if that potential is defined as the theoretical market for licensing the very use at bar."[8] 4 Nimmer on Copyright § 13.05 (2018); *see also Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 929 n.17 (2d Cir. 1994) ("[W]ere a court automatically to

---

[8] To reduce this risk of circular reasoning, courts are to consider only the copyright holder's "traditional, reasonable, or likely to be developed markets." *Seltzer*, 725 F.3d at 1179 (citing *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 81 (2d Cir. 1997)). Here, Plaintiff's proprietary "Style Guide," *see* Duvdevani Decl. Ex. 85, ECF No. 115-29–31, which is "the packet of materials that a partner under license would receive to help them start designing products for Dr. Seuss," Duvdevani Decl. Ex. 4 at 316:2–12, supports Defendants' argument that *Boldly* occupies a market that Plaintiff has not traditionally targeted or is likely to develop. Under "Do's and Don'ts," Plaintiff instructs its licensees not to show characters with items "not from [the Seuss] world" and not to "use Seuss characters with third party's characters." Duvdevani Decl. Ex. 85, ECF No. 115-29, at 680–81. Licensees are also not supposed to "make up Seuss-like rhymes." *Id.* at 681. *Boldly*, however, breaks these rules: it makes liberal (if not exclusive) use of third-party characters from Star Trek, mixes them with non-Seussian elements and worlds from Star Trek, and it creates its own Seuss-like rhymes using Star Trek wordplay. *See, e.g.*, Duvdevani Decl. Ex. 31 at 453 (depicting the protagonist in a spacesuit walking along the Enterprise as it floats through space and explaining that "Your big ship will take you to alien skies. / It's the best that we've got for your great enterprise."). It is therefore unlikely that *Boldly* is "precisely the type [of 'collab'] that [Plaintiff] might consider." *See* Pl.'s MSJ at 20.

30

conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would always favor the copyright holder."), *cert. dismissed*, 516 U.S. 1005 (1995); William F. Patry, *Patry on Fair Use* § 6:9 (2018) ("If taken to a logical extreme, the fourth factor would always weigh against fair use since there is always a potential market that the copyright owner could in theory license.").  After all, as the Supreme Court has admonished, "[t]he primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'  To this end, copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994) (quoting *Feist Publ'ns, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 349–50 (1991)).

And merely because Plaintiff has licensed works derivative of *Go!* does not mean that a license is required in all instances.  *See, e.g.*, *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 100 (2d Cir. 2014) ("[I]t is irrelevant that the Libraries might be willing to purchase licenses in order to engage in this transformative use (if the use were deemed unfair).  Lost licensing revenue counts under Factor Four only when the use serves as a substitute for the original."); *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 521 (7th Cir. 2002) ("Given that [the copyright holder] can license (in fact has licensed) the publication of collectors' guides that contain photos of all the [the copyrighted works], how could a competitor forbidden to publish photos of the complete line compete?  And if it couldn't compete, the result would be to deliver into [the copyright holder]'s hands a monopoly of [the copyrighted works] collectors' guides even though [the copyright holder] acknowledges that such guides are not derivative works and do not become such by being licensed by it."); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 607–08 (9th Cir. 2000) ("[The copyright holder] understandably seeks control over the market for devices that play games [the copyright holder] produces or licenses.  The copyright law, however, does not confer such a monopoly.") (citing *Sega Enters. Ltd. v. Accolade, Inc.*,

977 F.2d 1510, 1523–24 (9th Cir. 1992) ("[A]n attempt to monopolize the market by making it impossible for others to compete runs counter to the statutory purpose of promoting creative expression and cannot constitute a strong equitable basis for resisting the invocation of the fair use doctrine.")); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 n.11 (2d Cir. 1998) ("[B]y developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work, a copyright owner plainly cannot prevent others from entering those fair use markets"); *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993) ("[T]he author of 'Twin Peaks' cannot preserve for itself the entire field of publishable works that wish to cash in on the 'Twin Peaks' phenomenon."). Indeed, Section 107 specifically carves out of Plaintiff's monopoly uses that are "fair" and further the ultimate aims of copyright law.

Under circumstances such as this, in which Plaintiff has failed to introduce evidence tending to demonstrate that the challenged work will substantially harm the market for its Copyrighted Works, the Court may conclude that this factor favors neither party. *See Perfect 10*, 508 F.3d at 1168; *Equals Three*, 139 F. Supp. 3d at 1108.

e.   Weighing of the Factors

"No single factor or combination of factors controls the fair use analysis; rather, the Court must weigh all the facts 'in light of the purposes of copyright.'" *Sofa Entm't, Inc. v. Dodger Prods., Inc.,* 782 F. Supp. 2d 898, 910 (C.D. Cal. 2010) (quoting *Campbell*, 510 U.S. at 577–78 ("The task is not to be simplified with bright-line rules. . . . Nor may the four statutory factors be treated in isolation, one from another. All are to be explored, and the results weighed together, in light of the purposes of copyright.")) (citing *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975) ("Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts.")), *aff'd*, 709 F.3d 1273 (9th Cir. 2013).

/ / /

32

Here, the Court has concluded that *Boldly* is highly transformative. As such, *Boldly* serves to further "the goal of copyright, to promote science and the arts." *See Campbell*, 510 U.S. at 579. Despite *Boldly*'s commercial nature, the first factor of the fair use analysis therefore weighs in favor of Defendants. Of course, Plaintiff's copyrighted works are also highly creative, although they have also long been in publication, resulting in the second factor slightly favoring Plaintiff. Although Defendants borrowed heavily from *Go!* and the other Copyrighted Works, the Court ultimately concludes that Defendants took no more than was necessary for their purposes; consequently, this factor does not weigh against Defendants. Finally, the Court concludes that the harm to Plaintiff's market remains speculative and, accordingly, that the fourth factor is neutral. On balance, therefore, the fair use factors favor Defendants. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to fair use.

### 2. Trademark Infringement Claims

Defendants also seek summary adjudication of Plaintiff's surviving trademark infringement claims. [9] *See* Defs.' MSJ at 12–18. Following the Court's dismissal of Plaintiff's claims based on the title of *Boldly*, *see* ECF No. 89 at 8–9, Plaintiff's surviving trademark claims are premised upon Defendants' alleged misappropriation of "the stylized font that [Plaintiff] uses consistently throughout the Dr. Seuss books" and "Dr. Seuss's unique illustration style." *See, e.g.*, FAC ¶¶ 76, 85. Defendants contend that these claims are defective because neither a stylized font nor an illustration style is subject to trademark protection, *see* Defs.' MSJ at 13–15, and, even if they were, that Defendants' use merits

---

[9] Defendants also contend that they are entitled to judgment on Count II of Plaintiff's First Amended Complaint. *See* Defs.' MSJ at 12–13. In Count II, Plaintiff alleges that Defendants have used without authorization Plaintiff's United States Trademark Registration No. 5,099,531 for OH THE PLACES YOU'LL GO. FAC ¶¶ 66–72. On May 21, 2018, the Court concluded "that the title of *Boldly* does not violate the Lanham Act," and therefore "**GRANT[ED]** Defendants' Motion for Judgment on the Pleadings as to Counts II and III [and IV] of the First Amended Complaint as they relate to the title of *Boldly*." ECF No. 89 at 8–9. Given the Court's prior Order, Defendants were not required to seek summary adjudication of Count II here; nonetheless, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's Count II.

First Amendment protection under *Rogers v. Grimaldi*, 875 F.3d 994 (2d Cir. 1989).  Defs.' MSJ at 15–18.

a.    Trademark Protection

i.    Illustration Style

Defendants contend that "[t]rademark law does not protect an artist's overall style, rather than discrete manifestations of that style."  Defs.' MSJ at 13.  Despite acknowledging that "no reported case has involved these precise facts," Plaintiff counters that "illustrative style and font meet the Lanham Act's intentionally broad definition of mark."  Pl.'s MSJ Opp'n at 18.  Indeed, Plaintiff argues, "the undisputed evidence amply supports [Plaintiff]'s allegations that [Plaintiff's stylized font and unique illustration style] are distinctive and have acquired secondary meaning in the mind of the public, and are readily associated with [Plaintiff]."  *Id.* at 17.  Plaintiff relies heavily upon a survey introduced by its expert, Hal L. Poret, which "shows that 24% of consumers are confused as to origin [of *Boldly*] *because* Defendants deliberately used [Plaintiff's distinctive illustration style and font], which is legally probative of confusion."  *Id.* at 18 (emphasis in original).

In ruling on Defendants' motion to dismiss, the Court concluded that, "at this stage of the proceedings and based on the information in front of the Court, . . . Plaintiff's claimed general 'illustration style' is not protectable."  ECF No. 51 at 15 (citing *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 13 (D.D.C. 2004)).  As Defendants note, *see* Defs.' MSJ at 13, "[c]ourts have almost uniformly said no" trademark protection exists for an artistic style.  2 McCarthy on Trademarks and Unfair Competition § 10:40.50 (5th ed.).

The Court sees no legal or factual basis to change its conclusion at the summary judgment stage.  Accordingly, the Court **GRANTS** Defendants' motion and grants summary judgment on Plaintiff's trademark claims to the extent they are premised on Plaintiff's artistic style.  *See, e.g.*, *Munro v. Lucy Activewear, Inc.*, 899 F.3d 585, 590 (8th Cir. 2018) ("[C]opyright, not trademark, protects artistic and creative ideas and concepts."), *cert. denied*, No. 18-615, 2019 WL 271969 (U.S. Jan. 22, 2019); *Galerie Furstenberg v. Coffaro*, 697 F. Supp. 1282, 1290 (S.D.N.Y. 1988) ("Plaintiff seeks to

34

protect Dali's 'unique style and interpretation of a certain subject' (i.e., his authorship) 'as expressed on paper' (i.e., fixed in any tangible medium of expression).  This claim is properly brought under the federal copyright, not trademark, statute."); *see also Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) ("[I]n construing the Lanham Act, [the Supreme Court] ha[s] been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright."); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 382 (2d Cir. 1997) ("If the law protected style at such a level of abstraction, Braque might have prevented Picasso from selling cubist paintings in the United States.").

Because "the same result inures regarding Plaintiff's unfair competition claims," *see* ECF No. 38 at 19; ECF No. 51 at 23; *see also Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994), the Court similarly **GRANTS** Defendant's Motion for Summary Judgment and **DISMISSES** those claims to the same extent.

### ii.    Typeface[10]

Defendants first argue that "[a] mutable font is no more susceptible of trademark rights than a general style."  Defs.' MSJ at 14.  The Court must agree.  Although "[o]ne can obtain a trademark on the name of a typeface . . . , as trademarks only protect the use of a name or mark in commerce, trademark cannot protect the design of the typeface itself." Evans, *supra* note 10, at 323 (footnotes omitted) (citing Lipton, *supra* note 10, at 184).  A number of publications use distinctive typefaces.  *The New Yorker*, for example, uses its own Irvin typeface for its headlines, David Consuegra, *American Type Design and*

---

[10] Although the terms are used interchangeably in common parlance and the parties' filings, the Court clarifies that Defendants are alleged to have used Plaintiff's "typeface," rather than "font."  As Professor Lipton explains, "a typeface is the artistic creation of a typeface designer, while a font is the result of an industrial process to enable the reproduction of typefaces in the printing process."  Jacqueline D. Lipton, *To (c) or Not to (c)? Copyright and Innovation in the Digital Typeface Industry*, 43 U.C. Davis L. Rev. 143, 148 (2009) (footnote omitted).  Today, "'font' refers to the code or program that tells a computer or printer how to render or print a certain typeface on a computer monitor or piece of paper."  Emily N. Evans, *Fonts, Typefaces, and IP Protection: Getting to Just Right*, 21 J. Intell. Prop. L. 307, 310 (2014). Here, Defendants are alleged to have reproduced Plaintiff's typefaces; they are not alleged to have replicated Plaintiff's underlying "code" or font.

*Designers* 170–71 (2004), and Adobe Caslon for the text of its articles.  *See* Adam Gopnik, *John Updike*, New Yorker, Feb. 9, 2009, at 35.  Although *The New Yorker* may trademark the name of the typeface or its mark in that stylized typeface, *see* THE NEW YORKER, Registration No. 0844606, it cannot trademark (or copyright, *see* 37 C.F.R. §§ 202.1(a), (e)) the typeface itself.  It seems unlikely, therefore, that *The New Yorker* could turn to trademark law to prevent another publication from using a combination of the Irvin and Adobe Caslon typefaces, even if the somewhat unique combination of those typefaces is associated in the minds of readers with *The New Yorker*.

Even if the typeface Defendants copied for the cover, title page, and spine of *Boldly* were entitled to trademark protection, however, Defendants contend that "*Boldly* does not use th[e] 'Seuss font[s]'" Plaintiff urges licenses to use in its Style Guide.  Defs.' MSJ Reply at 8–9.  Defendants have introduced evidence that Plaintiff instructs licensees to use its custom Dr. Seuss Light or Bold fonts "for graphics, titles, or call outs on packaging."  Duvdevani Decl. Ex. 85-1, ECF No. 115-29, at 13.  The Dr. Seuss font "is the primary font of the Dr. Seuss licensing program" and was inspired by Dr. Seuss' hand lettered title from *The Cat in the Hat*.  *Id.* at 11.

The Court acknowledges that it previously concluded, without considering the Ninth Circuit's decision in *Twentieth Century Fox Television v. Empire Distributions, Inc.*, 875 F.3d 1192 (9th Cir. 2017) ("*Empire*"), that "Defendants ha[d] not satisfied th[e] nominative fair use factor" because "[t]he look of the lettering [of the titles] is unquestionable identical on both [*Go!* and *Boldly*], down to the shape of the exclamation point," which "was unnecessary."  ECF No. 51 at 21–22.  Upon review of *Empire*, however, the Court concluded that the title of *Boldly* did not violate the Lanham Act because "the title of *Boldly* . . . is relevant to its own content," ECF No. 89 at 7, and "Plaintiff has not pointed to, and is not able to point to, any evidence that the title of *Boldly* explicitly misleads as to the source of the work."  *Id.* at 8.

Having concluded that the title of *Boldly* does not violate the Lanham Act, the Court now concludes that Defendants' use of Seussian typefaces, not in conjunction with an

36

enforceable mark, cannot support a claim for violation of the Lanham Act or, consequently, California's Unfair Competition Law.   Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment as to Plaintiff's remaining trademark and unfair competition claims, to the extent they are based upon Defendants' alleged misappropriation of Plaintiff's typefaces.   The Court also **GRANTS** Defendant's Motion for Summary Judgment and **DISMISSES** Plaintiff's surviving unfair competition claims to the same extent.

> b.   First Amendment Protection Under *Rogers*

Given the Court's conclusion that neither Plaintiff's artistic style nor distinctive font is entitled to trademark protection, *see supra* Section III.B.2.a, the Court declines to address Defendants' argument that their use of the alleged marks is entitled to First Amendment protection under *Rogers*.  *See* Defs.' MSJ at 15–18.

> **B.    *Plaintiff's Motion for Summary Judgment***

In light of the Court's conclusion that Defendants are entitled to summary judgment on their fair use defense, *see supra* Section II.A.1, the Court **DENIES** Plaintiff's Motion for Summary Judgment.

> **EVIDENTIARY MOTIONS**

Plaintiff requests that the Court strike the Booth Declaration and Exhibits 1 through 7 thereto, *see generally* Mot. to Strike, and exclude the testimony of Defendants' expert, Dr. Joshua Gans.  *See generally* Mot. to Exclude.  Because the Court relies on neither the Booth Declaration nor the opinions of Dr. Gans in reaching the above conclusions, the Court **DENIES AS MOOT** Plaintiff's Motions to Exclude and to Strike.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 108), **DENIES** Plaintiff's Motion for Summary Judgment (ECF No. 107), and **DENIES AS MOOT** Plaintiff's Motions to Exclude (ECF No. 104) and to Strike (ECF No. 116).

**IT IS SO ORDERED.**

Dated:  March 12, 2019

*Janis L. Sammartino*

Hon. Janis L. Sammartino
United States District Judge

16-CV-2779 JLS (BGS)